No. 2015-1649, -1650, -1651

# United States Court of Appeals
# for the Federal Circuit

───────────────

SOFTWARE RIGHTS ARCHIVE, LLC,
*Appellant*,

v.

FACEBOOK, INC., LINKEDIN CORPORATION, TWITTER, INC.,
*Cross-Appellants*.

───────────────

Appeals from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in Nos. IPR2013-00479 and IPR2013-00480.

───────────────

**APPELLANT OPENING BRIEF**

───────────────

Martin M. Zoltick
Rothwell, Figg, Ernst & Manbeck, P.C.
607 14th Street, N.W., Suite 800
Washington, DC 20005
Phone: 202-783-6040

Victor Hardy
Minghui Yang
DiNovo Price Ellwanger & Hardy LLP
7000 North MoPac Expy, Suite 350
Austin, TX 78731
Phone:  512-539-2626

July 27, 2015          *Attorneys for Appellant*

## <u>CERTIFICATE OF INTEREST</u>

I, Minghui Yang, counsel for Appellant Software Rights Archive, LLC, certify the following:

1.    The full name of the party represented by me is Software Rights Archive, LLC.

2.    Software Rights Archive, LL3905C is the real party in interest.

3.    SRA, LLC is the parent company of Software Rights Archive, LLC.

4.    All parent corporations and publicly held companies that own 10 percent or more of the stock of this party are:  None

5.    The law firms and the partners and associates that appeared for this party in the *Inter Partes* Review case at the U.S. Patent and Trademark Office, Patent Trial and Appeal Board, or are expected to appear in this Court are:

ROTHWELL, FIGG, ERNST & MANBECK, P.C.
Martin M. Zoltick
Nancy J. Linck
Soumya P. Panda
607 14th Street, N.W., Suite 800
Washington, DC  20005
Phone:  202-783-6040

DINOVO, PRICE, ELLWANGER & HARDY, LLP
Victor G. Hardy
Minghui Yang
7000 North MoPac Expy, Suite 350
Austin, TX 78731
Phone:  512-539-2626

Date:  July 27, 2015                    Respectfully submitted,

                                        */s/Minghui Yang*                
                                        Minghui Yang
                                        DiNovo Price Ellwanger & Hardy LLP
                                        7000 North MoPac Expressway
                                        Suite 350
                                        Austin, Texas 78731
                                        Telephone:  512-539-2626
                                        Facsimile:  512-539-2627
                                        E-mail:  myang@dpelaw.com

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................ i

TABLE OF ADDENDA ........................................................................ v

TABLE OF AUTHORITIES ................................................................. vi

TABLE OF ABBREVIATIONS ............................................................ ix

STATEMENT OF RELATED CASES ................................................... xi

I.   STATEMENT OF JURISDICTION .................................................... 1

II.  STATEMENT OF THE ISSUES ......................................................... 1

III. STATEMENT OF THE CASE ............................................................ 1

    A.   Preliminary Statement .................................................................. 1

    B.   Factual Statement ......................................................................... 4

        1.   The Fox Papers ................................................................. 9

        2.   The Fox Papers, When Fairly Considered as a Whole,
             Teach that Using *BC* and *CC* Harm Search Results ....... 10

        3.   Fox's Methods Using Indirect Relationships Suffer from
             a Reliability Problem that Makes them Unfit for their
             Intended Purpose .......................................................... 17

        4.   The Art of Record as a Whole Confirms that It Was Not
             Obvious to Use Indirect Relationships for Search ......... 21

        5.   The Objective Evidence Confirms that the Fox Methods
             Concerning *BC* and *CC* did Not Render Searching with
             Indirect Relationships Obvious ..................................... 25

        6.   BC and CC Alone Without Higher Order Relationships
             Have Never Been Proven Effective for Improving Search
             ....................................................................................... 29

        7.   The Fox Papers Fail to Disclose an Analysis of Direct
             and Indirect Relationships in a Computer Database ...... 30

iii

IV.    SUMMARY OF THE ARGUMENT .................................................. 31

V.    ARGUMENT ................................................................................. 32

    **A.**    Standard of Review .................................................. 32

    **B.**    The Board Erred by Failing to Provide an "Explanation" as to Why One Would Use Indirect Relationships in View of the Empirical Evidence that Such Uses Harm Search Results . 34

    **C.**    The Board also Erred by Failing to Consider the Prior Art as a Whole and by Failing to Conduct a Weighing Analysis as to the Degree One Teaching May Discredit Another .............. 38

    **D.**    Had the Board Complied with its Duty to Consider the Prior art as a Whole It Would Have Found All Claims Nonobvious .................................................................. 40

    **E.**    The Board Erred by Failing to Analyze Important Objective Evidence of Nonobviousness .................................................. 44

    F.    The Board Erred by Finding That All elements of Claim 18 Are Suggested .......................................................... 50

    G.    The Board Erred by Finding Claim 45 Obvious ...................... 55

    H.    The Board Erred by Finding Claim 45 Obvious ...................... 60

    I.    The Board Erred by Concluding that SRA Failed to Provide a Nexus ................................................................... 63

CONCLUSION ........................................................................... 65

iv

## <u>TABLE OF ADDENDA</u>

1.  Final Written Decision – 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73, *Facebook, Inc. et al. v. Software Rights Archive, LLC*, Case IPR2013-00479 (P.T.A.B. January 29, 2015) (Paper 54)................JA00001-41

2.  Final Written Decision – 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73, *Facebook, Inc. et al. v. Software Rights Archive, LLC*, Case IPR2013-00480 (P.T.A.B. January 30, 2015) (Paper 55)................JA00042-66

3.  U.S. Patent No. 5,822,494.................................................................JA05000-92

4.  Final Written Decision – 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73, *Facebook, Inc. et al. v. Software Rights Archive, LLC*, Case IPR2013-00478 (P.T.A.B. February 2, 2015) (Paper 58)............................ 1-42

# TABLE OF AUTHORITIES

Cases

*Alco Standard Corp. v. Tenn. Valley Auth.*,
    808 F.2d 1490 (Fed. Cir. 1986)............................................................ 37, 43, 48

*Apple Inc. v. Int'l Trade Comm'n*,
    725 F.3d 1356 (Fed. Cir. 2013).................................................................... 36, 38

*Ashland Oil, Inc. v. Delta Resins & Refractories*,
    776 F.2d 281 (Fed. Cir. 1985)...........................................................................45

*Broadcom Corp. v. Emulex Corp.*,
    732 F.3d 1325 (Fed. Cir. 2013).........................................................................38

*Consol. Edison Co. v. NLRB*,
    305 U.S. 197 (1938).........................................................................................33

*Crocs, Inc. v. Int'l Trade Comm'n*,
    598 F.3d 1294 (Fed. Cir. 2010)............................................................ 64, 65, 66

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
    567 F.3d 1314 (Fed.  Cir. 2009)........................................................... 41, 42, 45

*Ecolochem, Inc. v. S. Cal. Edison Co.*,
    227 F.3d 1361 (Fed. Cir. 2000)................................................................. 13, 58

*Eurand, Inc. v. Mylan Pharms., Inc.*,
    676 F.3d 1063 (Fed. Cir. 2012).................................................................. 41, 48

*Ex parte Katz*,
    2010 WL 1003878 (P.T.A.B. 2010) ..................................................................34

*Ex parte Papst-Motoren*,
    1 U.S.P.Q.2d 1655 (B.P.A.I. 1986) ...................................................... 34, 55, 64

*In re Dow Chem. Co.*,
    837 F.2d 469 (Fed. Cir. 1988)..........................................................................47

*In re Gartside*,
    203 F.3d 1305 (Fed. Cir. 2000) ................................................................. 33

*In re Hedges*,
    783 F.2d 1038 (Fed. Cir. 1986) ................................................................. 39

*In re Kahn*,
    441 F.3d 977 (Fed. Cir. 2006) ................................................................... 37

*In re Klein*,
    647 F.3d 1343 (Fed. Cir. 2011) ................................................................. 33

*In re Kotzab*,
    217 F.3d 1365 (Fed. Cir. 2000) ........................................................ passim

*In re Rambus Inc.*,
    694 F. 3d 42 (Fed. Cir. 2012) .................................................................... 34

*In re Rouffet*,
    149 F.3d 1350 (Fed. Cir. 1998) ................................................................. 37

*In re Sullivan*,
    498 F.3d 1345 (Fed. Cir. 2007) ................................................................. 36

*In re Young*,
    927 F.2d 588 (Fed. Cir. 1991) ................................................................... 40

*Institut Pasteur & Universite Pierre et Marie Curie v. Focarino*,
    738 F.3d 1337 (Fed. Cir. 2013) ................................................................. 49

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*,
    688 F.3d 1342 (Fed. Cir. 2012) ................................................................. 47

*KSR Int'l Co. v. Telefex Inc.*,
    550 U.S. 398 (2007) ..................................................................... 2, 5, 12

*Leo Pharm. Products, Ltd. v. Rea*,
    726 F.3d 1346 (Fed. Cir. 2013) ................................................................. 46

*Phillips v. AWH Corp.*,
    415 F. 3d 1303 (Fed. Cir. 2005)........................................................34

*Rambus Inc. v. Rea*,
    731 F.3d 1248 (Fed. Cir. 2013).................................................. 49, 55

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.,*
    617 F.3d 1296 (Fed. Cir. 2010)........................................................46

Statutes

28 U.S.C. § 1295 ...............................................................................1

35 U.S.C. § 141 ................................................................................1

35 U.S.C. § 319 ................................................................................1

35 U.S.C. §314 .................................................................................1

Regulations

37 C.F.R. §42.53 ..............................................................................65

## <u>TABLE OF ABBREVIATIONS</u>

**Parties**

| | |
|---|---|
| Petitioners | Facebook, Inc., LinkedIn Corp., and Twitter Inc. |
| SRA | Software Rights Archive, LLC |

**Prior Art**

| | |
|---|---|
| Fox Papers | Fox Thesis, Fox SMART, Fox Collection |
| Fox Thesis | Edward A. Fox, Extending the Boolean and Vector Space Models of Information Retrieval with P-Norm Queries and Multiple Concept Types, (Aug.1983) (Ph.D. dissertation, Cornell Univ. Dept. of Comp. Sci.) |
| Fox SMART | Edward A. Fox, Some Considerations for Implementing the SMART Information Retrieval System under UNIX, (Sept. 1983) (Ph.D. dissertation, Cornell Univ. Dept. of Comp. Sci.) |
| Fox Collection | Edward A. Fox, Characterization of Two New Experimental Collections in Computer and Information Science Containing Textual and Bibliographic Concepts, (Sept. 1983) (Ph.D. dissertation, Cornell Univ. Dept. of Comp. Sci.) |
| Fox Envision | Edward A. Fox, et al., Users, User Interfaces, and Objects: Envision, a Digital Library, 44 J. Am. Soc. Inf. Sci., no. 8 at 480-91 (Sept. 1993) |
| Fox 1991 | Edward A. Fox, et al., Integrating Search and Retrieval with Hyptertext, In Hypertext/Hypermedia Handbook, ed. E. Berk and J. Devlin, McGraw-Hill, New York, 1991, 329-355 |
| Tapper Papers | Colin F.H. Tapper, *Citation Patterns in Legal Information Retrieval*, 3 Datenverarbeitung im Recht 249-75 (1976) and Colin Tapper, *The Use of Citation Vectors for Legal Information Retrieval*, 1 J. of Law and Info. Sci. 131-61 (1982) |

ix

| | |
|---|---|
| Kambayashi | Yahiko Kambayashi et al., *Dynamic Clustering Procedures for Bibliographic Data*, Kyoto University, Department of Inf. Sci., 90-99 (1981) |

**Terms**

| | |
|---|---|
| '494 Patent | U.S. Pat. No. 5,832,494 |
| Reviewed Claims | Claims 14, 18-20, 45, 48, 49, 51 and 54 of the '494 Patent |
| Board | Patent Trials and Appeal Board |
| CACM | Communications of the Association of Computing Machinery |
| IPR | *Inter Partes* Review |
| IR | Information Retrieval |
| ISI | Institute for Scientific Information |
| *au* | author |
| *bc* | bibliographic coupling |
| *cc* | co-citation |
| *cd* | co-citation direct |
| *cr* | *Computer Review* categorization |
| *ln* | direct links |
| *tm* | terms |

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Rule 47.5 of the Federal Circuit Rules, SRA states that no other appeal in or from the *Inter Partes* Review proceedings, Nos. IPR2013-00479 and IPR2013-00480, before the Patent Trial and Appeal Board of the U.S. Patent and Trademark Office (the "Board") has been before this or any other appellate court. This appeal is a consolidation of Appeal Nos. 15-1659, 15-1650, and 15-1651 and is a companion case to Cross-Appeal No. 15-1648 and Consolidated Cross-Appeal Nos. 15-1652, 1653. The three appeals have been assigned to the same merits panel pursuant to D.I.2.

# I.  STATEMENT OF JURISDICTION

This appeal is from two IPRs for US Patent 5,832,494 filed on July 30, 2014. JA01000; JA02000.  The Board had jurisdiction over the IPRs pursuant to 35 U.S.C. §314.  This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(4)(A), 35 U.S.C. § 319, and 35 U.S.C. § 141(c).

# II.  STATEMENT OF THE ISSUES

In finding the Reviewed Claims obvious, whether the Board erred by:

1. failing to provide an "explanation" as to why one would use indirect relationships in view of the experimental results that demonstrate they harm search results?

2. failing to consider the prior art as a whole, and objective indicia of nonobviousness?

3. failing to properly arrive at the ultimate conclusion of nonobviousness?

4. finding all elements of the claims suggested by the art?

# III.  STATEMENT OF THE CASE

## A.  Preliminary Statement

The Board erroneously invalidated the Reviewed Claims. JA00058-JA00059; JA00011-JA00012.  Every claim requires searching objects using an analysis of indirect relationships of a computer database.  JA05082.  The Supreme Court in *KSR Int'l Co. v. Telefex Inc.*, 550 U.S. 398, 401 (2007) explains that an

1

obvious combination is one that seeks to take (1) "familiar elements" and use them in (2) "known methods" to (3) "yield predictable results." Here, the prior art demonstrates that the Fox experiments on indirect citations involved using (1) only experimental elements that (2) yielded highly unpredictable and harmful results (3) in a method that's empirically shown not to work for the intended purpose of computerized search. JA17757-JA17770; JA25042-JA25046; JA17709(¶166).

The Board found the claims obvious based upon experiments performed on printed documents in the early 1980s to determine the utility of citation relationships and other factors for searching, even though the results of those experiments overwhelmingly demonstrated that the claimed use of indirect relationships was both too harmful and too unreliable for computerized search. Indeed, with respect to "cc" and "bc" (the only indirect relationships relied upon by Petitioners), Dr. Fox concludes that "cc is not really needed and bc is probably not either." JA17720.

These widely-published studies from some of the most prominent IR research departments did not make obvious using citation relationships to enhance search. Rather, for decades, these experiments and other publications discouraged using non-semantical relationships (i.e., citation or referential relationships) for search. JA17714-JA17730. Indeed, three years after the Fox Papers allegedly

rendered using indirect citation relationships obvious, Gerard Salton, Fox's thesis advisor, stated:

> Since no obvious way exists for distinguishing the positive from the negative effects, the citation methodology cannot be recommended for inclusion in practical retrieval environments.

JA17709. Consequently, early search engines relied exclusively on semantical relationships (i.e., relationships based upon the meaning of words). There was a complete absence for 15 years of any use of indirect relationships in a non-experimental search system after these experiments in the early 1980s. JA17724-JA17725.

Fifteen years after the Fox experiments, in 1998, Google became the first non-experimental search engine that analyzed indirect relationships to enhance search through its PageRank algorithm—a licensed embodiment of the '494 Patent. JA17887-JA17892. PageRank was considered a major technological breakthrough that revolutionized the search industry because it recognized that citation relationships were "meaningful" for search. JA17897-JA17898; JA17729-JA17730; JA17916-JA17925; JA17906-JA17907; JA17911-JA17912(breakthrough); JA17901-JA17902; JA17892-JA17902(meaningful). By 2003, all major search engines were using link analysis for search. JA17914-JA17915. Significantly, for 15 years after Fox's work which the Board said rendered obvious using citation relationships in a database, the very idea of

analyzing and processing hyperlink relationships to enhance computerized search

in "any" "meaningful" way was considered a revolutionary idea:

> We originally developed page rank[] kind of playing around with studying all the links on the web.  And that too was a pretty ***revolutionary idea*** though it seems very simple that you could even just collect [the links of the web and] ***do _anything_ meaningful*** …. I really credit Larry pursuing ***that idea that it's even worth collecting the graph.*** And then that you could ***run _any_ kind of processing*** on it.

JA17729; JA17901.

SRA presented compelling evidence that using indirect relationships in

search, particularly as arranged in the claimed method, was nonobvious.  The

Board never addressed the merits of this evidence.  Rather, the Board used the

claims as a road map to select various steps present across the Fox Papers with

hindsight bias to arrive at the claimed invention—while ignoring the results of

those experiments that both empirically and explicitly teach not to use indirect

relationships at all within the claimed method steps.  Had the Board properly

conducted its analysis, it would have concluded that the Reviewed Claims are

nonobvious.

**B.    Factual Statement**

4

The '494 Patent relates to using direct and indirect citations to search for objects in a database. Since these relationships are based upon a referential nature of a citation, rather than the occurrence or meaning of words, they are non-semantical. The terms "direct" and "indirect" refer to the type of reference of a citation relationship. As construed by the District Court and the Board, a direct



relationship is when "one object directly cites or refers to another object" (A contains a citation that refers to B). JA17655-JA17657; JA01183-JA01184. An indirect relationship refers to two objects being connected by a chain of citation references, and therefore, being "indirectly" referenced. *Id*.

The '494 Patent teaches a system that analyzes the contents of an *existing* computer database to determine the citation relationships that exist between the objects contained within the database. JA05058(3:26-30). The disclosed system employs an automated "extractor" or "crawler" that indexes the textual content of the database and creates the citation vectors for data

5

analysis.  JA05064-JA05065(16:53-17:32); JA05058(3:26-4:37); JA05081(49:30-33).  Without a database of objects that cite to other objects in the database, the "extractor" or "crawler" cannot retrieve the data to perform its function.

The Patent further discloses a novel "patterner" which examines the extracted citations for empirically useful indirect relationships.  JA05004; JA05065(17:33-18:40).  Unlike the experimental prior art systems that only analyzed two indirect relationships (*bc* and *cc*), the patterner recognized 18 different citation relationships that may be used together to create a single numerical representation for search:



JA05027; JA05030(14:14-57).  The indirect relationship patterns are weighted using various IR metrics and then used to generate multiple proximity and

similarity matrices. JA05064(15:47-16:26).  These different matrices support the

seven different Patent search routines:



JA05016.  The patent specification further discloses a unique analysis of indirect

relationships called the "cluster link generator."  By assigning weights (w) to each

direct relationship (N0-N3) that comprises an indirect relationship and then

aggregating those weights to determine a weight of the indirect  path, the cluster

link generator can analyze any type of indirect relationship within a specified

number of links:



Another unique feature of a "cluster link" is that it will analyze multiple indirect relationships of multiple different types to generate a single value for searching. JA05008; JA05067(22:5-34).

Another novel feature of the specification is that Egger recognized that hyperlink relationships of computer databases should be analyzed. JA05081(49:7-29). Analysis of these types of relationships from a computer database would revolutionize the search industry.

Claim 18, the only independent claim challenged, requires:

A method of analyzing a database having objects and a first numerical representation of ***direct relationships <u>in the database</u>***, comprising the steps of:

generating a second numerical representation using the first numerical representation, wherein ***the second numerical representation accounts for indirect relationships <u>in the database</u>***;

storing the second numerical representation;

8

identifying at least ***one object in the database, wherein the stored
numerical representation is used to identify objects***; and

***displaying one or more identified objects*** from the database.

JA05083(53:27-39).  Claim 18 ( and dependents) thus requires searching based on
an analysis of indirect relationships of objects in a computer database.

### 1.  The Fox Papers

The Fox Papers published in 1983 comprise Fox Thesis, Fox SMART, and
Fox Collection.  Petitioners rely upon the Fox Papers' experiments with two
collections:  CACM and ISI.  These experiments were methods applied, by hand,
to printed bibliographies and were not performed on any computer database of
objects with relationships, as claimed.  JA17667-JA17668; JA17631-JA17633.

Fox SMART describes the SMART system created by Gerard Salton used to
test IR methods.  JA05360.  Fox Collection described the collections available for
study.  JA05197.  Fox Thesis reported on the experimental results of Fox SMART
on the available collections.  JA05708-JA05735.

The experiments used a number of data types including:  terms [in titles of
documents only] ($t$), *Computer Review* subject matter categories ($cr$) ; co-citations
($cc$); co-citation direct ($cd$); direct citations ($ln$); authors ($au$) and bibliographic
couplings ($bc$).  JA05594.  The $ln$ subvector represents direct relationships between
two articles that cite each other.  The $bc$ subvectors represents two articles citing a

9

common article, and the *cc* subvectors represents two documents cited by another document:



### 2. The Fox Papers, When Fairly Considered as a Whole, Teach that Using *BC* and *CC* Harm Search Results

Petitioners rely upon the *cc* and *bc* subvectors as the claimed "analysis of indirect relationships." JA01014-JA01015. However, one would not have used *bc* and *cc* in the claimed arrangement to search a database because the experimental results demonstrate that such use is far more likely to harm search results than to improve them. JA17757-JA17770; JA25042-JA25046; JA17709(¶166).

Fox Thesis details nine experiments using *bc*, *cc* and other subvectors to determine whether these subvectors would lead to any improvement in search. JA25044-JA25045; JA17764-JA17765. Many of Fox's tests are directed towards combined subvectors for which *bc* and *cc* are just two of many data types included within a single subvector. The experiments are directed to using subvectors generally, with no particular focus on indirect relationships, thus

many of Fox's tables do not report directly on the specific impact that *bc* and *cc* may have on the results.  Since the issue here is whether it was obvious to use the claimed indirect relationships, Dr. Jacobs analyzed the data of these tables to determine the specific impact that can be attributed to *bc* and *cc* (as opposed to other data types in the combined vectors).  Whereas the combined subvector that contains *bc* or *cc* may at times show an improvement, the specific contribution of *bc* and *cc* to that improvement is almost always negative.  Neither Petitioner nor the Board has challenged the accuracy of Dr. Jacobs's analysis on the specific impact that *bc* and *cc* had on search results.  Dr. Jacobs's analysis of all nine experiments are set forth below:

| Experiment | Result | Experiment | Result |
|---|---|---|---|
| 8.2-ISI (*cc*) | -37% (vs terms) | 8.11-CACM (*bc*) | -6.3% (vs terms) |
| 8.2-ISI (*cd*) | -54% (vs terms) | 8.11-CACM (*cc*) | -1.4% (vs terms) |
| 8.3-ISI (*cc*+terms) | -6.2% (vs terms) | 8.11-CACM (*bc*+*cc*) | -2.9% (vs terms) |
| 8.3-ISI (*cc*+other subvectors) | -7.8% (vs terms) | 8.11-CACM (*bc*) | -7.4% (vs *ln*) |
| 8.3-ISI (*cc*+terms emphasized) | +4.5 to 6.1% (vs terms) | 8.11-CACM (*cc*) | -6% (vs *ln*) |
| 8.7-ISI (*cc*+terms regression) | +5 to 6% (vs terms) | 8.11-CACM (*bc*+*cc*) | -4.1% (vs *ln*) |
| 8.8-CACM (*bc*) | -62% (vs terms) | 8.12-CACM (*bc*) | -26.5% (vs terms) |
| 8.8-CACM (*cc*) | -51% (vs terms) | 8.12-CACM (cc) | -29% (vs terms) |

11

| Experiment | Result |
|---|---|
| 8.13-CACM (*bc*) | **-11.1%** (vs *ln*) |
| 8.13-CACM (*cc*) | **-3.7%** (vs terms) |
| 8.13-CACM (*bc+cc*) | **-11.5%** (vs *ln*) |
| 8.13-CACM (all subvectors regression) | undetermined but less than +2.1% divided among *au*, *cr*, *bc*, and *cc* (no positive contribution from indirect relationships because *bc* and *cc* weighed at less than 1% and 0% respectively) |

JA18028-JA18029; JA17758-JA17763.  When the specific contribution of *bc*

and *cc* is isolated, 7 of 9 experiments show *only* deterioration from their use.

JA17758-JA17770.  The remaining experiments show either a neutral impact or

an insignificant improvement insufficient to establish a connection between these

relationships and search improvement.  *Id*.

Although Petitioners seize on a few results that showed some slight

improvement (ISI in Table 8.3;8.7), the table above shows that when all of the

Fox Papers' teachings are fairly considered, they overwhelmingly demonstrate

that use of *bc* and *cc* harms search results for the vast majority of queries.  A

skilled artisan would thus understand that using *bc* and *cc* is far more likely to

hurt search results than to help and would not be motivated to use Fox's methods

regarding *bc* and *cc* on any collection, much less the claimed computer database.

*Id*.

Dr. Salton is considered the "father of information retrieval" and was the

Thesis Advisor on the Fox Papers.  JA17715.  He also conducted tests using

bibliographic subvectors on the same CACM and ISI collections as Fox.  Dr.

Salton stated that a 10% improvement is the "normal" threshold for determining

significant results.  JA17768.  Importantly, <u>none</u> of Fox's test results comes close

to Salton's 10% improvement threshold.  JA25044-JA25045; JA17758-JA17770;

JA17767-JA17768.

Furthermore, there "must be evidence that 'a skilled artisan, confronted

with the same problems as the inventor and with no knowledge of the claimed

invention, would select the elements from the cited prior art references for

combination *in the manner claimed*.'"  *Ecolochem, Inc. v. S. Cal. Edison Co.*,

227 F.3d 1361, 1375 (Fed. Cir. 2000); *see also In re Kotzab*, 217 F.3d 1365,

1371 (Fed. Cir. 2000).  Claim 18 requires a direct link numerical representation:

> A method of analyzing a database *having* objects and *a first
> numerical representation of direct relationships in the database*,

JA05083(53:27-29).  Based on this first numerical representation, the claimed

method then requires that one create a second numerical representation that

accounts for indirect relationships and then use it for searching:

> *generating* a second numerical representation using the first
> numerical representation, wherein the second numerical
> representation *accounts for indirect relationships* in the database;
>
> storing the second numerical representation;
>
> *identifying* at least one object in the database, wherein *the stored
> numerical representation is used to identify objects*;

<div align="center">13</div>

JA05083(53:30-39). Thus, the claimed method requires one to use indirect relationships for identifying objects (i.e., search) when one has direct links information available for use in searching. JA17720-JA17721.

Fox's experiments unequivocally demonstrate that, after creating the first numerical representation and making it available for use in searching, a skilled artisan would have no motivation to perform the additional steps pertaining to creating and using a second numerical representation based upon the *bc* and *cc* indirect relationships for search. These additional steps would involve not only an extreme multi-year effort using Fox's hand methods, but would actually harm the search results. JA17720-JA17721; JA17758-JA17763; JA25047-25048; JA250065-JA25066; JA25057-JA25059. Although there are two cases that show a slight improvement of indirect relationships over terms only, **there is no case** where the Fox Papers show using *bc* and *cc* improves search results when direct links (*ln*) are present, as required by the claims. *Id.* In **every single test** of Fox that addresses this matter, using *bc* and *cc* (in combination with direct links or alone or with each other) has resulted in deterioration of search results:

| Experiment | Result | Experiment | Result |
|---|---|---|---|
| 8.8-CACM (*bc*) | **-43.5%** (vs *ln*) | 8.11-CACM (*bc+cc*) | **-4.1%** (vs *ln*) |
| 8.8-CACM (*cc*) | **-26.7%** (vs *ln*) | 8.12-CACM (*bc*) | **-30%** (vs *ln*) |
| 8.11-CACM (*bc*) | **-7.4%** (vs *ln*) | 8.12-CACM (cc) | **-32.4%** (vs *ln*) |
| 8.11-CACM (*cc*) | **-6%** (vs *ln*) | | |

14

JA18078; JA17758-JA17763. Accordingly, there is no teaching in the Fox Papers

that would have suggested that *bc* or *cc* would improve results in the context that

the claims require, and they could not suggest the methods of the Reviewed

Claims. *Id*. Fox himself reaches this same conclusion and expressly states that the

*cc* and *bc* subvectors should **not** be used if one has other subvectors (which

includes the direct links subvector "*ln*"):

> [I]t can be inferred, however, that with the other subvectors present *cc*
> is not really needed and *bc* is probably not either.

JA17703. Notably, Fox also explicitly excludes *bc* and *cc* from his proposed

"recipe" for the subvectors, and instead teaches using just the direct links subvector

as the only non-semantic subvector because of "effectiveness tests":

> ***The recipe proposed is to at least employ terms (tm), some manually
> assigned categorization scheme (cr), and direct links between
> documents (ln).*** When bibliographic information is only available
> among articles in a collection the simplest form of that information,
> references (*ln*) [*i.e.*, the direct links vector], seems to be the most
> reliable and most useful of all the types considered (bc, ln, cc). ***The ln
> subvectors*** are typically longer than the other two and are easier to
> obtain ***so use of them is encouraged by*** practicality considerations as
> well as ***effectiveness tests***.

JA17717.

Fox identified the experiment of Table 8.13 as his most complete experiment

and compelling case of improvement. JA15467.

15

Table 8.13: Results of CACM Term Relevance Feedback
Using Subvector Combinations
With Equal (E) or Regression (R) Based Weights

| | Scaled Subvector Coefficients | | | | | Weight | Aver. | % Change vs. |
|---|---|---|---|---|---|---|---|---|
| tm | au | cr | bc | ln | cc | Scheme | Prec. | Terms Only |
| 1.0 | | | | | | | .3839 | |
| .5 | | | .5 | | | E | .3866 | ÷ 0.7 |
| .5 | | | | .5 | | E | .4352 | + 13.3 |
| .5 | | | | | .5 | E | .3696 | -3.7 |
| .33 | | | .33 | | .33 | E | .3851 | + 0.3 |
| .17 | .17 | .17 | .17 | .17 | .17 | E | .3845 | + 0.1 |
| .235 | | | | .765 | | R | .4876 | + 27.0 |
| .099 | .201 | .372 | .009 | .318 | 0 | R | .4979 | + 29.7 |

JA05733.  The weights above were determined through linear regression
(designated "R") of search results meant to determine a weight that improves
search results.  JA05733; JA17704-JA17707.  Fox achieved his best results by
down weighting *cc* to "0" and *bc* to ".009" (less than one percent)—effectively
turning off any meaningful influence from the indirect relationships on the search
results. JA17766-JA17767.  He accordingly concludes "*cc* is not really needed and
*bc* is probably not either."  This is further empirical support from Fox that *bc* and
*cc* should not be used to search for objects.  When the Fox Papers, including
experimental results, as a whole are fairly considered, they clearly teach that *bc*
and *cc* are highly likely to harm search results and should not be used in the
particular arrangement of claim 18.

16

### 3. Fox's Methods Using Indirect Relationships Suffer from a Reliability Problem that Makes them Unfit for their Intended Purpose

The Fox experiments also demonstrate that using citation relationships for search suffered from a reliability problem that made them unfit for computerized search. The impact of the indirect subvectors on search performance across retrieval environments was unpredictable, ranging from 5-6%, a slight improvement, to -62%, a significant degradation in search performance. JA17758-JA17763; JA25057-JA25059. For any given collection, indirect relationships were far more likely to result in degradation of search results than to help them and, consequently, the citation methodology was unsuited for use in automated retrieval. JA17708-JA17709.

In his 1986 experiments, Dr. Salton addresses how a skilled artisan would interpret data revealing a strong potential for degradation of search results. Dr. Salton sought to test the performance of using bibliographic citations for search across different "retrieval environments" (different queries and documents) to determine whether they could be reliably used in an operational search system. JA16208. His experiments were conducted using bibliographic subvectors on the same CACM and ISI collections used in the Fox Papers.

In his experiments, Dr. Salton achieves a significant "**30 percent**" **improvement** in precision from direct links in the CACM collection:

17

> The CACM results of [Table 3] show clearly that the addition to the document terms of title words from bibliographically related documents is beneficial, since the retrieval effectiveness improves by *about 30%* on average for the citing+cited method….

JA16211.  However, when trying to apply the same method to the ISI collection,

he experienced a **1-7 percent deterioration**:

> Unfortunately, this optimistic conclusion is not maintainable when the CISI results of Table 4 are considered. In that case, <u>*none*</u> of the bibliographic expansion method *proved beneficial* for the more effective tf x idF weighting system, *the deterioration in effectiveness ranging from about 1 percent to as much as 7 percent for the citing+cited method.*

JA16211-JA16212.  Thus, the same methods that seemed to be effective on the

CACM queries actually degraded the results when applied to different queries of

the ISI.  *Id*.  When Dr. Salton is confronted with a method that sometimes results in

positive results (+30 percent) and sometimes results in negative results (-7 percent

deterioration), he ultimately concludes that the method in unsuited for its intended

purpose of computerized search:

> *Since no obvious way exists for distinguishing the positive from the negative effects,* the citation methodology *cannot be recommended* for inclusion in practical retrieval environments.
> ***
> *Overall, the procedure is not sufficiently reliable to warrant incorporation into operational automatic retrieval systems.*

*Id*.

> Salton's conclusion is compelling evidence as to what a skilled artisan

would conclude in face of the evidence of Fox experiments' unpredictable,

disparate experimental results that reveal *bc* and *cc* are highly likely harm search results. JA17707-JA17709. Unlike Petitioners, Salton did not seize one positive result and ignore all of the negative results; rather he looked at the range of outcomes and concluded that the citation methodology was too unreliable for searching because of the strong potential for harming search results. This same problem of extreme variation and potential harm to search results that led Salton to this conclusion was also apparent in Fox's 1983 experimental work. JA17707-JA17709; JA25057-JA25059. Indeed, Fox's data suggests a far worse reliability problem than that in Salton's tests. One skilled in the art would see the following test results with respect to the CACM collection for *bc* and *cc*:

| Experiment | Result | Experiment | Result |
|---|---|---|---|
| 8.8-CACM (*bc*) | **-62%** (vs terms) | 8.12-CACM (*bc*) | **-26.5%** (vs terms) |
| 8.8-CACM (*cc*) | **-51%** (vs terms) | 8.12-CACM (cc) | **-29%** (vs terms) |
| 8.11-CACM (*bc*) | **-6.3%** (vs terms) | 8.13-CACM (*bc*) | **-11.1%** (vs *ln*) |
| 8.11-CACM (*cc*) | **-1.4%** (vs terms) | 8.13-CACM (*cc*) | **-3.7%** (vs terms) |
| 8.11-CACM (*bc*+*cc*) | **-2.9%** (vs terms) | 8.13-CACM (*bc*+*cc*) | **-11.5%** (vs *ln*) |
| 8.11-CACM (*bc*) | **-7.4%** (vs *ln*) | 8.13-CACM (all subvectors regression) | undetermined but less than +2.1% divided among *au*, *cr*, *bc*, and *cc*  (no positive contribution from indirect relationships because *bc* and *cc* weighed at less than 1% and 0% respectively) |
| 8.11-CACM (*cc*) | **-6%** (vs *ln*) | | |
| 8.11-CACM (*bc*+*cc*) | **-4.1%** (vs *ln*) | | |

JA18028-JA18029; JA17758-JA17763.  As reflected above, the impact of *bc* and *cc* for the CACM range from -62% degradation to potentially +2.1% improvement (but likely to be "0"[1]).

| Experiment | Result |
|---|---|
| 8.2-ISI (*cc*) | **-37%** (vs terms) |
| 8.2-ISI (*cd*) | **-54%** (vs terms) |
| 8.3-ISI (*cc*+terms) | **-6.2%** (vs terms) |
| 8.3-ISI (*cc*+other subvectors) | **-7.8%** (vs terms) |
| 8.3-ISI (*cc*+terms) | +4.5 to 6.1% (vs terms) |
| 8.7-ISI (*cc*+terms regression) | +5 to 6% (vs terms) |

JA18081; JA17758-JA17763.  With respect to the ISI, *bc* and *cc* ranged from negative -54% deterioration to potentially +6 % percent improvement. *Id*.  Thus, Fox's CACM and ISI results actually show far more extreme degradation (-54% and -62% (Fox) vs. -1% to -7% (Salton)) and far less beneficial results (+6% (Fox) v. +30% (Salton)) than the variation of results that led Dr. Salton, then the most prominent researcher in the world, to conclude that the citation methodology was unfit for its intended purpose.  JA17709; JA25057-JA25059.  Likewise, a skilled artisan would also view Fox's results as indicating that Fox's method pertaining to *bc* and *cc* suffered from a serious reliability problem making it unfit for use in

---

[1] JA17766-JA17767.

search.  Consequently, the skilled artisan would not be motivated to use this method in any search system, much less one for the claimed database relationships.

### 4. The Art of Record as a Whole Confirms that It Was Not Obvious to Use Indirect Relationships for Search

The negative experimental results of Fox must be viewed in the larger context of the art of record.  Petitioners' belief that the successful use of indirect relationships in a search system was a "predictable result," or obvious to one of ordinary skill, is factually unsupported.  JA17714-JA17730.  To the contrary, despite nearly 40 years of testing citations, the prior art as a whole indicates a field that struggled with finding any empirically-supported use of indirect relationships for search until after the Patent.  *Id.*  Accordingly, a skilled artisan would be skeptical of any method that used citation relationships and would demand strong empirical evidence supporting its utility for search—a feature lacking in the experimental results of the Fox method concerning *bc* and *cc*.

Dr. Jacobs sets forth a timeline of work done on citation relationships.  JA17714-JA17730.  The little work that had been done prior to the '494 Patent consisted of a few isolated experiments using small-scale collections such as CACM. *Id.*  This work is replete with negative or inconclusive experiments and explicit skepticism by the leading experts.  The fitness of citation relationships for search remained an open question studied by leading research experts for nearly 15

years after the work of Fox that allegedly rendered using indirect relationships

obvious to persons of ordinary skill. *Id*.

Dr. Jacobs's timeline included experiments from Salton, Fox's thesis

advisor and creator of the vector space model used by Fox.  JA17707-JA17715.

Salton noted that the "initial reaction must clearly be one of *skepticism*" toward

using bibliographic citations and that "[b]ecause of these and other variations,

citation and reference lists have not generally been used as an indication of

document content."  JA17715.  On pages 445-46, Salton lists many potential

reasons why citations may be an unreliable indicator of content including self-

selection, survey article problem, and availability of relevant works; thereby

demonstrating that their utility is not "predictable" or "obvious" to ordinary

practitioners.  *Id*.  Salton ultimately concludes that his experiments fail to establish

the utility of using citations for search:

> **<u>Clearly no proof</u>** has been presented in this study that citations do
> in fact play a significant role in automatic document retrieval
> systems.

JA17716.  In 1986, after conducting additional experiments with citation

relationships, Dr. Salton stated three years *after* the Fox thesis:

> Since **no obvious way** exists for distinguishing the positive from the
> negative effects, the citation methodology **cannot be recommended**
> for inclusion in practical retrieval environments.

> \*\*\*

22

> ***Overall, the procedure is not sufficiently reliable to warrant incorporation into operational automatic retrieval systems****.*

JA17709.  Others in the field made similar comments about using bibliographic relations.  JA17717 ("What they [Tapper's experimental results] do not, and cannot, demonstrate is …whether or not [his methodology] can be developed into a component part of an operational commercial system.").

Four years later, Fox's graduate student Gary Nunn further analyzed the original 1983 Fox data.  JA17710-JA17711.  Nunn attempted to determine if Fox's method could be extended to other collections.  The results were "disappointing" as the results obtained on one half of the CACM and ISI collections could not generalize to the other half of the *same* collection.  These results demonstrated that the isolated cases where citation links showed improvement could *not* be replicated on other queries made on the *same* collection.  JA17710.  Ultimately, Nunn concludes that Fox's methods were not generalizable to other collections and suggests further research is needed to find coefficients that could work on other collections:

> The author of this study would like to suggest that further research might be pursued along two paths…. The purpose of this … [would be] to try to develop coefficients that *could be* generalized to other collections.

JA17710-JA17711; JA16266.

23

In 1992, Frei and Steiger continued to discourage using citation relationships: "Retrieval experiments in a collection of bibliographic references showed that following citations – a kind of referential links— *produces ambiguous results*…. *The hope is that our semantic links* contain the information necessary…." JA17727. That same year Ledwith also expressed skepticism at the reliability of Fox's 1983 methods:

> [D]espite the significant efforts to explore and develop these models, *there remain concerns about the models' utility for the searching of large scientific databases*. Using the p-norm retrieval experiment described in ***Fox (1983)*** as an example, I will present my three major concerns…*the reliability of extrapolating the performance of research systems that use the collection to a system to search a file over 750 times larger than the collection is <u>highly questionable.</u>*…"

JA17727-JA17728.

The negative experimental results and skepticism by experts towards using citation relationships for years after the Fox experiments are objective evidence that the Fox Papers did not render obvious using indirect relationships for computerized search. To this day, no empirical test has confirmed that *bc* and *cc alone* (without other higher-order citation relationships like Egger) improves search results in a reliable fashion. Defendants made no attempt in their papers to address these teachings, nor did the Board comment substantively on the unreliability evidence.

24

**5. The Objective Evidence Confirms that the Fox Methods Concerning *BC* and *CC* did Not Render Searching with Indirect Relationships Obvious**

In 1963, Dr. Salton first experimented with indirect citation relationships. JA17715. Fox's experiments occurred in 1983. JA17717. In the 35 years since these relationships were initially studied (and 15 years since the Fox experiments allegedly rendered obvious using indirect relationships), no non-experimental system used indirect relationships for search prior to 1998 (except the system of Egger). JA17724-JA17725; JA17896. Indeed, since the SMART system analyzed relationships in paper copies, no system at all was used to analyze indirect relationships of a computer databases as claimed prior to the '494 Patent. *Id*.

The absence of any use of the claimed method for 35 years from Salton (and 15 years from Fox) is compelling evidence that the Fox's experiments did not render using indirect relationships obvious. JA17707-JA17715. This absence also strongly corroborates Jacob's testimony that the skilled artisan would understand from Fox's results and others that indirect relationships *bc* and *cc* actually harm search results. JA17714. Neither Petitioners, nor the Board address this compelling fact or offer any reason to explain this absence.

Furthermore, the inference of nonobviousness from this absence is even stronger here where the analysis of the claimed database citation relationships was considered a major breakthrough fifteen years after the Fox Papers allegedly

25

rendered their use obvious.  JA17906-JA17907; JA17916-JA17925; JA17911-JA17912.  Licensed embodiments of the claimed invention would later revolutionize the search industry.

In 1998, Google, a'494 Patent licensee, was the first commercial search system to analyze citation relationships in computer databases.  JA17887-JA17892.  Google and third-parties considered the unexpected results obtained from analyzing link relationships in a computer database to be a "major innovation," revolutionary, and "breakthrough technology that changed the way searches were conducted."  JA17906-17907; JA17916-JA17925; JA17911-JA17912.  Within a few years, Google's use of indirect relationships for search enabled the company to dominate the search industry.  JA17093-JA17907.  In contrast to the 35- and 15-year absence of any actual use after the Salton and Fox papers, within just two years after Google actually demonstrated the utility of analyzing indirect relationships, every major search engine began analyzing these relationships.  JA17914-JA17915.  Today, 99% of the search industry has licensed the '494 Patent for substantial royalties in the multiple tens of millions of dollars.  JA17926.

Critically, the evidence concerning the unexpected results does not center on the particulars of PageRank or even whether PageRank infringes the claims.  Rather, third party commentators and Google itself note that just the very idea of using non-semantic "links" of computer databases **<u>at all</u>** to improve search results

was novel:

> Stephen Levy [longtime technology writer and critic] describes how at the time *"no one at the web search companies mentioned using links. The links were the reason that a research project running on a computer in a Stanford dorm room had become the top performer."*

> Stanford computer science professor Rajeev Motwani describes the shift from content or text-only analysis to link analysis: "***Before this, people were only looking at the content.  They were completely ignoring the fact that people were going to the effort of putting a link from one page to another and <u>that there must be a meaning to that</u>***."

JA17926-JA17027.  In other words, the leaders of the field did not appreciate

that the citation relationships of a computer database had "meaning" that could

be used enhance search.  JA17901-JA17902; JA17916; JA17892-JA17902.

Google's founder elaborates that the discovery that the links were "meaningful"

was by "accident" rather than a predictable outcome of known research:

> We originally developed page rank[] kind of playing around with studying all the links on the web.  And that too was a pretty ***<u>revolutionary idea</u>*** though it seems very simple that you could even just collect [the links of the web and] ***do <u>anything</u> meaningful*** ….
> I really credit Larry pursuing ***that idea that it's even worth collecting the graph.*** And then that you could ***run <u>any</u> kind of processing*** on it.

JA17729.

> And we decided that for queries that really return a lot of results that we could do something more reasonable. ***And we sort of <u>stumbled</u> upon a way to do that by studying links***. . . But what we found was we—kind of ***<u>by accident</u>*** almost-- we found that this processing of the link structure of the web, we could create a search that was better in important ways. ***In ways that these search engines had ignored.***

27

JA17730.  *See* JA17892-JA17902 for discussion of the unexpected results achieved by web citation analysis.

This evidence is very important to the obviousness query regardless of whether PageRank bears a nexus with the claims or whether its success could be attributed to the patented invention.  The lack of appreciation in 1998 that citation links in computer databases could be used under "any" algorithm to "meaningfully" improve search is independently relevant to the obviousness query.  JA17901-JA17902; JA17898; JA17892-17902.  This lack of appreciation is fundamentally inconsistent with the idea that the widely published Fox papers demonstrated that the claimed analysis of citations in a database was obvious.  If it was a "revolutionary" idea to run "**any** kind of processing" on the non-semantic citations of a computer database to enhance search in a "meaningful" way in 1998, it certainly was not an obvious idea in 1996.  JA01306-JA01308.  Consequently, the claimed method directed at the relationships of such databases is not obvious to those of ordinary skill.  The comments cited above come from third-party industry leaders speaking outside the context of litigation and, as such, constitute compelling evidence of nonobviousness.

When the prior art as a whole is considered for what it fairly suggests, it demonstrates that the portions of Fox's method that used *bc* and *cc* citation relationships was not useful for search.  Fox simply used the wrong kind of indirect

relationships (*bc* and *cc,* without other higher order relationships) in a manner that was ineffective at improving search results. JA17895-JA17896. Since his method with respect to using *bc* and *cc* was ineffective for search, a skilled artisan would not be motivated to use it to search any type of collection, much less the claimed computer database. *Id*.

### 6. BC and CC Alone Without Higher Order Relationships Have Never Been Proven Effective for Improving Search

Dr. Langville, award winning author on PageRank, testifies that using *bc* and *cc* alone without other higher order relationships (*i.e.*, of longer link lengths) would never have led to the discovery of the benefits of the claimed invention. JA17895-JA17896. *Bc* and *cc* are the shortest indirect relationships consisting of only two link lengths, and therefore, only capture a small amount of the link structure of a database. Daniel Egger's second numerical representation embodies an analysis of up to 18 relationships simultaneously, and its analysis includes link relationships up to four link lengths long. *Id*. Egger's "cluster link" generator and the licensed "PageRank" algorithm of Google analyzed multiple indirect relationships of any length "N." Thus, unlike Fox's method, the methods disclosed in the specification analyze multiple types of empirically useful indirect relationships including higher order relationships and therefore, capture far more of the link structure of a database than just *bc* and *cc*. *Id*. No study of record has ever shown that use of *bc* and *cc* alone (without other longer citation relationships) is

29

capable of enhancing search in a reliable way.

### 7. The Fox Papers Fail to Disclose an Analysis of Direct and Indirect Relationships in a Computer Database

The '494 Patent is directed to an analysis of direct and indirect relationships between objects in a computer database. For example, claim 1 provides "creating a first numerical representation for each identified object in the database based upon the object's direct relationship with other objects in the database." Since a direct relationship is "a relationship where one object cites to another object" as construed both by the Board and the District Court, a skilled artisan would understand this claim to require an object to actually refer (*i.e.*, cite) to another object **in a database.** JA17738-JA17739.

The Board correctly found that SMART did not perform its steps on the claimed database relationships. *Facebook, Inc., et al. v. Software Rights Archive, LLC*, IPR2013-00478, Paper 58 at *21-22 (PTAB 2015). The database used by SMART was a bibliometric database that only has fields containing information relating to an object but omitting the actual citations from the object. Thus, none of the objects in the database actually referred to each other. *Id*. The analyzed bibliographic relationships were instead obtained by manually looking up the paper copies, which were never stored in any computer database. JA17667-JA17668. Consequently, none of the analyzed relationships constitute database relationships referring to objects in a database, as claimed.

Indeed, the Board's '352 Decision found that "[t]he Fox databases do not contain the full documents, meaning that the databases do not contain the portions of the documents that cite to other documents," and as such:

> **do not have direct relationships, because they do not contain cites to one another**…. Claim 26, however, requires that direct and indirect relationships exist between objects in the database first, prior to creating a first numerical representation. **In other words, the Raw_data of the Fox Collection CACM database cannot be both the objects that have relationships, as well as the first numerical representation of those relationships**.

*Facebook*, IPR2013-00478 at *21-22. Since every step of claim 18 is directed to these database relationships, none of the steps of claim 18 are actually performed by Fox's method.

## IV. SUMMARY OF THE ARGUMENT

All claims require using indirect relationships to search for objects in a database. JA05082. SRA provided compelling evidence that indirect relationships harm search results. Seven of nine tests performed by Fox himself demonstrated that the *bc* and *cc* indirect relationships (the only ones relied upon by Petitioners) harm search results. JA17757-JA17770; JA25044-JA25045; JA17764-JA17765. No test demonstrated an improvement meeting Salton's 10% threshold for significant improvement. JA17767-JA17767; *supra* at 12-13. No test showed any improvement by *bc* and *cc* when used as arranged in the claimed method that first created a direct relationship numerical representation. *Supra* at 13-16.

31

The PTO dismissed this evidence because it believed it could find all elements of the claimed invention "without modification" in the Fox Papers (i.e., a prima facie case). This stated reason represents clear legal error because a prima facie case of obviousness does not allow one to disregard evidence of teaching away or objective indicia of nonobviousness. *Infra* at 40-50. Similarly, the failure to provide any reasoned explanation in its opinion as to why one would be motivated to use indirect relationships as claimed in view of the negative empirical evidence and other teachings in the art as a whole represents another clear legal error. *Infra* at 34-40. Finally, the Board also failed to consider multiple objective indicia of nonobviousness. These legal errors regarding the required analysis for finding obviousness mandate that the Board's decision be set aside and given no deference. Had the Board properly conducted its analysis, it would have concluded that the claims are nonobvious.

## V.    ARGUMENT

### A.    Standard of Review

The Board's decision is reviewed *de novo* and the factual findings for substantial evidence. *In re Gartside*, 203 F.3d 1305, 1315 (Fed. Cir. 2000). Substantial evidence is less than the weight of the evidence but more than a mere scintilla of evidence. *Id.* at 1312. A review for substantial evidence "involves examination of the record as a whole, taking into account evidence that both

justifies and detracts from an agency's decision." *Id.*   Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

Here the Board's failure to provide any analysis or explanation as to why a skilled artisan would be motivated to use indirect relationships for search when the empirical evidence and the art as a whole demonstrated such use would hurt search results represents clear legal error.  As such, the Board's findings of obviousness are not entitled to deference.  Conclusory findings unsupported by analysis are not entitled to deference.  *In re Klein*, 647 F.3d 1343, 1350-51 (Fed. Cir. 2011).

The broadest reasonable claim construction standard, normally used in IPR proceedings, does not apply here because the Patent is expired.  In construing the expired patent, the Board must apply district court claim construction principles including adopting a reasonable construction supported by the record that upholds the validity of the patent if presented with one.  *Ex parte Papst-Motoren*, 1 U.S.P.Q.2d 1655, 1656 (B.P.A.I. 1986); *Ex parte Katz*, 2010 WL 1003878, at *3 (P.T.A.B. 2010); *In re Rambus Inc.*, 694 F. 3d 42, 46 (Fed. Cir. 2012) (citing *Phillips v. AWH Corp.*, 415 F. 3d 1303, 1316 (Fed. Cir. 2005)).  In *Papst-Motoren*, the Board held that in case of an expired patent "a policy of liberal construction…should be applied.  Such a policy *favors a construction of a patent claim that will render it valid,* i.e., a narrow construction, over a broad construction

33

that would render it invalid." 1 U.S.P.Q.D.2d at 1656. Here, the Board repeatedly ignored this axiom when construing the Patent.

### B.  The Board Erred by Failing to Provide an "Explanation" as to Why One Would Use Indirect Relationships in View of the Empirical Evidence that Such Uses Harm Search Results

All Reviewed Claims require using indirect relationships to search for objects. JA05082. SRA presented compelling evidence that demonstrated that using *bc* and *cc* indirect relationships in Fox's method (1) overwhelmingly harmed search results and (2) was so unpredictable that it was not fit for its intended purpose. *Supra* at 10-21. In rendering its decision, the Board did not address, provide weighing analysis or otherwise make findings on the merits of these two arguments. For example, it did not identify any flaws in SRA's interpretation of the data, nor did it identify any other evidence that contradicts SRA's claims. JA00021. There is simply no analysis or other attempt to provide a reasoned explanation with respect to the merits of this very important evidence.

Rather, the Board's opinion finds that because the Fox Papers "without modification" teach the missing feature of an "electronic database that has references to objects in the database," one does not have to consider the teachings in Fox that indirect relationships degrade search results:

> Patent Owner also contends that the inclusion of indirect relationships into search "degrades results," and therefore provides a teaching away from the invention. As Patent Owner acknowledges, its evidence of degraded results does not teach away from the *combination* of the Fox

34

Papers, but rather from the *modification* of the teachings of the Fox Papers to incorporate "an electronic database that has references to the objects in the database." We found above, however, that the Fox Papers teach this feature. In addition, to the extent modification of the Fox Papers is necessary to meet claim 18, we have found that modification is expressly suggested by the Fox Papers themselves. The record is insufficient to establish a teaching away.

JA00021. The Board is arguing that since all elements of the claimed invention including the missing one can be found among the three Fox papers (i.e., a *prima facie* case), it does not matter that the Fox experiments indicate that the claimed use of indirect relationships harms search performance using his method. Consequently, the Board found it unnecessary to make findings or otherwise address the merits of these issues.

The Board's reasoning is clearly erroneous. It is well established that the mere fact all elements of the claimed invention can be found "without modification" among a group of references (i.e., that a *prima facie* obviousness may be found), does not permit dismissal of other contrary teaching of the art or objective evidence of nonobviousness. *In re Sullivan*, 498 F.3d 1345, 1351 (Fed. Cir. 2007) ("Evidence rebutting a prima face case of obviousness can include… '*evidence 'that the prior art* teaches *away from the claimed invention in any material respect,*'... and evidence of secondary considerations...'"); *Apple Inc. v. Int'l Trade Comm'n,* 725 F.3d 1356, 1365 (Fed. Cir. 2013) (it is axiomatic that

"[t]he establishment of a *prima facie* case... is *not* a conclusion on the ultimate issue of obviousness.").

The obviousness question is not merely whether it is obvious to have an electronic database with objects that cite to each other. Rather, the issue is whether it is obvious to have such a database and then perform the remaining steps of the claimed method using indirect relationships of such database. Based on the evidence of unreliable and harmful results presented by SRA, it would not be. Critically, "the question[for obviousness] is not simply whether the prior art 'teaches' the particular element of the invention, but whether it would 'suggest the *desirability*, and thus the obviousness, of making the combination.'" *Alco Standard Corp. v. Tenn. Valley Auth.*, 808 F.2d 1490, 1498 (Fed. Cir. 1986). There is no more important evidence to the question of the "desirability" of using indirect relationships for search than the actual empirical results of Fox's (and others') experiments using these relationships. Those results overwhelmingly demonstrate that using the *cc* and *bc* indirect relationships for search harms search results in the claimed arrangement. *Supra* at 13-16. Consequently, the Board was required to provide a reasoned explanation why a skilled artisan would incorporate using indirect relationships despite the empirical data demonstrating that such relationships are overwhelmingly likely to harm search results—particularly within the claimed arrangement. *Id*. The Board committed reversible error by failing to

36

provide any "explanation" or other analysis explaining the motivation to perform the claimed invention in view of this evidence. *In re Kahn*, 441 F.3d 977, 986 (Fed. Cir. 2006) ("When the Board does not explain the motivation, or the suggestion or teaching, that would have led the skilled artisan at the time of the invention to the claimed combination as a whole, we infer that the Board used hindsight to conclude that the invention was obvious… By requiring the Board to explain the motivation, suggestion, or teaching as part of its *prima facie* case, the law guards against hindsight…."); *In re Rouffet*, 149 F.3d 1350, 1357-59 (Fed. Cir. 1998) ("However, the Board reversibly erred… The Board provides no reasons that one of ordinary skill in this art, seeking to minimize handovers due to satellite motion, would combine Ruddy with Rosen and King in a manner that would render the claimed invention obvious…. In other words, the Board *must explain* the reasons one of ordinary skill in the art would have been motivated to select the references and to combine them to render the claimed invention obvious."); *Apple,* 725 F.3d at 1365 (finding clear error when opinion fails to contain weighing analysis of important evidence, stating: "The ITC, however, never even mentioned, much less weighed as part of the obviousness analysis, the secondary consideration evidence Apple presented…. This is not adequate under our law."); *Broadcom Corp. v. Emulex Corp.,* 732 F.3d 1325, 1335 (Fed. Cir. 2013) ("An invention is not obvious just 'because all elements that comprise the invention were known in the

prior art;' rather, a finding of obviousness at the time of invention requires a 'plausible rational [sic] as to why the prior art references would have worked together.'").  Accordingly, the Board's failure to provide such an explanation requires reversal of its decision.

### C.     The Board also Erred by Failing to Consider the Prior Art as a Whole and by Failing to Conduct a Weighing Analysis as to the Degree One Teaching May Discredit Another

It is also well established that one must consider what the prior art as a whole fairly suggests:

> *[T]he prior art as a whole must be considered*. The teachings are to be viewed as they would have been viewed by one of ordinary skill. "*It is impermissible* within the framework of section 103 *to pick and choose from any one reference* only so much of it as will support a given position, to the exclusion of other parts necessary to the full appreciation of what such reference fairly suggests to one of ordinary skill in the art."

*In re Hedges*, 783 F.2d 1038, 1041 (Fed. Cir. 1986).  Here, the Board improperly picks and chooses to rely upon Fox's teachings that some search systems support full text searching to conclude that it was obvious to apply Fox's methods to a computer database, but ignores the negative results of Fox experiments and others that demonstrate that Fox's methods concerning indirect relationships should not be used to search any collection at all, much less the claimed computer database. *Supra* at 13-16.  Critically relevant to the proper inquiry is whether either the (1) Fox experiments or (2) the prior art as a whole including subsequent

experimentation demonstrate that the claimed use of indirect relationships harms

search results or is so unreliable that it is not useful for its intended purpose.  If

either of these propositions are true, then one skilled in the art would not be

motivated to use the parts of the Fox combination pertaining to tests using indirect

relationships, regardless if one needs to modify Fox's method or not.

Furthermore, the duty to consider the art as a whole is not confined to the

teachings within one reference but rather applies across all the prior art references.

Indeed, the Board has a duty to weigh each reference for its suggestive power to

resolve conflicts in the teaching of different art:

> When prior art contains apparently conflicting references, the Board
> **<u>must</u> weigh each reference for its power to suggest solutions to an
> artisan of ordinary skill**.  The Board must consider all disclosures of
> the prior art …to the extent that the references are, as here, in
> analogous fields of endeavor and thus would have been considered by
> a person of ordinary skill in the field of the invention.  The Board, in
> weighing the suggestive power of each reference, **must consider the
> degree to which one reference might accurately discredit another**.

*In re Young*, 927 F.2d 588, 591 (Fed. Cir. 1991).  Despite the fact that the Jacobs

timeline (JA17714-JA17730) puts forth substantial evidence that Fox's

experimentation as well as *experimentation by other leaders in the field*

demonstrated that indirect relationships harm search results, the Board's decision is

completely devoid of the required analysis weighing the references for their

suggestive power or otherwise determining the degree that one reference may

discredit another.  This error is particularly egregious considering the fact that

among the evidence that SRA presented was that Salton, Fox's thesis advisor,

concluded "the citation methodology cannot be recommended for inclusion in

practical retrieval environments" and that other authors who explicitly criticize

Fox's method.  JA17709.  Accordingly, the Board clearly erred by selectively

relying upon the teaching of the art without properly analyzing what the art as a

whole fairly suggests.

### D. Had the Board Complied with its Duty to Consider the Prior art as a Whole It Would Have Found All Claims Nonobvious

Had the Board properly considered the prior art as a whole, it would have

been compelled to find nonobviousness.  The mere fact that elements are capable

of being combined is not enough to establish obviousness:

> Although predictability is a touchstone of obviousness, the
> "predictable result" discussed in KSR refers *not only* to the
> expectation that prior art elements are *capable of being physically
> combined,* but also that the *combination would have worked for its
> intended purpose*…. The *opposite conclusion would follow*, however,
> if the prior art indicated that the invention *would not have worked for
> its intended purpose or otherwise taught away from the invention*….

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1326 (Fed.

Cir. 2009); *see also Eurand, Inc. v. Mylan Pharms., Inc.,* 676 F.3d 1063, 1068-69

(Fed. Cir. 2012).  Thus, Petitioners had the burden to prove that searching using

the indirect relationships of *bc* and *cc* is fit for its intended purpose of

computerized search.  The "opposite conclusion" – nonobviousness – is *compelled*

if the art indicates that the combination "would not have worked for its intended purpose *or otherwise taught away*."  *DePuy*, 567 F.3d at 1326.

Here the Board relies upon certain statements that discuss the general capability of SMART to simulate searches using *bc* and *cc*.  JA01013-JA01018.  These teachings merely represent the capability to physically combine certain elements of the invention by SMART—which under *DePuy* is not enough to establish obviousness.  Rather, one skilled in the art would ultimately be informed of the fitness of using the *bc* and *cc* subvectors for the intended purpose of computerized search by the actual experimental results of the *bc* and *cc* subvectors reported in  the Fox Thesis.  *Supra* at 10-16.  Dr. Jacobs' analysis establishes that those tests indicated that using *bc* and *cc* overwhelmingly harmed to search results and therefore Fox's method as to these data types were not fit for the intended purpose of computerized search.  *Id*.  Neither Petitioners nor the Board challenged the accuracy of this testimony.  Jacobs further showed that no test in Fox supported using indirect relationships in the *arrangement claimed* (i.e., when direct relationships representations available for use in searching).  *Supra* at 13-16.  ***In all seven cases where this was tested, using* bc *and* cc *under the claimed arrangement harmed search performance.*[2]**  Not one test result showed an improvement over using direct links alone.  *Id*.

---

[2] The ISI experiments did not test direct links.  JA17769(¶249).

SRA put on direct evidence of how one skilled would react to the potential deterioration of search results present in the Fox experimental results. *Supra* at 17-21. It demonstrated that when Salton was confronted with results in his experiments that contained much less degradation and far greater improvement (than Fox's), he still concluded that the methodology was unfit for its intended purpose: "*Overall, the procedure is not sufficiently reliable to warrant incorporation into operational automatic retrieval systems.*" JA17709. SRA further showed that no person ever used indirect relationships to analyze the claimed databases in a non-experimental system until 15 years after the Fox papers—thereby further corroborating Salton's interpretation of the evidence. *Supra* at 17-21; 25-26.

Petitioners have put forward no plausible explanation that demonstrates that using indirect relationships would be "desirable" in view of Fox's actual test results. *Alco*, 808 F.2d at 1498 ("the question [for obviousness] is not simply whether the prior art 'teaches' the particular element of the invention, but whether it would 'suggest the *desirability*...'"). Petitioners have failed to identify any test results that support using indirect relationships in a reliable fashion in the manner claimed, nor have they identified any errors in Jacobs' analysis. They have made no attempt explain why there is a multi-decade absence of any use of *bc* and *cc* if it was obvious to use it, nor do they attempt to explain why it was considered a major

discovery to analyze links in computer databases to improve search more than 15 years after the Fox papers allegedly rendered this obvious to a skilled artisan. JA17725; JA17896.

In *Eli Lilly & Co. v. Teva Pharms. USA, Inc.*, 619 F.3d 1329, 1332 (Fed. Cir. 2010), the patent claimed using "raloxifene" to treat "postmenopausal osteoporosis." The defendant relied upon a reference that noted "bioavailability concerns" that suggested that raloxifene would not ultimately be efficacious in humans. *Id*. at 1338-39. Despite the fact that the references explicitly tested raloxifene for treatment of bone loss (*i.e.*, the ***claimed feature***), the Federal Circuit found nonobviousness, stating: "[the Defendant] points to no evidence from before the time of invention that would teach, suggest, or motivate or ***supply any common sense reason*** for a person of ordinary skill in the art ***to reject the bioavailability concerns and routinely, simply, or easily arrive at the inventive result***." *Id.* at 1336-37. Just like in *Teva*, Petitioners here failed to identify any plausible explanation that would cause a person to reject the reliability concerns identified by Fox and Salton's experimental results and motivate to one routinely, simply, or easily arrive at the inventive result.

Similarly, in *Eli Lilly & Co. v. Actavis Elizabeth LLC*, the patent claimed using "atomoxetine" to treat ADHD. 435 F. App'x 917, 919 (Fed. Cir. 2011). The patent owner submitted evidence of "negative reports" of potential death from

using atomoxetine; this Court held that because there was "no evidence that the advantageous and effective properties of atomoxetine to treat ADHD, *devoid of the negative effects* of known and similar products," it was impermissible to "pick and choose from any one reference" so the claims were nonobvious. *Id.* at 921. Here, like in *Actavis*, there is no evidence of a way to take advantage of the benefits of the invention without the "*negative effects*" of potential search degradation. Indeed, Salton explicitly states "Since ***no obvious way exists*** for distinguishing the positive from the ***negative effects***, the citation methodology cannot be recommended…." Consequently, a finding of nonobviousness is similarly compelled.

When all of the teachings are fairly considered, Petitioners failed to meet their burden with respect to the use of indirect relationships. Nor have they demonstrated that using *bc* and *cc* is fit for the intended purpose of computerized search. As such, the "opposite conclusion" of nonobviousness is "compelled" under *DePuy*, 567 F.3d at 1326.

### E.    The Board Erred by Failing to Analyze Important Objective Evidence of Nonobviousness

With the exception of commercial success, the Board's decision is devoid of any analysis of SRA's objective evidence of nonobviousness. The Board ignored the following indicators presented by SRA: lack of actual use, unexpected results (of link analysis), skepticism, failure of others, long felt need, and praise of the

industry.  Under this Court's jurisprudence, all objective evidence of nonobviousness must be considered before it is legally permissible to conclude that a claim is obvious.  *Ashland Oil, Inc. v. Delta Resins & Refractories*, 776 F.2d 281, 307 (Fed. Cir. 1985) (failing to consider nonobviousness evidence constitutes an "error as a matter of law.").  The failure to address this evidence alone constitutes reversible error.  *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.,* 617 F.3d 1296, 1305 (Fed. Cir. 2010) (reversing the district court stating "[t]o be clear, a district court must always consider any objective evidence of nonobviousness presented in a case").

The Board's conclusion of obviousness is strongly contradicted by nearly every category of objective evidence:

**Lack of Actual Use:** SRA showed an absence of any use of any indirect relationship in a non-experimental system for 15 years after the Fox Papers and 35 years after testing on citation relationships began.  *Supra* at 25-26.  This 15/35 year long absence of use is strong evidence of nonobviousness.  *Leo Pharm. Products, Ltd. v. Rea*, 726 F.3d 1346, 1356-59 (Fed. Cir. 2013) (reversing where there was a delay of 14 and 22 years between the prior art's teachings and actual use of the claimed method—stating that the intervening time "speaks volumes to the nonobviousness of the patent.").

**Unexpected Results (of link analysis)**: SRA provided evidence showing that the very idea of analyzing citation relationships in a computer database to improve search was not appreciated until 15 years after the Fox Papers. Leaders of the field expressed surprise in 1998 that the hyperlink citation links in web documents could be used in "any meaningful" way. JA17901-JA17902; JA17898; JA17892-JA17902. If the appreciation of analyzing computer database relationships such as hyperlink citations to improve search was "revolutionary" in 1998 to the leaders of the industry, it could not have been rendered obvious to those of ordinary skill by Fox in 1983.

**Skepticism by Experts:** Jacobs's testimony showed that the prior art as a whole overwhelmingly discouraged using indirect relationships. *Supra* at 21-24. Dr. Salton explicitly noted that the "***initial reaction must clearly be one of skepticism***" toward using bibliographic citations. JA17715. Experts as late as 1992 (the year before the filing of patents) were criticizing the Fox methodology as being unreliable as well as noting that analysis of citations produces "ambiguous results." JA17711-JA17712. No less than four empirical studies (Salton '63, Fox '83, Salton '86 and Nunn '87) largely demonstrated that indirect relationships harm search results and failed to prove that citations can be used in a reliable way. JA25074. No study of record empirically demonstrates that *bc* and *cc* alone can be used to improve search in a reliable way. *Kinetic Concepts, Inc. v. Smith &*

46

*Nephew, Inc.,* 688 F.3d 1342, 1367 (Fed. Cir. 2012) (invention properly found nonobvious where "leading experts in the field were skeptical that the [invention] could work"); *In re Dow Chem. Co*., 837 F.2d 469, 473 (Fed. Cir. 1988) (reversing PTO finding of obviousness where experts were skeptical despite five to six years of research).

**Failure of Others/Long-Felt Need:** Jacobs's timeline establishes a 40-year period beginning with Salton '63 where the art of record discusses the need for improvement of search results and begins testing potential citation solutions to the problem. JA17714-JA17730. Despite nearly 40 years since testing began, the prior art as a whole indicates a field that struggled with finding any empirically-supported use of indirect relationships that could be fashioned into a successful search method until well after the '494 Patent's filing. JA17714-JA17730; JA17927-JA17929. SRA provided a solution to this long-felt problem by analyzing multiple types of empirically useful indirect relationships (18 different patterns and higher order relationships of length "N") that capture more of the link structure than the tested patterns of *bc* and *cc* (focused on by the prior art) and therefore reliably improved search. JA17895-JA17896. This testimony was unrebutted. Such unrebutted testimony shows that the invention was a nonobvious solution. *Alco*, 808 F.2d at 1500-01 (finding "strong secondary considerations indicating nonobviousness" where the evidence showed that "'for well over a

47

decade the industry had searched for a reliable method of detecting discontinuities in rotor forgings,' [and] that "major turbine manufacturers had tried and failed to develop a reliable method…"); *Eurand*, 676 F.3d at 1081 ("[T]here can be little better evidence negating an expectation of success than actual reports of failure…. In such circumstances, 'evidence of failed attempts by others could be *determinative* on the issue of obviousness.'""). The repeated failures of Fox, Salton, and others in the art to develop an empirically effective search method using indirect relationships are compelling evidence of nonobviousness.

Similarly, the analysis of link relationships of a computer database to enhance search was another solution to the long-felt need to improve search ranking. JA17927-JA17929. This solution was ignored until SRA's licensees demonstrated its utility in 1998 and revolutionized the search industry. All major search engines now license and use Egger's solution. *Supra* at 26.

**Industry Acquiescence:** SRA showed industry acquiescence to the validity of the patents based upon pervasive licensing of the patents. 99% of the search industry have taken licenses under the Patent for over $30 million, with at least half of that amount being paid by Google. JA17926. This widespread licensing for millions of dollars supports the nonobviousness of the claimed invention. *See, e.g., Institut Pasteur & Universite Pierre et Marie Curie v. Focarino,* 738 F.3d 1337, 1347 (Fed. Cir. 2013) (licensing of the patent is "'probative and cogent

48

evidence' of nonobviousness.").  Despite the eight digit sums being paid which indicate merit to the claims, the patent office erroneously dismissed this evidence because the licenses were done in the context of litigation.  *Rambus Inc. v. Rea*, 731 F.3d 1248, 1254, 1257 (Fed. Cir. 2013) (reversing the Board's finding that Rambus's licensing evidence lacked a nexus because competitors may take licenses for reasons including litigation).

**Unexpected Results, Praise and Commercial Success of PageRank:**

SRA put on substantial evidence that PageRank, a licensed embodiment, produced unexpected results that "revolutionized" the search industry.  JA17892-JA17902. Further, Google's dramatic takeover of the search industry using the licensed PageRank points to the nonobviousness of the claimed invention.  JA17903-JA17906.  Although the PTO did not find commercial success, it made a number of errors that caused to reach the wrong conclusion. *Infra* at 63-65.

Each of the above objective indicators is irreconcilable with Petitioner's position that the Fox experiments rendered using indirect relationships for search obvious.  Each of these indicators confirm and corroborate Dr. Jacobs' testimony that the Fox methods regarding *bc* and *cc* harmed search results and were considered too unreliable for use in computerized search.  *Supra* at 10-21. When the experimental results of Fox are considered in the context of the prior art as a whole and the objective evidence of nonobviousness, it is clear that the Board

49

erred in its ultimate legal conclusion of obviousness and this court should find the claims nonobvious.

### F. The Board Erred by Finding That All Elements of Claim 18 Are Suggested

The Board's decision erroneously relies on the notion that the three Fox papers disclose the claimed inventions without any "modification" so that one does not need to consider evidence of harm to search results. JA00021. The Board also erred in finding the steps of the claims are suggested in the three papers taken together.

The Board's '352 Decision explicitly found that the Fox databases did not contain objects with citations to other objects in a database, as claimed. *Facebook*, IPR2013-00478 at *21-22. Nevertheless, the Board ruled that the following sentence in the introduction of the Fox thesis discloses an analysis of relationships in electronic databases:

> Some [Information Retrieval] systems store the full text of the various documents or other items being manipulated. In addition to being able to locate documents of interest, the user may be able to retrieve and/or examine paragraphs, passages, sentences, or single word occurrences (in context).

JA00017; JA05352. The above statement is found in a general background section that summarizes the history and work of others in the field. In order to find obviousness, the Fox papers not only have to disclose all elements of the claim, but they must also teach or suggest these elements as arranged in the claim. It is not

enough to note that full textual databases exist in the work of others, which may not contain citations to other objects in the database. One must show that the combination suggested that one should perform the steps of the claim with respect to *bc* and *cc* on the citation relationships of that database to create the claimed numerical representations used for searching. Merely noting that full text databases exist and then constructing a database that lacks the claimed citation relationships is not a suggestion to perform the steps of the claim on such a database. Indeed, Fox's deliberate choice to construct a database of objects excluding the claimed relationships is, if anything, an affirmative teaching to use his method in a manner that does not practice the claimed invention.

Similarly on pp. 16-17, the Board attempts to recast claim 18 so as to remove the requirement that the numerically represented relationships do not have to relate to the objects in the database:

> There is no requirement in claim 18, however, that the first numerical representation be "based on" objects in the database. The preamble of claim 18 assumes a pre-existing database that contains two things: objects, and a first numerical representation of direct relationships. Once the Raw_data pairs were compiled and entered into the CACM database, as disclosed in Fox Collection, these requirements were met.

JA00016-JA00017. The Board misreads the preamble. Claim 18 provides "a method of analyzing a *database* having objects and a first numerical representation of direct relationships *in the database*…." The claim does not require that *the database contain* (1) objects and (2) a first numerical representation of direct

51

relationships, but rather that "*the method of analyzing*" be performed on (1) the database having objects and (2) a "first numerical representation of direct relationships *in the database*." **Indeed, the claim further requires "displaying one or more identified objects *from the database*" identified using the numerical representations, which requires that the numerical representations relate to the relationships of objects actually in the database so that the objects can be displayed.**

The Raw_data relation, *bc* subvector and *cc* subvector, are merely numerical *representations* of direct and indirect relationships, not relationships themselves. JA17738. The actual analyzed relationships used to create these numerical representations are between paper documents analyzed by Fox's "thesis helpers" outside any database—therefore are not "relationships in a database," as claimed. JA17736-JA17741. Regardless of how one construes the preamble, the claim makes clear that the first numerical representation is "a first numerical representation of direct relationships **in the database.**" Since direct relationships are "relationships where one object cites to another object" as construed by the Board and the District Court (JA17655-JA17657; JA01183-JA01184), the plain reading of the term means "relationships where one object cites to another object **in the database**." Since the Fox databases are a bibliometric databases that omit the citations from the objects, no object cites to another object in the database.

JA17662; JA17667-JA17670.  The printed copies that actually contain citations to other *printed* works were never stored in a database.  *Facebook*, IPR2013-00478 at *21-22.  As such, the Raw_data relation, even if stored, would not reflect any "direct relationships in a database."  JA17736-JA17741.  Similarly, the claim requires a "second numerical representation accounts for indirect relationships *in the database*."  Since none of the CACM objects in the database refer to other objects in a database, Fox's method does not analyze any indirect relationships in a database either.  Thus, Fox papers do perform any step relating to analyzing any relationship "*in a database*," as claimed.

The Board's suggestion that claim 18 does not require the direct relationships to be based upon objects in the database is inconsistent with the specification.  No embodiment discloses a database (1) containing a first numerical representation of direct relationships (2) unrelated to the relationships of actual objects in the database.  JA05058(3:26-34; 4:26-31); JA05067(21:30-44).  All disclosed embodiments teach that a first numerical representation is created by an "extractor" or "crawler" analyzing the text of objects in the database for citations to other objects in the database.  JA05064-JA05065(16:53-17:32); JA05081(49:30-33).  Indeed, all embodiments require a database that has objects that cite to other objects in the database to function.  Without such a database, the extractor or crawler cannot extract the citations used for the first numerical representation.

53

Similarly, the "cases after" search routine identifies the direct links of an object and then displays the content of directly linked objects. JA05069 (25:8-33); JA05061(9:22-25); JA05021. **Without a database that has objects that refer to other objects in the database, the system could not display the directly linked objects as it would be outside the computer database.** *Id*.

Finally, even if one accepts the Board's construction, the claimed "first numerical representation of direct relationships" is not suggested by storing the "Raw_data relation." JA00016-JA00017. Petitioners rely on the Raw_data relation as the first numerical representation. JA01013-JA01014. The Raw_data relation cannot be both the claimed "first numerical representation" and the claimed "direct relationships in the database" that the first numerical representation represents. Indeed, the Board explicitly found so with respect to the '352: "the Raw_data of the Fox Collection CACM database cannot be both the objects that have relationships, as well as the first numerical representation of those relationships." *Facebook*, IPR2013-00478 at *21-22. Accordingly, Fox does not suggest "a first numerical representation of direct relationships in a database." JA17734-JA17746.

SRA has offered a reasonable construction closely supported by the claim language and specification that upholds validity of the claim. Since this is an expired patent, the Board was required to adopt it. *Ex parte Papst-Motoren*, 1

54

U.S.P.Q.2d at 1656 ("Such a policy favors a construction of a patent claim that will render it valid, i.e., a narrow construction, over a broad construction that would render it invalid."). Its failure to do so was clearly erroneous.

### G.    The Board Erred by Finding Claim 45 Obvious

Claim 45 requires "the direct relationships are hyperlink relationships between objects on the world wide web" and, therefore, claim 45 embodies the inventive step of applying citation analysis to hyperlink relationships.

None of the Fox Papers suggest any method pertaining to analyzing hyperlink relationships on the World Wide Web or other network. Hyperlinks differ from bibliographic citations in many important respects. Bibliographic citations involve an attempt to use human judgment subject to scrupulous academic review to provide a source that supports a given point; therefore, there is an expectation that the citation may refer to related subject matter. In contrast, hyperlink references are made for many different reasons and competing commercial interests. They are most often used for navigational and commercial purposes that do not necessarily indicate similarity of content. Not only do these links have less quality as a content indicator, at the time of the patent, they are very difficult to collect given the immense size of the internet and ever changing nature of the web and its hyperlinks. Indeed, it would be impossible to apply to the Web

the hand methods of Fox, which took several years to index a mere 6000 articles. JA01311.

SRA presented compelling evidence that the very idea that one can "do anything meaningful" by analyzing hyperlinks on the web for search was considered a revolutionary breakthrough in 1998. *See supra* at 26-29. Prior to that, the art and indeed the field as a whole had failed to appreciate that hyperlinks contained "meaningful" information that could be used to improve search. This lack of appreciation and the breakthrough nature of this discovery is a matter of public record by third parties outside the context of litigation and thus, constitute compelling evidence of nonobviousness.

Fox Envision does not teach the idea that one should analyze hyperlinks as opposed to bibliographic citations to enhance search. In all cases, the Fox Papers at most analyzed bibliographic citations (i.e., formal citations to academic papers contained in bibliographies) and even then, Fox's results suggested that using bibliographic citations degraded search performance. JA05205; JA05213. Despite any lack of explicit teaching for this important idea that was considered--years later--to be a major innovation, the Board imputes this teaching based upon a misunderstanding of the following paragraph:

> We are beginning to see the emergence of wide area hypertext systems (Yankelovich, 1990) like the World Wide Web (WWW), that carry this concept forward into a distributed environment. ***Clearly, we must coordinate hypertext and hypermedia linking with the various***

56

> ***approaches to search and retrieval (Fox et al., 1991b).*** One
> approach is the idea of information graphs (including hypergraphs),
> *where objects of all types are interrelated by links or arcs that capture*
> *not only citation (reference) but also inheritance, inclusion,*
> *association, synchronization, sequencing, and other relationships.*

JA00029; JA05845. Nowhere, however, does this passage state that one should

analyze indirect relationships as expressed in hyperlink references. The Board

erroneously seizes on the emphasized portion of the above quote as teaching the

steps of analyzing hyperlinks. The quote about coordinating "hypertext and

hypermedia linking with the various approaches to search and retrieval" is so

general as not to suggest any particular method of search and retrieval, much less

citation analysis of Fox 1983. In fact, this statement cites to Fox 1991 which is not

about citation analysis at all but rather using links for navigation purposes.

JA05859.

In order to find obviousness, there "must be evidence that 'a skilled

artisan… would select the elements from the cited prior art references for

combination *in the manner claimed.*'" *Ecolochem*, 227 F.3d at 1375. One could

"coordinate" with a hypertext system or the World Wide Web without analyzing

any direct and indirect hyperlink references at all "in the manner claimed." One

could place the CACM and ISI articles in a hypertext system or the web and then

analyze the bibliographic citations (which are not hyperlinks) of these articles

using Fox's methods described in his 1983 papers. One could use these

relationships to find related text and "coordinate" hypertext to provide easy navigation between related subject matter. In this example, no direct or indirect *hyperlink* relationships are ever analyzed for purposes of identifying search results. JA17855. Rather, the analysis is confined to bibliographic citations as explicitly taught in the Fox 1983 papers. Thus, the above statement relied upon by the Board does not constitute a teaching regarding the inventive step of analyzing hyperlink relationships in the manner claimed.

The above scenario is not a hypothetical but what is actually disclosed in the source code of the Fox Envision hypertext[3] system which is the subject of the Fox Envision paper. These files analyze the CACM database loaded into the Envision hypertext system. JA17855-JA17856. The source code produced from Fox reveals that the "arcs" of ENVISION included "author", "cite", "cocite", and "bibcoup" based upon bibliographic– not hyperlink – citations. JA17851-JA17856. Of course, this is because the articles of the CACM were created in the 1970s and do not have any hyperlinks in them to analyze. Rather, Fox analyzed the same bibliographic citations—not hyperlinks—that he analyzed in his 1983 work. JA17855-JA17856. Accordingly, Fox Envision's statement were not directed to the analysis of hyperlink relationships of web objects and the combination as a whole is missing this inventive step.

---

[3] JA17855-JA17856.

The Board's sole response is as follows:

> Patent Owner argues that the above-referenced excerpt of Fox Envision is not sufficient because "[n]owhere is there any suggestion that hyperlinks should be treated as citations for purposes of citation analysis." PO Resp. 18. Dr. Jacobs makes the same claim. Ex. 2113 ¶ 393. Patent Owner and Dr. Jacobs's statements are inaccurate representations of the reference. **The approach taught in Envision is interrelating "objects of all types," including objects on the World Wide Web, so as to capture citation relationships (Ex. 1006, 482).**

JA00029. The relied upon sentence does not say hyperlinks would be analyzed as citations for purposes of search. JA17853(¶407). This sentence specifically teaches representing data including bibliographic citations, in the form of arcs of a graph. JA17856-JA17857. This means that bibliographic information including citations, semantic relationships, authors and other information can be represented as a link or arc in an infograph or hypergraph.[4]

It does not mean that the arcs of the graph are derived from analyzing hyperlink references. The reference to "citations" being captured in the "links or arcs" of the graph refer to creating "arcs" based upon bibliographic "citations" not

---

[4] It is should be noted that a "hypergraph" does not suggest a graph of hyperlinks as the mathematical term means: "In mathematics, a **hypergraph** is a generalization of a graph in which an edge can connect any number of vertices." https://en.wikipedia.org/wiki/Hypergraph.

hyperlink ones.  JA17853(¶406).  No article of Fox has ever suggested analyzing

hyperlink references with citation analysis.  Dr. Jacob's review of the source

code—which was not challenged – confirmed that the arcs were based upon

bibliographic citations of the CACM collection.  Given that the evidence that the

field did not appreciate the significance of hyperlink references, this Court should

not impute this missing inventive step.

### H.    The Board Erred by Finding Claim 45 Obvious

Claim 45 requires "analyzing direct link *weights* in a set of paths between

two indirectly related objects."

The Board erroneously determines that Fox Thesis teaches this:

> Dr. Fox testifies that Fox Thesis discloses that "[t]he bc and cc
> subvectors are generated based on an analysis of direct links, and are
> weighted according to the *count of the coupling and co-citation
> relationships established by those direct links*."
>
> ***
>
> In other words, the weighting of the paths *bc* and *cc* in Fox Thesis are
> generated using a count of the direct links, which are each weighted as
> 1. Ex. 1209, 171–72, Figs. 6.3, 6.4.  Patent Owner provides no reason
> why a weight of 1 for each direct link is insufficient to meet the
> limitation of a "direct link weight," and we discern no disclosure in
> the specification of the '494 patent that would require a narrower

JA00028.

Claim 45 analysis of direct link weights is directed to the cluster link

analysis disclosed in col. 21 ln. 30 and Fig. 3G of the Patent and must be read in

light of its disclosure:



*Fig. 3G*

Fig. 3G discloses cluster link C3 is generated by weighing the direct links W1, W2, and W3 which are direct links in a path between indirectly related objects N0 and N3. Weights W1, W2, and W3 are assigned to each direct link N0-N1, N1-N2, and N2-N3 in the path that defines an indirect relationship from N0 to N3. These weights are then used to calculate the overall value C3, as shown in the arc 2036 and the function of C3 to determine the strength of that indirect relationship. JA05067(22:5-31). Importantly, a direct link weight (W) is assigned to each individual direct citation that makes up an indirect relationship path. Fox Thesis discloses that *bc/cc* subvectors are generated by counting the number of co-citations or bibliographic couplings—not counts of direct links that make up such relationships. Fox does not assign any weight to any *direct link* at all, but rather

61

counts the number of $bc$ or $cc$ relationships between objects:

Figure 6.3: $\underline{bc}$ Submatrix

|  | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| A | 1 |  |  |  |  |  |  |
| B |  | 1 | 1 |  |  |  |  |
| C |  | 1 | 2 | 1 | 1 |  |  |
| D |  |  | 1 | 2 | 2 |  |  |
| E |  |  | 1 | 2 | 3 |  |  |
| F |  |  |  |  |  | 0 |  |
| G |  |  |  |  |  |  | 1 |

**"2" means D and E are bibliographically coupled twice**

Note: $bc_{E,G} \neq 1$ since J is not $\in O$.

JA05647; JA05645-JA05648; JA17783-JA17784.  Even if one accepts that the count of "1" was a weight, this count is of co-citations (or bibliographic couplings), which are indirect relationships not direct links.  Fox's testimony above explicitly confirms this understanding as he states "bc and cc subvectors… are weighted according to the *count of the coupling and co-citation relationships* established by those direct links."  JA06660(¶209).  Thus, no weight or count is assigned to any of the individual direct links that make up an indirect relationship path.  Accordingly, the claim is not suggested by the combination.  Furthermore, SRA has offered a reasonable interpretation supported by the claim language and specification that upholds validity and, as such, the Board was required to adopt it.

62

*Ex parte Papst-Motoren*, 1 U.S.P.Q.2d at 1656 ("policy favors a construction of a patent claim that will <u>render it valid</u>… over a broad construction that would render it invalid.").

## I.    The Board Erred by Concluding that SRA Failed to Provide a Nexus

The Board erred in concluding that SRA failed to establish a nexus between the claims and Google's success.  "Once the patentee demonstrates a prima facie nexus, the burden of coming forward with evidence in rebuttal shifts to the challenger."  *Crocs, Inc. v. Int'l Trade Comm'n,* 598 F.3d 1294, 1311 (Fed. Cir. 2010).  If then the petitioner asserts that market forces unrelated to the patent may influence commercial success, the petitioner "must make a convincing case that those market forces indeed were the likely cause of the success."  *Id*.  Petitioners failed to do so.

The Board summarily dismisses SRA's evidence of nexus "Because Patent Owner has failed to provide the source code of PageRank, or any other detailed information beyond publicly-available, generalized hearsay statements about Google's search (Ex. 2051)"  JA00022.  The Board apparently missed the declaration of Dr. Langville, award-winning author on PageRank, which sets forth (1) that Google and third parties identified PageRank as <u>the</u> reason for its success (JA17916-JA17923; JA17897-JA17898); (2) highly detailed claim charts based on Google's publicly disclosed algorithms showing element-by-element how using

63

PageRank practices the claimed invention (JA16433-JA16607), (3) testimony that she reviewed the PageRank code and it conformed with Google's disclosed algorithm (JA17891(¶39)), (4) Google paid an eight digit license fee to SRA (JA17926), and (5) 99% of the search industry paid fees to SRA for using "PageRank." (JA17926). This evidence is not hearsay as the Board contends because under 37 C.F.R. §42.53(a), the Langville Declaration constitutes direct testimony for which Petitioners had an opportunity to cross examine. Experts may also rely upon hearsay testimony. FED. R. EVID. 703.

Accordingly, SRA met its prima facie burden by showing that PageRank was the reason for Google's success (JA17916-JA17923) and that its use falls within the claims (JA16433-JA16607). *See Crocs, Inc.,* 598 F.3d at 1311. In contrast, Petitioners provided no rebuttal evidence. Instead, Petitioners generally assert, without any supporting evidence, that Langville failed to consider other factors that *may* have caused the success of Google. JA01387. These unsupported arguments speculating that factors other than PageRank may have contributed Google's success are simply insufficient in view of the prima facie case of SRA. The Board fails to even identify a single factor in their view that may have in fact contributed to Google's success. Petitioners failed to provide the requisite evidence to establish a "convincing case" that these factors were *in fact the likely cause* of the success of Google. *See Crocs, Inc.*, 598 F.3d at 1311 ("Once the

patentee demonstrates a prima facie nexus," the defendants "must make a convincing case that those market forces indeed were the likely cause of the success." ).  Accordingly, the Board erred in finding the claims lack a nexus with PageRank.

## **<u>CONCLUSION</u>**

For these reasons, the Court should find the Reviewed Claims nonobvious.

Dated:  July 27, 2015                              Respectfully submitted,

*/s/Minghui Yang*
Martin M. Zoltick
Rothwell, Figg, Ernst & Manbeck, P.C.
607 14th Street, N.W., Suite 800
Washington, DC 20005

Victor Hardy
Minghui Yang
DiNovo Price Ellwanger & Hardy LLP
7000 North MoPac Expy, Suite 350
Austin, TX 78731

*Attorneys for Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of July, 2015, the foregoing BRIEF OF APPELLANT was filed electronically with the U.S. Court of Appeals for the Federal Circuit by means of the Court's CM/ECF system.  I further certify that the foregoing was served by means of electronic mail as well as by the Court's CM/ECF system, which should have sent a Notice of Docket Activity, upon the following counsel of record for Cross-Appellants:

Heidi L. Keefe, Esq.
Mark R. Weinstein, Esq.
Cooley LLP
1299 Pennsylvania Ave., N.W., Suite 700
Washington, DC 20004
Ph: 650-843-5001
Fx: 650-849-7400
E-mail: hkeefe@cooley.com
mweinstein@cooley.com

*Counsel for Appellee Facebook, Inc.*

David Silbert, Esq.
Asim M. Bhansali, Esq.
Sharif E. Jacobs, Esq.
Keker & Van Nest LLP
633 Battery Street
San Francisco, CA 94111
Ph: 415-391-5400
Fx: 415-397-7188
E-mails: djs@kvn.com
abhansali@kvn.com
sjacob@kvn.com

*Counsel for Appellees LinkedIn Corp. and Twitter, Inc.*

/s/Minghui Yang
Minghui Yang
DiNovo Price Ellwanger & Hardy LLP
7000 North MoPac Expressway
Suite 350
Austin, Texas 78731
Telephone:  512-539-2626
Facsimile:  512-539-2627
E-mail:  myang@dpelaw.com

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 13,961 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Date:  July 27, 2015                     Respectfully submitted,

                                         */s/Minghui Yang*
                                         Minghui Yang
                                         DiNovo Price Ellwanger & Hardy LLP
                                         7000 North MoPac Expressway
                                         Suite 350
                                         Austin, Texas 78731
                                         Telephone:  512-539-2626
                                         Facsimile:  512-539-2627
                                         E-mail:  myang@dpelaw.com

**ADDENDUM 1**

Final Written Decision – 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73,
*Facebook, Inc. et al. v. Software Rights Archive, LLC*, Case IPR2013-00479
(P.T.A.B. February 2, 2015) (Paper 54)

JA00001 – JA00041

2015-1649, 2015-1650, 2015-1651

SOFTWARE RIGHTS ARCHIVE, LLC
v.
FACEBOOK, INC., LINKEDIN CORPORATION, TWITTER, INC.

Trials@uspto.gov                                    Paper 54
494.272.7822                            Entered: February 2, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

FACEBOOK, INC., LINKEDIN CORP., and TWITTER, INC.,
Petitioner,

v.

SOFTWARE RIGHTS ARCHIVE, LLC,
Patent Owner.
_____

Case IPR2013-00479
Patent 5,832,494
_____

Before SALLY C. MEDLEY, CHRISTOPHER L. CRUMBLEY, and
BARBARA A. PARVIS, *Administrative Patent Judges.*

CRUMBLEY, *Administrative Patent Judge.*

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

I.      BACKGROUND

*A.    Introduction*

On July 30, 2013, Facebook, Inc., LinkedIn Corp., and Twitter, Inc. (collectively, "Petitioner") filed a Petition requesting an *inter partes* review of claims 18–20, 45, 48, 49, 51 and 54 of U.S. Patent No. 5,832,494 (Ex. 1201, "the '494 patent"). Paper 2 ("Pet."). On February 3, 2014, we

IPR2013-00479
Patent 5,832,494

instituted trial on all challenged claims, on certain of the grounds of
unpatentability alleged in the Petition.  Paper 18 ("Decision to Institute" or
"Inst. Dec.").

After institution of trial, Software Rights Archive, LLC ("Patent
Owner"), filed a Patent Owner Response ("PO Resp.").  Paper 31.  Petitioner
also filed a Reply.  Paper 40 ("Reply").

A consolidated oral hearing for IPR2013-00478, IPR2013-00479,
IPR2013-00480, and IPR2013-00481, each involving the same Petitioner
and the same Patent Owner, was held on October 30, 2014.  The transcript of
the consolidated hearing has been entered into the record.  Paper 53, "Tr."

We have jurisdiction under 35 U.S.C. § 6(c).  This Final Written
Decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

Petitioner has shown by a preponderance of the evidence that claims
18–20, 45, 48, 49, 51 and 54 of the '494 patent are unpatentable.

B.    *Related Proceedings*

Petitioner and Patent Owner both indicate that the '494 patent is
involved in the following co-pending district court proceedings:  *Software
Rights Archive, LLC v. Facebook, Inc.,* Case No. 12-cv-3970; *Software
Rights Archive, LLC v. LinkedIn Corp.,* Case No. 12-cv-3971; and *Software
Rights Archive, LLC v. Twitter, Inc.,* Case No. 12-cv-3972, each pending in
the United States District Court for the Northern District of California.  Pet.
1; Paper 9, Patent Owner's Mandatory Notice, 2.

Petitioner filed another Petition seeking, and we instituted, *inter
partes* review of other claims of the '494 patent in Case IPR2013-00480.  In
addition, we instituted trial on Petitioner's petitions on related patents
including:  (1) IPR2013-00478, which seeks *inter partes* review of U.S.

2

IPR2013-00479
Patent 5,832,494

Patent No. 5,544,352 (the "'352 patent") and (2) IPR2013-00481, which seeks *inter partes* review of U.S. Patent No. 6,233,571 (the "'571 patent"). The '352 patent issued from the parent of the application that issued as the '494 patent. The '571 patent issued from an application that was a divisional of the application that issued as the '494 patent. The '494 patent was the subject of Reexamination No. 90/011,014.

C.    *The '494 patent*

The '494 patent relates to computerized research on databases. Ex. 1201, 1:11–13. The '494 patent discloses that it improves search methods by indexing data using proximity indexing techniques. *Id.* at 3:20–31. According to the '494 patent, proximity indexing techniques generate a quick-reference of the relations, patterns, and similarity found among the data in the database. *Id.* at 3:28–31.

Figure 2 of the '494 patent illustrates the high-level processing of software for computerized searching (*Id.* at 8:7–8) and is reproduced below:



*Fig. 2*

3

IPR2013-00479
Patent 5,832,494

Figure 2 depicts software system 60 comprising Proximity Indexing
Application Program 62, Computer Search Program for Data Represented by
Matrices ("CSPDM") 66, and Graphical User Interface ("GUI") program 70.

Ex. 1201, 11:29–36.

Processing of software system 60 begins with Proximity Indexing

Application Program 62 indexing a database. *Id*. at 11:46–47. Then,

CSPDM 66 searches the indexed database and retrieves requested objects.

*Id*. at 11:49–53. CSPDM 66 relays the retrieved objects to GUI program 70

to display on a display. *Id*. at 11:53–55.

Software system 60 runs on a computer system comprising, for

example, a processor of a personal computer. *Id*. at 10:11–15. The system

comprises a display, which displays information to the user. *Id*. at 10:43–44.

Exemplary displays include: computer monitors, televisions, LCDs, or

LEDs. *Id*. at 10:44–46.

The processor is connected to a database to be searched. *Id*. at 10:18–

20. Data in the database may be represented as a node. *Id.* at 12:29–33.

Exemplary nodes include an object or a portion of an object, a document or

section of a document, and a World Wide Web page. *Id*. at 12:35–38.

A cluster link generation algorithm may be used alone or in

conjunction with other proximity indexing subroutines, and prior to

searching. *Id*. at 21:30–33. The cluster link generation algorithm may

generate candidate cluster links (*Id*. at 21:64–66) and then derive actual

cluster links, which are used to locate nodes for display (*Id*. at 22:1–4).

Actual cluster links are: "a subset of the candidate cluster links . . . which

meet a certain criteria." *Id*. at 22:1–4.

4

IPR2013-00479
Patent 5,832,494

D.    *Illustrative Claim*

Of the challenged claims, only claim 18 is independent, whereas

claims 19–20, 45, 48, 49, 51 and 54 depend directly or indirectly from claim

18.  Claim 18 is illustrative of the claimed subject matter and is reproduced

below:

> 18.    A method of analyzing a database having objects
> and a first numerical representation of direct relationships in the
> database, comprising the steps of:
>
> generating a second numerical representation using the
> first numerical representation, wherein the second numerical
> representation accounts for indirect relationships in the
> database;
>
> storing the second numerical representation;
>
> identifying at least one object in the database, wherein
> the stored numerical representation is used to identify objects;
> and
>
> displaying one or more identified objects from the
> database.

Ex. 1201, 53:27–39.

E.    *The Prior Art References Upon Which Trial Was Instituted*

Colin F.H. Tapper, *Citation Patterns in Legal Information Retrieval*, 3

DATENVERARBEITUNG IM RECHT  249–75 (1976) ("Tapper 1976") (Ex.

1204).

Colin Tapper, *The Use of Citation Vectors for Legal Information

Retrieval*, 1 J. OF LAW AND INFO. SCI. 131–61 (1982) ("Tapper 1982") (Ex.

1205).

Edward A. Fox, *Characterization of Two New Experimental

Collections in Computer and Information Science Containing Textual and*

5

IPR2013-00479
Patent 5,832,494

*Bibliographic Concepts* (Sept. 1983) (Ph.D. dissertation, Cornell Univ.
Dep't of Comp. Sci.) ("Fox Collection") (Ex. 1206).

Edward A. Fox, *Some Considerations for Implementing the SMART
Information Retrieval System under UNIX* (Sept. 1983) (Ph.D. dissertation,
Cornell Univ. Dep't of Comp. Sci.) ("Fox SMART") (Ex. 1208).

Edward A. Fox, *Extending the Boolean and Vector Space Models of
Information Retrieval with P-Norm Queries and Multiple Concept Types*
(Aug. 1983) (Ph.D. dissertation, Cornell Univ. Dept. of Comp. Sci.) ("Fox
Thesis") (Ex. 1209).

Edward A. Fox, et al., *Users, User Interfaces, and Objects: Envision,
a Digital Library*, 44 J. AM. SOC. INF. SCI. 480–91 (Sept. 1993) ("Fox
Envision") (Ex. 1210).

Tatsuki Saito, *A Clustering method using the strength of citation*, 16 J.
INF. SCI. 175–81 (Jan. 1990) ("Saito Clustering") (Ex. 1212).

Thomas D.C. Little, *Commerce on the Internet*, IEEE Multimedia at
Work 74–78 (1994) ("Little") (Ex. 1216).

The parties do not dispute the prior art status of the references.

JA00006

IPR2013-00479
Patent 5,832,494

*F.     The Pending Grounds of Unpatentability*

| References | Basis | Claims instituted |
|---|---|---|
| Fox Thesis, Fox SMART, and Fox Collection | § 103 | 18–20, 48, and 49 |
| Tapper 1976 and Tapper 1982 | § 103 | 18–20, 48, and 49 |
| Fox Thesis, Fox SMART, Fox Collection, Saito Clustering, and Fox Envision | § 103 | 45 and 51 |
| Fox Thesis, Fox SMART, Fox Collection, Saito Clustering, Fox Envision, and Little | § 103 | 54 |

## II.    ANALYSIS

*A.     Claim Construction*

*1.  Principles of Law*

Petitioner asserts, and Patent Owner does not dispute, that the '494
patent expired on June 14, 2013.  Pet. 6.  The Board's interpretation of the
claims of an expired patent is similar to that of a district court's review.  *See
In re Rambus, Inc.*, 694 F.3d 42, 46 (Fed. Cir. 2012).  We, therefore, are
guided by the principle that the words of a claim "are generally given their
ordinary and customary meaning," as understood by a person of ordinary
skill in the art in question at the time of the invention.  *Phillips v. AWH
Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc) (citation omitted).
"In determining the meaning of the disputed claim limitation, we look
principally to the intrinsic evidence of record, examining the claim language
itself, the written description, and the prosecution history, if in evidence."
*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.,* 469 F.3d 1005, 1014
(Fed. Cir. 2006) (citing *Phillips*, 415 F.3d at 1312–17).  There is a "heavy
presumption," however, that a claim term carries its ordinary and customary

7

IPR2013-00479
Patent 5,832,494

meaning. *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) (citation omitted).

### 2. Overview of the Parties' Positions

In the Decision to Institute, we found it instructive to construe the claim terms *direct relationships* and *indirect relationships*. Inst. Dec. 10–11. Our constructions are set forth in the table below.

| Claim Term or Phrase | Construction |
|---|---|
| *direct relationships* | "relationships where one object cites to another object" Inst. Dec. 11. |
| *indirect relationships* | "relationships where at least one intermediate object exists between two objects and where the intermediate object(s) connect the two objects through a chain of citations" Inst. Dec. 11. |

Petitioner does not challenge any of our constructions. Reply 1–2. Patent Owner appears to agree with many of our constructions, and states that it uses our constructions for the purpose of evaluating patentability of the challenged claims of the '494 patent. PO Resp. 8–11. Based on the complete record now before us, we discern no reason to change our prior constructions.

Additionally, Patent Owner addresses the terms *computerized database* and *numerical representation of direct relationships* which are evaluated below. PO Resp. 8–11. Petitioner's Reply further addresses *database* and *numerical representation*. Reply 1–2.

### 3. computerized database

Patent Owner asks that we construe *computerized database*, and asserts that "the claims of the '494 patent are methods that are directed to

8

IPR2013-00479
Patent 5,832,494

representing, analyzing, and searching objects *in a computer database* having direct and indirect relationships *between objects in the database*." PO Resp. 8 (emphasis in original).  The phrases *computerized database* or *computer database,* however, appear nowhere in the claims of the '494 patent that are subject to this trial.

To the extent that the Patent Owner wishes for us to construe *database*, which does appear in the claims, Petitioner correctly notes that the specification of the '494 patent states that the database "can be any device which will hold data" such as "any type of magnetic or optical storing device."  Ex. 1201, 10:18–21.  We do not consider the term to need any additional construction.

### 4.  *numerical representation*

Patent Owner asks for a construction of *numerical representation of direct relationships*, proffering the interpretation "a numerical value or set of values that represent direct relationships in a computer database."  PO Resp. 11.  Patent Owner distinguishes these numerical representations from "strings," which may include letters.  *Id*. at 7.  At oral argument, Patent Owner confirmed that its construction of *numerical representation* is something "represented only by digits," or in other words "expressed by numbers, not by letters."  Tr. 85.

Petitioner responds that *numerical* includes "any representation of binary or digital data that can be processed and analyzed by a computer," and means simply "of or relating to numbers."  Reply 1; Tr. 13.  Petitioner's construction is, therefore, not limited to representations consisting only of numbers.  At oral argument, Petitioner argued that the inclusion of a single

9

IPR2013-00479
Patent 5,832,494

number into a string is sufficient to make that string a *numerical representation*.  Tr. 25.

Petitioner's proffered construction is overly broad and unsupported by the specification.  While one dictionary definition of *numerical* is "of or relating to a number or series of numbers," it may also refer to "expressed in or counted by numbers."  THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (2000) (Ex. 3001); *see also* COLLINS ENGLISH DICTIONARY (2000) (Ex. 3002) ("measured or expressed in numbers").

The specification of the '494 patent uses *numerical* consistent with this latter interpretation.  In the Initial Extractor Subroutine, the "full textual objects" of the database are numbered "with Arabic numbers from 1 through n."  Ex. 1201, 16:64–65.  These numbers are used to create vectors and matrices, which are then run through various algorithms such as the Opinion Patterner Subroutine.  *Id*. at 17:3–37.  "Numerical factors" are then "calculated" to determine "values."  *Id*. at 17:34–37; 21:10–14.  This emphasis on calculation, values, and on processing by computer algorithms, leads us to conclude that *numerical representation*, as used in the '494 patent specification, must refer to solely numbers, so that a computer can process the representations using mathematical algorithms.

Petitioner's attempt to link the *numerical representation* of the specification to the West "key number" system is unpersuasive.  Reply 2.  While the specification of the '494 patent does discuss the key number system, and such "key numbers" include letters, there is no indication that the patentee intended to link the *numerical representation* of the claims to the West key number system discussed—and distinguished—in the

10

IPR2013-00479
Patent 5,832,494

background portion of the specification. Ex. 1201, 2:25–29 ("such a numbering process is subjective and is prone to error").

Nor do we find persuasive Petitioner's argument that *numerical* is somehow distinct from "numeric," in that the latter term means only numbers but the former may encompass letters. Tr. 13. Not only was this argument advanced for the first time at oral hearing,[1] but it is unsupported by any evidence of record. Indeed, the two terms are used interchangeably in dictionary definitions. *See* Ex. 3001 (entry for "numerical also numeric"); Ex. 3002 (entry for "numerical or numeric").

For these reasons, we construe *numerical representation* as "representation consisting exclusively of numbers or a set of numbers."

B.    *Obviousness of Claims 18–20, 48, and 49 Over the Fox Papers*

We instituted trial to determine whether claims 18–20, 48, and 49 are unpatentable under 35 U.S.C. § 103 as having been obvious over the combined disclosures of Fox Thesis, Fox SMART, and Fox Collection (collectively, "the Fox Papers"). Inst. Dec. 12–16. In support of the asserted ground of unpatentability, Petitioner sets forth the teachings of the cited prior art, provides detailed claim charts, and cites to the declaration of Dr. Fox (Ex. 1218 ¶¶ 182–210), explaining how each limitation is taught in the cited prior art combination. Pet. 8–18.

We have considered Petitioner's arguments and evidence, as well as the counterarguments in Patent Owner's Response, and the evidence cited therein, and conclude that Petitioner has shown by a preponderance of the

---

[1] Our Rules do not permit arguments to be raised for the first time at oral hearing. 37 C.F.R. § 42.70(a) (permitting oral argument only on "an issue raised in a paper.").

11

IPR2013-00479
Patent 5,832,494

evidence that each of claims 18–20, 48, and 49 of the '494 patent is unpatentable, under 35 U.S.C. § 103, as having been obvious over the Fox Papers.

### 1. Fox Thesis

Fox Thesis describes improving query and document representation schemes for information retrieval. Ex. 1209, 261. In particular, useful types of bibliographic data are incorporated into a model to test clustering and retrieval functions. *Id.* at 164. Bibliographic connections between articles are illustrated for an exemplary set "O" of documents, which are represented by letters A through G. *Id*. at 165–66, Fig. 6.2. This exemplary set "O" includes direct and indirect citation references. *Id.* at 166–67, Table 6.2.

Based on the reference pattern for a set of documents, Fox Thesis describes deriving various measures of the interconnection between the documents. *Id.* at 166. For example, weights are assigned "based upon integer counts" for bibliographically coupled documents. *Id.* at 167. Citation submatrices represent reference or citation information. *Id*. at 169–70. For example, submatrix *bc* represents bibliographically coupled reference information and submatrix *cc* represents co-citation reference information. *Id*. at 169–72, Figs. 6.3–6.5.

### 2. Fox SMART

Fox SMART describes the System for Mechanical Analysis and Retrieval of Text (SMART) as a project for designing a fully automatic document retrieval system and for testing new ideas in information science. Ex. 1208, 3. Fox SMART describes the computer system used to implement the experiments described in the Fox Thesis. Ex. 1218 ¶ 27. The software components of SMART are implemented in the C Programming Language

12

IPR2013-00479
Patent 5,832,494

and run under the UNIX™ operating system on a VAX™ 11/780 computer.
Ex. 1208, 1, 4.

In SMART, an automatic indexing component constructs stored
representations of documents. *Id*. at 3. Bibliographic information is used to
enhance document representations. *Id*. at 29. The SMART system may
process basic raw data, such as an exemplary "N" collection of articles and
citation data describing which articles are cited by others. *Id.*at 29–30. Data
is entered into the SMART system as a set of tuples $\{(d_i, d_j)|d_i \rightarrow d_j\}$ which
describe the cited and citing documents, as well as the direction of citation.
*Id*. at 29. The exemplary input data also includes indirect citation
relationships, such as bibliographic coupled and co-citation relationships.
*Id*. at 30–32. These relationships are used to create extended vectors which
can then be clustered and searched to aid document retrieval. *Id*. at 29.

### 3. *Fox Collection*

Fox Collection describes collections of data which are said to be
useful for investigating the interaction of textual and bibliographic data in
retrieval of documents. Ex. 1206, 1. According to the testimony of Dr. Fox,
Fox Collection was originally part of the same work as Fox Thesis and Fox
SMART, and describes the manner in which the data sets were obtained and
processed prior to their use in the Fox SMART experiments. Ex. 1218 ¶ 27.

According to Fox Collection, the experiments were performed on a
collection of bibliographic records (title, abstract, author, keywords, etc.)
from the *Communications of the ACM*, termed the "CACM collection." Ex.
1206, 14.[2] Two individuals then examined printed copies of the articles

---

[2] The Fox Collection also discusses an ISI Collection, but in his Reply
Declaration Dr. Fox explains that he cites the ISI collection to "emphasize

13

IPR2013-00479
Patent 5,832,494

referenced by the CACM bibliographic records, and citation data was obtained from the articles and entered into a set Raw_data. *Id*. The citation data contained pairs of identifiers (citing, cited) which were the document id numbers ("dids") of the citing record and record it cites. *Id*. From this Raw_data matrix, secondary matrices such as bc (bibliographic coupling) and cc (co-citation) were derived computationally. *Id*. at 14–16.

### 4. Claim 18

Petitioner's claim chart persuasively reads all elements of claim 18 onto the combined teachings of Fox Thesis, Fox SMART, and Fox Collection. Pet. 9–14 (citing Ex. 1206, 14–15, 45–46; Ex. 1208, 3, 11–13, 23–24, 26–27, 29–32, 38, 41–54, 58–59; Ex. 1209, 17, 19, 173, 179, 181–83, 194, 201, 207, 211, 213; 1218 ¶¶ 71–108, 122–131, 182–184, 194–196). For instance, the combination of Fox Thesis, Fox SMART, and Fox Collection teaches a database having objects, and a first numerical representation of direct relationships in the database, as recited in claim 26. In particular, Fox Collection teaches a database containing the CACM collection of bibliographic entries. Ex. 1206, 14. Printed copies of each article with a bibliographic entry in the CACM collection are then manually reviewed, to obtain bibliographic subvectors in the form "Raw_data (cited, citing)," and the results entered into the database *Id*. This is a first numerical representation of the direct relationship between the "cited, citing" pair.

---

findings in the prior art about the value of using co-citation data (a non-semantic indirect relationship) in information retrieval, not to fully address all the elements of claims. . . . For the sake of simplicity, the Board should focus on the methodology given in Fox Papers, and the examples of their use with the CACM Collection." Ex. 1233 ¶ 6.

14

IPR2013-00479
Patent 5,832,494

The combination of Fox Thesis, Fox SMART, and Fox Collection also teaches generating a second numerical representation using the first numerical representation, wherein the second numerical representation accounts for indirect relationships in the database, as recited in claim 18. Fox SMART teaches that direct relationships may be represented by tuples called "CITED," which contain a citing document, a cited document, and the direction of the citation. Ex. 1208, 29. These tuples are then processed to construct submatrices such as *bc* and *cc*, which contain numbers representing indirect relationships. *Id*. at 30–32 ("construct BC by counting the number of identical tuples of C"). Dr. Fox testifies that the CITED tuples of Fox SMART refer to the Raw_data derived from the CACM collection. Ex. 1218 ¶ 124. Because these *bc* and *cc* submatrices are numerical representations, are generated from the first numerical representations CITED which are based on direct relationships, and account for indirect relationships, we find that the Fox Papers together teach generating a second numerical representation.

### a. Combination of References

As to whether Petitioner has satisfied the requirements for combining the teachings of Fox Thesis, Fox SMART, and Fox Collection, we determine that Petitioner has articulated sufficient reasoning with a rational underpinning as to why one of ordinary skill in the art would have combined the retrieval systems taught in Fox Thesis, Fox SMART, and Fox Collection. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007) (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)). Dr. Fox states that the three publications arose from the same thesis project, and were originally one document. Ex. 1218 ¶ 70. Furthermore, Dr. Fox notes that Fox Thesis

15

IPR2013-00479
Patent 5,832,494

"explain[s] the method and experimental results of [his] information retrieval work," Fox SMART "detail[s] the updated SMART computer system used to execute the experiments," and Fox Collection "describes how the data sets were obtained and processed prior to being used in the experiments." *Id*. We give Dr. Fox's statement that one of skill in the art would have been motivated to combine the references because they "describe a complete project with its underlying system and data" (*id*.) substantial weight, because it is consistent with the considerable overlap in the disclosures of the Fox Papers and their internal references to one another. *See, e.g.,* Ex. 1209, 343 (Fox Thesis cites to Fox SMART); Ex. 1208, 84 (Fox SMART cites to Fox Thesis).

   b. *Patent Owner's Counterarguments*

   We have considered Patent Owner's counterarguments and do not find them persuasive. Patent Owner contends that various elements of claim 18 are not taught or suggested by the Fox Papers in combination. First, Patent Owner argues that the Fox Papers do not teach analyzing a database having objects and a first numerical representation of direct relationships in the database. PO Resp. 21. In particular, Patent Owner focuses on the fact that the first numerical representation of Raw_data was not derived from objects in the database, but rather from manually reviewing the full articles to which the objects pertain. *Id*. at 22. Patent Owner concludes that "there is simply no database disclosed with objects citing to other objects, and Raw_data cannot be based upon 'an object's direct relationships with other objects in the database.'" *Id*. at 23.

   There is no requirement in claim 18, however, that the first numerical representation be "based on" objects in the database. The preamble of claim

16

IPR2013-00479
Patent 5,832,494

18 assumes a pre-existing database that contains two things: objects, and a first numerical representation of direct relationships. Once the Raw_data pairs were compiled and entered into the CACM database, as disclosed in Fox Collection (Ex. 1208, 14), these requirements were met.

Even if claim 18 did require the objects of the database to have direct and indirect relationships, Petitioner persuasively argues this feature is suggested by the Fox Papers in combination. For example, Petitioner shows persuasively that that it would have been obvious to modify the databases of the Fox Papers to contain full text documents. Reply 4. Dr. Fox's testimony supports this argument, noting that if storage resources allowed storage of the full text of documents, this would have been understood as preferable. Ex. 1218 ¶¶ 76, 89. We credit Dr. Fox's testimony on this point, as it is consistent with the disclosure of Fox Thesis that "some [information retrieval] systems store the full text of the various documents." Ex. 1209, 6. Fox Thesis adds that full text permits users to "locate documents of interest," as well as "retrieve and/or examine paragraphs, passages, sentences, or single word occurrences (in context)." *Id*. These extra capabilities are described as "straightforward generalizations of document retrieval methods." *Id*.

Furthermore, if modified to include full text documents, Fox SMART teaches that it would be of "particular value" in such applications to compute vectors (a first numerical representation) for smaller items than just documents. Ex. 1208, 80. As an example, Fox SMART discusses computing vectors for verses and chapters of the Bible, subsets of the entire document. *Id*.

17

IPR2013-00479
Patent 5,832,494

We, therefore, conclude that the Fox Papers suggested to one of ordinary skill in the art at the time of the invention the modification of the Fox databases to include full text documents. With such a modification, the databases would contain, as objects, the full text documents—or even subsets of the full text documents—and these objects would have direct and indirect relationships due to their citation of one another. Patent Owner's argument to the contrary is unpersuasive.

Patent Owner also argues that the Fox Papers do not teach or suggest displaying one or more identified objects from the database, as claim 18 requires. PO Resp. 25. Patent Owner emphasizes that the identifying and displaying steps of claim 18 must apply to objects in the same database. *Id*. Because, Patent Owner alleges, the identified objects of Fox SMART are the full articles which are not present in the database, the objects cannot be displayed. *Id*.

Fox SMART, however, discloses an operation in which documents are retrieved, and then desired portions of the text of the retrieved documents are displayed to the user. Ex. 1208, 24, Fig. 6; *see also id*. at 11 ("display of portions of text from selected top-ranked documents"). Because, as noted above, we find that the Fox Papers suggest that the objects in the database can be both full text documents, as well as portions of those documents,[3] we conclude that the displaying one or more identified objects requirement of claim 18 is met.

Patent Owner's remaining contentions relate to whether Petitioner has satisfied the requirements for combining the teachings of Fox Thesis, Fox

---

[3] "For example, a section, page, or paragraph of text taken from a longer text may be treated as a textual object." Ex. 1201, 14:2–4.

18

IPR2013-00479
Patent 5,832,494

SMART, and Fox Collection.  For example, Patent Owner contends that the systems disclosed in the individual Fox Papers are "narrowly tailored" and would not have been combined merely because of their common authorship. PO Resp. 16–21.

As indicated above, we determine that Petitioner has articulated sufficient reasoning with a rational underpinning as to why one of ordinary skill in the art would have combined the retrieval systems taught in Fox Thesis, Fox SMART, and Fox Collection.  *See KSR*, 550 U.S. at 398.  For example, Dr. Fox wrote each of Fox Thesis, Fox SMART, and Fox Collection.  See Ex. 1209, i; Ex. 1208, 1; Ex. 1206, 1.

Patent Owner also contends that the Raw_data relation of Fox Collection could not be combined with the CITED tuples of Fox SMART, because they are "fundamentally incompatible."  PO Resp. 17.  In support of this argument, Dr. Jacobs testifies, for example, that CITED does not describe using document ids ("dids") while Raw_data does.  Ex. 2113 ¶¶ 124–125.  Dr. Fox testifies to the contrary, stating that the CITED tuples of Fox SMART specifically refer to the "Raw_data" derived from the CACM collection.  Ex. 1218 ¶ 124.  We give Dr. Fox's testimony on this point substantial weight, and do not credit Dr. Jacobs' testimony.  Our determination is not only due to Dr. Fox's personal knowledge of the Fox Papers, but also supported by the descriptions of Raw_data and CITED in the references.  The references indicate that both Raw_data and CITED contain pairs of document identifiers, with the sole difference being that CITED also contains a third data element that signifies the direction of the citation.  Furthermore, while the description of CITED in Fox SMART is silent as to document ids, other portions of the document discuss dids which

19

IPR2013-00479
Patent 5,832,494

are an "index in range 1 . . . N." Ex. 1208, 36. We do not consider the combination of Raw_data with CITED, or the combination of the systems of Fox Collection, Fox SMART, and Fox Thesis, to be beyond the level of ordinary skill in the art.

Patent Owner further contends that using indirect relationships in a computerized search system would not have been predictable at the time of the invention of the '494 patent. PO Resp. 48–50. In particular, Patent Owner contends that Google's introduction of its algorithms took experts in the field by surprise and was considered a major breakthrough. PO Resp. 49 (citing Ex. 2113 ¶ 431; Ex. 2114 ¶¶ 43–65). Patent Owner's contention is based on its view that the combined teachings of Fox Thesis, Fox SMART, and Fox Collection are not sufficient because they do not teach computerized searching of an electronic database. PO Resp. 54; *see also* Tr. 49 ("[T]he Fox papers by themselves don't get you there . . . every one . . . is directed to printed articles, not an electronic database."). According to Patent Owner, the prior art cited by Petitioner teaches experiments that are not directed to web based documents, "but rather are directed toward limited experimentation with bibliographic relationships existing among paper documents." PO Resp. 1.

We disagree with Patent Owner. For example, Fox SMART teaches an implementation in which software components of SMART are implemented in the C Programming Language and run under the UNIX™ operating system on a VAX™ 11/780 computer. Ex. 1208, 1, 4. In SMART, an automatic indexing component constructs stored representations of documents. *Id*. at 3. In light of the various teachings of Fox Thesis, Fox SMART, and Fox Collection discussed herein, we determine that Fox

20

IPR2013-00479
Patent 5,832,494

Thesis, Fox SMART, and Fox Collection, taken together, teach or suggest computerized searching of an electronic database.

Patent Owner also contends that the inclusion of indirect relationships into search "degrades results," and therefore provides a teaching away from the invention.  PO Resp. 51.  As Patent Owner acknowledges, its evidence of degraded results does not teach away from the *combination* of the Fox Papers, but rather from the *modification* of the teachings of the Fox Papers to incorporate "an electronic database that has references to the objects in the database."  Tr. 49–50.  We found above, however, that the Fox Papers teach this feature.  In addition, to the extent modification of the Fox Papers is necessary to meet claim 18, we have found that modification is expressly suggested by the Fox Papers themselves.  The record is insufficient to establish a teaching away.

Patent Owner also asserts objective indicia of non-obviousness, focusing on Google's search engine using its PageRank algorithm.  PO Resp. 57–60.  As an initial matter, Patent Owner's contentions again appear to be based on its view that the combined teachings of Fox Thesis, Fox SMART, and Fox Collection are not sufficient because they do not teach computerized searching of an electronic database.  *Id*. at 56 ("Link analysis technology applied to the Web, as claimed in the '494 patent and embodied in PageRank, satisfied a long felt need for improved computerized search." (citation omitted)); Tr. 60–61 ("[I]t certainly wouldn't have been obvious to one of ordinary skill based on Fox's work to extend these ideas from this paper collection to electronic databases.").  For the reasons discussed above, we disagree with Patent Owner's view and determine that Fox Thesis, Fox

21

IPR2013-00479
Patent 5,832,494

SMART, and Fox Collection, taken together, teach or suggest computerized searching of an electronic database.

Furthermore, we note that Patent Owner has not shown that the asserted success of a commercial embodiment of the '494 patent actually resulted from features recited in the claims of the '494 patent. Patent Owner has not provided sufficient evidence to support a nexus between claim 18 and the Google PageRank algorithm. Because Patent Owner has failed to provide the source code of PageRank, or any other detailed information beyond publicly-available, generalized hearsay statements about Google's search (Ex. 2051), the record is insufficient to prove that PageRank uses the method of claim 18. Without further information, even if PageRank's algorithm incorporates the method of claim 18, we cannot determine that Google's success is due to the method of claim 18, as opposed to other elements of the algorithm.

Patent Owner also points to Google's license of the '494 patent as evidence of nexus. PO Resp. 59–60. Patent Owner, however, admits that this license resulted in the settlement of a lawsuit (*id*.), which without additional contextual evidence, weighs against finding a nexus.

Additionally, we determine that in light of the weak showing of secondary considerations, the evidence of obviousness with respect to Fox Thesis, Fox SMART, and Fox Collection, is sufficient to support the conclusion that claim 18 would have been obvious. See *Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007). As discussed above, Petitioner has provided a strong case of obviousness.

Accordingly, even after considering the counterarguments in Patent Owner's Response, and the evidence cited therein, we find that Petitioner

22

IPR2013-00479
Patent 5,832,494

has shown by a preponderance of the evidence that claim 18 is unpatentable as it would have been obvious over the combination of Fox Thesis, Fox SMART, and Fox Collection.

### 5. Dependent Claims

Petitioner's claim chart persuasively reads all elements of dependent claims 19, 20, 48, and 49 onto the teachings of Fox Thesis, Fox SMART, and Fox Collection, taken together.  Pet. 11–21 (citing Ex. 1206, 14–16; Ex. 1208, 7–8, 10–11, 15, 20–21, 23–24, 29–33, 41, 53; Ex. 1209, 181–82, 237–38, 246–47; 1003 ¶¶ 78–88, 99–106, 108, 127–129, 131, 185–188, 192, 193, 197, 199, 201–05).  For instance, we determine that Petitioner has shown by a preponderance of the evidence that the combination of Fox Thesis, Fox SMART, and Fox Collection teaches that the identifying step comprising searching for objects in a database using the stored numerical representation, wherein direct and/or indirect relationships are searched, as required by claim 20.  Fox SMART teaches a "p-norm query" example, in which a user can search for documents linked to, bibliographically coupled to, or co-cited with a previously retrieved document.  Ex. 1208, 41, Fig. 14.  Links represent direct relationships, while bibliographic coupling and co-citation are indirect relationships, thus satisfying claim 20's additional limitations.

We also conclude that Petitioner has shown by a preponderance of the evidence that the combination of Fox Thesis, Fox SMART, and Fox Collection teaches identifying objects using "the second numerical representation and semantical factors to rank objects for display," as recited in claim 48.  Petitioner identifies several portions of the Fox Papers which allegedly teach this limitation.  Pet. 16–17.  For example, Petitioner notes the disclosure of Fox SMART that "it should be possible to rank the

23

IPR2013-00479
Patent 5,832,494

documents retrieved by a Boolean search according to some other similarity function." *Id*. (citing Ex. 1208, 10). Petitioner also identifies Figure 14 of Fox SMART, which discloses sequentially searching using various concept types including terms (a semantical factor), followed by retrieval of documents using non-semantical terms such as bibliographic coupling. *Id*. (citing Ex. 1208, 41); Ex. 1233 ¶ 233.

Claim 49 requires that generating the second numerical representation considers the quantity of direct relationships between objects. We determine that Fox SMART teaches, for example, the construction of *bc* subvectors, which represent bibliographic coupling and therefore are second numerical representations. Ex. 1208, 31, Fig. 9. This process uses the CITED tuples to generate the *bc* subvectors, and "count[s] the number of identical tuples," which represent direct relationships. *Id*. at 30–31. We, therefore, conclude that Fox SMART teaches the additional limitation of claim 49.

Additionally, for the reasons discussed above with respect to claim 18, we determine that Petitioner has satisfied the requirements for combining the teachings of Fox Thesis, Fox SMART, and Fox Collection.

Again, we are unpersuaded by Patent Owner's counterarguments. Patent Owner argues that Petitioner has not proven by a preponderance of the evidence that all elements of the dependent claims are taught or suggested by the Fox Papers. PO Resp. 27–34. Some of these arguments are based on the fact that the databases of the Fox Papers do not include full text documents (*see, e.g., id*. at 29–30), while others are based on the alleged incompatibility between the Fox Collection Raw_data and the Fox SMART CITED tuples. *See*, *e.g., id*. at 31, 32. We find these arguments unpersuasive for the same reasons discussed above with respect to claim 18.

24

IPR2013-00479
Patent 5,832,494

The Fox Papers suggest the inclusion of full text documents into the databases, and that such a modification could be beneficial.

Patent Owner also argues that claim 48's requirement of using the second numerical representation and semantical factors to rank objects for display is not met by the Fox Papers. *Id*. at 33. According to Patent Owner, Petitioner's argument conflates two distinct disclosures of Fox SMART: searching using indirect relationships (second numerical representation), but not ranking; or ranking, but not in the context of indirect relationships. *Id*. Dr. Jacobs testifies that "the claim specifically requires using the combination of the second numerical representation (alleged to be bc and/or cc) and 'semantic factors' together to rank objects for display." Ex. 2113 ¶ 272 (underlining in original).

We disagree with Patent Owner's interpretation of claim 48. The claim does not require, contrary to Dr. Jacobs's testimony, that the second numerical representation and the semantical factors be used *together*, but rather that they are both used to rank objects for display. The search operation of Figure 14 of Fox SMART discloses using both indirect representations and semantical factors sequentially (Ex. 1208, 41), which satisfies claim 48. Furthermore, Fox SMART discloses retrieving documents with "highest similarity" to a query, which necessarily requires ranking of the retrieved results by similarity. Indeed, Fox SMART teaches that "ranking of documents should be possible for any type of search method." Ex. 1208, 10. Dr. Fox testifies that "Figure 14 discloses that the user can input any desired [concept types], including semantical . . . and the indirect relationship . . ., to obtain a set of search results with the documents

25

IPR2013-00479
Patent 5,832,494

ranked based on those factors." Ex. 1233 ¶ 233. We find this testimony credible and consistent with the disclosure of Fox SMART.

With respect to claim 49, Patent Owner contends that the Fox Papers do not teach or suggest considering "a quantity of direct relationships" when generating the second numerical representation, because "the 'counting' in the Fox Papers alleged to teach the features of claim 49 refer to counting indirect relationships, not direct links." PO Resp. 34. As discussed above, we find that Figure 9 of Fox SMART is contrary to Patent Owner's argument and satisfies claim 49.

We also note Dr. Jacobs testifies that Fox SMART only teaches counting indirect relationships, and quotes the reference as stating that "[f]orming the bc submatrix requires a bit more processing. . . . result is also sorted and duplicates are counted." Ex. 2113 ¶ 274 (quoting Ex. 1208, 30). The ellipsis in Dr. Jacobs's quotation, however, omits a sentence that directly contradicts Patent Owner's contention: "Cited tuples are sorted on the second attribute and then coupled articles are identified." Ex. 1208, 30. The CITED tuples of Fox SMART are the direct links, not the indirect relationships Patent Owner and Dr. Jacobs contend. Because of omission, Dr. Jacobs's testimony on this issue lacks credibility.

For the foregoing reasons, Petitioner has shown by a preponderance of the evidence that claims 19, 20, 48, and 49 of the '494 patent are unpatentable under 35 U.S.C. § 103(a) as they would have been obvious over Fox Thesis, Fox SMART, and Fox Collection.

### 6. Combinations With Other References

In addition to the obviousness ground based solely on the Fox Papers, we instituted trial on two related grounds alleging obviousness of various

26

IPR2013-00479
Patent 5,832,494

dependent claims over the Fox Papers in combination with other secondary references.  Inst. Dec. 19–23 (claims 45 and 51 over Fox Papers, Saito Clustering, and Fox Envision; claim 54 over Fox Papers, Saito Clustering, Fox Envision, and Little).  As set forth below, Petitioner has established by a preponderance of the evidence that claims 45, 51, and 54 are unpatentable.

### a. Claim 45

We find that Petitioner has established by a preponderance of the evidence that claim 45 would have been obvious over the combined disclosures of the Fox Papers, Fox Envision, and Saito Clustering.  Claim 45 depends from claim 19, and further requires, *inter alia*, that "the direct relationships are hyperlink relationships between objects on the world wide web" and "analyzing direct link weights in a set of paths."  Petitioner contends that the former limitation is taught by Fox Envision, whereas the latter is taught by Fox Thesis, Fox SMART, or Saito Clustering.  Pet. 54–55.

Petitioner asserts that Fox Envision "suggests the extension of [information retrieval] techniques to the Web," and that a person of ordinary skill in the art would have combined Fox Envision with the Fox Papers because Envision is follow-on work to Dr. Fox's original thesis.  Pet. 53–54.

Petitioner characterizes Saito Clustering as "applying a weighting factor to each link in [a path of links] that diminishes as the number of links increases."  *Id*.  Saito Clustering's "total citation relation matrix" includes a weight $w_k$ that reduces for each additional link in a path.  *Id*.  Petitioner provides no testimony from Dr. Fox regarding the disclosure of Saito Clustering.

Patent Owner contends that Saito Clustering fails to disclose the analyzing direct link weights element of claim 45, and thus the combination

27

IPR2013-00479
Patent 5,832,494

of Saito Clustering with the Fox Papers and Fox Envision fails to render claim 45 obvious.  PO Resp. 44–46.  Patent Owner argues that the weight $w_k$ in Saito Clustering is applied to a "walk," meaning the entire path between two nodes, as opposed to the individual links of the path.  *Id*.  Dr. Jacobs adds that a person of ordinary skill in the art would have understood that "a directed walk is not a link, but rather corresponds to a path."  Ex. 2113 ¶ 399.

We agree with Patent Owner that Saito Clustering's weights are applied to a path, not the direct links therein, and thus do not meet claim 45's limitation.  However, Patent Owner fails to address the disclosures of Fox Thesis and Fox SMART, which are also cited by Petitioner.  One cannot show non-obviousness by attacking references individually where the challenge is based on a combination of references.  *In re Merck & Co., Inc.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986); *In re Keller*, 642 F.2d 413, 426 (CCPA 1981).

Dr. Fox testifies that Fox Thesis discloses that "[t]he bc and cc subvectors are generated based on an analysis of direct links, and are weighted according to the count of the coupling and co-citation relationships established by those direct links."  Ex. 1218 ¶ 209.  In other words, the weighting of the paths *bc* and *cc* in Fox Thesis are generated using a count of the direct links, which are each weighted as 1.  Ex. 1209, 171–72, Figs. 6.3, 6.4.  Patent Owner provides no reason why a weight of 1 for each direct link is insufficient to meet the limitation of a "direct link weight," and we discern no disclosure in the specification of the '494 patent that would require a narrower interpretation.

28

IPR2013-00479
Patent 5,832,494

Patent Owner contends that the Petition does not establish that "analyzing web-based links would have been obvious to one of ordinary skill in 1996; they are obvious only in hindsight." PO Resp. 46. Dr. Jacobs acknowledges that "the Web was known before 1996, and hypertext had been known long before the Web," but argues that "[w]hile it may have been obvious to combine some information retrieval methods with the Web in 1996 . . . the inventive step of the '494 patent of treating Web links as citations was by all indications non-obvious." Ex. 2113 ¶ 403.

Fox Envision, however, teaches applying citation analysis to hypertext systems, including the World Wide Web:

> We are beginning to see the emergence of *wide area hypertext systems* (Yankelovich, 1990) *like the WorldWideWeb (WWW)*, that carry this concept forward into a distributed environment. Clearly, *we must coordinate hypertext and hypermedia linking with the various approaches to search and retrieval* (Fox et al., 1991b). *One approach* is the idea of information graphs (including hypergraphs), where *objects of all types are interrelated by links or arcs that capture not only citation (reference)* but also inheritance, inclusion, association, synchronization, sequencing, *and other relationships*.

Ex. 1210, 482 (emphases added).

Patent Owner argues that the above-referenced excerpt of Fox Envision is not sufficient because "[n]owhere is there any suggestion that hyperlinks should be treated as citations for purposes of citation analysis." PO Resp. 18. Dr. Jacobs makes the same claim. Ex. 2113 ¶ 393. Patent Owner and Dr. Jacobs's statements are inaccurate representations of the reference. The approach taught in Fox Envision interrelates "objects of all types," including objects on the World Wide Web, so as to capture citation relationships (Ex. 1210, 482).

29

IPR2013-00479
Patent 5,832,494

### b. Claim 51

We find that Petitioner has established by a preponderance of the evidence that claim 51 would have been obvious over the combined disclosures of the Fox Papers, Fox Envision, and Saito Clustering.  Claim 51 depends from claim 48—which we have found to have been obvious over the Fox Papers—and further requires that the identified objects include web sites, and the identifying step includes providing a Universal Resource Locator that identifies a web page.  Patent Owner does not address any particular limitation of claim 51, but rather repeats its argument that analyzing web-based links would not have been obvious to one of ordinary skill.  PO Resp. 46.  We find this argument unpersuasive for the reasons discussed above.

### c. Claim 54

Claim 54 depends from claim 45, which we have found would have been obvious for the reasons discussed above.  The additional limitation of claim 54 recites that "an independent application determines a cost associated with accessing the identified objects."  Petitioner contends that claim 54 would have been obvious over an eight-reference[4] combination of Fox Thesis, Fox SMART, Fox Collection, Fox Envision, Saito Clustering, Saito Design,[5] Fox Hypertext,[6] and Little.  Pet. 56.  The Petition primarily

---

[4] Because the Petition set forth the ground of unpatentability of claim 54 as being based on the combination of all eight references, we repeat them here. Pet. 56.  However, we do not rely on all references in the ground to find that all elements of the claims are taught or suggested by the prior art.

[5] Tatsuki Saito, *Design and Implementation for Scientific Article Data Base*, Bulletin of the Faculty of Eng'g, Hokkaido Univ. no. 151 pp. 19–34 (July 30, 1990) ("Saito Design") (Ex. 1213).

30

IPR2013-00479
Patent 5,832,494

relies on Little, which discloses methods for billing users of a website according to the amount of information accessed or the amount of detail extracted (Ex. 1216, 77), to teach the additional limitation of claim 54. Petitioner further contends that it would have been obvious to use a program separate from the content database to determine the cost for accessing the information in the database, because Little recites advantages for doing so. Pet. 56–57.

Patent Owner does not argue the patentability of claim 54 separately or address the disclosure of Little. Upon review of the Petition and supporting evidence, we conclude that Petitioner has shown by a preponderance of the evidence that claim 54 would have been obvious over the combination of Fox Thesis, Fox SMART, Fox Collection, Fox Envision, Saito Clustering, and Little.

C.    *Obviousness of Claims 18–20, 48, and 49 Over the Tapper Papers*

We instituted trial to determine whether claims 18–20, 48, and 49 are unpatentable under 35 U.S.C. § 103 as having been obvious over the combined disclosures of Tapper 1976 and Tapper 1982 (collectively, "the Tapper Papers"). Inst. Dec. 16–19.

We have considered Petitioner's arguments and evidence, as well as the counter-arguments in Patent Owner's Response, and the evidence cited therein, and conclude that Petitioner has not shown by a preponderance of the evidence that claims 18–20, 48, and 49 of the '494 patent are

---

[6] Edward A. Fox, et al., *Integrating Search and Retrieval with Hypertext*, HYPERTEXT/ HYPERMEDIA HANDBOOK, 329–355 (1991) ("Fox Hypertext") (Ex. 1211).

31

IPR2013-00479
Patent 5,832,494

unpatentable, under 35 U.S.C. § 103, as having been obvious over the
Tapper Papers.

### 1. Tapper 1976

Tapper 1976 discloses a "citation vector technique" for retrieving
legal information that seeks to overcome perceived deficiencies in Boolean
search strings. Ex. 1204, 270–71. Rather than characterizing a legal
document by the words it contains, vector matching focuses on the citations
the document contains. *Id*. at 263. Tapper 1976 also notes that the
technique may be used as an adjunct to a full-text retrieval system. *Id.* at
272.

By repeating the vector characterization of the documents, Tapper
1976 discloses that a matrix may be created that shows the similarities
between the documents. *Id.* By re-ordering the matrix, the documents may
be clustered according to their similarity. *Id.* The reference also discloses
that "second generation citations" may be used: "if a case cites cases A', B'
and C', and case A' cites a1', a2' and a3', case B' b1', b2' and b3' and case C'
c1', c2' and c3' the original case would be represented by a combination of
its own vector, and those of cases A', B' and C'." *Id.* at 266.

### 2. Tapper 1982

Tapper 1982 similarly focuses on the drawbacks of full-text searching
of legal documents and the alternative use of citation vectors for legal
research. Ex. 1205, 135–36. The reference discusses weighting certain
citation vectors more heavily than others, for example by the difference in
the ages of the citing and cited case. *Id.* at 138.

A pilot project implementing such a citation vector-based system is
also described by Tapper 1982. *Id.* at 139. The reference discloses a

32

IPR2013-00479
Patent 5,832,494

correlation algorithm used in the pilot project to cluster together vectors with a high degree of association. *Id.* at 143–44. Such clustering is said to permit a document to be retrieved "not only because it is itself closely associated with another target document, but also because both it and the target document are closely associated with a third." *Id.*

### 3. Claim 18

As discussed above, the preamble of claim 18 requires that the database have "a first numerical representation of direct relationships in the database." We find that this limitation is neither taught nor suggested by the combined Tapper Papers.

Petitioner's claim chart does not identify a first numerical representation, instead merely identifying where the Tapper papers disclose direct relationships. Pet 27. For example, Tapper 1976 is cited as disclosing "algorithms that identify citations in full-text automatically" (Ex. 1204, 260) and "[c]haracterizing a legal document not by the words, but by the citations it contains." *Id*. at 262. Tapper 1982 is cited as disclosing "the use of case citations as selection vectors in legal information retrieval." Ex. 1205, Abstract. These portions of Tapper, however, merely discuss the use of case citations (direct relationships) as the basis for non-semantical search. Petitioner provides no citation to a disclosure by the Tapper Papers that these direct relationships are represented by a first numerical representation.

The narrative portion of the Petition accompanying the claim chart pertaining to the Tapper Papers does not address first numerical representation, or specify how the second numerical representation is created. Pet. 26–27, 36–37.

33

IPR2013-00479
Patent 5,832,494

In its Reply Brief, Petitioner identifies two other disclosures by the Tapper Papers it contends satisfy the first numerical representation limitation. First, Petitioner argues that "the legal citations in Tapper clearly qualify as numerical representations." Reply 11. The legal citations Petitioner identifies, however, are in the exemplary form of "500 F.2d 411," which includes letters. As we have construed the term, this is not a numerical representation.

Second, Petitioner notes that the Tapper Papers describe assigning cases in the database a unique ID number. *Id*. (citing Ex. 1205, 148). At oral argument, Petitioner's counsel directed our attention to Table 2 of Tapper 1982, which includes in the leftmost column pairs of numbers which signify pairs of documents. Tr. 16; Ex. 1205, 147. The document numbers indicated by Petitioner are numerical representations of *documents*,[7] not the *relationships* between those documents. Claim 18 requires that the first numerical representations are of direct relationships in the database. Numerical representations of documents, not the relationships between them, cannot satisfy this limitation.

Nor can the document number *pairs* be a first numerical representation, as Tapper 1982 does not disclose that the pairs represent a direct relationship (i.e., one of the documents in the pair citing the second). Rather, the pairs of documents appear to be listed together in the table because of their high "correlation values." Ex. 1205, 148. As Petitioner acknowledges, these correlation values represent indirect relationships between the documents (Reply 12 ("correlation values of cases' indirect

---

[7] "The first column gives the numbers allocated to the cases." Ex. 1205, 148.

34

IPR2013-00479
Patent 5,832,494

relationships"")), therefore they cannot be a first numerical representation of a direct relationship.

Petitioner argues in the alternative that "there is nothing non-obvious about creating citation vectors consisting solely of numbers." Reply 11. At the outset, we note that this argument was presented for the first time in the Reply; the sole modification to the Tapper Papers addressed in the Petition is the combination of the disclosures of the two references. Pet. 36–37. Nor did Petitioner present any testimony with the Petition regarding the Tapper Papers, or how a person of ordinary skill in the art would have modified the references. It would be a proper exercise of our discretion, therefore, to not consider this argument and the Reply Declaration of Dr. Fox (Ex. 1233), which presents testimony on the Tapper Papers for the first time.[8] *See* Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,767 (Aug. 14, 2012) ("a reply that raises a new issue or belatedly presents evidence will not be considered.")

Even if we were to consider Petitioner's Reply and Dr. Fox's Reply Declaration, however, we are not persuaded. Petitioner cites to various portions of the Tapper Papers (Reply 11), but none of these citations sufficiently establish a reason to substitute numerical representations for those disclosed in Tapper. For example, Petitioner argues—using pieced-together quotations—that "Tapper [1982] also makes clear that one could 'very easily' use a 'simple conversion table' to map 'extracted' citations to any 'chosen style.'" *Id.* (citing Ex. 1205, 136). Upon reading the full context from which these quotes are drawn, however, it is clear that Tapper

---

[8] We address Patent Owner's Motion to Exclude portions of the Reply Declaration below.

35

IPR2013-00479
Patent 5,832,494

1982 is discussing "parallel reports of the same decision." Ex. 1205, 136. In other words, Tapper 1982 does not contemplate converting letter-containing case citations into numbers, but rather converting one letter-containing citation into another.

Dr. Fox's Reply Declaration (Ex. 1218 ¶¶ 107–115) relies on the same arguments as Petitioner's Reply, and we find them unpersuasive for the same reasons. Nor are we persuaded by the portions of Dr. Jacobs's cross-examination Petitioner cites (Reply 11 (citing Ex. 1235, 313:7–316:23, 339:3–342:6)), as Dr. Jacobs's testimony was to what a person of ordinary skill would have understood from the '494 patent specification, not the Tapper Papers. *See In re Vaeck*, 947 F.2d 488, 493 (Fed. Cir. 1991) (suggestion to make invention cannot "be founded . . . in the applicant's disclosure"). The record before us does not support the conclusion that a person of ordinary skill in the art would have modified the combined disclosures of the Tapper Papers to include a first numerical representation.

### 4. Dependent Claims

The remaining instituted claims all depend, directly or indirectly, from claim 18, and thus incorporate claim 18's requirement of a first numerical representation. We, therefore, find that the Tapper Papers do not teach or suggest all elements of these dependent claims.

### D. Motion to Exclude

Patent Owner filed a Motion to Exclude (Paper 44) in which Patent Owner seeks to exclude portions of the Reply Declaration of Dr. Edward A. Fox (Ex. 1233) ("Reply Declaration") submitted with Petitioner's Reply. In particular, Patent Owner identifies three issues with the Declaration, each of

36

IPR2013-00479
Patent 5,832,494

which is based on the argument that portions of the Declaration are improper reply evidence.

In its Reply, a Petitioner may only respond to arguments raised in the Patent Owner's Response.  37 C.F.R. § 42.23(a).  "A reply that raises a new issue or belatedly presents evidence will not be considered."  Office Patent Trial Practice Guide, 77 Fed. Reg. at 48,767.  The Practice Guide provides, as indications of improper reply evidence, "new evidence necessary to make out a *prima facie* case for . . . patentability or unpatentability . . ., and new evidence that could have been presented in a prior filing."  *Id*.

A motion to exclude evidence under 37 C.F.R. § 42.64(c), however, "normally is not the proper vehicle for resolution of a dispute regarding reply arguments and evidence exceeding the proper scope of a reply."  *ABB, Inc. v. Roy-G-Biv Corp*., Case IPR2013-00063, slip op. 13–14 (PTAB May 16, 2014) (Paper 71); *Corning Inc. v. DSM IP Assets B.V.*, Case IPR2013-00047, slip op 7 n.3 (PTAB May 1, 2014) (Paper 84) (characterizing such motions as "now disfavored").  Rather, when evaluating the record after oral argument, the Board is capable of determining what, if any, evidence exceeds the proper scope of rely, and accordingly disregarding that evidence.

While we, therefore, *deny* Patent Owner's Motion, we also note that even if it were proper, we would dismiss it as moot.  With respect to the objected-to portions of the Reply Declaration which discuss the Tapper Papers, we have considered them above, found Dr. Fox's testimony unpersuasive, and found in favor of Patent Owner on the Tapper Papers ground.  With respect to the Fox Papers grounds, we have found in favor of Petitioner, but did not rely on any of the objected-to portions of the Reply

37

IPR2013-00479
Patent 5,832,494

Declaration in so doing.  A decision to exclude the Reply Declaration would,
therefore, not affect our determinations in this case.

E.    *Motions to Seal*

Patent Owner filed a Motion to Seal (Paper 32) the Declaration of Dr.
Amy N. Langville ("Langville Declaration") filed as Exhibit 2114.
Petitioner filed a Motion to Seal (Paper 39) the Transcript of the Deposition
of Amy N. Langville, Ph.D. ("Langville Transcript") filed as Exhibit 1236.
Both of these motions are unopposed.

Regarding Patent Owner's Motion to Seal, according to Patent Owner
paragraphs 25, 112, and 113 of the Langville Declaration make reference to
certain facts about confidential licenses to the patents under review.  Paper
32, 3.  Additionally, Patent Owner contends that this information has not
been made, and will not be made, public.  *Id.*

Regarding Petitioner's Motion to Seal, according to Petitioner, Patent
Owner has designated the transcript as confidential.  Paper 39, 3.  To avoid
public disclosure, therefore, Petitioner submits sealing the Langville
Transcript is appropriate.  *Id.*

There is a strong public policy in favor of making information filed in
*inter partes* review proceedings open to the public.  *See Garmin Int'l v.
Cuozzo Speed Techs., LLC*, Case IPR2012-00001 (PTAB Mar. 14, 2013)
(Paper 34).  Under 35 U.S.C. § 316(a)(1), the default rule is that all papers
filed in an *inter partes* review are open and available for access by the
public.[9]  The standard for granting a motion to seal is "good cause."

---

[9] Additionally, we note that confidential information subject to a protective
order ordinarily would become public 45 days after final judgment in a trial.
Office Patent Trial Practice Guide, 77 Fed. Reg. at 48,761.  However, after

38

IPR2013-00479
Patent 5,832,494

37 C.F.R. § 42.54.  A moving party bears the burden of showing that the relief requested should be granted.  37 C.F.R. § 42.20(c).

Regarding Patent Owner's Motion to Seal, Patent Owner, as the moving party, has failed to carry its burden.  Patent Owner identifies only three paragraphs in the Langville Declaration that purportedly contain confidential information.  However, Patent Owner has not pointed to proof in the record that any information contained in these paragraphs is confidential.  Additionally, although Patent Owner contends that this information has not been made, and will not be made, public, Patent Owner presented this information during the hearing on October 30, 2014, which was open to the public.  *See* Tr. 54:12–25.  We, therefore, determine that Patent Owner has not met its burden of proof.

Regarding Petitioner's Motion to Seal, Patent Owner's designation of the transcript as confidential is not sufficient to show that the transcript contains confidential information.  We, therefore, determine that Petitioner has not met its burden of proof.

We recognize a denial of the motions to seal would immediately unseal the material that Patent Owner desires to remain confidential and the effect would be irreversible.  Therefore, rather than denying the motions at this time, we will provide Patent Owner and Petitioner one week to (1) withdraw the motions to seal and request that we expunge Exhibits 2114 and 1236, or (2) withdraw the motions to seal, request that we expunge Exhibits 2114 and 1236, and replace them with redacted versions that leave out the confidential information.  We note that we have not relied on the

---

denial of a petition to institute a trial or after final judgment in a trial, a party may file a motion to expunge confidential information from the record. 37 C.F.R. § 42.56.

39

IPR2013-00479
Patent 5,832,494

three paragraphs of the Langville Declaration that Patent Owner identifies as containing allegedly confidential information.

## III.    CONCLUSION

We conclude that Petitioner has shown by a preponderance of the evidence that claims 18–20, 45, 48, 49, 51, and 54 of the '494 patent are unpatentable under 35 U.S.C. § 103.

## IV.    ORDER

For the reasons given, it is

ORDERED that claims 18–20, 45, 48, 49, 51, and 54 of U.S. Patent No. 5,544,494 are determined by a preponderance of the evidence to be unpatentable;

FURTHER ORDERED that Patent Owner's Motion to Exclude the Reply Declaration of Dr. Edward A. Fox (Exhibit 1233) is denied;

FURTHER ORDERED that Exhibit 2114 and Exhibit 1236 will be made available to the public after 5 PM Eastern five business days after the entry date of this decision, unless prior to that time, each of Patent Owner and Petitioner (1) withdraws the motions to seal and requests that we expunge Exhibits 2114 and 1236, or (2) withdraws the motions to seal, requests that we expunge Exhibits 2114 and 1236, and replaces them with redacted versions that leave out the confidential information; and

FURTHER ORDERED that, because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

40

IPR2013-00479
Patent 5,832,494

FOR PETITIONER:

Heidi L. Keefe
COOLEY, LLP
hkeefe@cooley.com
dcpatentdocketing@cooley.com.

David Silbert
KEKER & VAN NEST, LLP
djs@kvn.com
efiling@kvn.com


FOR PATENT OWNER:

Martin M. Zoltick
Nancy J. Linck
Soumya P. Panda
ROTHWELL, FIGG, ERNST & MANBECK, P.C.
mzoltick@rfem.com
nlinck@rfem.com
SRA-IPR@rfem.com

41

**ADDENDUM 2**

Final Written Decision – 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73,
*Facebook, Inc. et al. v. Software Rights Archive, LLC*, Case IPR2013-00480
(P.T.A.B. January 30, 2015) (Paper 55)

JA00042 – JA00066

2015-1649, 2015-1650, 2015-1651

SOFTWARE RIGHTS ARCHIVE, LLC
v.
FACEBOOK, INC., LINKEDIN CORPORATION, TWITTER, INC.

Trials@uspto.gov                                              Paper 55
571.272.7822                                      Entered:January 30, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

FACEBOOK, INC., LINKEDIN CORP., and TWITTER, INC.,
Petitioner,

v.

SOFTWARE RIGHTS ARCHIVE, LLC,
Patent Owner.

———————

Case IPR2013-00480
Patent 5,832,494

———————

Before SALLY C. MEDLEY, CHRISTOPHER L. CRUMBLEY, and
BARBARA A. PARVIS, *Administrative Patent Judges.*

PARVIS, *Administrative Patent Judge.*

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

I. BACKGROUND

*A.    Introduction*

On July 30, 2013, Facebook, Inc., LinkedIn Corp., and Twitter, Inc.
(collectively "Petitioner") filed a Petition ("Pet.") requesting an *inter partes*
review of claims 1, 5, 8, 10, 11, 14–16, 35, and 40 of U.S. Patent No.

IPR2013-00480
Patent 5,832,494

5,832,494 (Ex. 1001, "the '494 Patent"). Paper 2. On February 3, 2014, we

instituted trial for all challenged claims 1, 5, 8, 10, 11, 14–16, 35, and 40 of

the '494 Patent on certain of the grounds of unpatentability alleged in the

Petition. Paper 17 ("Decision to Institute" or "Inst. Dec.").

After institution of trial, Patent Owner, Software Rights Archive, LLC

("Patent Owner"), filed a Patent Owner Response ("PO Resp."). Paper 31.

Patent Owner also filed a Motion to Amend to cancel claims 8, 10, 11, 35,

and 40. Paper 32 ("Motion to Amend" or "Mot. Am."). Patent Owner's

Motion to Amend did not propose to add or amend any claims. Mot. Am. 1.

Petitioner filed a Reply to the Patent Owner Response. Paper 40 ("Reply").

A consolidated oral hearing for IPR2013-00478, IPR2013-00479,

IPR2013-00480, and IPR2013-00481, each involving the same Petitioner

and the same Patent Owner, was held on October 30, 2014. The transcript of

the consolidated hearing has been entered into the record. Paper 53 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6(c). This final written

decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

Petitioner has shown by a preponderance of the evidence that claim 14

of the '494 Patent is unpatentable.

Petitioner has not shown by a preponderance of the evidence that any

of claims 1, 5, 15, or 16 of the '494 Patent are unpatentable.

Patent Owner's Motion to Amend to cancel claims 8, 10, 11, 35, and

40 of the '494 Patent is *granted*.

B.    *Related Proceedings*

Petitioner indicates that the '494 patent is involved in the following

co-pending lawsuits: *Software Rights Archive, LLC v. Facebook, Inc.*, No.

12-cv-3970 (N.D. Cal., filed July 27, 2012), *Software Rights Archive, LLC v.*

2

IPR2013-00480
Patent 5,832,494

*LinkedIn Corp.*, No. 12-cv-3971 (N.D. Cal., filed July 27, 2012), and *Software Rights Archive, LLC v. Twitter, Inc.*, No. 12-cv-3972 (N.D. Cal., filed July 27, 2012). Pet. 2. Petitioner also indicates that the '494 patent was the subject of prior litigation: *Software Rights Archives, Inc. v. Google*, No. 08-cv-3172 (N.D. Cal.) ("Google Litigation"). Pet. 9.

Petitioner filed another petition, IPR2013-00479, which also seeks *inter partes* review of the '494 patent. The '494 patent was the subject of reexamination no. 90/011,014. Additionally, Petitioner filed other petitions on related patents including: (1) IPR2013-00478, which seeks *inter partes* review of U.S. Patent No. 5,544,352 ("the '352 Patent") and (2) IPR2013-00481, which seeks *inter partes* review of U.S. Patent No. 6,233,571 ("the '571 Patent"). The '352 Patent issued from the parent of the application that issued as the '494 Patent. The '571 Patent issued from an application that was a divisional of the application that issued as the '494 Patent.

C. *The '494 Patent*

The '494 Patent relates to computerized research on databases. Ex. 1001, 1:11–13. The '494 Patent discloses that it improves search methods by indexing data using proximity indexing techniques. *Id.* at 3:20–31. According to the '494 patent, proximity indexing techniques generate a quick-reference of the relations, patterns, and similarities found among the data in the database. *Id.* at 3:28–31.

Figure 2 of the '494 Patent illustrates the high-level processing of software for computerized searching (Ex. 1001, 8:7–8) and is reproduced below:

3



*Fig. 2*

Figure 2 illustrates high-level processing of three main
programs for computerized searching.

As shown in Figure 2 above, software system 60 comprises:
Proximity Indexing Application Program 62, Computer Search Program for
Data Represented by Matrices (CSPDM) 66, and Graphical User Interface
(GUI) Program 70. Ex. 1001, 11:29–36. Processing of software system 60
begins with Proximity Indexing Application Program 62 indexing a
database. *Id.* at 11:46–47. Then, CSPDM 66 searches the indexed database
and retrieves requested objects. *Id.* at 11:49–53. CSPDM 66 relays the
retrieved objects to GUI Program 70 to display on a display. *Id.* at 11:53–
55.

Software system 60 runs on a computer system comprising, for
example, a processor of a personal computer. Ex. 1001, 10:11–15. The
system comprises a display, which displays information to the user. *Id.* at
10:43–44. Exemplary displays include: computer monitors, televisions,
LCDs, and LEDs. *Id.* at 10:44–46.

4

IPR2013-00480
Patent 5,832,494

The processor is connected to a database to be searched. Ex. 1001, 10:18–20. Data in the database may be represented as a node. *Id*. at 12:29–33. Exemplary nodes include an object or a portion of an object, a document or section of a document, and a World Wide Web page. *Id*. at 12:35–38.

A cluster link generation algorithm may be used alone, or in conjunction with other proximity indexing subroutines, and prior to searching. Ex. 1001, 21:30–33. The cluster link generation algorithm may generate candidate cluster links (*id*. at 21:64–66) and then derive actual cluster links, which are used to locate nodes for display (*id*. at 22:1–4). Actual cluster links are: "a subset of the candidate cluster links . . . which meet a certain criteria." *Id*. at 22:1–3.

D.    *Illustrative Claims*

The independent claims are 1 and 14. Dependent claim 5 depends directly from claim 1. Each of dependent claims 15 and 16 depends, directly or indirectly, from claim 14.

Independent claims 1 and 14 illustrate the claimed subject matter and are reproduced below:

> 1. A method of analyzing a database with indirect relationships, using links and nodes, comprising the steps of:
>
> selecting a node for analysis;
>
> generating candidate cluster links for the selected node, wherein the step of generating comprises an analysis of one or more indirect relationships in the database;
>
> deriving actual cluster links from the candidate cluster links;
>
> identifying one or more nodes for display; and
>
> displaying the identity of one or more nodes using the actual cluster links.

5

IPR2013-00480
Patent 5,832,494

14. A method for representing the relationship between nodes using stored direct links, paths, and candidate cluster links, comprising the steps of:

a) initializing a set of candidate cluster links;

b) selecting the destination node of a path as the selected node to analyze;

c) retrieving the set of direct links from the selected node to any other node in the database;

d) determining the weight of the path using the retrieved direct links;

repeating steps b through d for each path; and

e) storing the determined weights as candidate cluster links.

E.    *The Prior Art References Supporting Alleged Unpatentability*

Edward A. Fox, *Some Considerations for Implementing the SMART Information Retrieval System under UNIX*, (Sept. 1983) (Ph.D. dissertation, Cornell Univ. Dept. of Comp. Sci.) ("Fox SMART") (Ex. 1005).

Edward A. Fox, *Extending the Boolean and Vector Space Models of Information Retrieval with P-Norm Queries and Multiple Concept Types*, (Aug. 1983) (Ph.D. dissertation, Cornell Univ. Dept. of Comp. Sci.) ("Fox Thesis") (Ex. 1008).

The parties do not dispute the prior art status of the references.

F.    *The Pending Grounds of Unpatentability*

| Reference | Basis | Claims challenged |
|-----------|-------|-------------------|
| Fox Thesis | § 102 | 14–16 |
| Fox SMART | § 102 | 1 and 5 |

6

IPR2013-00480
Patent 5,832,494

## II. ANALYSIS

*A.    Claim Construction*

*1.    Principles of Law*

Petitioner asserts, and Patent Owner does not dispute, that the '494 Patent expired on June 14, 2013.  Pet. 9.  The Board's interpretation of the claims of an expired patent is similar to that of a district court's review.  *See In re Rambus, Inc.*, 694 F.3d 42, 46 (Fed. Cir. 2012).  We, therefore, are guided by the principle that the words of a claim "are generally given their ordinary and customary meaning," as understood by a person of ordinary skill in the art in question at the time of the invention.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312, 13 (Fed. Cir. 2005) (en banc).  "In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence."  *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.,* 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing *Phillips*, 415 F.3d at 1312–17).  There is a "heavy presumption," however, that a claim term carries its ordinary and customary meaning.  *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002).

*2.    Overview of the Parties' Positions*

In the Decision to Institute, we construed "cluster links," "candidate cluster links," "indirect relationships in the database," "displaying," and "actual cluster links."  Our constructions are set forth in the table below.

| Claim Term or Phrase | Construction |
|---|---|
| "cluster links" | "[R]elationships used for grouping interrelated nodes."  Inst. Dec. 9. |
| "candidate cluster links" | "[A] set of possible cluster links between a search node and a target node."  Inst. Dec. 10. |

7

IPR2013-00480
Patent 5,832,494

| Claim Term or Phrase | Construction |
|---|---|
| "indirect relationships in the database" | "[R]elationships that are characterized by at least one intermediate node between two nodes." Inst. Dec. 11. |
| "displaying" "[D]epic | ting information on a hardware display." Inst. Dec. 12. |
| "actual cluster links" | "[A] subset of the candidate cluster links[,] which meet certain criteria." Inst. Dec. 13. |

We also determined that "wherein the step of generating comprises an analysis of one or more indirect relationships in the database" requires no express construction other than the construction of "indirect relationships in the database" noted above. Inst. Dec. 11. We further determined that an express construction is not necessary for "selecting a node for analysis." Inst. Dec. 11.

Patent Owner provides contentions based on Patent Owner's view that the claims recite a specific arrangement of steps. PO Resp. 1–2. Patent Owner also makes arguments based on a construction of "cluster links" that is narrower than our construction. *Id*. Below, we evaluate whether the challenged claims recite a specific arrangement of steps. We also evaluate whether to adopt a construction of "cluster links" that is narrower than the construction that we adopted in our Decision to Institute.

With the exception of the arrangement of steps of the challenged claims and the construction of "cluster links," for each of the other claim terms above, we discern no reason, based on the complete record now before us, to change our construction thereof.

8

IPR2013-00480
Patent 5,832,494

*3.    Order of Steps*

Patent Owner contends that the challenged claims of the '494 Patent are arranged in a specific manner.  PO Resp. 2.  For example, Patent Owner contends that claim 1 requires a specific arrangement in which "deriving actual cluster links from the candidate cluster links" is performed after "generating candidate cluster links for the selected node." *Id*. at 16.  Patent Owner similarly contends that claim 14, from which claim 15 depends, requires a specific arrangement. *Id*. at 48 (citing Ex. 2113 ¶ 205).  Patent Owner contends that the prior art does not disclose the specific arrangement of the challenged claims.

Petitioner does not take a position on whether the elements of the challenged claims require the specific arrangement argued by Patent Owner. Petitioner contends that the asserted prior art discloses the steps as arranged in the challenged claims. *See e.g.*, Reply 9.

To evaluate Patent Owner's and Petitioner's contentions, we determine whether claims 1 and 15 recite a specific arrangement of steps such that deriving actual cluster links is performed after candidate cluster links are generated, as recite in claim 1, or after a set of candidate cluster links is initialized and stored, as recited in claim 15.

The full recitations of the phrases of claim 1 at issue are below.

1.  A method of analyzing a database . . . comprising the steps of:

. . .*generating candidate cluster links* for the selected node, wherein the step of generating comprises an analysis of one or more indirect relationships in the database;

*deriving* actual cluster links *from the candidate cluster links*. . . .

9

IPR2013-00480
Patent 5,832,494

(Emphases added). Claim 15 similarly recites deriving the actual cluster links after the steps of initializing and storing candidate cluster links.

We determine that actual cluster links can be derived from candidate cluster links only if the candidate cluster links already have been generated. This determination is consistent with the specification of the '494 Patent. In particular, the specification of the '494 Patent explains that candidate cluster links are the set of all possible cluster links between a search node and a target node. Ex. 1001, 21:64–22:1. The '494 Patent specification continues that actual cluster links are a subset of the candidate cluster links, which meet certain criteria. *Id*. at 22:1–4.

We agree with Patent Owner that claims 1 and 15 recite a specific arrangement with respect to the two steps of generating candidate cluster links and deriving actual cluster links from the candidate cluster links, as recited in claim 1, and as commensurately recited in claim 15. In particular, actual cluster links are derived from candidate cluster links after the candidate cluster links have been generated, as recited in claim 1, or stored, as recited in claim 15.

4.    *"cluster links"*

The term "cluster links" is recited, for example, in claims 1 and 14, within "candidate cluster links." The term "cluster links" also is recited in claims 1 and 15 within "actual cluster links." In the Decision to Institute, we construed "cluster links" in light of the specification to mean "relationships used for grouping interrelated nodes." Inst. Dec. 9.

Patent Owner contends that the asserted art describes "experimentation with relationships existing <u>among printed documents</u>." PO Resp. 1. Patent Owner further contends that the challenged claims of the

10

IPR2013-00480
Patent 5,832,494

'494 Patent are directed to analyzing and searching a computer database of objects. *Id.* Petitioner contends that Patent Owner's argument that the prior art describes relationships between paper documents, not electronic ones, is irrelevant because nothing in the challenged claims requires a database of objects that cite to other objects. Reply 1.

To evaluate Patent Owner's and Petitioner's contentions, we determine whether "cluster links" means relationships between two nodes, which are represented in data stored in a computer. Claim 1 recites a method of analyzing data in a database with indirect relationships using links and nodes. Claim 14 similarly recites a method for representing the relationship between nodes, using stored direct links, paths, and candidate cluster links.

As explained in the '494 Patent specification, data in the database may be represented as a node. Ex. 1001, 12:29–33. Exemplary nodes include an object or a portion of an object, a document or section of a document, and a World Wide Web page. *Id.* at 12:35–38. The '494 Patent specification states that a link is a "relationship between two nodes." *Id.* at 12:65–66. The '494 Patent specification continues, "[a] link [] can be represented by a vector or an entry on a table and contain information for example, a from-node identification [] (ID), a to-node ID [], a link type [], and a weight." *Id.* at 13:3–6. As described in the '494 Patent specification, a link is represented in data stored in a computer.

We, therefore, determine that "cluster links" means relationships, which are represented in data stored in a computer and are used for grouping interrelated nodes.

11

IPR2013-00480
Patent 5,832,494

B.     *Alleged Anticipation of Claims 1 and 5 by Fox SMART*

Petitioner contends that claims 1 and 5 of the '494 Patent are unpatentable, under 35 U.S.C. § 102, as anticipated by Fox SMART. Pet. 17–20.  To establish anticipation, each and every element in a claim, arranged as is recited in the claim, must be found in a single prior art reference.  *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008); *Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376, 1383 (Fed. Cir. 2001).  We determine that Petitioner has not shown by a preponderance of the evidence that claims 1 and 5 are unpatentable as anticipated by Fox SMART.

1.     *Fox SMART*

The System for Mechanical Analysis and Retrieval of Text (SMART) is described as a project for designing a fully automatic document retrieval system and for testing new ideas in information science.  Ex. 1005, 3.

In SMART, an automatic indexing component constructs stored representations of documents.  Ex. 1005, 3.  Bibliographic information is used to enhance document representations.  *Id*. at 29.  The SMART system may process basic raw data, such as an exemplary $N$ collection of articles and citation data describing which articles are cited by others.  *Id.* at 29–30. The exemplary input data includes indirect citation relationships, such as bibliographic coupled and co-citation relationships.  *Id.* at 30–32.

A clustering algorithm is processed by the SMART system as follows: "[t]he clustering algorithm produces a hierarchy where all $N$ documents in a collection end up as leaves of a multilevel tree. . . . Clustering proceeds by adding documents one by one starting with an initially empty tree."  Ex. 1005, 44.  Adding documents involves finding the proper place to insert,

12

IPR2013-00480
Patent 5,832,494

attaching the incoming entry appropriately, and recursively splitting overly large nodes. *Id*. at 47.

In addition to splitting, the SMART system may delete clusters that exhibit too much overlap and assign others to a garbage or orphan cluster. Ex. 1005, 49. Eventually, only clusters that pass all appropriate tests are accepted. *Id.* at 51.

2.    *Claims 1 and 5*

Petitioner points to Fox SMART's description of a clustering algorithm as disclosing generating candidate cluster links for a selected node by analyzing indirect relationships in a database, as recited in claim 1. Pet. 18–19 (citing Ex. 1005, 30–32, 44, 46; Ex. 1009 ¶¶ 160–61). In particular, Petitioner points to Fox SMART's description of constructing bibliographic and co-citation subvectors by analyzing indirect relationships, specifically bibliographic and co-citation relationships. *Id.* at 18 (citing Ex. 1005, 30–32). According to Petitioner's Declarant, Dr. Edward A. Fox, the resulting bibliographic and co-citation subvectors are stored in a computer for further computations using the clustering procedure. Ex. 1009 ¶¶ 173–74 (citing Ex. 1005, 36–38, 46). Petitioner additionally points to Fox SMART's description that the clustering algorithm produces a hierarchy or classification in which "all" of the *N* documents in the collection end up as leaves of a multilevel tree. Pet. 18–19 (citing Ex. 1005, 44). The resulting tree, according to Petitioner, is a set of possible cluster links between a search node and a target node. *Id.*; *see also* Ex. 1009 ¶ 160 ("Fox SMART . . . disclose[s] **generating candidate cluster links** . . . For example, the particular clustering analysis that I employed builds a tree.").

13

IPR2013-00480
Patent 5,832,494

Petitioner, however, points to this same clustering algorithm for deriving actual cluster links from the candidate cluster links, as recited in claim 1. Pet. 19 (citing Ex. 1005, 47, 49–51; Ex. 1009 ¶ 162). In particular, Petitioner points to Fox SMART's description of concentration tests performed as part of the clustering algorithm. *Id.* (citing Ex. 1005, 51). As described in Fox SMART:

> Candidate clusters which pass the concentration test are those formed by having enough highly correlated pairs in the proposed cluster. . . .
>
> "Uncour" repeatedly considers the remaining cluster that is most heavily covered by other clusters. If the overlap is too much, it is deleted. Eventually only clusters that pass all appropriate tests are accepted.

Ex. 1005, 50–51.

Petitioner's Declarant, Dr. Fox, testifies that Fox SMART derives a subset because "clusters that do not pass all the concentration and overlap tests are deleted." Ex. 1009 ¶ 162 (citing Ex. 1005, 51). Dr. Fox supplements his testimony by stating, "Fox SMART teaches that potential (i.e., candidate) clusters are rejected ('deleted') if they fail any one of these tests." Ex. 1028 ¶ 281 (citing Ex. 1005, 51). Dr. Fox further states that claim 1 does not require that candidate cluster links be deleted. *Id.*

Patent Owner contends that Dr. Fox incorrectly states that clusters that do not pass all of the tests are deleted. PO Resp. 33 (citing Ex. 2113 ¶¶ 82–103). Patent Owner's Declarant, Dr. Paul S. Jacobs, provides his analysis of various aspects of the clustering process and concludes that the clustering algorithm, including the concentration tests noted above, does not result in a subset. Ex. 2113 ¶¶ 82–103. In particular, Dr. Jacobs states that the clustering process involves accepting trial clusters, which then must pass the

14

IPR2013-00480
Patent 5,832,494

concentration tests to become candidate clusters. *Id.* ¶ 91. Dr. Jacobs also states that clusters are deleted only in the case of overlap with a new group of clusters formed from splitting. *Id.* ¶ 88. Additionally, Dr. Jacobs states that moving orphans to the garbage cluster does not result in deleting those orphans or creating a subset. *Id.* ¶ 101. Dr. Jacobs, instead, states that the orphans may not be garbage in the end as they may be assigned a node as new documents are added to the tree. *Id.*

We determine that the statements of Patent Owner's Declarant are consistent with Fox SMART's description of clustering. Fox SMART describes the clustering process as initializing a new tree as empty, adding documents to the tree, and recursively splitting overly large nodes of the tree. Ex. 1005, 47. Fox SMART states that splitting is accomplished by the following procedures: div_cent, cleave, and uncour. *Id.* at 49. Fox SMART further describes the splitting process as follows:

> First a complete similarity matrix is formed based on the pairwise combined similarity values. "Cleave" then identifies a plausible clustering except that no limit on overlap is considered. "Uncour" compensates for that by first deleting clusters that exhibit too much overlap with remaining clusters, and secondly by assigning the others to a "garbage" or "orphan" cluster.

*Id.*

As described in Fox SMART, the concentration tests that are cited by Petitioner are performed as part of forming the cluster tree. *Id.* Petitioner does not identify disclosure in Fox SMART of deleting clusters other than those that simply overlap, or duplicate, other clusters. Overlapping clusters are deleted following a routine that identifies plausible clustering with "no limit on overlap." *Id.* Additionally, Fox SMART includes code that collects

15

IPR2013-00480
Patent 5,832,494

orphans. *Id*. at 52. Petitioner, however, has not shown that Fox SMART describes a subset which does not include these orphans.

Dr. Fox's supplemental testimony that "Fox SMART teaches that potential (i.e., candidate) clusters are rejected ('deleted') if they fail any one of these tests" (Ex. 1028 ¶ 281 (citing Ex. 1005, 51)) suggests that the terms "rejected" and "deleted" are the same. We do not agree. In view of Dr. Fox's testimony in both of his Declarations and the testimony of Dr. Jacobs, we find that one of ordinary skill in the art reasonably would have understood Fox SMART as describing deleting overlap that had been generated by the immediately preceding software routine. Additionally, we find that one of ordinary skill in the art reasonably would have understood Fox SMART as describing that the tests referred to by Dr. Fox are processed during formation of the tree. We, therefore, determine that Dr. Fox's testimony does not address persuasively the requirement in claim 1 of deriving a subset of the already generated candidate cluster links.

Claim 1 additionally recites "displaying the identity of one or more nodes using the actual cluster links." For this element, Petitioner points to Fox SMART's description of searching a clustered tree. Pet. 19 (citing Ex. 1005, 53–54; Ex. 1009 ¶ 163). Fox SMART states that "one would like to retrieve and rank documents so that all relevant documents, regardless of what cluster they appear in, are retrieved as soon as possible." Ex. 1005, 53. Fox SMART continues that "most of the documents in a retrieved cluster are presented to the user." *Id*. at 54.

We are not persuaded that Fox SMART's description of ranking documents discloses deriving a subset because a set of ranked documents provides an indication of an order of presentation, but is not a subset.

16

IPR2013-00480
Patent 5,832,494

Additionally, Fox SMART indicates that documents from multiple clusters are ranked. Furthermore, Petitioner does not point to disclosure in Fox SMART of criteria for forming a subset. Because Petitioner does not point to disclosure of deriving a subset, Petitioner has not shown by a preponderance of the evidence display using links of that subset.

In light of the Declaration by Patent Owner's Declarant, Dr. Jacobs, we determine that Petitioner has not shown by a preponderance of the evidence that Fox SMART discloses either: (1) deriving actual cluster links for the candidate cluster links; or (2) displaying the identity of one or more nodes using the actual cluster links. For the foregoing reasons, Petitioner has not established by a preponderance of the evidence that claim 1 is anticipated by Fox SMART. Because claim 5 depends from claim 1, we also determine that Petitioner has not established by a preponderance of the evidence that claim 5 is anticipated by Fox SMART.

C.    *Alleged Anticipation of Claims 14–16 by Fox Thesis*

Petitioner contends that claims 14–16 of the '494 Patent are unpatentable, under 35 U.S.C. § 102, as anticipated by Fox Thesis. Pet. 10–16. In support of the asserted ground of unpatentability, Petitioner sets forth the disclosure of Fox Thesis, provides a detailed claim chart, and cites to the declaration of Dr. Fox (Ex. 1009 ¶¶ 156–78), explaining how each limitation is disclosed in Fox Thesis. Pet. 10–16.

Petitioner's claim chart persuasively reads all elements of claim 14 onto the disclosure of Fox Thesis. Despite the counter-arguments in Patent Owner's Response, and the evidence cited therein, which we have also considered, Petitioner has shown by a preponderance of the evidence that claim 14 is unpatentable as anticipated by Fox Thesis.

17

IPR2013-00480
Patent 5,832,494

We, however, determine that Petitioner has not shown by a preponderance of the evidence that claims 15 and 16 are unpatentable as anticipated by Fox Thesis.

1. *Fox Thesis*

Fox Thesis describes improving query and document representation schemes for information retrieval. Ex. 1008, 261. In particular, useful types of bibliographic data are incorporated into a model to test clustering and retrieval functions. *Id.* at 164.

Bibliographic connections between articles are illustrated for an exemplary set "O" of documents, which are represented by letters A through G. Ex. 1008, 165, 66; Fig. 6.2. This exemplary set "O" includes direct and indirect citation references. *Id.* at 166, 67; Table 6.2.

Based on the reference pattern for a set of documents, Fox Thesis describes deriving various measures of the interconnection between the documents. Ex. 1008, 166. For example, weights are assigned "based upon integer counts" for bibliographically coupled documents. *Id.* at 167.

Citation submatrices represent reference or citation information. Ex. 1008, 169. For example, submatrix $\underline{bc}$ represents bibliographically coupled reference information and submatrix $\underline{cc}$ represents co-citation reference information. *Id*. at 169–72; Figs. 6.3–6.5.

2. *Claim 14*

Petitioner's claim chart persuasively reads all elements of claim 14 onto the disclosure of Fox Thesis. Pet. 14–16 (citing Ex. 1008, 164–68, 170–72, 174–77, 181–82, 193, 195, 213, 237–39, 261, 272; Ex. 1009 ¶¶ 157–61, 169, 172–74). We address Patent Owner's counter-arguments in turn.

18

IPR2013-00480
Patent 5,832,494

Patent Owner contends that Petitioner "slap[s] together" disparate quotes from unrelated portions of Fox Thesis. PO Resp. 3. For example, Patent Owner contends that a user query relied on by Petitioner for disclosing selecting a destination node, as recited in claim 14, does not relate "in any way" to steps of a clustering process identified by Petitioner for other steps of claim 14. PO Resp. 47–48.

Fox Thesis, however, describes interrelated experiments. Ex. 1008, 21. In particular, Fox Thesis describes that the user query relied on by Petitioner (Pet. 12 (citing Ex. 1008, 237–39)) is used "[t]o quickly test the utility of extended vector feedback" (Ex. 1008, 237). As is evident in Fox Thesis, a query may be used to initiate a search. *Id*. at 234. Additionally, according to Fox Thesis, searches are conducted using clustering processes. *Id*. at 218. We, therefore, are persuaded that Petitioner shows by a preponderance of the evidence that Fox Thesis describes selecting a destination node, as recited in claim 14.

Patent Owner additionally contends that Fox Thesis does not disclose retrieving the set of direct links, as recited in claim 14. PO Resp. 49. In particular, Patent Owner contends that although the Fox Thesis describes using an *ln* sub-vector as a representation of direct links, the *ln* links are not used for obtaining the sub-vectors representing the indirect links. *Id*. Patent Owner further argues that retrieving the set of direct links is not a necessary precursor to finding co-citation values. *Id*. at 50.

Petitioner, however, points to Fox Thesis's description of a reference pattern for a set of documents and measures of interconnection between those documents. Pet. 15 (citing Ex. 1008, 166–168). As set forth in Fox Thesis, this discussion pertains to direct references between documents, as

19

IPR2013-00480
Patent 5,832,494

well as indirect references. Ex. 1008, 167. Additionally, Dr. Fox testifies
that retrieving direct links is a precursor to finding indirect relationships.
Ex. 1009 ¶ 171. Dr. Fox's testimony is consistent with Fox Thesis's
description of a distance "k," which designates the number of "arcs"
between a document and another cited document. Ex. 1008, 167. We,
therefore, are persuaded that Petitioner's identification of the above
disclosure shows by a preponderance of the evidence that Fox Thesis
describes retrieving the set of direct links, as recited in claim 14.

Patent Owner, in reliance on its Declarant, Dr. Jacobs, further
contends that co-citation count does not describe a weight of a path. PO
Resp. 52 (citing Ex. 2113 ¶ 221). Dr. Jacobs states that claim 14 has a
specific arrangement, which requires using an existing path and a new
weight, presumably for a new path made up of the existing path extended by
new links. Ex. 2113 ¶ 205 n. 21. Dr. Jacobs acknowledges "the claim does
not specifically state this." *Id*. Nonetheless, based on this view of claim 14,
Dr. Jacobs states that because every path is counted once in Fox Thesis, the
weight is applied to the count of paths, not to a path. Ex. 2113 ¶ 221.

Patent Owner's contention is not commensurate with the scope of
claim 14. As noted by Petitioner's Declarant, Fox Thesis illustrates citation
submatrices with count-based weights for each path having a source and
destination document in example "O" collection of documents. Ex. 1009
¶ 174 (citing Ex. 1008, 171–72; *see also id*. at 167 ("the next two definitions
can result in the assignment of weights that are based on integer counts.")).
We, therefore, are persuaded that Petitioner shows by a preponderance of the
evidence that Fox Thesis discloses determining the weight of the path using
the retrieved links, as recited in claim 14.

20

IPR2013-00480
Patent 5,832,494

Accordingly, even after considering the counter-arguments in Patent Owner's Response, and the evidence cited therein, we find that Petitioner has shown, by a preponderance of the evidence, that claim 14 is unpatentable as anticipated by Fox Thesis.

3.    *Claims 15 and 16*

Claim 15 depends from independent claim 14 and recites, "further comprising the step of deriving the actual cluster links wherein the actual cluster links are a subset of the candidate cluster links." Claim 14, from which claim 15 depends, recites "initializing a set of candidate cluster links" and "storing the determined weights as candidate cluster links." Petitioner again points to the same clustering process for the step of deriving actual cluster links from the candidate cluster links recited in claim 15, as Petitioner identified for the identifying and storing steps recited in claim 14. Pet. 16 (referring to "claim 1(c) above" and citing Ex. 1009 ¶¶ 162, 177); *see also* Pet. 13 (referring to "[c]laim 1(b) above" and citing Ex. 1008, 199–200; Ex. 1009 ¶ 162). For the reasons discussed above with respect to claim construction and claim 1, we determine that Petitioner has not shown by a preponderance of the evidence that claim 15 is unpatentable as anticipated by Fox Thesis. Because claim 16 depends from claim 15, we also determine that Petitioner has not shown by a preponderance of the evidence that claim 16 is unpatentable as anticipated by Fox Thesis.

D.    *Motion to Exclude*

Patent Owner filed a Motion to Exclude (Paper 44) in which Patent Owner seeks to exclude the Reply Declaration of Dr. Edward A. Fox (Ex. 1028) ("Reply Fox Declaration"). Patent Owner contends that the Reply Fox Declaration should be excluded because it presents evidence and/or

21

IPR2013-00480
Patent 5,832,494

arguments for the first time.  Paper 44, 1.  A reply may respond to arguments raised in the corresponding patent owner response.  37 C.F.R. § 42.23(a).  Examples of indications that a new issue has been raised in a reply include new evidence necessary to make out a *prima facie* case for the unpatentability of a claim.  Office Patent Trial Practice Guide, 77 Fed.Reg. 48,756, 48,767 (Aug. 14, 2012).  We determine that the evidence presented in the Reply Fox Declaration that is discussed in this Decision properly responds to arguments raised in the Patent Owner Response.  Additionally, we do not rely on evidence in the Reply Fox Declaration in our determination that Petitioner established by a preponderance of the evidence that claim 14 is unpatentable.

For the reasons given, we deny Patent Owner's Motion to Exclude.

E.    *Motions to Seal*

Patent Owner filed a Motion to Seal (Paper 33) the Declaration of Dr. Amy N. Langville ("Langville Declaration") filed as Exhibit 2114.  The motion is unopposed.  According to Patent Owner, paragraphs 25, 112, and 113 of the Langville Declaration makes reference to certain facts about confidential licenses to the patents under review.  Paper 33, 3.  Additionally, Patent Owner contends that this information has not been made, and will not be made, public.  *Id*.

There is a strong public policy in favor of making information filed in *inter partes* review proceedings open to the public.  *See Garmin Int'l v. Cuozzo Speed Techs., LLC*, Case IPR2012-00001 (PTAB March 14, 2013) (Paper 34).  Under 35 U.S.C. § 316(a)(1), the default rule is that all papers filed in an *inter partes* review are open and available for access by the

22

IPR2013-00480
Patent 5,832,494

public.[1]  The standard for granting a motion to seal is "good cause."  37

C.F.R. § 42.54.  A moving party bears the burden of showing that the relief

requested should be granted.  37 C.F.R. § 42.20(c).

    Patent Owner, as the moving party, has failed to carry its burden.

Patent Owner identifies only three paragraphs in the Langville Declaration

that purportedly contain confidential information.  However, Patent Owner

has not pointed to proof in the record that any information contained in these

paragraphs is confidential.  Additionally, although Patent Owner contends

that this information has not been made, and will not be made, public, Patent

Owner presented this information during the hearing on October 30, 2014,

which was open to the public.  *See* Tr. 54:12–25.  We, therefore, determine

that Patent Owner has not met its burden of proof.

    We recognize a denial of the motion to seal would immediately unseal

the material that Patent Owner desires to remain confidential and the effect

would be irreversible.  Therefore, rather than denying the motion at this

time, we will provide Patent Owner one week to (1) withdraw the motion to

seal and request that we expunge Exhibit 2114, or (2) withdraw the motion

to seal, request that we expunge Exhibit 2114, and replace it with a redacted

version that leaves out the confidential information.

    We note that the Langville Declaration relates to secondary

considerations, which are not at issue in this case as the remaining

---

[1]  Additionally, we note that confidential information subject to a protective
order ordinarily would become public 45 days after final judgment in a trial.
Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,761 (Aug. 14,
2012).  However, after denial of a petition to institute a trial or after final
judgment in a trial, a party may file a motion to expunge confidential
information from the record.  37 C.F.R. § 42.56.

23

IPR2013-00480
Patent 5,832,494

challenges are based on anticipation. We, therefore, do not rely on the
Langville Declaration in this Decision.

## III. CONCLUSION

We conclude that Petitioner has shown by a preponderance of the
evidence that claim 14 of the '494 Patent is unpatentable, under 35 U.S.C.
§ 102, as anticipated by Fox Thesis. We further conclude that Petitioner has
not shown that any of claims 1, 5, 15, or 16 of the '494 Patent are
unpatentable.

This is a final written decision of the Board under 35 U.S.C. § 318(a).
Parties to the proceeding seeking judicial review of this decision must
comply with the notice and service requirements of 37 C.F.R. § 90.2.

## IV. ORDER

For the reasons given, it is

ORDERED that claim 14 of U.S. Patent No. 5,832,494 is determined
by a preponderance of the evidence to be unpatentable;

ORDERED that claims 1, 5, 15, and 16 of U.S. Patent No. 5,832,494
are not determined to be unpatentable;

FURTHER ORDERED that Patent Owner's Motion to Amend to
cancel claims 8, 10, 11, 35, and 40 of the '494 Patent is GRANTED;

FURTHER ORDERED that Patent Owner's Motion to Exclude the
Reply Declaration of Dr. Edward A. Fox (Exhibit 1028) is DENIED;

FURTHER ORDERED that Exhibit 2114 will be made available to
the public after 5 PM Eastern five business days after the entry date of this
decision, unless prior to that time, Patent Owner (1) withdraws the motion to
seal and requests that we expunge Exhibit 2114, or (2) withdraws the motion

24

IPR2013-00480
Patent 5,832,494

to seal, requests that we expunge Exhibit 2114, and replaces it with a

redacted version that leaves out the confidential information; and

 FURTHER ORDERED that, because this is a final written decision,

parties to the proceeding seeking judicial review of the decision must

comply with the  notice and service requirements of 37 C.F.R. § 90.2.


FOR PETITIONER:

Heidi L. Keefe
COOLEY, LLP
ATTN: Heidi L. Keefe, Patent Docketing
777 6th Street N.W., Suite 1100
Washington, DC  20001
hkeefe@cooley.com
dcpatentdocketing@cooley.com.

David Silbert
KEKER & VAN NEST, LLP
633 Battery Street
San Francisco, CA  94111
djs@kvn.com
efiling@kvn.com


FOR PATENT OWNER:

Martin M. Zoltick
Nancy J. Linck
ROTHWELL, FIGG, ERNST & MANBECK, P.C.
607 14th St., N.W., Suite 800
Washington, DC  20005
mzoltick@rfem.com
nlinck@rfem.com
SRA-IPR@rfem.com

25

# ADDENDUM 3

U.S. Patent No. 5,822,494

JA05000 – JA05092

2015-1649, 2015-1650, 2015-1651

SOFTWARE RIGHTS ARCHIVE, LLC
v.
FACEBOOK, INC., LINKEDIN CORPORATION, TWITTER, INC.



US005832494A

# United States Patent [19]

Egger et al.

[11]  **Patent Number:**      **5,832,494**

[45]  **Date of Patent:**      **Nov. 3, 1998**

[54] **METHOD AND APPARATUS FOR INDEXING, SEARCHING AND DISPLAYING DATA**

[75] Inventors: **Daniel Egger**, Durham; **Shawn Cannon**, Hillsborough; **Ronald D. Sauers**, Mebane, all of N.C.

[73] Assignee: **Libertech, Inc.**, Durham, N.C.

[21] Appl. No.: **649,304**

[22] Filed: **May 17, 1996**

**Related U.S. Application Data**

[63] Continuation-in-part of Ser. No. 76,658, Jun. 14, 1993, Pat. No. 5,544,352.

[51] Int. Cl.$^6$ ................................................ G06F 17/30
[52] U.S. Cl. .............................. 707/102; 707/104; 707/5
[58] Field of Search ...................................... 707/102, 104, 707/5

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,868,733 | 9/1989 | Fujisawa et al. | 707/5 |
| 5,265,065 | 11/1993 | Turtle | 395/600 |
| 5,287,493 | 2/1994 | Jacopi | 707/4 |
| 5,386,556 | 1/1995 | Hedlin et al. | 707/4 |
| 5,471,611 | 11/1995 | McGregor | 707/4 |
| 5,544,352 | 8/1996 | Egger | 707/5 |
| 5,546,517 | 8/1996 | Marks et al. | 707/501 |
| 5,586,311 | 12/1996 | Davies et al. | 707/1 |
| 5,630,120 | 5/1997 | Vachey | 707/2 |
| 5,649,193 | 7/1997 | Sumita et al. | 707/103 |

OTHER PUBLICATIONS

Agosti, et al., "a Two–level Hypertext Retrieval Model for Legal Data," SIGIR '91 (1991).
Fowler, et al., "Integrating Query, Thesaurus and Documents Through a Common Visual Representation, " SIGIR '91 (1991).
Rose & Belew, "Legal Information Retrieval: A Hybrid Approach," ICAIL '89 (1989).
Belew, Richard, "A Connectionist Approach to Conceptual Information Retrieval," ICAIL '87 (1987).

Gelbart & Smith, "Beyond Boolean Search: Flexicon, A Legal Text–Based Intelligent System," ICAIL '91 (1991).
Lin, "A Self–Organizing Semantic Map for Information Retrieval," SIGIR '91 (1991).
Turtle & Croft, "Interference Networks for Document Retrieval," SIGR '90 (1990).
Uzzi, V–Search Integration Toolkit for Folio Views, User's Manual, 6 Dec. 1995.
Uzzi, V–Search Publisher's Toolkit, Beta Release 2.0, User's Manual, Dec. 8, 1995.

*Primary Examiner*—Wayne Amsbury
*Attorney, Agent, or Firm*—Dorsey & Whitney LLP

[57]            **ABSTRACT**

A computer research tool for indexing, searching and displaying data is disclosed. Specifically, a computer research tool for performing computerized research of data including textual objects in a database or a network and for providing a user interface that significantly enhances data presentation is described. Textual objects and other data in a database or network is indexed by creating a numerical representation of the data. The indexing technique called proximity indexing generates a quick-reference of the relations, patterns and similarity found among the data in the database. Proximity indexing indexes the data by using statistical techniques and empirically developed algorithms. Using this proximity index, an efficient search for pools of data having a particular relation, pattern or characteristic can be effectuated. The Computer Search program, called the Computer Search Program for Data represented in Matrices (CSPDM), provides efficient computer search methods. The CSPDM rank orders data in accordance with the data's relationship to time, a paradigm datum, or any similar reference. An alternative embodiment of the invention employs a cluster link generation algorithm which uses links and nodes to index and search a database or network. The algorithm searches for direct and indirect links to a search node and retrieves the nodes which are most closely related to the search node. The user interface program, called the Graphical User Interface (GUI), provides a user friendly method of interacting with the CSPDM program and prepares and presents a visual graphical display. The graphical display provides the user with a two or three dimensional spatial orientation of the data.

**33 Claims, 56 Drawing Sheets**



001

Facebook Inc. Ex. 1201



*Fig. 1*

Facebook Inc. Ex. 1201



*Fig. 2*

Facebook Inc. Ex. 1201

Case: 15-1649    Document: 39    Page: 153    Filed: 07/27/2015



*Fig. 3A*

JA05003                                    Facebook Inc. Ex. 1201



*Fig. 3B*

Facebook Inc. Ex. 1201



*Fig. 3C*

Facebook Inc. Ex. 1201



*Fig. 3D*

Facebook Inc. Ex. 1201



*Fig. 3E*

Facebook Inc. Ex. 1201



*Fig. 3F*



*Fig. 3G*

Facebook Inc. Ex. 1201



*Fig. 3H*

Facebook Inc. Ex. 1201



Fig. 4A

Facebook Inc. Ex. 1201

*Fig. 4B*



Facebook Inc. Ex. 1201



232

*Fig. 4C*

Facebook Inc. Ex. 1201



236

RECEIVE SELECTION OF A
SINGLE TEXTUAL OBJECT
FROM RESEARCHER — 400

EXAMINE n x n OPINION
CITATION MATRIX AND
OTHER FACTORS — 412

RETRIEVE CITING
TEXTUAL OBJECTS — 416

*Fig. 4D*

Facebook Inc. Ex. 1201



*Fig. 4E*

Facebook Inc. Ex. 1201



*Fig. 4F*

Facebook Inc. Ex. 1201



248

RECEIVE POOL
OF TEXTUAL
OBJECTS
IDENTIFIED BY
RESEARCHER — 428

EVALUATE nxn
OPINION
PROXIMITY MATRIX
FOR POOL OF
TEXTUAL OBJECTS — 448

DETERMINE PARADIGM
TEXTUAL OBJECT BY
CALCULATING THE MEAN
OF EUCLIDEAN DISTANCES
OF TEXTUAL OBJECTS
IN POOL — 452

DETERMINE SIMILARITY — 456
BETWEEN PARADIGM
TEXTUAL OBJECT AND
OTHER TEXTUAL OBJECTS
IN POOL

*Fig. 4G*

Facebook Inc. Ex. 1201



252

RECEIVE POOL OF TEXTUAL OBJECTS IDENTIFIED BY RESEARCHER — 428

EVALUATE nxn OPINION MATRIX FOR POOL OF TEXTUAL OBJECTS — 448

EVALUATE NUMERICAL FACTORS AND RESULTS OF WEIGHING ALGORITHM CALCULATED BY THE OPINION PATTERNER SUBROUTINE FOR THE POOL OF TEXTUAL OBJECTS — 460

DETERMINE IMPORTANCE OF EACH TEXTUAL OBJECT IN POOL — 464

*Fig. 4H*

Facebook Inc. Ex. 1201



*Fig. 4I*

Facebook Inc. Ex. 1201



*Fig. 5A*

Facebook Inc. Ex. 1201



Fig. 5B

Facebook Inc. Ex. 1201



*Fig. 5C*

Facebook Inc. Ex. 1201

022
JA05021



*Fig. 5D*

Facebook Inc. Ex. 1201

023
JA05022



**Fig. 5E**

Facebook Inc. Ex. 1201



*Fig. 5F*

Facebook Inc. Ex. 1201

025
JA05024



Fig. 5G

Facebook Inc. Ex. 1201

026
JA05025

Fig. 5H

JA05026          Facebook Inc. Ex. 1201

SCHEMATIC REPRESENTATIONS OF THE EIGHTEEN PRIMARY PATTERNS




*Fig. 6*



Fig. 7

Facebook Inc. Ex. 1201



*Fig. 8-1*



*Fig. 8-2*

Facebook Inc. Ex. 1201



Fig. 8-3

Facebook Inc. Ex. 1201

Facebook Inc. Ex. 1201

**Fig. 8-4**



THE RESTRICTIONS LAPSE, UNLESS AT THE TIME HE PURCHASED THE STOCK

ECTED TO INCLUDE AS INCOME THE DIFFERENCE BETWEEN THE PURCHASE

E AND THE FAIR MARKET VALUE AT THAT TIME. 1   THE ISSUE HERE IS

THER SECTION 83 [image] APPLIES TO AN EMPLOYEE'S PURCHASE OF

RICTED STOCK WHEN , ACCORDING TO THE STIPULATION OF THE PARTIES, THE

UNT PAID FOR THE STOCK EQUALED ITS FULL FAIR MARKET VALUE, WITHOUT

ARD TO ANY RESTRICTIONS.   THE TAX COURT, WITH TWO DISSENTING

IOINS, HELD THAT SECTION 83 [image] APPLIES TO ALL RESTRICTED STOCK THAT IS

NSFERRED "IN CONNECTION WITH THE PERFORMANCE OF SERVICES,"

ARDLESS OF THE AMOUNT PAID FOR IT.  79 T. C. [image] AT 878.  WE AFFIRM.

TS

ERAL DIGITAL CORPORATION (THE COMPANY) WAS FORMED IN APRIL,

D, TO MANUFACTURE AND MARKET MICRO-ELECTRONIC CIRCUITS.  AT ITS

T MEETING, THE COMPANY'S BOARD OF DIRECTORS RESOLVED TO ISSUE

00 SHARES OF ITS COMMON STOCK TO ITS COMPANY PRESIDENT, AND

00 SHARES TO THE COMPANY UNDERWRITER.  THE BOARD ALSO VOTED TO

AN ADDITIONAL 264,000 SHARES OF COMMON STOCK TO SEVEN NAMED

033
JA05032



*Fig. 9*

Facebook Inc. Ex. 1201

Facebook Inc. Ex. 1201

035
JA05034



Fig. 10A-1



*Fig. 10A-2*

BROWN V. UNITED STATES...

KEENE CORP. V. UNITED STATES
113 S. CT. 2035 (1993)
OVERRULING ISSUE NO. 1 AT 2045

UNR INDUSTIRES, INC. V. UNITED STATES
962 F. 2D 1013 (FED. CIR. 1992)
OVERRULING ISSUE NO. 2 AT 1022

1032

WEBB & ASSOCIATES V. UNITED STATES
19 CL. CT. 650 (1990)
FOLLOWING ISSUE NO. 1 AT 655

2112

BOEHM V. UNITED STATES
22 CL. CT. 511 (1991)
FOLLOWING ISSUE NO. 2 AT 515

Facebook Inc. Ex. 1201



Fig. 10A-3

Facebook Inc. Ex. 1201



*Fig. 10A-4*

Facebook Inc. Ex. 1201

## Fig.10B-1



Facebook Inc. Ex. 1201

## Fig.10B-2



Facebook Inc. Ex. 1201

## *Fig.10B-3*



Facebook Inc. Ex. 1201

*Fig.10B-4*



Facebook Inc. Ex. 1201

*Fig. 10C-1*



CLUSTER MAP - PAGEL, INC.

1032

PAGEL, INC. V. COMMISSIONER
91 T.C. 200 (1988)

Facebook Inc. Ex. 1201
JA05042



Fig. 10C-2

Facebook Inc. Ex. 1201



Fig. 10C-3

THE SECURITIES EXCHANGE ACT OF 1934
15 U.S.C. § 78P (B) 1934

JAN. 1924    JAN. 1930    JAN. 1936    JAN. 1942    JAN. 1948    JAN. 1954

Facebook Inc. Ex. 1201



*Fig. 10C-4*

Facebook Inc. Ex. 1201

046
JA05045



*Fig. 11*

Facebook Inc. Ex. 1201



*Fig. 12*

JA05047    Facebook Inc. Ex. 1201

*Fig. 13A-1*



Facebook Inc. Ex. 1201

049
JA05048

Facebook Inc. Ex. 1201

*Fig. 13A-2*



*Fig. 13A-3*



Facebook Inc. Ex. 1201

051
JA05050



*Fig. 13A-4*

Facebook Inc. Ex. 1201

052
JA05051

*Fig. 13B-1*

FOLIO BOUND VIEWS

FILE EDIT VIEW SEARCH V-SEARCH WINDOW HELP

THE CONSTITUTIONAL RIGHT TO PRIVACY: ROE V. WADE AND BEYOND

OPEN

SAVE

QUERY

CLEAR QUERY

NEXT

PREVIOUS

BACKTRACK

**UNION PACIFIC RAILWAY COMPA**

UNION PACIFIC RAILWAY CO. V. BOTSFOR|

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR TH|
NO. 1375.
SUBMITTED JANUARY 6, 1891.--DECIDED MAY 2

LIBERTECH CASE HOLDING: FEDERAL COURTS DO NOT HAVE THE POWER U|
TO ORDER A PLAINTIFF IN A PERSONAL INJURY CIVIL SUIT TO SUBMIT TO A|
DEFENSE TO DETERMINE THE EXTENT OF HIS OR HER INJURIES. JUSTICE GR|
THE COURT.

Facebook Inc. Ex. 1201



*Fig. 13B-2*

NY V. BOTSFORD

D 141 U.S. 250

E DISTRICT OF INDIANA.

5, 1891.

NDER FEDERAL STATUTES OR COMMON LAW
PHYSICAL EXAMINATION REQUESTED BY THE
AY WROTE THE OPINION FOR 7 MEMBERS OF

Facebook Inc. Ex. 1201

*Fig. 13B-3*



Facebook Inc. Ex. 1201

055
JA05054

Facebook Inc. Ex. 1201

056
JA05055

*Fig. 13B-4*





*Fig. 14A*          *Fig. 14B*

Facebook Inc. Ex. 1201

5,832,494

**1**

## METHOD AND APPARATUS FOR INDEXING, SEARCHING AND DISPLAYING DATA

### RELATED APPLICATIONS

This application is a continuation-in-part of U.S. application Ser. No. 08/076,658, filed Jun. 14, 1993 with the same title, now U.S. Pat. No. 5,544,352.

### TECHNICAL FIELD

This invention pertains to computerized research tools. More particularly, it relates to computerized research on databases. Specifically, the invention indexes data, searches data, and graphically displays search results with a user interface.

### BACKGROUND

Two manuals containing background materials are hereby incorporated by reference: "V-Search Integration Tool Kit for Folio VIEWS", containing thirty-six (36) pages, and "V-Search Publisher's Tool Kit User's Manual", containing one hundred sixty (160) pages.

Our society is in the information age. Computers maintaining databases of information have become an everyday part of our lives. The ability to efficiently perform computer research has become increasingly more important. Recent efforts in the art of computer research have been aimed at reducing the time required to accomplish research. Computer research on non-textual objects is very limited. Current computer search programs use a text-by-text analysis procedure (Boolean Search) to scan a database and retrieve items from a database. The user must input a string of text, and the computer evaluates this string of text. Then the computer retrieves items from the database that match the string of text. The two popular systems for computerized searching of data used in the legal profession are Westlaw™, a service sold by West Publishing Company, 50 W. Kellogg Blvd., P.O. Box 64526, St. Paul, Minn. 55164-0526, and Lexis™, a service sold by Mead Data Central, P.O. Box 933, Dayton, Ohio 45401.

However, Boolean searches of textual material are not very efficient. Boolean searches only retrieve exactly what the computer interprets the attorney to have requested. If the attorney does not phrase his or her request in the exact manner in which the database represents the textual object, the Boolean search will not retrieve the desired textual object. Therefore, the researcher may effectively by denied access to significant textual objects that may be crucial to the project on which the researcher is working. A second problem encountered with Boolean searches is that the search retrieves a significant amount of irrelevant textual objects. (It should be noted that in the context of research, a textual object could be any type of written material. The term textual object is used to stress the fact that the present invention applies to all types of databases. The only requirement that a textual object must satisfy in order to be selected by a Boolean search program is that part of the textual object match the particular request of the researcher. Since the researcher cannot possibly know all of the groupings of text within all the textual objects in the database, the researcher is unable to phrase his request to only retrieve the textual objects that are relevant.

Aside from the inefficiency of Boolean searches, the present systems for computerized searching of data are inadequate to serve the needs of a researcher for several other reasons. Even if one assumes that all the textual

**2**

objects retrieved from a Boolean search are relevant, the listing of the textual objects as done by any currently available systems does not convey some important and necessary information to the researcher. The researcher does not know which textual objects are the most significant (i.e., which textual object is referred to the most by another textual object) or which textual objects are considered essential precedent (i.e., which textual objects describe an important doctrine).

In the legal research field, both Westlaw™ and Lexis™ have a Shepardizing™ feature that enables the researcher to view a list of textual objects that mention a particular textual object. The Shepardizing feature does not indicate how many times a listed textual object mentions the particular textual object. Although the shepardizing feature uses letter codes to indicate the importance of a listed textual object (e.g. an "f" beside a listed textual object indicates that the legal rule contained in particular textual object was followed in the listed textual object), data on whether a listed textual object followed the rule of a particular textual object is entered manually by employees of Shepard's™/McGraw Hill, Inc., Div. of McGraw-Hill Book Co., 420 N. Cascade Ave., Colorado Springs, Colo. 80901, toll free 1-800-525-2474. Such a process is subjective and is prone to error.

Another legal research system that is available is the Westlaw™ key number system. The Westlaw™ key number system has problems similar to the shepardizing feature on the Lexis™ and Westlaw™ systems.

The video displays of both the West™ and Lexis™ systems are difficult to use. The simple text displays of these systems do not provide a researcher with all the information that is available in the database.

Computerized research tools for legal opinions and related documents are probably the most sophisticated computer research tools available and therefore form the background for this invention. However, the same or similar computer research tools are used in many other areas. For example, computer research tools are used for locating prior art for a patent application. The same problems of inefficiency discussed above exist for computer research tools in many areas of our society.

What is needed is a system for computerized searching of data that is faster than the available systems of research.

What is needed is a system for computerized searching of data that enables researchers to research in a manner in which they are familiar.

What is needed is a computerized research tool that will reorganize, re-index or reformat the data into a more efficient format for searching.

What is needed are more sophisticated methods to search data.

What is needed is a system for computerized searching of data that will significantly reduce the number of irrelevant textual objects it retrieves.

What is needed is a user friendly computerized research tool.

What is needed is a visual user interface which can convey information to a user conveniently.

What is needed is a system for computerized searching of data that easily enables the researcher to classify the object according to his or her own judgment.

What is needed is a system for computerized searching of data that provides a visual representation of "lead" objects and "lines" of objects, permitting a broad overview of the shape of the relevant "landscape."

Facebook Inc. Ex. 1201

5,832,494

| 3 | 4 |

What is needed is a system for computerized searching of data that provides an easily-grasped picture or map of vast amounts of discrete information, permitting researchers to "zero in" on the most relevant material.

What is needed is a system for computer searching of data that provides a high degree of virtual orientation and tracking, the vital sense of where one has been and where one is going, and that prevent researchers from becoming confused while assimilating a large amount of research materials.

Accordingly, there is an unanswered need for a user friendly computerized research tool. There is a need for "intelligent" research technology that emulates human methods of research. There is a need in the marketplace for a more efficient and intelligent computerized research tool.

The present invention is designed to address these needs.

SUMMARY OF THE INVENTION

This invention is a system for computerized searching of data. Specifically, the present invention significantly aids a researcher in performing computerized research on a database or a network. The invention simplifies the research task by improving upon methods of searching for data including textual objects and by implementing a user interface that significantly enhances the presentation of the data.

The invention can be used with an existing database by indexing the data and creating a numerical representation of the data. This indexing technique called proximity indexing generates a quick-reference of the relations, patterns, and similarity found among the data in the database. Using this proximity index, an efficient search for pools of data having a particular relation, pattern or characteristic can be effectuated. This relationship can then be graphically displayed.

There are three main components to the invention; a data indexing applications program, a Computer Search Program for Data Represented by Matrices ("CSPDM"), and a user interface. Each component may be used individually. Various indexing application programs, CSPDMs, and user interface programs can be used in combination to achieve the desired results. The data indexing program indexes data into a more useful format. The CSPDM provides efficient computer search methods. The preferred CSPDM includes multiple search subroutines. The user interface provides a user friendly method of interacting with the indexing and CSPDM programs. The preferred user interface program allows for easy entry of commands and visual display of data via a graphical user interface.

The method which the invention uses to index textual objects in a database is called Proximity Indexing. This method can also be used to index objects located on a network. The application of this method to network domains is discussed in greater detail later in this specification. Proximity Indexing is a method of preparing data in a database for subsequent searching by advanced data searching programs. Proximity Indexing indexes the data by using statistical techniques and empirically developed algorithms. The resulting search by an advanced data searching program of the Proximity Indexed data is significantly more efficient and accurate than a simple Boolean search.

The Proximity Indexing Application Program indexes (or represents) the database in a more useful format to enable the Computer Search Program for Data Represented by Matrices (CSPDM) to efficiently search the database. The Proximity Indexing Application Program may include one or more of the following subroutines, an Extractor, a Patterner, and a Weaver. The Proximity Indexing Application Program indexes (or represents) data in a locally located database or remotely located database. The database can contain any type of data including text, alphanumerics, or graphical information.

In one embodiment, the database is located remotely from the Computer Processor and contains some data in the form of textual objects. The Proximity Indexing Application Program indexes the textual objects by determining how each full textual object (e.g., whole judicial opinion, statute, etc.) relates to every other full textual object by using empirical data and statistical techniques. Once each full textual object is related to each other full textual object, the Proximity Indexing Application Program compares each paragraph of each full textual object with every other full textual object as described above. The Proximity Indexing Application Program then clusters related contiguous paragraphs into sections. Subsequently, the Proximity Indexing Application Program indexes each section and the CSPDM evaluates the indexed sections to determine which sections to retrieve from the database. Such organization and classification of all of the textual objects in the database before any given search commences significantly limits the irrelevant textual objects that the CSPDM program retrieves during the subsequent search and allows retrieval of material based on its degree of relevancy.

In a preferred embodiment, the Proximity Indexing Application Program includes a link generation subroutine wherein direct and indirect relationships between or among data is used to generate a representation of the data. Generally, direct and indirect relationships in the database are identified as links and placed in a table.

Again, this method of computerized research can be used for nearly any database including those containing nontextual material, graphical material, newspapers material, data on personal identification, data concerning police records, etc.

The remaining two programs in the present invention are the CSPDM and the GUI Program. The CSPDM has seven subroutines that each search for different pools of objects. The GUI Program also has seven subroutines. Each CSPDM subroutine performs a different type of search. Each of the subroutines of the GUI uses the results of the corresponding subroutine of the CSPDM to create the proper display on the display.

After the Proximity Indexing Application Program indexes a database, the CSPDM application program is used to search the indexed database. For example, the CSPDM program can either be located in memory that is remote from the Computer Processor or local to the Computer Processor. In addition, the CSPDM program can either be remote or local in relation to the database.

The subroutines of the CSPDM utilize the coefficients and other data created by the Proximity Indexing Application Program to facilitate its search. However, if the researcher does not have the particular object citation available, the researcher can perform a Boolean search to retrieve and organize a pool of objects. Alternatively, the researcher can subsequently search for related objects by using the Pool-Similarity Subroutine, the Pool-Paradigm Subroutine, the Pool-Importance Subroutine or the Pool-Paradigm-Similarity Subroutine as defined below.

If the researcher already has the citation of a particular object available, the researcher can search for related objects by utilizing the Cases-In Subroutine, Cases-After Subroutine or Similar-Cases Subroutine. The Cases-In Subroutine retrieves all of the objects from the database to which a

059
JA05058
Facebook Inc. Ex. 1201

5,832,494

5

selected object refers. In addition, the subroutine determines the number of times the selected object refers to each retrieved object and other characteristics of each object, including its importance, and degree of relatedness to the selected object.

The Cases-After Subroutine retrieves all of the objects from the database that refer to the selected object. Also, the subroutine determines the number of times each retrieved object refers to the selected object and other characteristics of each object, including its importance, and degree of relatedness to the particular object to which it refers.

The Similar-Cases Subroutine determines the degree of similarity between the retrieved objects and the selected object. Similarity may be defined, in the context of legal cases, as the extent to which the two objects lie in the same lines of precedent or discuss the same legal topic or concept. Numerous other relationships may be used to define similarity.

In addition, for a textual object, if the researcher does not know of a particular textual object on which to base his or her search, the researcher may execute a Boolean word search. After a standard Boolean word search has been run, the researcher may run the Pool-Similarity Subroutine to retrieve information containing the degree of similarity between each textual object in the pool and a particular textual object selected by the user. Similarly, the Pool-Importance Subroutine can be used to determine the degree of importance (i.e., whether a judicial opinion is a Supreme Court opinion or a District Court opinion) and other characteristics of each textual object retrieved using the Boolean word search.

The Pool-Paradigm Subroutine calculates the geographic center in vector space of the pool of textual objects retrieved by the Boolean word search or other pool generating method. It then orders the retrieved textual objects by their degree of similarity to that center or "paradigm." The researcher can then evaluate this "typical textual object" and utilize it to help him or her find other relevant textual objects. In addition, the researcher can scan through neighboring "typical textual objects" to evaluate legal subjects that are closely related to the subject of the researcher's search.

The Pool-Paradigm-Similarity Subroutine similarly creates a paradigm textual object from the retrieved textual objects. However, the subroutine calculates the similarity of all textual objects in the database to the paradigm textual object in addition to the similarity of the retrieved textual objects to the paradigm textual object.

After the CSPDM has retrieved the desired objects, the Graphical User Interface (GUI) Program may be used to display the results of the search on the display. In one embodiment, the GUI is a user interface program. The GUI Program contains three main subroutines: Cases-In Display Subroutine (CIDS), Cases-After Display Subroutine (CADS) and Similar-Cases Display Subroutine (SCDS). The main subroutines receive information from the corresponding subroutines Cases-In, Cases-After and Similar-Case s of the CSPDM. The GUI Program also contains four secondary subroutines: Pool-Similarity Display Subroutine ("PSDS"), Pool-Paradigm Display Subroutine ("PPDS"), Pool-Importance Display Subroutine ("PIDS"), and the Pool-Paradigm-Similarity Display Subroutine (PPSDS). The secondary subroutines also receive information from the corresponding subroutines Pool-Similarity Subroutine, Pool-Paradigm Subroutine, Pool-Importance Subroutine and the Pool-Paradigm Similarity Subroutine of the CSPDM.

6

The CIDS subroutine receives information gathered from the Cases-In Subroutine of the CSPDM. The CIDS subroutine displays user friendly active boxes and windows on the display which represent the textual objects retrieved from the database represented in Euclidean space. It can also use the boxes to represent objects retrieved from a network. Various active box formats and arranging of information within the boxes may be utilized. The display depicts the appropriate location of textual objects in Euclidean space on a coordinate means. An algorithm may be used to determine the appropriate location of the boxes. The coordinate means may have one or more axis. In one embodiment, the horizontal axis of the coordinate means may represent the time of textual object creation; the vertical axis could represent a weighted combination of the number of sections in which that particular retrieved text is cited or discussed, its degree of importance, and its degree of similarity to the host textual object and the depth axis (Z-axis) represents the existence of data and length of the textual data or object.

The invention can also alter the background color of the window itself to communicate additional information graphically to the user. For example, if the horizontal axis represented time, then the invention could display the portion of the window containing objects occurring previous to the search object in one color and the portion containing the objects occurring after in another. Thus, the researcher can understand at a glance the relative position of his search target in relation to all the other objects related to it.

CIDS also enables the researcher to open up various active boxes on the display by entering a command into the computer processor with the input means. After entering the proper command, the active box transforms into a window displaying additional information about the selected textual object. These windows can be moved about the display and stacked on top or placed beside each other via the input means to facilitate viewing of multiple windows of information simultaneously. In one embodiment, the windows are automatically arranged by the computer system. Since the number of textual objects retrieved in a single search may exceed the amount which could be displayed simultaneously, the GUI Program enables the researcher to "zoom in" or "zoom out" to different scales of measurement on both the horizontal and vertical axis.

The CADS receives information gathered by the Cases-After Subroutine of the CSPDM. The CADS creates a display similar to the CIDS display. However, the active boxes representing the retrieved textual objects indicate which textual objects in the database refer to a selected textual object as opposed to which textual objects a selected textual object refers.

The SCDS receives information gathered by the Similar-Cases Subroutine of the CSPDM. The SCDS causes a similar display on the display as the CIDS and the CADS except that the vertical axis indicates the degree of similarity between the retrieved textual objects and the selected textual object.

The GUI Program contains four secondary subroutines: Pool-Search Display Subroutine (PSDS), Pool-Paradigm Display Subroutine (PPDS), Pool-Importance Display Subroutine (PIDS) and the Pool-Paradigm-Similarity Display Subroutine (PPSDS). The PSDS receives the results gathered by the Pool-Search Subroutine of the CSPDM. The PPDS receives the results gathered by the Pool-Paradigm Subroutine of the CSPDM. The PIDS receives the results gathered by the Pool-Importance Subroutine of the CSPDM. The PPSDS receives the results gathered by the Pool-

Facebook Inc. Ex. 1201

5,832,494

7

Paradigm-Similarity Subroutine of the CSPDM. The results of the PSDS, PPDS, PIDS and PPSDS are then displayed in a user friendly graphical manner similar to the results of the CIDS, CADS and SCDS. A researcher can access the PSDS, PIDS, PSDS or PPSDS from any of the three main or four secondary subroutines of the GUI to gather information corresponding to the active boxes that represent the pool of textual objects retrieved by the corresponding subroutine of the CSPDM.

By using the graphical display, the researcher can view immediately a visual representation of trends in the data (for example, trends developing in the law and current and past legal doctrines). In addition, the researcher can immediately identify important data or important precedent and which object serving as the precedent is most important to the project on which the researcher is working. This visual representation is a vast improvement over the current computerized research tools. Furthermore, the researcher using the present invention does not have to rely on the interpretation of another person to categorize different textual objects because the researcher can immediately visualize the legal trends and categories of law. In addition, new topic areas can be recognized without direct human intervention. The current research programs require a researcher to view objects in a database or to read through the actual text of a number of objects in order to determine which objects are important, interrelated, or most closely related to the topic at hand and which ones are not.

It is an object of this invention to create an efficient and intelligent system for computerized searching of data that is faster than available systems of research.

It is an object of the invention to integrate the system of computerized searching into the techniques to which researchers are already accustomed.

It is an object of the invention to utilize statistical techniques along with empirically generated algorithms to reorganize, re-index and reformat data in a database into a more efficient model for searching.

It is an object of the invention to utilize statistical techniques along with empirically generated methods to increase the efficiency of a computerized research tool.

It is an object of the invention to create a system of computerized searching of data that significantly reduces the number of irrelevant objects retrieved.

It is an object of this invention to create a user friendly interface for computer search tools which can convey a significant amount of information quickly.

It is an object of the invention to enable the researcher to easily and immediately classify retrieved database objects according to the researcher's own judgment.

It is an object of the invention to provide a visual representation of "lead" objects and "lines" of objects, permitting a broad overview of the shape of the relevant "landscape."

It is an object of the invention to provide an easily-grasped picture or map of vast amounts of discrete information, permitting researchers to "zero in" on the most relevant material.

It is an object of the invention to provide a high degree of virtual orientation and tracking that enables a researcher to keep track of exactly what information the researcher has already researched and what information the researcher needs to research.

These and other objects and advantages of the invention will become obvious to those skilled in the art upon review

8

of the description of a preferred embodiment, and the appended drawings and claims.

DESCRIPTION OF THE DRAWINGS

FIG. 1 is a high level diagram of the hardware for the system for computerized searching of data.

FIG. 2 is high level diagram of the software for the system for computerized searching of data. The three main programs are the Proximity Indexing Application Program, the Computer Search Program for Data Represented by Matrices (CSPDM) Application Program and the Graphical User Interface (GUI) Program.

FIG. 3A is a flow chart illustrating a possible sequence of procedures that are executed during the Proximity Indexing Application Program.

FIG. 3B is a flow chart illustrating a possible sequence of the specific subroutines that are executed during one stage of the Proximity Indexing Application Program. The subroutines are the Initial Extractor Subroutine, Opinion Weaver Subroutine, the Opinion Weaver Subroutine, the Paragraph Patterner Subroutine (Optional), the Paragraph Weaver Subroutine and the Section Comparison Subroutine.

FIG. 3C is flow chart illustrating a possible sequence of subroutines that are executed after the Section Comparison Subroutine. The Section Comparison Subroutine may comprise the Sectioner-Geographic Subroutine and the Section-Topical Subroutine (Optional). The sequence of subroutines executed after the Section Comparison Subroutine are the Section Extractor Subroutine, the Section Patterner Subroutine and the Section Weaver Subroutine.

FIG. 3D is a high level flow chart illustrating a possible sequence of subroutines that comprise the Boolean Indexing Subroutine which are executed during another stage of the Proximity Indexing Application Program. The first two subroutines, Initialize Core English Words and Create pxw Boolean Matrix, are executed by the Initial Extractor Subroutine. The results are then run through the Pool-Patterner Subroutine, the Pool-Weaver Subroutine, the Pool-Sectioner Subroutine, the Section-Extractor Subroutine, the Section-Patterner Subroutine and the Section Weaver Subroutine.

FIG. 3E is a chart illustrating the database format. The figure shows the types of structures contained within the database, links, link types, link subtypes, nodes, node types, node subtypes, and visual styles and also shows the various types of information that can be assigned to the links and nodes, including weights, identifications, names, comments, icons, and attributes.

FIG. 3F is a high level diagram showing a sequence of nodes, $N_0$–$N_3$, connected by direct links which have weights $W_1$–$W_3$ .

FIG. 3G is a high level diagram showing a sequence of nodes, $N_1$–$N_3$, connected by direct and indirect links. The set of cluster links are also shown in the figure as functions of the weights associated with the direct links and the weight of the previous cluster link.

FIG. 3H is a flow chart which depicts the Cluster Link Generation Algorithm.

FIG. 4A is a high level diagram illustrating the flow of various search routines depending on the type of search initiated by the user by inputting commands to the Computer Processor via the input means. The diagram further illustrates the interaction between the CSPDM and the GUI Program.

FIG. 4B is a high level flow chart illustrating the sequence of subroutines in the CSPDM program and user interactions with the subroutines.

Facebook Inc. Ex. 1201

5,832,494

**9**

FIG. 4C is a high level flow chart for the Cases-In Subroutine.

FIG. 4D is a high level flow chart for the Cases-After Subroutine.

FIG. 4E is a high level flow chart for the Similar-Cases Subroutine.

FIG. 4F is a high level flow chart for the Pool-Similarity Subroutine.

FIG. 4G is a high level flow chart for the Pool-Paradigm Subroutine.

FIG. 4H is a high level flow chart for the Pool-Importance Subroutine.

FIG. 4I is a high level flow chart showing two possible alternate Pool-Paradigm-Similarity Subroutines.

FIG. 5A is a high level diagram illustrating the interaction between respective subroutines of the CSPDM and of the GUI Program. The diagram further illustrates the interaction between the GUI Program and the display.

FIG. 5B is an example of the display once the Cases-After Display Subroutine (CADS) is executed.

FIG. 5C is an example of the display after a user selects an active box representing a textual object retrieved by the Cases-After Subroutine and chooses to open the "full text" window relating to the icon.

FIG. 5D is an example of the display once the Cases-In Display Subroutine (CIDS) is executed.

FIG. 5E is an example of the display once the Similar-Cases Display Subroutine (SCDS) is executed.

FIG. 5F is an example of the display after a user chooses to execute the Similar Cases Subroutine for a textual object retrieved by the Similar-Cases Subroutine represented in FIG. 5E.

FIG. 5G is an example of the display after a user chooses to execute the Similar Cases Subroutine for one of the cases retrieved by the Similar-Cases Subroutine represented in FIG. 5F.

FIG. 5H depicts an Executive Search Window.

FIG. 6 depicts a schematic representation of eighteen patterns.

FIG. 7 is a high level diagram of the Layout of Boxes Algorithm.

FIG. 8 is a diagram of a screen showing execution of a show usage command.

FIG. 9 is a diagram of the Internal Box Layout Algorithm.

FIG. 10A is a diagram of a screen showing an Influence Map, which is a screen used in one embodiment of this invention.

FIG. 10B is a diagram of a screen showing a Source Map, which is a screen used in one embodiment of this invention.

FIG. 10C is a diagram of a screen showing a Cluster Map, which is a screen used in one embodiment of the invention.

FIG. 11 depicts a Look-Up Table for Bitmaps.

FIG. 12 is a software flow chart for the auto arranging window feature.

FIG. 13A is a depiction of a display with vertically tiled windows.

FIG. 13B is a depiction of a display with horizontally tiled windows.

FIG. 14A is a high level diagram of a method for searching, indexing, and displaying data stored in a network.

FIG. 14B is a high level diagram of a method for searching, indexing, and displaying data stored in a network using the cluster generation algorithm.

**10**

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring now to the drawings, the preferred embodiment of the present invention will be described.

FIG. 1 is an overview of the preferred embodiment of the hardware system 26 for computerized searching of data. The hardware system 26 comprises a Computer Processor 30, a database 54 for storing data, input means, display 38, and RAM 34.

The Computer Processor 30 can be a processor that is typically found in Macintosh computers, IBM computers, portable PCs, clones of such PC computers (e.g. Dell computers), any other type of PC, or a processor in a more advanced or more primitive computing device. Parallel processing techniques may also be utilized with this invention.

The database 54 is connected to the Computer Processor 30 and can be any device which will hold data. For example, the database 54 can consist of any type of magnetic or optical storing device for a computer. The database 54 can be located either remotely from the Computer Processor 30 or locally to the Computer Processor 30. The preferred embodiment shows a database 54 located remotely from Computer Processor 30 that communicates with the personal computer 28 via modem or leased line. In this manner, the database 54 is capable of supporting multiple remote computer processors 50. The preferred connection 48 between the database 54 and the Computer Processor 30 is a network type connection over a leased line. It is obvious to one skilled in the art that the database 54 and the Computer Processor 30 may be electronically connected in a variety of ways. In the preferred embodiment the database 54 provides the large storage capacity necessary to maintain the many records of textual objects.

The input means is connected to the Computer Processor 30. The user enters input commands into the Computer Processor 30 through the input means. The input means could consist of a keyboard 46, a mouse 42, or both working in tandem. Alternatively, the input means could comprise any device used to transfer information or commands from the user to the Computer Processor 30.

The display 38 is connected to the Computer Processor 30 and operates to display information to the user. The display 38 could consist of a computer monitor, television, LCD, LED, or any other means to convey information to the user.

The Random Access Memory (RAM 34) is also connected to the Computer Processor 30. The software system 60 for computerized searching of data may reside in the RAM 34, which can be accessed by the Computer Processor 30 to retrieve information from the software routines. A Read Only Memory (ROM), Erasable Programmable Read Only Memory (EPROM), disk drives, or any other magnetic storage device could be used in place of the RAM 34. Furthermore, the RAM 34 may be located within the structure of the Computer Processor 30 or external to the structure.

The hardware system 26 for computerized searching of data shown in FIG. 1 supports any one, or any combination, of the software programs contained in the software system 60 for computerized searching of data. The software system 60 for the computerized searching of data comprises one or more of the following programs: the Proximity Indexing Application Program 62, the Computer Search Program for Data Represented by Matrices (CSPDM 66) and the Graphical User Interface (GUI) Program. The Proximity Indexing

Facebook Inc. Ex. 1201

5,832,494

11

Application Program **62** could reside in RAM **34** or in separate memory connected to the database **54**. The Computer Processor **30** or a separate computer processor **50** attached to the database **54** could execute the Proximity Indexing Application Program **62**. In the preferred embodiment the Proximity Indexing Application Program **62** resides in separate memory that is accessible to the database **54**, and a separate computer processor **50** attached to the database **54** executes the Proximity Indexing Application Program **62**.

The CSPDM **66** could reside in the RAM **34** connected to the Computer Processor **30** or in the separate memory connected to the database **54**. In the preferred embodiment, the CSPDM **66** is located in the RAM **34** connected to the Computer Processor **30**. This is also the preferred embodiment for the application of this method to network searching. For network application, a separate database **54** storing information to be analyzed is remodeling connected to the computer processor **30**. The CSPDM **66** may use the display **38** to depict input screens for user entry of information.

The GUI Program **70** could likewise reside in the RAM **34** connected to the Computer Processor **30** or in separate memory connected to the database **54**. In the preferred embodiment, the GUI Program **70** is located in the RAM **34** connected to the Computer Processor **30**. The GUI Program **70** also communicates with the display **38** to enhance the manner in which the display **38** depicts information.

FIG. **2** is an overview of the preferred embodiment of the software system **60** for computerized searching of data. The software system **60** for computerized searching of data comprises at least one or more of the following programs: the Proximity Indexing Application Program **62**, the Computer Search Program for Data Represented by Matrices (CSPDM **66**) and the Graphical User Interface (GUI) Program. Proximity Indexing is a method of identifying relevant data by using statistical techniques and empirically developed algorithms. (See Appendix # 2) The Proximity Indexing Application Program **62** is an application program which represents or indexes the database **54** to a proper format to enable the Computer Search Program for Data Represented by Matrices (CSPDM **66**) to properly search the database **54**. The Proximity Indexing Application Program **62** can index data in a local database **54** or a remote database **54**. The Proximity Indexing Application Program **62** is shown in more detail in FIGS. 3A to 3H.

After the Proximity Indexing Application Program **62** indexes the database **54**, the CSPDM **66** application program can adequately search the database **54**. The CSPDM **66** program searches the database **54** for objects according to instructions that the user enters into the Computer Processor **30** via the input means. The CSPDM **66** then retrieves the requested objects. The CSPDM **66** either relays the objects and other information to the GUI program in order for the GUI program to display this information on the display **38**, or the CSPDM **66** sends display commands directly to the Computer Processor **30** for display of this information. However, in the preferred embodiment, the CSPDM **66** relays the objects and other commands to the GUI Program **70**. The CSPDM **66** is described in more detail in FIGS. **4A** to **4I**.

After the CSPDM **66** has retrieved the objects, the Graphical User Interface (GUI) Program, which is a user interface program, causes the results of the search to be depicted on the display **38**. The GUI Program **70** enhances the display of the results of the search conducted by the CSPDM **66**. The GUI Program **70**, its method and operation,

12

can be applied to other computer systems besides a system for computerized searching of data. The GUI Program **70** is described in more detail in FIGS. 5A to 5H.

FIGS. 3A to 3D depict examples of the procedures and subroutines of a Proximity Indexing Application Program **62**, and possible interactions among the subroutines. FIG. 3A depicts a sequence of procedures followed by the Proximity Indexing Application Program **62** to index textual objects for searching by the CSPDM **66**. FIG. 3B depicts specific subroutines that the Proximity Indexing Application Program **62** executes to partition full textual objects into smaller sections. FIG. 3C depicts subroutines executed by the Section Comparison Routine of FIG. 3B and subsequent possible subroutines to format and index the sections. FIG. 3D depicts a sequence of subroutines of the Proximity Indexing Application Program **62** which first sections and then indexes these sections of "core english words" **140** contained in the database **54**. "Core english words" **140** are words that are uncommon enough to somewhat distinguish one textual object from another. The word searches of the CSPDM **66** search these sections of core English words to determine which textual objects to retrieve.

FIGS. 3E–3H show a preferred embodiment for representing the data in a database **54** or documents in a network in accordance with the present invention. The application of this method for representing documents on a network is described in greater detail later in this specification.

FIG. 3E shows a method for representing the data using the present invention. Specifically, FIG. 3E shows a method in which links **2004** and nodes **2008** can be used along with link types **2012**, link subtypes **2020**, node types **2016** and node subtypes **2024** to represent the data.

A node **2008** is any entity that can be represented by a box on a display **38** such as a GUI **70**. A node **2008** might be for example, an object in a database **54**, a portion of an object in a database **54**, a document, a section of a document, a World Wide Web page, or an idea or concept, such as a topic name. A node **2008** need not represent any physical entity such as an actual document. It is preferred that a node **2008** have links **2004**, specifically, it is preferred that a node **2008** have links to other nodes **2008** (for example source links (a source link is a link **2004**, or influence links (an influence link is a link **2004**)). A node **2008** can represent any idea or concept that has links to other ideas or concepts. For example, two nodes **2008** can exist such as a node **2008** called Modern Architecture (not shown) and a node **2008** called Classical Architecture (not shown) and the links would show that Classical Architecture is a source for Modern Architecture and that Modern Architecture is influenced by Classical Architecture. In this example, a source link **2004** and an influence link **2004** would exist between the two nodes **2008**. (Many times, links **2004** represent inverse relationships such as source links **2004** and influence links **2004**, and one type of link may be derived or generated from analysis of another link.)

More specifically, in the preferred embodiment, the software defines a node **2008** as something that has a unique node **2008** identification, a node type **2016**, a node subtype **2024**, and an associated date (or post date). Node types **2016** or subtypes may have names **2021** or identifications, title descriptors **2026** and external attributes. A node **2008** may have a corresponding numerical representation assigned, a vector, a matrix, or a table. In the preferred embodiment a table format is used for the nodes.

Referring to FIG. 3E, 3F, and 3G a link **2004** is another name or identification for a relationship between two nodes

Facebook Inc. Ex. 1201

5,832,494

13

2008. The relationship may be semantical, non-semantical, stated, implied, direct 2032, indirect 2036, actual, statistical and/or theoretical. A link 2004 can be represented by a vector or an entry on a table and contain information for example, a from-node identification 2010 (ID), a to-node ID 2010, a link type 2012, and a weight 2034. A group of links 2004 may be represented by a series of vectors or entries in a table, a link table. Link subtypes 2020 may be used, named and assigned comments.

In addition, to better integrate the GUI 70 and the data representation, visual styles 2028 may be assigned for example to nodes 2008, links 2004, link types 2012, and link subtypes 2020 to assist in the visual displays 38.

In the preferred embodiment, three types of links 2004 are used: source links 2004, influence links 2004 and cluster links 2004. Source links 2004 generally link a first node 2008 to second node 2008 that represents information or documentation specifically cited or referred to by the first node 2008. Influence links 2004 are generally the inverse of a source link 2004. The relationships represented by these links 2004 may be explicit or implied.

Links 2004 and nodes 2008 may be manually entered by a user or automatically generated by a computer 30. It is preferred that cluster links 2004 be generated automatically by a processor. A cluster link 2004 is a relationship between two nodes 2008, for example, two nodes 2008 both directly linked to the same intermediate nodes 2008, may be indirectly linked through many paths and therefore have a cluster link 2004 between them. The cluster links 2004 may be determined using the specific or general methods described later for finding relationships in a database 54. However, the preferred method is through using a Proximity Indexing Application Program.

"Proximity indexing" is a method of indexing that uses statistical techniques and empirically generated algorithms to organize and categorize data stored in databases or on a network. The Proximity Indexing Application Program 62 applies the Proximity indexing method to a database 54. One embodiment of the present invention uses the Proximity Indexing Application Program 62 to Proximity index textual objects used for legal research by indexing objects based on their degree of relatedness—in terms of precedent and topic—to one another.

Applying the method to legal research, the "Proximity indexing" system treats any discrete text as a "textual object." Textual objects may contain "citations," which are explicit references to other textual objects. Any legal textual object may have a number of different designations of labels. For example, 392 U.S. 1, 102 S.Ct 415, 58 U.S.L.W. 1103, etc. may all refer to the same textual object.

Cases are full textual objects that are not subsets of other textual objects. Subjects of a full textual object include words, phrases, paragraphs, or portions of other full textual objects that are referred to in a certain full textual object. (The system does not treat textual objects as subsets of themselves.)

Every case, or "full" textual object, is assigned a counting-number "name"—designated by a letter of the alphabet in this description—corresponding to its chronological order in the database 54. Obviously, textual objects may contain citations only to textual objects that precede them. In other words, for full textual objects, if "B cites A," (i.e. "A is an element of B" or "the set 'B' contains the name 'A'"), textual object A came before B, or symbolically, A<B. Every textual object B contains a quantity of citations to full textual objects, expressed as Q(B), greater than or equal to zero, such that Q(B)<B.

14

Textual objects other than full textual objects may be subsets of full textual objects and of each other. For example, a section, page, or paragraph of text taken from a longer text may be treated as a textual object. Phrases and words are treated as a special kind of textual object, where Q(w)=0. Sections, pages, and paragraphs are generally subsets of only one full textual object, and may be organized chronologically under the numerical "name" of that full textual object. For purposes of chronology, phrases and words are treated as textual objects that precede every full textual object, and can generally be treated as members of a set with name "0," or be assigned arbitrary negative numbers.

Any two textual objects may be related to each other through a myriad of "patterns." Empirical research demonstrates that eighteen patterns capture most of the useful relational information in a cross-referenced database 54. A list of these eighteen patterns, in order of importance, follows:

Given that:

a,b,c<A;

A<d, e, f<B; and

B<g, h, i.

Patterns Between A and B Include

1. B cites A.
2. A cites c, and B cites c.
3. g cites A, and g cites B.
4. B cites f, and f cites A.
5. B cites f, f cites e, and e cites A.
6. B cites f, f cites e, e cites d, and d cites A.
7. g cites A, h cites B, g cites a, and h cites a.
8. i cites B, i cites f [or g], and f [or g] cites A.
9. i cites g, i cites A, and g cites B.
10. i cites g [or d], i cites h, g [or d] cites A, and h cites B.
11. i cites a, i cites B, and A cites a.
12. i cites A, i cites e, B cites e.
13. g cites A, g cites a, A cites a, h cites B, and h cites a.
14. A cites a, B cites d, i cites a, and i cites d.
15. i cites B, i cites d, A cites a, and d cites a.
16. A cites b, B cites d [ or c], and d [or c] cites b.
17. A cites b, B cites d, b cites a, and d cites a.
18. A cites a, B cites b, d [or c] cites a, and d [or c] cites b.

These 18 patterns are shown schematically in FIG. 6. (For a discussion on probability theory and statistics, see Wilkinson, Leland; SYSTAT: The System for Statistics; Evanston, Ill.: SYSTAT Inc., 1989 incorporated herein by reference.) Some patterns occur only between two full textual objects, and others between any two textual objects; this distinction is explained below. Semantical patterning is only run on patterns number one and number two, shown above.

For purposes of explaining how patterns are used to generate the Proximity Index, only the two simplest patterns are illustrated.

The simplest, Pattern #1, is "B cites A." See FIG. 6. In the notation developed, this can be diagramed: a b c A d e f B g h i where the letters designate textual objects in chronological order, the most recent being on the right, arrows above the text designate citations to A or B, and arrows below the text designate all other citations. The next simplest pattern between A and B, Pattern #2, is "B cites c and

Facebook Inc. Ex. 1201

5,832,494

| 15 | 16 |

A cites c," which can also be expressed as "there exists c, such that c is an element of (A intersect B)." See Appendix #1. This can be diagramed: a b c A d e f B g h i. For every textual object c from 0 to (A–1), the existence of Pattern #2 on A and B is signified by 1, its absence by 0. This function is represented as P#2AB(c)=1 or P#2AB(c)=0. The complete results of P#1AB and P#2AB can be represented by an (A)x(1) citation vector designated $\underline{X}$.

The functions of some Patterns require an (n)x(1) matrix, a pattern vector. Therefore it is simplest to conceive of every Pattern function generating an (n)x(1) vector for every ordered pair of full textual objects in the database **54**, with "missing" arrays filled in by 0s. Pattern Vectors can be created for Pattern #1 through Pattern #4 by just using the relationships among textual object A and the other textual objects in the database **54** and among textual object B and the other textual objects in the database **54**. Pattern Vectors for Patterns #5 through #18 can only be created if the relationship of every textual object to every other textual object is known. In other words, Pattern Vectors for Patterns #1 through #4, can be created from only the rows A and B to the Citation Matrix but Pattern Vectors for Patterns #5 through #18 can only be created from the whole Citation Matrix.

(total textual objects c)/(theoretical maximum textual objects c) $[(\underline{x})(\underline{x})^T/\text{TMax}]$,

(total textual objects c)/(actual maximum textual objects c) $[(\underline{x})(\underline{x})^T/\text{AMax}]$

frequency of object c per year [f], and

the derivative of the frequency [f].

In pattern #2, given that A<B, the theoretical maximum ("TMax") number Q(A intersect B)=A minus 1. The actual maximum possible ("AMax"), given A and B, is the lesser of Q(A) and Q(B). The ratios "$\underline{X}(\underline{X})^T/\text{TMax}$" and "$\underline{X}(\underline{X})^T/\text{AMax}$," as well as the frequency of occurrence of textual objects c per year, f2(A, B), and the first derivative f'2(A, B), which gives the instantaneous rate of change in the frequency of "hits," are all defined as "numerical factors". These are the raw numbers that are used in the weighing algorithm.

For Pattern #2, the total number of possible textual objects c subject to analysis, i.e. TMax, is A–1, one only for the years at issue which are those up to the year in which A occurred. However, a relationship may remain "open," that is, it may require recalculation of f(x) and f'(x) as each new textual object is added to the database **54**, (for a total of n cases subject to analysis).

The "numerical factors" for all eighteen patterns are assigned various weights in a weighing algorithm used to generate a scalar F(A, B). The function F generates a scalar derived from a weighted combination of the factors from all eighteen patterns. The patterns are of course also weighted by "importance," allowing Supreme Court full textual objects to impose more influence on the final scalar than District Court full textual objects, for example. The weighing of the more than 100 factors is determined by empirical research to give results closest to what an expert human researcher would achieve. The weighing will vary depending upon the type of material that is being compared and the type of data in the database **54**. (See Thurstone, The Vectors of Mind, Chicago, Ill.: University of Chicago Press, 1935, for a description of factor loading and manipulating empirical data incorporated herein by reference.) In a commercial "Proximity Indexer" it will be possible to reset the algorithm to suit various types of databases.

A scalar F(A, B) is generated for every ordered pair of full cases in the database **54**, from F(1, 2) to F(n–1, n). F(z,z) is defined as equal to 0.

The full results of F(A,B) are arranged in an (n)x(n) matrix designated $\underline{F}$. Note that F(B, A) is defined as equal to F(A, B), and arrays that remain empty are designated by 0. For every possible pairing of cases (A,B), a Euclidean distance D(A,B) is calculated by subtracting the Bth row of Matrix $\underline{F}$ from the Ath row of Matrix $\underline{F}$. In other words:

$$D(A,B)=[(F(1, A)-F(1, B))^2+(F(2, A)-F(2, B))^2+\ldots+(F(n, A)-F(n, B))^2]^{1/2}.$$

A function designated D(A,B) generates a scalar for every ordered pair (A,B), and hence for every ordered pair of textual objects (A,B) in the database **54**. The calculations D(A,B) for every ordered pair from D(1,1) to D(n,n) are then arranged in an (n)x(n) "proximity matrix" $\underline{D}$. Every column vector in $\underline{D}$ represents the relationship between a given case A and every other case in the database **54**. Comparing the column vectors from column A (representing textual object A) and column B (representing textual object B) allows one to identify their comparative positions in n-dimensional vector space, and generate a coefficient of similarity, S(A,B), from 0–100%, which is more precise and sophisticated than F(A,B) or D(A,B) alone. A similarity subroutine can run directly on F(A,B). However, the real power of the Proximity Matrix $\underline{D}$ is that it allows one to identify "groups" or "clusters" of interrelated cases.

Through factor loading algorithms, the relationships represented by $\underline{D}$ for "n" cases can be re-represented in a vector space containing fewer than "n" orthogonal vectors. This knowledge can be reflected in S(A,B).

The Proximity Indexing Application Program **62** is an application program that applies the above techniques and algorithms to index and format data to be searched by the CSPDM **66**.

FIG. 3A describes the overall procedure of the Proximity Application Indexing Program **72**. The first stage initializes the data **74** in the database **54**. The second stage determines the relationships between full textual objects **78**. The third stage determines the relationships between paragraphs of each textual object and each full textual object **80**. The fourth stage clusters related paragraphs using factor loading and empirical data and then groups the paragraphs into sections based on such data **84**. The fifth stage determines the relationships between the sections **88**. In the final stage, the sectioned textual objects are not further processed until commands are received from the CSPDM Routine **92**.

The following description of FIG. **3B** and FIG. **3C** elaborates on this general procedure by describing specific subroutines of a Proximity Indexing Application Program **62**. The following is a step by step description of the operation of the Proximity Indexing Application Program **62**.

Section A Initial Extractor Subroutine **96**

FIG. 3B describes subroutines for the first portion of the preferred Proximity Indexing Application Program **62**. The first subroutine of the Proximity Indexing Applications Program is the Initial Extractor Subroutine **96**. The Initial extractor subroutine **96** performs three primary functions: Creation of the Opinion Citation Matrix, creation of the Paragraph Citation Matrix, and creation of Boolean Word Index.

The following steps are performed by the Initial extractor subroutine **96**.

1. Number all full textual objects chronologically with arabic numbers from 1 through n.

2. Number all paragraphs in all the full textual objects using arabic numbers from 1 through p.

5,832,494

| 17 | 18 |

3. Identify the page number upon which each paragraph numbered in step two above begins.

4. Create Opinion Citation Vectors ($\underline{X}$). By comparing each full textual object in the data base to every other full textual object in the data base that occurred earlier in time.

5. Combine Opinion Citation Vectors to create the bottom left half portion of the nxn Opinion citation matrix.

6. Create a mirror image of the bottom left half portion of the Opinion citation matrix in the top right half portion of the same matrix, to complete the matrix. In this manner only $n^2/2$ comparisons need to be conducted. The other ⅓ of the comparisons are eliminated.

7. Create the pxn Paragraph Citation Vectors by comparing each paragraph to each full textual object that occurred at an earlier time. This will require (n/2)p searches.

8. Create a Paragraph Citation Matrix by combining Paragraph Citation Vectors to create the bottom left half portion of the matrix.

9. Complete the creation of the Paragraph Citation Matrix by copying a mirror image of the bottom left half portion of the matrix into the top right half portion of the matrix.

10. Initialize the Initial extractor subroutine 96 with a defined set of core English words 140.

11. Assign identification numbers to the core English words 140. In the preferred embodiment, 50,000 English words are used and they are assigned for identification the numbers from −50,000 to −1.

12. Create a Boolean Index Matrix 144 with respect to the core English words by searching the database 54 for the particular word and assigning the paragraph number of each location of the particular word to each particular word. This procedure is described in greater detail in FIG. 3D.

Section B Opinion Patterner Subroutine 100

The Opinion Patterner Subroutine 100 performs three primary functions: Pattern analysis on matrices, calculation of the numerical factors and weighing the numerical factors to reach resultant numbers.

13. Process the Opinion Citation Matrix through each of the pattern algorithms described above and in FIG. 6 for each ordered pair of full textual objects to create opinion pattern vectors for each pattern and for each pair of full textual objects. The pattern algorithms determine relationships which exist between the ordered pair of full textual objects. The first four pattern algorithms can be run utilizing just the Opinion Citation Vector for the two subject full textual objects. Each pattern algorithm produces a opinion pattern vector as a result. The fifth through eighteenth pattern algorithms require the whole Opinion Citation Matrix to be run through the Opinion Patterner Subroutine 100.

14. Calculate total hits (citation) for each pattern algorithm. This can be done by taking the resultant opinion pattern vector (OPV) and multiplying it by the transposed opinion pattern vector (OPV)T to obtain a scalar number representing the total hits.

15. Calculate the theoretical maximum number of hits. For example, in the second pattern, the theoretical maximum is all of the full textual objects that occur prior in time to case A(A--).

16. Calculate the actual maximum number of hits. For example, in the second pattern, the actual maximum possible number of hits is the lesser of the number of citations in full textual object Q(A) or full textual object Q(B).

17. Calculate the total number of hits (citations) per year. This is labeled f(A,B).

18. Calculate the derivative of the total change in hits per year. This is the rate of change in total hits per year and is labeled f'(A,B).

19. Calculate the ratio of total hits divided by theoretical max $[((OPV)(OPV)^{t}/TMAX]$.

20. Calculate the ratio of the total hits divided by the actual maximum $[(O\underline{PV}(O\underline{PV})^{t}/AMAX]$.

21. Calculate a weighted number F(A,B) which represents the relationship between full textual object A and full textual object B. The weighted number is calculated using the four raw data numbers, two ratios and one derivative calculated above in steps 14 through 20 for each of the 18 patterns. The weighing algorithm uses empirical data or loading factors to calculate the resulting weighted number.

22. The Opinion Patterner Subroutine 100 sequence for the Opinion Citation Matrix is repeated n−1 times to compare each of the ordered pairs of full textual objects. Therefore, during the process, the program repeats steps 13 through 21, n−1 times.

23. Compile the Opinion Pattern Matrix by entering the appropriate resulting numbers from the weighing algorithm into the appropriate cell locations to form an nxn Opinion Pattern Matrix.

Section C The Opinion Weaver Subroutine 104

The Opinion Weaver Subroutine 104 shown in FIG. 3B, performs two primary tasks: calculation of the Opinion Proximity Matrix and calculation of the Opinion Similarity Matrix. The Opinion Proximity Matrix D is generated by calculating the Euclidean Distance between each row A and B of the Opinion Pattern Matrix (D(A,B)) for each cell DC(A,B). The Opinion Similarity Matrix is generated by calculating the similarity coefficient from 0 to 100 between each row A and B of the Opinion Proximity Matrix (S(A,B)) in each cell SC(A,B) in matrix S.

24. Calculate the nxn Opinion Proximity Matrix. To calculate D(A,B) the program takes the absolute Euclidian distance between column A and column B of the nxn Opinion Pattern Matrix. The formula for calculating such a distance is the square root of the sum of the squares of the distances between the columns in each dimension, or:

$$D(A,B)=[(F(1,A)-F(1,B))^2+(F(2,A)-F(2,B))^2+\ldots+(F(N,A)F(N,B))^2]^{1/2}$$

The Opinion Proximity Matrix created will be an nxn matrix. The smaller the numbers in the Opinion Proximity Matrix the closer the relationship between full textual object A and full textual object B.

25. Create nxn Opinion Similarity Matrix. To calculate the Opinion Similarity Matrix each scalar number in the Opinion Proximity Matrix is processed through a coefficient of similarity subroutine which assigns it a number between 0 and 100. By taking the coefficient of similarity, the program is able to eliminate full textual objects which have Euclidian distances that are great. (For example, a Euclidean distance that is very large and is run through the coefficient of similarity would result in a very low coefficient of similarity. Euclidean distances resulting in similarities below four are eliminated in the preferred embodiment).

Section D Paragraph Patterner Subroutine 108 (Optional)

26. Obtain the pxn Paragraph Citation Matrix calculated by the Initial extractor subroutine 96.

27. Run each ordered pair of rows of the pxn Paragraph Citation Matrix for an individual full textual object i through the pattern algorithms number one and two and determine the resultant Paragraph Pattern Vector.

28. Calculate the various numerical factors (AMax, TMax, etc.) by evaluating the values in the Paragraph Pattern Vector.

29. Run the Paragraph Pattern Vector and the numerical factors through the weighing algorithm to determine the

Facebook Inc. Ex. 1201

5,832,494

**19**

appropriate value for each cell of the $c_i \times n$ Partial Paragraph Pattern Matrix where $c_i$ is the number of paragraphs in full textual object i.

30. Repeat steps 27 through 29 for each full textual object i where i=1 to n, to create the $p \times n$ Paragraph Pattern Matrix.

Section E Paragraph Weaver Subroutine 112

31. Calculate the Euclidean distance of each ordered pair of rows of either the $p \times n$ Paragraph Citation Matrix or the $p \times n$ Paragraph Pattern Matrix for a single full textual object i.

32. Place the resultant Euclidean distance values in the appropriate cell of the $c_i \times c_i$ Paragraph Proximity Matrix where $c_i$ is the number of paragraphs in full textual object i, where $0 < i < n+1$.

33. Repeat steps 31 through 32 n times in order to calculate n different Paragraph Proximity Matrices (one for each full textual object i).

34. The Section Comparison Subroutine 116 clusters all p paragraphs in the database 54 into sections. Then the sections are compared and indexed in the database 54. This procedure is explained in greater detail in FIG. 3C.

FIG. 3C depicts possible subroutines that the Section Comparison Subroutine 116 comprises. The subroutines are the Sectioner Geographical Subroutine 120, the Sectioner Topical Subroutine 124 (Optional), the Section Extractor Subroutine 128, the Section Patterner Subroutine 132 and the Section Weaver Subroutine 136.

Section F Sectioner Geographical Subroutine 120

35. For each full textual object i, the Sectioner Geographical Subroutine 120 uses the corresponding $c_i \times c_i$ Paragraph Proximity Matrix and a contiguity factor for each paragraph to determine which paragraphs may be clustered into sections. Sections are made up of continuous paragraphs that are combined based upon weighing their Euclidean distances and contiguity.

36. Repeat step 35 for all n full textual objects until all p paragraphs are grouped into q sections.

Section H Sectioner Topical Subroutine 124 (Optional)

37. The Sectioner Topical Subroutine 124 provides additional assistance to the Sectioner Geographical Subroutine 120 by considering the factor of topical references to determine the q sections.

38. For the total number of discrete references "z" to each full textual object in a particular full textual object, a $z \times z$ Citation Proximity Matrix is formed by comparing the Euclidean distances between each reference to a full textual object contained in each paragraph and calculating the topical weight given to each paragraph.

Section I Section Extractor Subroutine 128

39. The Section Extractor Subroutine 128 numbers each section created by the Sectioner Geographical Subroutine 120 and Sectioner Topical Subroutine 124 Subroutines from 1 to q.

40. The Sectioner Extractor Subroutine 128 creates a $q \times q$ Section Citation Matrix by determining which sections refer to every other section.

Section J Section Patterner Subroutine 132 (shown in FIG. 3C)

41. The Section Patterner Subroutine 132 then calculates 18 Section Pattern Vectors corresponding to each row of the $q \times q$ Section Citation Matrix using the 18 pattern algorithms.

42. From the Section Pattern Vectors, the numerical factors (AMax, TMax, etc.) are calculated.

43. The weighing algorithm evaluates the numerical factors and the Section Pattern Vectors and determines the values for each cell of the $q \times q$ Section Pattern Matrix.

Section K Section Weaver Subroutine 136

**20**

44. The Section Weaver Subroutine 136 calculates the Euclidean distances between each row of the $q \times q$ Section Pattern Matrix and creates a $q \times q$ Section Proximity Matrix.

45. The Section Weaver Subroutine 136 then creates a $q \times q$ Section Similarity Matrix with coefficients 0 to 100 using the values of the Section Proximity Matrix and empirical data and factor loading.

Section L Semantical Clustering of a Boolean Index Routine 138

FIG. 3D depicts a possible Semantical Clustering of a Boolean Index Routine 138. (See Hartigan, J. A. *Clustering Algorithms*. New York: John Wiley & Sons, Inc., 1975, for detailed description of clustering algorithms incorporated herein by reference.) The Semantical Clustering routine of a Boolean Index 138 indexes the textual objects according to the similarity of phrases and words contained within each textual object in a database 54. The routine comprises seven possible subroutines: the Initial Opinion Extractor Subroutine 96, the Pool Patterner Subroutine 152, the Pool Weaver Subroutine 156, the Pool Sectioner Subroutine 160, the Section Extractor Subroutine 128, the Section Patterner Subroutine 132 and the Section Weaver Subroutine 136. In fact, it is quite possible, using only semantical statistical techniques, to "Proximity-index" documents that do not refer to one another at all based on there Boolean indices.

Section M Initial Extractor Subroutine 96

46. As described in steps 10 and 11, the Initial Extractor Subroutine 96 initializes a set of core English words 140 and assigns each word a number. The preferred embodiment uses 50,000 discrete core English words 140 and assigns each discrete core English word 140 a number from −50,000 to −1.

47. The Initial Extractor Subroutine 96 then converts the core English words 140 into a $p \times w$ matrix. The number of columns (w) represents the number of discrete core English words 140 in the database 54 and the number of rows (p) represents the number of paragraphs in the database 54.

48. The Initial Extractor Subroutine 96 fills the $p \times w$ matrix by inserting a "1" in the matrix cell where a certain paragraph contains a certain word.

Section N Pool Patterner Subroutine 152

49. The Pool Patterner Subroutine 152 creates two pattern algorithm vectors for only the first two patterns and determines values for the total number of hits, the theoretical maximum number of hits, the actual maximum number of hits, the total number of hits per year and the derivative of the total number of hits per year.

50. The weighing algorithm of the Pool Patterner Subroutine 152 uses empirical data and factor loading to determine values to enter into a $p \times w$ Paragraph/Word Pattern Matrix.

51. The Pool Weaver Subroutine 156 creates a $p \times w$ Paragraph/Word Pattern Matrix by filling the appropriate cell of the Matrix with the appropriate value calculated by the weighing algorithm.

52. The Pool Patterner Subroutine 152 creates a $p \times w$ Paragraph/Word Proximity Matrix taking the Euclidean distance between the rows of the Paragraph/Word Pattern Matrix.

Section O Pool Sectioner Subroutine 160

53. The Pool Sectioner Subroutine 160 evaluates the Euclidean distances in the Paragraph/Word Proximity Matrix and the contiguity factor of each paragraph to cluster the paragraphs (p) into a group of (v) sections and create a $v \times w$ Preliminary Cluster Word Matrix.

Section P Section Extractor Subroutine 128

54. The Section Extractor Subroutine 128 numbers each section chronologically and creates a $v \times v$ Section Word Citation Matrix.

Facebook Inc. Ex. 1201

21

Section Q Section Patterner Subroutine 132

55. The Section Patterner Subroutine 132 evaluates the vxv Section Word Citation Matrix to create two word pattern vectors for only the first two patterns algorithms (described above and shown in FIG. 6) and determines numerical factors for the total number of hits, the theoretical maximum number of hits, the actual maximum number of hits, the total number of hits per year and the derivative of the total number of hits per year.

56. The Weighing algorithm uses empirical data and factor loading to weigh the numerical factors created from the word pattern vectors and uses the numerical factors and the word pattern vectors to determine values to enter into a vxv Section Word Pattern Matrix.

Section R Section Weaver Subroutine 136

57. The Section Weaver Subroutine 136 creates a vxv Section Word Proximity Matrix by taking the Euclidean distance between the rows of the Section Word Pattern Matrix and placing the appropriate Euclidean distance value in the appropriate cell of the Section Word Proximity Matrix.

58. The Section Weaver Subroutine 136 create a vxv Section Word Similarity Matrix by evaluating the Euclidean distances from the Section Word Proximity Matrix and empirical data, and calculating the similarity coefficient for each ordered pair of sections, and places the value in the appropriate cell of the Section Word Similarity Matrix.

59. The Pool Searches of the CSPDM 66 evaluate the Section Word Similarity Matrix as well as other matrices to determine whether or not to retrieve a full textual object.

The following describes a preferred cluster link generator 2040 which implements a specific type of patterner or clustering system for use alone or in conjunction with other proximity indexing subroutines, and prior to searching. The cluster link generator 2040 analyzes a set of numerical representations of a database 54 and generates a second set of numerical representations of the database 54. This second set is stored in the RAM. This second set of numerical data can represent indirect 2036, direct 2032, or direct 2032 and indirect 2036 relationships in the database 54. Preferably, the second set of numerical representations accounts for indirect 2036 relationships in the database 54. It is preferred that the first and second set of numerical data be in a table format and that the first set represent direct 2032 relationships or links and the second set represent cluster links 2004.

Referring to FIG. 3H, the cluster link generation algorithm 2044 analyzes links to generate a set of cluster links 2004. More specifically, the cluster link generation algorithm 2044 generates a set of cluster links 2004 by analyzing direct 2032 and/or indirect links 2004 between nodes 2008 or between objects in a database 54 and generates a set of cluster links 2004. The set of cluster links 2004 is generated based upon direct 2032 and indirect 2036 paths or links existing in the database 54.

In the preferred embodiment, the cluster link generator 2040 analyzes direct links 2004 (for example source links 2004 and influence links 2004). These direct links 2004 may be represented by a table or series of vectors. The generator then locates indirect 2036 paths between nodes 2008 or objects in a database 54. The indirect 2036 paths are preferably made up of direct links 2004. The cluster link generator 2040 then generates a set of cluster links 2004 based upon both the direct links 2004 and on the indirect 2036 paths. The cluster links 2004 may be represented by a table or a series of vectors. Another embodiment of this invention uses candidate cluster links 2004 to provide a more efficient search. Candidate cluster links are the set of all possible cluster links 2004 between a search node 2008

22

and a target node 2004. In this embodiment, only a subset of the candidate cluster links 2004, the actual cluster links 2004, which meet a certain criteria are used to locate nodes 2008 for display.

Consider a set of nodes 2008 $N_0 \ldots N_3$ connected by a sequence of direct links 2004 whose weights 2034 are given by $W_1 \ldots W_3$, as shown in FIGS. 3F.

Node 2008 $N_1$ is reachable from $N_0$ through a path of length 1 (that is, $N_0 \rightarrow N_1$); node 2008 $N_2$ is reachable through a path of length 2 ($N_0 \rightarrow N_1 \rightarrow N_2$); and so on.

Each path provides some evidence that the start node 2008 ($N_0$) and destination node 2008 ($N_1$, $N_2$, or $N_3$) are related to some extent. The strength of the implied relationship depends on the length of the path, and on the weights 2034 of the individual direct links 2004 along that path.

In FIG. 3G, the implied relationships from $N_0$ to $N_1$, $N_2$, and $N_3$ are shown as arcs.

The weight 2034 of each implied link, $C_1 \ldots C_3$, is a function of the weight 2034 of the path to the previous node 2008 and the weight 2034 of the last link.

The individual functions F1 . . . F3 describe how to combine the weights 2034 of the direct links 2004 to determine the weight 2034 of an implied link. Selecting appropriate functions is the key to making cluster link generation work well. A preferred definition of $F_N$ is as follows:

$$C_N = F_N(C_{N-1}, W_N) = min(C_{N-1}, D_N * W_N),$$

where $D_N$ is a damping factor that decreases rapidly as N increases.

The cluster link algorithm 2044 determines the set of all paths P from a given node 2008 $N_0$ that have a length less than or equal to a given length L. Each path is rated using the method described above. The paths are then grouped by destination node 2008; the candidate cluster link 2004 $C(N_0, N_N)$ between $N_0$ and a given destination node 2008 $N_N$ has a weight 2034 equal to the sum of the weights 2034 of all paths $P_N$ leading to $N_N$.

The set of all candidate cluster links 2004 is then sorted by weight 2034. A subset of the candidate cluster links 2004 is chosen as actual cluster links 2004. The number of cluster links 2004 chosen may vary, depending on the number of direct links 2004 chosen from $N_0$, and on the total number of candidate cluster links 2004 available to choose from.

Performance considerations and efficiency are more important than for small databases. For large databases, finding the set of all paths P from a given node 2008 $N_0$ that have a length less than or equal to a given length L may be impractical, since the number of unique paths may number in the tens of millions.

One embodiment of this invention uses candidate cluster links 2004 to provide a more efficient search. Candidate cluster links 2004 are the set of all possible cluster links 2004 between a search node (2008) and a target node. (2008) In this embodiment, only a subset of the candidate cluster links 2004, the actual cluster links 2004, which meet a specified criteria are used to identify nodes (2008) for display 38.

Clearly, it is not necessary to examine millions of paths when the goal is to select the top or strongest cluster links 2004 for each $N_0$ (for example, the top 20 to 25 cluster links 2004). The great majority of paths have an insignificant effect on the final results. What is needed is an implementation of the cluster link algorithm 2044 where the total number of paths examined is bounded, independent of the size of the database 54, without a loss in effectiveness. To

Facebook Inc. Ex. 1201

5,832,494

### 23

this end, we have an implementation of the algorithm **2044** such that a cluster link **2004** is defined recursively.

We define $C_L(N_0, N_N)$, the order-L cluster link **2004** from $N_0$ to $N_N$, as the cluster link **2004** between $N_0$ and $N_N$, considering only paths of length less than or equal to L. Then, we can derive $C_{L+1}(N_0, N_N)$ from $C_L(N_0, N_N)$ and $C_1(N_0, N_N)$.

The assumption is that most of the paths $P_L(N_0, N_N)$ of length L (or greater) from $N_0$ to $N_N$ will not have a significant impact on cluster link generation. Therefore, we use a set of candidate cluster links **2004** $C_L(N_0, N_N)$ as a summary of that path information for the purpose of determining $C_{L+1}(N_0, N_N)$. This assumption has a significant impact on the performance of the algorithm **2044** in this implementation, since the search space is significantly reduced at each step. The computer processing "cost" of generating cluster links **2004** is bounded by the size of the candidate cluster link **2004** sets generated at the intermediate steps, rather than by the total number of relevant paths in the database **54**.

The size of the candidate cluster link **2004** set generated at each intermediate step affects the speed of the algorithm **2044** in this implementation. If too many candidate cluster links **2004** are generated at each intermediate step, the algorithm **2044** is too slow. On the other hand, if too few candidate cluster links **2004** are generated, and too many paths are pruned, then $C_L(N_0, N_N)$ is no longer an accurate summary of $P_L(N_0, N_N)$.

Finally, since the weights **2034** of the individual candidate cluster links **2004** in $C_L(N_0, N_N)$ are generally much greater than the weights **2034** of the individual paths in $P_L(N_0, N_N)$, the damping factors $D_N$ used to derive the combined weights **2034** at each step must be decreased accordingly in this implementation.

The specifics for the basic algorithm **2044** of this implementation, for determining the set of order N cluster links **2004** from a given start node **2008** $N_0$, are shown in FIG. 3H. The general algorithm **2044** works for any value of N greater than zero. If N=1, the set of candidate cluster links **2004** generated is simple. The processing cost of determining the candidate cluster links **2004** increases with N. In practice, N=3 appears to yield the best results.

The algorithm **2044** starts by initializing the candidate cluster link **2004** set **2048** and creating a loop for i=0 to N **2052**. The algorithm **2044** then performs a series of steps for each path P **2056**. First, it selects the destination node **2008** as the node to analyze and retrieves the set of direct links **2004** (L) from the selected node **2008** to any other node **2008** in the database **54**, $N_{i+1}$. Second, for each direct link **2004** L the algorithm **2044** performs a series of steps:

The algorithm **2044** creates a new path P' of length i+1 consisting of the path P plus the direct link **2004** L from the selected node **2008** to the node **2008** $N_{i+1}$ **2056**. The algorithm **2044** then determines the combined weight **2034** $WC_{i+1}$ from $WC_i$, the weight **2034** of the path P, and $W_{i+1}$, the weight **2034** of Link **2004** L, using the following preferred formula:

$$WC_{i+1} = min(WC_i, D_{i+1} \cdot W_{i+1})2064.$$

Following these computations, the algorithm **2044** decides whether there already is a path in the cluster link **2004** from $N_0$ to $N_{i+1}$ **2068**. If there is not already a path, the algorithm **2044** adds P' to $C_{i+1}$ **2072**. If there already is a path, the algorithm **2044** adds $WC_{i+1}$ to the weight **2034** of the existing path in $C_{i+1}$ **2076**. These steps are then repeated as necessary.

### 24

Once the candidate cluster link **2004** set has been generated, deriving the actual cluster links **2004** is a simple matter of selecting or choosing the T top rated candidate links **2004**, and eliminating the rest. In practice, the following formula has yielded good results:

$$T = min(constant, 4 \cdot d),$$

where d is the number of direct links **2004** from No. Setting the constant equal to twenty has yielded good results. More than T cluster links **2004** may be generated if there are ties in the ratings. After each iteration, the candidate cluster link **2004** set $C_i$ may be pruned so that it contains only the top candidate cluster links **2004** (for example, the top **200**).

FIGS. **4A** and **4B** are high level flow charts that illustrate the general flow of the subroutines of the CSPDM **66**. FIG. **4A** illustrates that the flow of various search routines depend on the type of search initiated by the researcher. The diagram further illustrates the interaction between the CSPDM **66** and the GUI Program **70**. FIG. **4B** illustrates the sequence of subroutines in the CSPDM **66** program and the user interactions with the subroutines. FIG. **4B** further shows that the researcher can access the different search subroutines and use information that the researcher has already received to find new information.

FIG. **4B** provides a high level flow chart illustrating the sequence of subroutines in the CSPDM **66** program and the researcher's interactions with the subroutines. Assuming that the database **54** the researcher desires to access has been proximity indexed, the researcher must log on **260** to the database **54**. By entering the appropriate information into the Computer Processor **30** via the input means, the researcher electronically access **264** the database **54** and enables the CSPDM **66** to search **200** the database **54**.

FIGS. **4A** and **4B** both show the preliminary options that the researcher can choose from before selecting one of the searching subroutines of the CSPDM **66**. The CSPDM **66** questions the researcher on whether the researcher has identified a pool of textual objects **204**. If the researcher has selected a pool of textual objects **204**, then the researcher is able to choose one of the pool search **208** subroutines **212**. If the researcher has not selected a pool of textual objects, the CSPDM **66** questions the researcher on whether the researcher has selected a single textual object **216**. If the researcher has selected a single textual object **216**, then the researcher is able to choose one **220** of the textual object searches **224**. If the researcher has not selected either a pool of textual objects **204** or a single textual object **216**, then the researcher must execute a Boolean Word Search or alternate Pool-Generation Method **228** to retrieve textual objects **268**, **272**.

After CSPDM **66** subroutine has executed a particular search, the CSPDM **66** retrieves the appropriate data from the database **54**, analyzes the data, and sends the data to the GUI Program **70** in order for the GUI Program **70** to display the results of the search on the display **38**.

FIG. **4B** illustrates that after the CSPDM **66** has completed the above procedure, the researcher has the option to exit the CSPDM **66** by logging off **300**, executing a search based on the results of a previous search, or executing a new search.

FIGS. **4A** and **4B** also depict the seven subroutines of the CSPDM **66**. There are three textual object search subroutines **224** and four pool search subroutines **212**. The three textual object search subroutines **224** are: the Cases-In Subroutine **232**, the Cases-After Subroutine **236** and the Similar Cases Subroutine **240**. The four pool search sub-

Facebook Inc. Ex. 1201

5,832,494

25

routines **212** are the Pool-Similarity Subroutine **244**, the Pool-Paradigm Subroutine **248**, the Pool-Importance Subroutine **252**, and the Pool-Paradigm-Similarity Subroutine **256**. Each of these subroutines are described in more detail in FIGS. **4C** to **4I**. The following is a step by step description of the subroutines **224**, **212** of the CSPDM **66**.

Section A Cases-In Subroutine **232**

FIG. **4C** is a high level flow chart for the Cases-In Subroutine **232**.

1. The researcher must select a single textual object **400**.

2. The researcher selects the Cases-In Subroutine **232** option.

3. The Cases-In Subroutine **232** examines the n×n Opinion Citation Matrix and other matrices **404** created by the Proximity Indexing Application Program **62** and retrieves the textual objects to which the selected textual object refers **408**, data relating to the number of times the selected textual object refers to the retrieved textual objects, data relating to the importance of each textual object, and other relevant data.

Section B Cases-After Subroutine **236**

FIG. **4D** is a high level flow chart for the Cases-After Subroutine **236**.

4. The researcher must select a single textual object **400**.

5. The researcher selects the Cases-After Subroutine **236** option.

6. The Cases-After Subroutine **236** examines the n×n Opinion Citation Matrix and other matrices **412** created by the Proximity Indexing Application Program **62** and retrieves the textual objects that refer to the selected textual object **416**, data relating to the number of times the retrieved textual objects refer to the selected textual object, data relating to the importance of each textual object, and other relevant data.

Section C Similar-Cases Subroutine **240**

FIG. **4E** is a high level flow chart for the Similar-Cases Subroutine **240**.

7. The researcher must select a single textual object **400**.

8. The researcher selects the Similar-Cases Subroutine **240** option.

9. The Similar-Cases Subroutine examines the q×q Section Similarity Matrix and other matrices **420** created by the Proximity Indexing Application Program **62** and retrieves the textual objects that are similar to the selected textual object **424**, data relating to the degree of similarity between the selected textual object and the retrieved textual objects, data relating to the importance of each textual object, and other relevant data. In order to be retrieved, a textual object must have a similarity coefficient with respect to the selected textual object of at least a minimum value. The preferred embodiment sets the minimum similarity coefficient of four percent (4%).

Section D Pool-Similarity Subroutine **244**

FIG. **4F** is a high level flow chart for the Pool-Similarity Subroutine **244**.

10. The researcher must select a pool of full textual objects **428**.

11. The researcher must then select a single full textual object **400** to which in compare the pool of full textual objects. It should be noted that the researcher can select the single textual object from the selected pool of textual objects, or the researcher can select a textual object from outside of the pool **432**.

12. The Pool-Similarity Subroutine **244** examines the n×n Opinion Similarity Matrix and other matrices **436** and values created by the Proximity Indexing Application Program **62** for the selected full textual object and the pool of full textual objects.

26

13. The Pool-Similarity Subroutine **244** determines the degree of similarity of other full textual objects in the pool to the selected full textual object **440**.

Section E Pool-Paradigm

FIG. **4G** is a high level flow chart for the Pool-Paradigm Subroutine **248**.

14. The researcher must select a pool of full textual objects **428**.

15. The Pool-Paradigm Subroutine **248** examines the n×n Opinion Proximity Matrix, the n×n Opinion Similarity Matrix and other matrices and values created by the Proximity Indexing Application Program **62** for the pool of full textual objects **448**.

16. The Pool-Paradigm Subroutine **248** determines the Paradigm full textual object by calculating the mean of the Euclidean distances of all the textual objects in the pool **452**.

17. The Pool-Paradigm Subroutine **248** determines the similarity of the other full textual objects in the pool to the Paradigm full textual object **456**.

Section F Pool-Importance Subroutine **252**

FIG. **4H** is a high level flow chart for the Pool-Importance Subroutine **252**.

18. The researcher must select a pool of full textual objects **428**.

19. The Pool-Importance Subroutine **252** examines **448** the n×n Opinion Citation Matrix, numerical factors and other matrices and values created by the Proximity Indexing Application Program **62** for the pool of full textual objects **460**.

20. The Pool-Importance Subroutine **252** then ranks the importance of each of the full textual objects in the pool **464**.

FIG. **4I** is a high level flow chart showing two possible alternate Pool-Paradigm-Similarity Subroutines **256**.

Section G Pool-Paradigm-Similarity Subroutine **256** (Option 1) **256**

21. The researcher must select a pool of k full textual objects where k equals the number of full textual objects in the pool **428**.

22. For each of the k full textual objects, the Pool-Paradigm-Similarity Subroutine **256** selects a n×1 vector from the corresponding column of the n×n.

23. The Pool-Paradigm-Similarity Subroutine **256** creates an n×k matrix by grouping the n×1 vector representing each of the k full textual objects beside each other.

24. The Pool-Paradigm-Similarity Subroutine **256** calculates the mean of each row of the n×k matrix and enters the mean in the corresponding row of an n×1 Paradigm Proximity Vector **472**.

25. The Pool-Paradigm-Similarity Subroutine **256** combines the n×1 Paradigm Proximity Vector with the n×n Opinion Proximity Matrix to create an (n+1)×(n+1) Paradigm Proximity Matrix **476**.

26. From the (n+1)×(n+1) Paradigm Proximity Matrix, the Pool-Paradigm-Similarity Subroutine **256** evaluates the Euclidian distances and empirical data to create an (n+1)×(n+1) Paradigm Similarity Matrix **480**.

27. The Pool-Paradigm Similarity Subroutine searches the row in the (n+1)×(n+1) Paradigm Similarity Matrix that corresponds to the Paradigm full textual object and retrieves the full textual objects that have a maximum degree of similarity with the Paradigm full textual object **500**.

Section H Pool-Paradigm-Similarity Subroutine **256** (Option 2)

28. The researcher must select a pool of k full textual objects where k equals the number of full textual objects in the pool **428**.

29. For each of the k full textual objects, the Pool-Paradigm-Similarity Subroutine **256** selects an n×1 vector from the corresponding column of the n×n.

Facebook Inc. Ex. 1201

5,832,494

27

30. The Pool-Paradigm-Similarity Subroutine **256** creates an n×k matrix by grouping the n×1 vector for each of the k full textual objects beside each other.

31. The Pool-Paradigm-Similarity Subroutine **256** calculates the mean of each row of the n×k matrix and enters the mean in the corresponding row of an n×1 Paradigm Pattern Vector PF **488**.

32. The Pool-Paradigm-Similarity Subroutine **256** combines the n×1 Paradigm Pattern Vector PF with the n×n Opinion Pattern Matrix to create a (n+1)×(n+1) Paradigm Pattern Matrix **492**.

33. From the (n+1)×(n+1) Paradigm Pattern Matrix, the Pool-Paradigm-Similarity Subroutine **256** evaluates the Euclidean distances between the rows of the Paradigm Pattern Matrix and creates an (n+1)×(n+1) Paradigm Proximity Matrix **496**.

34. From the (n+1)×(n+1) Proximity Matrix, the Pool-Paradigm-Similarity Subroutine **256** evaluates the Euclidean distances between the rows of the (n×1)×(n×1) Paradigm Proximity Matrix and empirical data to create an (n+1)×(n+1) Paradigm Similarity Matrix **480**.

35. The Pool-Paradigm Similarity Subroutine searches the row in the (n+1)×(n+1) Paradigm Similarity Matrix that corresponds to the Paradigm full textual object and retrieves the full textual objects that have a minimum degree of similarity with the Paradigm full textual object **500**.

### Application of the Proximity Indexing Technique

The above Proximity Indexing Application Program **62** and CSPDM **66** have a number of different applications and versions. Three of the most useful applications are described below.

The first type of Proximity Indexing Application Programs **62** is for use on very large databases. The matrices generated by this type of Proximity Indexer are "attached" to the database **54**, along with certain clustering information, so that the database **54** can be searched and accessed using the Cases-In Subroutine **232**, Cases-After Subroutine **236**, Cases-Similarity Subroutine, Pool-Similarity Subroutine **244**, Pool-Paradigm Subroutine **248**, Pool-Importance Subroutine **252** and Pool-Paradigm-Similarity Subroutine **256** of the CSPDM **66**.

The second type of Proximity Indexing Application Program **62** is a Proximity Indexer that law firms, businesses, government agencies, etc. can use to Proximity Index their own documents in their own databases **54**. The researcher can navigate through the small business's preexisting database **54** using the Cases-In Subroutine **232**, Cases-After Subroutine **236**, Cases-Similarity Subroutine, Pool-Similarity Subroutine **244**, Pool-Paradigm Subroutine **248**, Pool-Importance Subroutine **252** and Pool-Paradigm-Similarity Subroutine **256** of the CSPDM **66**. In addition, this type of Proximity Indexer Application Program will be designed to be compatible with the commercial third-party databases **54** which are Proximity Indexed using the first type of program. In other words, the researcher in a small business may "weave" in-house documents into a commercial database **54** provided by a thirdparty, so that searches in the large database **54** will automatically bring up any relevant in-house documents, and vice versa.

The third type of Proximity Indexing Application Program **62** involves the capacity to do Proximity indexing of shapes. Each image or diagram will be treated as a "textual object." The various matrix coefficients can be generated purely from topological analysis of the object itself, or from accompanying textual information about the object, or from

28

a weighted combination of the two. The text is analyzed using the Proximity Indexing Application Program **62** as explained above. Shapes are analyzed according to a coordinate mapping procedure similar to that used in Optical Character Recognition ("OCR"). The numerical "maps" resulting from scanning the images are treated as "textual objects" that can be compared through an analogous weighing algorithm to generate a proximity matrix for every ordered pair of "textual objects" in the database **54**. A similarity matrix can then be generated for each ordered pair, and the results organized analogous to a database **54** totally comprised of actual text.

This third type of Proximity indexing applications program can provide "Proximity Indexed" organization access to many different types of objects. For example, it can be used to search patent diagrams, or compare line drawings of known pottery to a newly discovered archeological find. It can be used to scan through and compare police composite drawings, while simultaneously scanning for similar partial descriptions of suspects. It can be used to locate diagrams of molecular structures, appraise furniture by comparing a new item to a database **54** of past sales, identify biological specimens, etc., etc.

FIG. 5A is a high level drawing that depicts one embodiment of the GUI Program **70** and its interaction with both the CSPDM **66** and the display **38**. The GUI Program **70** has one or more display subroutines. One embodiment contains seven display subroutines. The seven subroutines comprise three textual object display subroutines **504** and four pool display subroutines **508**. The three textual object display subroutines **504** are the Cases-In Display Subroutine (CIDS) **512**, the Cases-After Display Subroutine (CADS) **516** and the Similar-Cases Display Subroutine (SCDS) **520**. The four pool display subroutines **508** are the Pool-Similarity Display Subroutine (PSDS) **524**, the Pool-Paradigm Display Subroutine (PPDS) **528**, the Pool-Importance Display Subroutine (PIDS) **532** and the Pool-Paradigm-Similarity Display Subroutine (PPSDS) **536**. The three textual object display subroutines receive data from the corresponding textual object search subroutine **224** of the CSPDM **66**. Similarly, the four pool display subroutines **508** receive data from the corresponding pool search subroutine **212** of the CSPDM **66**. Once the display subroutines have processed the data received by the search subroutines, the data is sent to the integrator **540**. The integrator **540** prepares the data to be displayed in the proper format on the display **38**.

FIGS. 5B through 5H depict screens generated by the textual object display subroutines, CIDS **512**, CADS **516** and SCDS **520**. The three types of screens are the Cases In screen **1000**, the Cases After screen **1004** and the Similarity Screen **1008**, respectively. The Similarity Screen **1008** provides the most "intelligent" information, but all three screens generated by the textual object display subroutines work in tandem as a system. The other screens created by the pool display subroutines are variances of these three, and also work in tandem with each other and with the three textual object display screens.

FIG. 5B depicts the "Cases After" **1004** Screen created by the CADS **516** for the textual object, Terry v. Ohio, 392 U.S. 1 (1968). The Cases-After subroutine **236** search produces all of the textual objects in the designated field (here D.C. Circuit criminal cases since 1990) that cite Terry. The number "12" in the upper left hand corner indicates that there are a total of 12 such textual objects. The vertical axis **1012** indicates the degree to which a given textual object relied upon Terry. The number "10" immediately below the 12 indicates that the textual object in the field which most

5,832,494

### 29

relied upon Terry, namely U.S. v. Tavolacci, 895 F.2d 1423 (D.C. Cir. 1990), discusses or refers to Terry in ten of its paragraphs.

The Tear-Off Window **1016** feature is illustrated in FIG. 5B by the Tear-Off Window **1016** for U.S. V. McCrory 930 F.2d 63 (D.C. Cir. 1991). The four Tear-Off Window active boxes **1020** (displayed on the Tear-Off Window **1016**): 1) open up the full text **1104** of McCrory to the first paragraph that cites Terry; 2) run any of the three searches, namely Cases-In Subroutine **232** Cases-After Subroutine **236** or Cases-Similar Subroutine **240** for McCrory itself (the default is to run the same type of search, namely Cases-After Subroutine **236** again); 3) hide the Terry execute search window **1024**; and 4) bring the Terry Execute Search window to the foreground, respectively. The weight numeral **1028** indicates the number of paragraphs in McCrory that discusses or refers to Terry, in this textual object (in this example there is only one).

The Cases After screen **1004** for a given Textual object B displays a Textual Object Active Box **1032** representing every subsequent textual object in the database **54** that refers explicitly to Textual object B. The analysis starts with the same pool of material as a Shepard's™ list for Textual object B. As well as some additional material not gathered by Shepards. However, the Cases After screen **1004** conveys a wealth of information not conveyed by a Shepards™ list.

The horizontal axis **1036** may represent time, importance or any other means of measurement to rank the textual objects. The Shepards list itself contains no information as to when a case was decided. The vertical axis **1012** similarly may represent any means of measurement to rank the textual objects. In the preferred embodiment, the vertical axis **1012** represents the degree to which the subsequent Textual object C relied upon the original Textual object B. The display **38** makes it obvious when a textual object has received extensive discussion in another textual object, or provides key precedent for a subsequent textual object, or merely mentions the earlier textual object in passing. It also provides guidance as to possible gradations in between extensive, or merely citing.

The "shape" of the overall pattern of active boxes on the Cases After screen **1004** provides a rich lode of information to be investigated. For example, a "dip" in citation frequency immediately after a particular textual object suggests that the particular textual object, while not formally overruling Textual object B, has largely superseded it. A sudden surge in citation frequency after a particular Supreme Court case may indicate that the Supreme Court has "picked up" and adopted the doctrine first enunciated in Textual object B. The researcher can instantly determine if the holding of Textual object B has been adopted in some circuits but not in others, if Textual object B is losing strength as a source of controlling precedent, etc. None of this information is now available to lawyers in graphical or any other form.

As with the Cases In screen **1000**, every Textual Object Active Box **1032** on the Cases After screen **1004** is active, and includes a Tear-Off Window **1016** that may be moved by dragging on the tear-off window **1016** with a mouse **42**, and that tear-off window **1016** becomes a text Tear-Off Window **1040**, visible even when one moves on to other searches and other screens. Thus one may "tear off" for later examination every relevant citation to Textual object B, or even for a group of textual objects. The text tear-off windows **1040** "tile"; that is, they can be stacked on top of one another to take up less room. There is also a "Select All" feature (not shown), that creates a file containing the citations of every textual object retrieved in a given search.

### 30

In Cases After screen **1004** mode, clicking on the expanded-view button **1044** of the text tear-off window **1040** opens the text of the subsequent Textual object C to the first place where Textual object B is cited. A paragraph window **1048** displays a paragraph selection box **1052** indicating what paragraph in Textual object C the researcher is reading, and a total paragraph box **1056** indication how many paragraphs Textual object C contains in total. The user can view paragraphs sequentially simply by scrolling through them, or see any paragraph immediately by typing its number in the paragraph selection box **1052**. Clicking on a Next paragraph active box **1060** immediately takes the researcher to the next paragraph in Textual object C where Textual object B is mentioned. Traditional Shepardizing allows the researcher to explore the subsequent application of a doctrine in a range of different factual situations, situations that help to define the outer contours of the applicability of a rule. Combining the expanded-view button **1044** functions and "Next Paragraph" active box **1060** functions allows the researcher to study how Textual object B has been used in all subsequent textual objects, in a fraction of the time the same task currently requires with available searching methods.

Perhaps the most fundamental form of legal research is "Shepardizing." A researcher starts with a textual object known to be relevant, "Textual object B," and locates the "Shepards" for that textual object. The "Shepards" is a list of every subsequent textual object that explicitly refers to Textual object B. The researcher then looks at every single textual object on the list. Shepardizing is often painstaking work. Many subsequent references are made in passing and have almost no legal significance. Although Shepards includes some codes next to its long lists of citations, such as "f" for "followed" and "o" for "overruled," the experience of most lawyers is that such letters cannot be relied upon. For example, the researcher may be citing Textual object B for a different holding than that recognized by the anonymous Shepards reader, interpreting Textual object B differently, or interpreting the subsequent textual object differently. However, for really thorough research, checking a Shepards type of list is essential. The researcher must make absolutely sure that any textual object cited as legal authority in a brief, for instance, has not been superseded by later changes in the law.

Very often, textual objects located on the Shepards list for Textual object B refer back to other important textual objects, some of which may predate Textual object B, all of which may be Shepardized in turn. This "zig-zag" method of research is widely recognized as the only way to be sure that one has considered the full line of textual objects developing and interpreting a doctrine. The real power of the Cases After screen **1004** emerges when it is used in conjunction with the Cases In screens **1000** and Similarity screens **1008**. Using the preferred embodiment, the researcher may engage in the same kind of careful "zig-zag" study of a legal doctrine in a much more efficient manner.

For example, consider the following hypothetical search. The researcher reads Textual object B, and makes a list of every Supreme Court textual object it substantially relies upon, perhaps six textual objects. The researcher then Shepardizes Textual object B and reads each of those textual objects, in order to find other Supreme Court textual objects that the relied upon, perhaps eight. One then Shepardizes those fourteen Supreme Court decisions, in order to find any Court of Appeals cases in a selected circuit within the last three years on the same basic topic. This process would take at least an hour, even using Shepards through an on-line service. The same search can be performed with the present

5,832,494

31

invention using the Cases In screens **1000** and Cases After screens **1004** in under five minutes.

In order to perform the same search, a researcher can pull up both the Cases In screens **1000** and Cases After screens **1004** for Textual object B simultaneously. The researcher can then "tear-off" all of the Supreme Court Cases on both lists, run Cases-After Subroutine **236** searches on every Supreme Court Case mentioned on either list, then examine the Cases In screens **1000** for all of the Supreme Court cases produced by these searches. The researcher can locate every recent Court of Appeals case from a selected circuit mentioned in any of those Supreme Court cases. Use of the Similarity screen **1008** as well, allows the researcher to find the pool of relevant Court of Appeals full textual objects even faster.

FIG. 5C depicts the Cases After Screen **1004** for U.S. v. Lam Kwong-Wah, 924 F.2d 298 (D.C. Cir. 1991). FIG. 5C shows a text Tear-Off Window **1040** on a Cases After Screen **1004**, (in this textual object the Tear-Off Window **1016** for U.S. v. Barry, 938 F.2d 1327 (D.C. Cir. 1991), is opened using the full text active box **1064**. A text Tear-Off Window **1040** containing the text of Barry opens, to the first cite of U.S. v. Lam Kwong-Wah at paragraph 15. Clicking on the Next Paragraph active box **1060** will open the text of Barry to the next paragraph that cites Lam Kwong-Wah.

The number "34" in the lower-left corner of the total paragraph box **1056** indicates that Barry has a total of 34 paragraphs in the cite U.S. v. Lam Kwong-Wah. Dragging the small squares **1068** to the left and below the text allow the researcher to move within a paragraph, and from paragraph to paragraph, in the text of Barry, respectively. The empty space below the text **1072** would contain the text of any footnote in paragraph 15. The compress window active box **1074** now closes the window and replaces it with the corresponding active textual object box **1032**.

FIG. 5D depicts the Cases In Screen **1000** for U.S. v. North, 910 F.2d 843 (D.C. Cir. 1990). FIG. 5D contains a Textual Object Active Box **1032** representing every textual object or node with persuasive authority, cited in the text of North. The vertical axis **1012** represents the degree to which North relied upon a given textual object. In this example it is immediately apparent that Kastigar v. United States, 406 U.S. 441 (1972) is the most important precedent, and its Tear-Off Window **1016** have been activated. The weight numeral **1028** indicates that Kastigar is referred to in 77 paragraphs of North.

A highlighted Textual Object Active Box **1076** can be created by clicking on it, as has been done with U.S. v. Mariana, 851 F.2d 595 (D.C. Cir. 1988). The number "212" in the case number box **1080** indicates that citations to two-hundred-twelve distinct texts appear in North. Fewer are visible because the textual object activeboxes **1032** "tile" on top of one another; the "Zoom" feature is used to focus on a smaller area of the screen, and ultimately resolves down to a day-by-day level, making all the textual object active boxes **1032** visible.

The unique Cases In screen **1000** provides a schematic representation of the precedent from which Textual object A is built. The Cases In screen **1000** contains a textual object active box **1032** representing every textual object which is relied upon, or even mentioned, in Textual object A. Any citation in textual object A to a textual object that possesses potential persuasive authority, whether a statute, constitutional provision, treatise, scholarly article, Rule of Procedure, etc., is treated as a "textual object." The textual object active boxes **1032** are color-coded to indicate the

32

court or other source of each textual object. Supreme Court cases are red, Court of Appeals cases are green, District Court cases are blue, and statutes are purple, for example. Each Textual Object Active Box **1032** contains the full official citation **1084** of its textual object. Clicking on any Textual Object Active Box **1032** immediately pulls up a larger window, known as a tear-off window **1016**, also containing the full citation **1084** to the textual object (Tear-Off Window Citation **1088**), its date **1092**, its circuit **1096**, and its weight numeral **1028** to the textual object being analyzed. The user may then drag the Tear-Off Window **1016** free of the Textual Object Active Box **1032** and release it.

This creates a text Tear-Off Window **1040** that remains visible until the researcher chooses to close it, no matter how many subsequent screens the researcher examines. The text Tear-Off Window **1040** can be moved anywhere by dragging it with the mouse **42**. The text Tear-Off Window **1040** contains small text active boxes **1100** allowing the researcher to access or "pull up" the full text **1104** of the textual object it represents with a single click of the mouse **42**. This feature also allows the researcher to run Cases-In Subroutine **232** Cases-After Subroutine **236** and Cases-Similar Subroutine **240** searches on the textual object. (See below for a description of the Similarity screen **1008**).

The organization of the boxes on the screen, including their position on the horizontal axis **1036** and vertical axis **1012**, represents the real "intelligence" behind the Cases-In screen **1000**. The horizontal axis **1036** in the preferred embodiment represents time, with the left margin **1108** corresponding to the present, i.e., the date **1092** when the search is run. The right margin **1112** represents the date of decision of the earliest textual object cited in Textual object A. (Certain special materials, such as treatises updated annually, and the U.S. Constitution, are located in a column **1116** to the left of the margin.)

The vertical axis **1012** in the preferred embodiment represents the degree to which Textual object A relied upon each particular textual object it contains. For example, if the Cases In screen **1000** is run on a district court case (Textual object A) which happens to be a "stop and search" textual object that mainly relies upon Terry v. Ohio 392 U.S. 1 (1968), Terry will be at the top of the screen, with all other textual object active boxes **1032** appearing far below. The researcher can thus access the text of Terry directly without ever reading the text of Textual object A. Of course, the full text **1104** of Textual object A is also instantly available if desired. If the researcher wants to see where Terry "came from," the researchers can instantly, by clicking on a text active box **1100** within the Terry text Tear-Off Window **1040**, run the Cases-In Subroutine **232** for Terry—and so on. There is no limit to the number of "levels" or "generations" the researchers may explore using this technique. It is therefore possible (assuming a sufficient database **54**) to find, in a matter of seconds, without having to read through layers of texts, the possibly long-forgotten eighteenth-century precursors to a modern doctrine.

The Cases In screen **1000** creates an instant visual summary or "blueprint" of a textual object. The blueprint can help a researcher make a preliminary judgment about whether a particular textual object is worth closer examination. Viewing the Cases In screens **1000** for a group of textual objects allows a researcher to recognize whether there are precedents common to that group. The blueprint tells the researcher whether Textual object A is primarily a statutory construction case, a textual object that relies on local Court of Appeals cases without Supreme Court

Facebook Inc. Ex. 1201

5,832,494

33

support, a textual object relying on precedent outside the circuit **1096** as persuasive authority, etc.

The initial Cases In screen **1000** presents every citation within a given textual object. In a textual object with an unusually large number of citations, the screen will be crowded with textual object active boxes **1032**. The GUI therefore contains a "zoom" feature that allows the researcher to expand any small portion of the screen. To get back to the "big picture," the researcher simply selects the "Fit in Window" menu item, or else selects the "zoom out" feature. The same "zoom," "zoom out," and "Fit in Window" functions are present in the Cases After screen **1004** and Similarity screen **1008** as well.

The routine that calculates "degree to which Textual object A relies upon the cited textual object" clearly ranks major textual objects at the top, textual objects mentioned only in passing at the bottom, and textual objects of potentially greater relevance in between via display the appropriate textual object active boxes **1032** in the appropriate place. In addition, the routine can recognize when a highly relevant textual object is mentioned only in passing and give a higher weight to that textual object than it would otherwise receive in the ranking procedure.

The "intelligence" behind the entire GUI is driven by the knowledge that the lawyers do not want the computer to do legal analysis or make judgments for them, but simply guide them through the great mass of irrelevant material to those texts where lawyerly analysis of a problem begins.

The Cases In screen **1000** is designed with practical legal research in mind. It is common in legal research to locate a lower court textual object on the correct topic, call it "local Textual object A." However, the researcher desired to find the most persuasive authority available. The aim of this type of research is to find the "lead" textual object or textual objects on a particular topic. The researcher ultimately desires the first textual object, most famous textual object, and most recent textual objects of the Supreme Court (or state Supreme Court in state law issues) that stand for the same principle. ("Lead" textual objects also occur at the intermediate and trial court level.)

The standard way to find lead textual objects is to read through the text of a local Textual object A until one finds references to "higher court textual objects," then look up each of those higher court textual objects in turn. The researcher then reads the text of those textual objects until the researcher determines the textual objects they have in common, the textual objects that appear many times. Very often, the lower court textual object from which the researcher started is of no real value in and of itself—it may well be from a different local jurisdiction—and the researcher reads through it only to find citations within it. Since the GUI quickly locates and schematically diagrams the textual objects, this process is accelerated dramatically using the GUI.

FIGS. 5E through 5G depict multiple Similar Case Subroutine **240** searches run in sequence. A Similarity Screen **1008** for U.S. v. Caballero, 936 F.2d 1292 (D.C. Cir. 1991), reveals via the case number box **1080**, that 17 textual objects were retrieved by Similar Cases Subroutine **240** search. The vertical axis **1012** indicates that the textual objects retrieved had similarity coefficients **1120** between 4% and 15% with respect to U.S. v. Caballero. Textual objects with less than 4% similarity are not shown. The vertical axis **1012** represents degree of similarity, or textual relatedness, so that 100% would be two identical texts. The Tear-Off Window **1016** of U.S. v. Nurse 916 F.2d 20 (D.C. Cir. 1990) shows that the textual object has a similarity of 9%.

34

The Similarity screen for a given Textual object C is organized like the Cases In screen **1000** and Cases After screen **1004**, with the same color-coded textual object active boxes representing textual objects, and time on the horizontal axis **1036**. However, the vertical axis **1012** represents the degree to which the represented textual object is related to Textual object C. The system is built on the principle that legal doctrines tend to emerge out of lines of textual objects developing a legal principle. Lines of textual objects contain "lead" textual objects that establish basic rules and subsequent textual objects that do not establish new rules, but apply and re-interpret the pre-existing rules in various circumstances. Some lead textual objects invent new doctrines, while others modify or redirect the law based on earlier precedent.

The routine that operates behind the Similarity screen **1008** determines which line or lines of textual objects that Textual object C can be grouped. The routine then ranks the textual objects in that line depending on how closely they are related to Textual object C. For example, a typical similarity search starting with a Court of Appeals case in a certain circuit, Textual object D, will find the Supreme Court and Court of Appeals cases that have established the principles followed in Textual object D. The Supreme Court and Court of Appeals case will appear as textual object active boxes whether or not they are cited in Textual object D. Furthermore, the Similar Cases Subroutine **240** search will find the textual objects decided subsequent to Textual object D that have applied, and possibly modified, those principles, whether or not those textual objects cite Textual object D.

Similarity searches allow a researcher to find textual objects on the same topic that do not share common phrases and might be overlooked by a Boolean word search. Similarity searches also allow researchers, who only have an obscure district court case, to "tap in" to the lead textual objects in any area. By organizing all case law in "conceptual space," the Similarity screens **1008** allow one to locate emerging topics that have not been formally recognized by those assigning "key numbers" or otherwise manually classifying textual objects—or even by the authors of the textual objects themselves.

The "shape" of a Similarity Screen **1008** may convey a great deal of information about a particular legal concept. For example, the screen conveys to the researcher whether a certain concept, which is essentially novel, is supported by Supreme Court case law. Or is an old doctrine that has been recently applied in a new context. The system as a whole gives lawyers the ability to assess what textual objects are "available" on their topic, and to zero in on the textual objects that are most useful. The researcher has the ability to track down every subsequent reference to any particular textual objects by utilizing multiple "Cases After" searches, identifying core precedents through "Cases In" searches, and by running new "Similarity" searches to obtain any textual objects that emerge in closely related topic areas. The "Similarity" algorithm is more "aggressive" then the others, since it contains built-in judgments as to what "relatedness" means. It also judges what is no longer sufficient to display on the screen. The bottom edge of the screen represents a minimum degree of similarity below which the connections are too tenuous to be worth pursuing. In the commercial product, this minimum level can be reset at the preference of the user.

FIG. 5F is the Similarity Screen **1008** for U.S. v. Nurse. Clicking on the run search Tear-Off Window active box **1128**, which is on the Tear-Off Window **1016** for Nurse produces FIG. 5F. Clicking on the Textual Object Active

Facebook Inc. Ex. 1201

5,832,494

35

Box **1032** for U.S. v. Jordan. 951 F.2d 1278 (D.C. Cir. 1991) long enough to pull up its Tear-Off Window **1016**, and then clicking on Jordan's run search Tear-Off Window active box **1020** (not shown), produces the Similarity Screen **1008** shown in FIG. 5G.

FIG. 5G shows how multiple tear-off windows **1016** can be shown at the same time, here the U. S. v. Jordan similarity Tear-Off Window **1016** depicts for the three textual objects most similar to Jordan. Note that U.S. v. Jordan, 958 F.2d 1085 (D.C. Cir. 1992), is very closely related, i.e., 41%, to U.S. v. Jordan, 951 F.2d 1278 (D.C. Cir. 1991) apparently as it is a subsequent full textual object decision of the same dispute as the first textual object.

FIG. 5H depicts a close-up view of an Execute Search Window **1024**. The researcher can input a selected textual object that is either represented or not represented on a display **38** screen as a Textual Object Active Box **1032**. The researcher can title his search by inputting the title in the Title Search box **1132**. The researcher can then input the reference to the selected textual object in the reference input boxes **1136**. The reference input boxes of the preferred embodiment allow the researcher to refer to the selected textual object by Volume, Category, Page and/or Section by inputting the appropriate values in the volume reference box, category reference box, page reference box, and/or section reference box, respectively.

The researcher can also identify the type of search to be performed on the selected textual object by selecting the appropriate search in the Analysis box.

Once the researcher has inputted all the appropriate values, the researcher executes the search by activating the execute search button.

Referring generally to FIGS. 5A through 5H, the PSDS **524**, PPDS **528**, PIDS **532** and PPSDS **536** of the GUI Program **70**, also create similar displays to the CIDS **512**, CADS **516**, and SCDS **520** subroutines. The only major difference between the screens created by the three textual object display subroutines and the four pool display subroutines is the information contained in the Execute Search window and the options available in the analysis box.

The options in the analysis box enable a researcher to select a textual object outside the pool of textual objects and compare how the selected textual object relates to the pool of textual objects by selecting to the Pool-Similarity Subroutine **244**, the Pool-Paradigm Subroutine **248** or Pool-Importance Subroutine **252** of the CSPDM **66**.

The PSDS **524** creates a Pool-Similarity Screen **1008**. The vertical axis **1012** ranks the similarity of the objects in a pool of textual objects with respect to a selected textual object. All of the other aspects of this display **38** are similar to the Similar Cases Screen.

PPDS **528** creates a Pool-Paradigm Screen. The vertical axis **1012** ranks the similarity of the pool of textual objects on the screen with respect to the paradigm textual object. The paradigm textual object is calculated by averaging the mean of all the Euclidean distances of the pool of textual objects on the screen. All of the other aspects of this display **38** are similar to the Similar-Cases Screen.

The PIDS **532** creates a Pool-Importance Screen. The vertical axis **1012** ranks the importance of the pool of textual objects on the screen. All other aspects of the PIDS **532** display **38** are similar to the Cases-In Screen **1000** and Cases-After Screen **1004**.

The PPSDS **536** creates a Pool-Paradigm Similarity Screen **1008**. The vertical axis **1012** represents the similarity

36

of all textual objects in the database **54** to the paradigm textual object created by a selected pool of textual objects. All other aspects of the PPSDS **536** display **38** are similar to Similar-Cases Screen **1008**.

Before displaying the text boxes **1032** representing result nodes **2104** on the screen to the user, the graphical user interface program **70** optimally organizes and arranges the location **1032** of boxes on the X and Y axis. In the preferred embodiment, the GUI Program **70** uses a layout of boxes algorithm to optimally place boxes within a window.

Referring to FIG. 7, generally, a layout algorithm plots text boxes **1032** on a Cartesian axis as determined by their X and Y values **1200**. The algorithm compares the locations of boxes **1032** within a display window to determine if there are any overlapping boxes **1204**. In order to perform this comparison, the preferred algorithm initializes a first loop, for i=0 to N, and chooses box$_i$ to begin the comparison. The algorithm next creates a second loop, for j=1 to N, and chooses box$_j$ to compare with box$_i$. For both loops, N is the number of result nodes obtained. Performing $N^2$ comparisons provides the optimal number of comparisons needed to determine the existence of any overlaps. If the boxes **1032** are a known size, certain steps may be eliminated from the method.

More particularly, a preferred algorithm compares the X and Y values of a first and second box **1032** to determine if the boxes **1032** are occupying the same Cartesian space **1204**. This comparison is accomplished by identifying the X and Y coordinate pairs of the corners of the two boxes **1032**, and then choosing one of the coordinate pairs of a corner of the second box **1032** to be compared. The X value of that pair is compared to the X values of all of the coordinate pairs of the corners of the first box **1032**. If the X value of the chosen coordinate pair is a value less than all of the first box corner X values or a value greater than all of the first box corner X values, then the algorithm compares the Y value of the chosen pair to all of the first box corner Y values. If the Y value of the chosen pair is either a value less than all of the first box corner Y values or a value greater than all of the first box corner Y values of the first box **1032**, then the algorithm determines that the boxes **1032** do not overlap. The algorithm adds 1 to counter j and then repeats the routine. The routine is repeated until j reaches N and then 1 is added to the i value, and the entire process is repeated again. This particular method ensures that every box is compared with every other box **1032**.

If during the comparison of the X values the algorithm finds that the X value of the chosen pair is greater than one of the first box corner X values, but is less than one of the first box corner X values, then the algorithm determines that the boxes **1032** overlap. If during the comparison of the Y values the algorithm finds that the Y value of the chosen pair is greater than one of the first box corner Y values but is less than one of the first box corner Y values, then the algorithm determines that the boxes **1032** overlap.

If the preferred algorithm has determined that two boxes **1032** overlap, then the algorithm moves **1208** one of the boxes **1032**. Preferably, this is accomplished by adjusting the Y values of the second box **1032** by increasing or adding a predetermined value (to its Y values.) The algorithm performs the above comparison routine **1204** again to see if there is an overlap. If there is an overlap, it moves **1208** the box again. Preferably, it adjusts **1208** the second box's Y value again, and compares **1204** again. If there is no overlap, then the algorithm adds 1 to the j counter and repeats the comparison routine with another box **1032** until $N^2$ comparisons have been completed.

Facebook Inc. Ex. 1201

5,832,494

37

When the preferred layout algorithm has ensured that no boxes **1032** overlaps, the algorithm determines whether the results of the search will fit on one screen **1212**. The algorithm compares the Y values of each of the boxes **1032** with the highest Y value represented on a single screen display. If the Y value of one or more boxes **1032** exceeds the highest Y value represented on the screen display, then the preferred algorithm increases the length of the X axis and rescales the Y axis to match (e.g., doubling the length of the X axis) **1216**. The algorithm again compares the Y values of each of the boxes **1032** to the highest Y value on the screen to determine if the search results will fit on one screen **1212**. If they will not, then the algorithm adjusts the X axis **1216** again and compares the Y values **1212** again until the search results fit on one screen.

Once the search results fit on one screen, the algorithm replots **1200** all of the boxes **1032** to their coordinate positions, and then performs the overlap comparison check **1204** again to see if any boxes **1032** are overlapping. If boxes **1032** are overlapping, the algorithm performs its adjustment step **1208** and the axis resizing step **1216** until the window displays **1220** all of the result nodes on a single screen without any of the boxes overlapping.

At the option of the user, the algorithm can allow the display **1220** to scroll off the screen in the Y direction or the X direction without resizing **1216** the axes. This option enhances the information content of the map by keeping the scale of the axes small.

The preferred algorithm can perform this routine by adjusting **1208** the X axis, the Y axis, or both axes. The algorithm has the additional capability of graphically breaking an axis, if one or a few result nodes **2104** are so far away graphically from the main body of result nodes **2104** that representing the far away result nodes **2104** would unnecessarily encumber the graphical display of the main nodes. This graphical break may be represented by a squiggly line at the break point in the axis. Using this axis break allows all of the result nodes **2104** to be displayed on one window, and still maximizes the informational content that the relative spacing on the X or Y axis provides for the result nodes **2104** which are positioned closer together.

Various other specific methods of optimally organizing and locating boxes **1032** on a graphical computer display **38** may be used with the GUI Program **70**.

In the preferred embodiment, the graphical user interface **70** maximizes the types and quantity of information about particular boxes **1032**, nodes **2008**, objects in the database **54** that can be displayed without visually overloading the user. The preferred embodiments ergonomically and efficiently represent complex data sets. Each embodiment must strike a balance between that which is technically and intellectually possible to be displayed on a screen, and that which can be visually understood and comprehended by the typical user of the database **54** (on a screen). This method can also be used to display objects retrieved from a network, but it is not the preferred method at the present time.

An important feature of the invention is its use of a three-dimensional box to communicate information to the user, in addition to the information provided by the location of the box in the X and Y coordinates. Referring to FIG. **8**, in the preferred embodiment a three coordinate view or map is displayed on a two dimensional CRT screen. The variables represented by the X, Y, and Z coordinate planes may be interchanged from one coordinate to another. In other words, the X, Y or Z coordinate plane may represent, for example, the variable time. For use of the Z coordinate, it is preferred

38

that a six-sided box **1033** be used and appear to be "floating" at its appropriate location in the Z direction. More importantly, the invention also can use the depth of the box **1032** (size of the box **1032** in the Z direction) to convey additional information to the user (in addition to the information provided by the location of the box **1032** in the X, Y, Z coordinate).

First, using box depth, a bit of binary information is passed along to the user by the fact that the box **1033** has no depth (little or nominal depth) or the box **1033** has a significant depth in the Z direction. In the preferred embodiment, this binary piece of information informs the user of whether or not there is available (hidden) data associated with that box **1033**. For example, a box **1033** or node which represents an object in the database **54** may have associated graphics, maps, menus, or text which is not shown. If the box **1033** is shown on the screen as having a significant depth then additional data associated with that box **1033** is available for viewing by the user. If the box **1033** has nominal or no depth then there is no additional data available to the user.

In addition to the binary information of whether or not additional data is available to the user, in the preferred embodiment the magnitude of the depth of the box **1033** corresponds to the amount of additional or hidden data available to the user. For example, if the box **1033** represents an object in the database **54** which has an extensive amount of associated data the magnitude of the depth of the box **1033** would be large in comparison to other boxes **1033** on the same screen. In this manner, a box **1033** which represents, for example, a textual object of great length would have a larger depth than a box **1033** representing a textual object with little or no text associated with that object in the data base. In this manner, important information is visually passed to the user easily and on the same screen on which other information about the database **54** is being presented.

Also, in advanced embodiments, the depth of a box **1033** or the fact that a box **1033** has depth may be used to represent to the user that the box **1033** enables the user to tie-in or access another application, program, menu, extension, or another database **54**. In this way, active boxes **1033** with depth can allow a user great flexibility to move around within the database **54** or within associated database **54**s or even to access other applications. This can be particularly useful when the underlying data supporting a node or box **1032** is not located locally at the user's location and requires the user to access communication links or a second database **54** in order to obtain the underlying data. With this invention, the user is able to access the underlying data from the graphical user interface screen.

Also in advanced embodiments, an axis may represent a variable such as cost data associated with a node **2008** or the cost of accessing the underlying data. In one example, if the data is available only through a separate application which may impose a cost, the box's depth would increase in proportion to that cost. Or, if the application itself imposes a cost for accessing data, then the depth of each box **1033** would represent the cost of accessing that box's data.

In summary, the depth of a box **1033** provides two types of information. First, binary-type information regarding the presence of additional data or information, or lack thereof, and second, based on the relative measure of the depth of the box, **1033** the amount or size of the underlying data or information which is available and associated with that box **1033**. Thus, a box **1033** can be activated and brought to life

Facebook Inc. Ex. 1201

5,832,494

**39**

so that there is an extension that points to either data or another entity independent of the original database 54 which assist the GUI 70 user.

Additional information concerning the database is presented by this invention by the intelligent use of comments. Comments attached to the textual object boxes provide the user with easy access to vital information contained in the database. FIG. 3E shows the various information types which can be added to the database 54. For example, FIG. 3E shows that links 2004 are assigned weights 2032, that nodes 2008 are assigned node identifications (IDs) 2010 and plot dates 2011 (creation date or the like), that link sub-types 2020 can be assigned names 2021, comment descriptors 2022, comment display orders 2023, comment place holders 2027 and always display comment commands 2030, that node sub-types 2024 can be assigned names 2021 and title descriptors 2026, that node types 2016 can also be assigned names 2021 as well as extra attributes in an extra-attributes table 2016, that link types 2012 can be assigned names 2021 and icon files 2014 for icon graphics and various visual styles 2028 can be assigned to nodes 2008 and links 2004. In addition to those items specifically described, various attributes can be assigned to links 2004, nodes 2008 and link sub-types 2020 and node sub-types 2024. The various additional information which is stored in the database 54 can be shown on maps or on menus when using the database 54. These identifications can be used as part of the searching algorithms discussed previously.

A unique feature of the graphical user interface program 70 is its ability to optimally space the information within displayed objects. More particularly, the GUI program 70 arranges text and graphics within boxes 1032 or the like on a computer display 38 screen. The preferred GUI Program achieves this by using a box spacing algorithm as shown in FIG. 9. A preferred box spacing algorithm is described below.

The boxes 1032 used by the preferred GUI Program 70 generally include different types of information or data such as box titles, textual information, and graphical information within the box 1032, as discussed previously. The information types may be assigned to nodes 2008, node sub-types 2024, links 2004, or link sub-types 2020. Preferably, the GUI 70 defines and/or selects points in the box 1032 to serve as anchor points 2200 for each type of information. For example, the GUI 70 may designate a point 2200 near the upper right hand corner of a box 1032 as the anchor point for the graphical information, the lower left hand corner as the anchor for the textual information, and the upper left hand corner as the anchor point for the box title. In the preferred embodiment, the algorithm finds an arrangement which keeps the size of the boxes as small as possible while preventing overlaps between the different types of information.

Also, the preferred embodiment adjusts the positioning 2212 of the information or data within the box 1032 to make the box 1032 aesthetically pleasing. Preferably, the anchor points are moved or adjusted to arrange or rearrange the content within the box.

Referring to FIG. 9, generally, the box spacing algorithm plots 2204 the information types at their designated anchor points and determines whether the plotted information fits within the default box size 2208. If necessary, the box 1032 is resized 2212. Following, the algorithm checks for any overlap of information types within the box 2216 and adjusts the location of anchor points 2212, if necessary.

The overlap checking function performed by the preferred box spacing algorithm is similar to the overlap checking

**40**

function performed by the preferred layout algorithm discussed above. Various tolerances or thresholds may be set to ensure that the information or data within the box 1032 not only does not overlap, but is sufficiently spaced so that it can be easily understood by a user. If the information overlaps, the anchor points are moved and/or the boxes are reshaped. Finally, the processed boxes are displayed 2220.

More particularly, to perform the function of arranging anchor points and reshaping boxes, the preferred box spacing algorithm initializes a loop, for i=0 to N, where N is the number of information types to be displayed on the box; chooses information type$_i$ and then initialize a second loop, for j=1 to N; and chooses information type$_j$ to compare to information type$_i$.

The preferred algorithm plots 2204 the first information type on the box 1032 at its designated anchor point. The algorithm plots 2204 the information beginning at the anchor point and fills out horizontally or vertically from there until the information is plotted. After plotting, the algorithm determines if the information fits within a normal or default box size 2208. If the box is too small, the algorithm may adjust 2212 the box 1032 dimensions horizontally or vertically to accommodate the size of the information.

The algorithm then plots 2204 the second type information in the box 1032. After this information is plotted, the algorithm determines X and Y values of the first information type (using the left and lower edges of the main box as coordinate axes) and compares 2216 them with the X and Y values of the second information type. The box spacing algorithm performs this function in the same manner as the layout algorithm performs its comparison function.

If there is an overlap, then the algorithm preferably attempts to adjust the location of anchor points 2212 to eliminate overlap. If this is not possible, the algorithm adjusts the size 2212 of the box by a set value in either the X or Y direction. The algorithm re-plots the information types 2204 at their anchor points. Preferably, the anchor points generally remain in the same relative position in the box, but as the box increases in size, the anchor points are in an absolute sense farther away from each other. After adjustments, the algorithm runs the comparison routine 2216 again to determine if the two information types overlap or are aesthetically displeasing. A box 1032 may be aesthetically displeasing if the data within the box 1032 is not evenly or symmetrically distributed, or if data is too close.

If the information types are appropriately spaced within the box, the algorithm adds 1 to the j counter, and compares 2216 the first information type to the j+1 information type. The algorithm continues to compare 2216 information types until the first information type has been compared 2216 with all of the information types in the box 1032. Then, the algorithm routine returns to the i loop, adds 1 to i, and then compares 2216 the second information type to the other information types until the second has been compared 2216 to all of the information types. If the algorithm ever finds an overlap, the algorithm adjusts 2212 the location of the anchor points and/or the size of the box as described earlier to fit in all of the information. Once the algorithm has compared the information types 2216, found no overlap, and found that the information fits 2208 within the box 1032, it displays 2220 the box 1032. In this way, the graphical user interface program 70 ensures that the information types displayed by the boxes 1032 do not overlap and are aesthetically pleasing, while keeping the size of the box 1032 to a minimum.

Facebook Inc. Ex. 1201

5,832,494

41

Many box spacing algorithms may be used with the GUI 70. Many variations of the described algorithm are possible which will perform the function of spacing text and/or graphics within a circumscribed space on a display 38. In the preferred embodiment, as shown in FIGS. 10A and 10B, comments 2112 are used extensively on graphical displays to assist the user in understanding the data and relationships of the data the user is viewing. In this manner, a great deal of information about a node 2008 or a link 2004 can be placed in or around a graphical box 1032 display for the node 2008. With this information a user has a better understanding of the relationship between data and the database 54 and the graphical box 1032 represents more than just a location in the X, Y and/or Z coordinate plane.

The comment descriptor shown on FIG. 3E allows comments 2112 to be assigned to a particular link sub-type and for these comments 2112 to be displayed on the node box 1032 of a linked node 2008. It is preferred that this comment descriptor assigned to a link sub-type be placed on the to-node 2008 of the link 2004. Some examples of possible comment descriptors are "overruled by," "criticizes," "distinguishes." When a node box 1032 is displayed, these comment descriptorsmay be shown in any portion of the node box 1032. In a preferred embodiment, thenode box 1032 is subdivided into three parts: (1) a title place holder part; (2) a graphics place holder part; and (3) an indicator part.

To specify the specific place within the node box 1032 that the comment be displayed, a comment place holder 2027, which is a more specific type of the anchor point discussed previously. In the preferred embodiment, a comment place holder 2027, may specify three different place holder 2027 areas (title area, indicator area, or graphics area) in the node box 1032 in which the comment is to be displayed. Various other place holder 2027 options within or in the vicinity of a box are possible.

Also, using the commands available through the comment display order 2023 or the always display comment commands 2030, the user or designer of the database 54 may specify when particular comments 2112 will or will not be displayed and in what position the comments 2112 will be displayed. In the preferred embodiment, the always display comment 2030 is used to make a comment always available or globally available at any time it is relevant. In other words, the comment will be displayed whenever the to-node box 1032 is drawn on any map. It is preferred that this global comment be used whenever a comment is so important that it should be shown whenever relevant.

The comment display order 2023 specifies the order or preference in which to display multiple comments 2116 in one comment place holder 2027. In the preferred embodiment, a number in the range of zero (0) to two hundred fifty-five (255) is assigned as the priority of any specific comment 2112. Wherein zero (0) signifies that the comment 2112 has high priority and should be displayed at the top of the title or indicator place holder or on the left in the graphics place holder where a value of two hundred fifty-five (255) means that the comment 2112 has very low priority and should be displayed at the bottom of the title or indicator place holder 2027 or on the right in the graphics place holder.

The always display comment 2030 can be simply a binary value of zero (0) or one (1) wherein if the value is zero (0) the comment 2112 is only displayed on the to-node 2008 when a link 2004 of the specified link type 2012 is represented on a map and the from-node 2008 is also on the map.

42

A one (1) means that the comment 2112 is displayed on the to-node 2008 at all times whether or not the from-node 2008 appears on the map.

Comments 2112 may be active or inactive. Active comments 2112 provide another means for a user to navigate in the database 54 in a customized and flexible manner. Active comments 2112 allow a user to jump or to access a menu, a map or an extension by selecting the comment 2112. The active comments 2112 may also allow a user to jump into a particular object in the database 54. In the preferred embodiment, comments 2112 which are always displayed or are global comments are preferably active comments. Comments 2112 which are assigned low priorities and/or are not global are preferably not active comments 2112. Referring to FIG. 10C, the comment 2112 may be an icon or graphics such as the red flag 2020 shown in the node boxes 1032.

Coloring, shading, texture and background can be useful and very effective tools for visually passing information to a user. Shading, texture or coloring can be used both within boxes 1032 on the screen and in the background area of the maps or screen displays. The coloring or background inside a box 1032 can represent a particular data type. In one embodiment, the user chooses a color to assign to all the distinct data types used in the database 54. When the user subsequent uses the invention, the invention will display those data types in the color chosen by the user. For example, in a medical database where boxes 1032 represent patients, patients admitted through an emergency room can be assigned a different color box 1032 than patients admitted through a normal process, or patients that survive a procedure may have a different color box 1032 than patients who die. This allows a user to see at a glance what type of data he or she is looking at. Changing the color between boxes 1032 is particularly useful and is discussed in further detail later.

Some of the preferred uses for passing additional information through the background are changing the background type of a map at a particular point on the X, Y, or Z coordinate. A specific example would be changing the background coloring on a map at a particular point on an axis where that point on the axis represents an average, a median, or an important date. Another example is creating a background coloring band between two points on the same axis representing an acceptable or ideal range for a variable. Either the computer or the user can choose what value to change the background type around. The background can change on more than one axis creating "panels" or areas within a map or screen.

Finally, for purposes of consistency within a particular application of the graphical user interface 70, the coloring of the background of maps of the same type are preferably same or similar. For example, source maps showing the source for a particular searched object may all have yellow background while influence maps which show objects that have been influenced from an identified object may all have a blue background for the map. In this way, background, coloring and texture can play an important role in visually providing information to the user on a map or screen with the present invention.

In order to present the most aesthetically pleasing display or output, the preferred GUI Program 70 chooses an optimal bit map 2300 or swatch to create a graphical display. In particular, the GUI 70 determines the color, resolution, and style supported by a display 38, output from a printing device or any other computer output. The GUI Program 70 preferably accomplishes this by categorizing general types

Facebook Inc. Ex. 1201

5,832,494

43

of displays **38** and output devices and assigning bit maps **2300** or swatches for use with those general types. These general types may include types of printing devices such as color printers, laser printers, inkjet printers, dot matrix printers and types of displays such **38** as black and white monitors and color monitors with differing resolution capabilities. This feature of the GUI **70** chooses the optimal bit maps **2300** or swatches to use as fill-in on boxes **1032** and the like used in the graphical display.

To achieve this capability the GUI Program **70** preferably uses an algorithm to determine what type of display **38** or printer or other output device is being used by the user. The algorithm then matches that type with one of the general types of categories stored in a look up table **2304**, as shown in FIG. **11**. If the type of display **38** or output device is an exact match with one of the stored types, then the algorithm instructs the GUI Program to use the bit map **2300** indicated by the table. If the type of display or printer does not match with one of the stored types, then the algorithm determines the optimal bitmap **2300** for this display **38** or printer.

The preferred bit map fill algorithm determines an optimal fill by determining the category the display **38** or printer being used is closest to, and then picking a bitmap **2300** according to certain weighted factors. The algorithm preferably chooses a bitmap **2300** or swatch that will optimize the color depth and resolution of the display **38** or printer. If both color depth and resolution cannot be optimized by one bitmap **2300**, the algorithm preferably chooses a category of bitmaps which will optimize the display **38** or printer's color depth, and then looks in that sub-category for bitmaps **2300** which will optimize its resolution. The use of this algorithm results in graphical outputs that take advantage of the user's hardware capabilities.

The GUI Program **70** also preferably uses the look up table to determine the best bit map **2300** to be used as a background for the windows **2300**. The GUI Program **70** executes an algorithm which determine what type of display **38** is being used and accesses the look up table **2304** to determine the preferred bitmap **2300**. If the type of display **38** being used is not in the table, the algorithm preferably selects the bitmap **2300** that is the best fit, again weighing factors such as color depth and resolution in determining the best bitmap **2300** for display as a window background **2308**.

It is preferred that the graphical user interface (GUI **70**) use a windows approach or a Windows® type application. The preferred GUI **70** for a database **54** is unusual in that during the normal course of operation it is common (in fact preferred) for many search map windows (**1000**, **1004**, **1008**) to be visible at any given time. The preferred GUI **70** embodiments utilize various mechanisms to help manage these windows (**1000**, **1004**, **1008**) and avoid confusing the user with too many "open" or active windows (**1000**, **1004**, **1008**).

An example of the type of hardware which may be used to implement a preferred window management system is shown in FIG. **1**. Specifically, it is preferred that a processor **30**, display **38**, memory **34**, **58**, and a input device such as a mouse **42** or keyboard **46** are used. Although the GUI **70** is described primarily for use with a database management system, the GUI **70** may be used with many other software applications and in many other hardware configurations.

For the preferred GUI **70** window management system embodiments, a parent window (or parent frame window) is used with multiple active child windows. Various mechanisms or commands may be utilized to help manage a plurality of active windows (**1000**, **1004**, **1008**). For

44

example, cascading may be used to arrange the currently displayed windows (**1000**, **1004**, **1008**) in an orderly, consistently-overlapping fashion. The windows (**1000**, **1004**, **1008**) are arranged such that each newly activated window (**1000**, **1004**, **1008**) is a fixed size, and the title bars of previous windows (**1000**, **1004**, **1008**) are still visible. Tiling may also be used to arrange the currently displayed windows (**1000**, **1004**, **1008**) in an orderly, non-overlapping fashion. When using tiling, the child windows are drawn as large as possible within the parent frame window, covering the entire frame window area. There are two preferred methods of tiling, Tile Vertical and Tile Horizontal. Vertical tiling generally involves the side by side display of child windows (e.g., two windows (**1000**, **1004**, **1008**) side by side), shown in FIG. **13A**, while horizontal is above and below (e.g. two windows (**1000**, **1004**, **1008**), one above and one below), shown in FIG. **13B**. Minimizing may be used to display or represent a particular child window in a very small space, examples of representative displays include graphics, icons and/or a text titles. The minimized child window may be displayed at various places in the parent window (e.g. at the bottom of the parent window, taskbar, or titlebar). Maximizing may also be used to display a particular child window as large as possible within a parent windows area. A maximized child window covers or obscures all other active child windows. Restoring may be used to restore a minimized or maximized child window to its previous state. Icon arranging may be performed to arrange all child windows being represented as icons in an orderly fashion.

In addition, in the preferred GUI **70** embodiment an auto arrange feature is utilized for enhanced window management. The auto arrange feature solves many of the problems inherent in an interface which creates a large number of child windows. When the number of child windows is large, no arrangement that tries to display all windows at the same time works very well. The child windows either become too small or too cluttered. Forcing the user to manually select a subset of the child windows in which the user is most interested, manually arranging those windows (**1000**, **1004**, **1008**) to be viewed in a primary format and minimizing the rest of the windows (**1000**, **1004**, **1008**) for viewing in a secondary format (or ignored). The user must perform this window management each time a new arrangement is desired which often means each time a new window (**1000**, **1004**, **1008**) is activated or displayed. The auto arrange feature automates this process for the user and intelligently arranges the windows (**1000**, **1004**, **1008**) for the user's screen.

With the auto arrange feature a limit is placed on the number of windows (**1000**, **1004**, **1008**) to be displayed in the primary format at any one time, a desired number of activated windows (**1000**, **1004**, **1008**). This limit may be set by default, by the user, or by an intelligent process which analyzes for example, the amount of data to be visually represented, screen size, and other variables to determine an optimum number of windows (**1000**, **1004**, **1008**) and a layout for those windows (**1000**, **1004**, **1008**).

Referring generally to FIG. **12**, one version of the auto arrange process involves the following general steps: (1) Based on a default value or through an intelligent process, identify the most recently activated windows (**1000**, **1004**, **1008**) which will be allocated the greatest amount of screen space **2080**; (2) Using one of several methods, minimize the screen size of the remaining windows (**1000**, **1004**, **1008**) so that their identities may be recognized by the user but only need a small amount of screen space (e.g. icons, text) **2084**;

Facebook Inc. Ex. 1201

5,832,494

45

(3) Arrange the identified windows (**1000**, **1004**, **1008**) in a useful and space efficient manner (e.g. vertically, horizontally, cubes etc. **2088**) (4) Arrange the minimized but recognizable windows (**1000**, **1004**, **1008**) in an orderly but non-obtrusive manner on the screen (e.g. arrange icons in lower corner of screen **2092**). Using this automated process, the windows (**1000**, **1004**, **1008**) can be automatically rearranged each time a new window (**1000**, **1004**, **1008**) is activated (by repeating the above steps) or whenever the user initiates the process. The windows (**1000**, **1004**, **1008**) are kept in an organized and useable fashion with little effort on the part of the user. The auto arrange can use different formats (primary, secondary, tertiary, etc) for different levels of interest in the window (**1000**, **1004**, **1008**). The auto arrange feature can also be turned on or off at the will of the user.

Instead of recognizing and minimizing the windows (**1000**, **1004**, **1008**) which are beyond the desired number of active windows (**1000**, **1004**, **1008**), the system may simply ignore these windows (**1000**, **1004**, **1008**), or some combination of minimizing and ignoring may be used **2084**. For example, if the desired number of active windows (**1000**, **1004**, **1008**) for display is two, the last two activated windows (**1000**, **1004**, **1008**) may by arranged on the screen side by side in a full format and an additional three windows (**1000**, **1004**, **1008**) may be recognized and minimized to icons for display on a small portion of the screen. Any windows (**1000**, **1004**, **1008**) beyond the last five activated windows (**1000**, **1004**, **1008**) are ignored by the GUI **70** window management system.

By providing some options, preferences options, for the auto arrange feature, the feature can be customized to the particular taste of a user. The desired arrangement of the windows (**1000**, **1004**, **1008**), or target arrangement can be explicitly chosen by the user and changed at will by the user (or chosen from a list of available formats). For example, a user can specify the number of windows (**1000**, **1004**, **1008**) to display, the particular format each window (**1000**, **1004**, **1008**) will appear on the screen, and the layout of the screen. There possible screen layouts are nearly limitless. Various formats are possible for each window (**1000**, **1004**, **1008**), for example as ½, ¾, full, vertically stretched, horizontally stretched or enlarged format. The user can chose the number of windows (**1000**, **1004**, **1008**) to be displayed in each format for example two, three, or four windows (**1000**, **1004**, **1008**) in the ½ format. And therefore, a target arrangement can be chosen such as full format, two windows (**1000**, **1004**, **1008**), vertically side by side. Thus, when step three of the auto arrange process is preformed, the system will identify the two most recently activated windows (**1000**, **1004**, **1008**) and arrange the two windows (**1000**, **1004**, **1008**) in the target arrangement, side by side, rather than in some other manner. In the preferred embodiment, a menu is provided to the user permitting the user to chose a target arrangement including number of windows (**1000**, **1004**, **1008**), format of windows (**1000**, **1004**, **1008**), and screen arrangement.

For "high-end" power users, the window management system can be modified to allow the user to custom build nearly any arbitrary layout for the screen. The user creates any number of arbitrary layouts, each of which is given a name that is inserted into a window menu and is stored in a database. After a layout has been named, it is then treated as a new window management command which can be executed. In the most sophisticated embodiments, through the use of pointer and/or a mouse **42** the user selects anchor points, such as center points, or upper left, upper right, lower

46

left, lower right, and various shapes for the windows (**1000**, **1004**, **1008**) such as hand sketched, rectangular, triangular, rhomboids, octagons etc. In this manner displays can be generated which are suited for specific uses. Also, through this medium, the artistry and creativity of the user may be expressed in aesthetically pleasing displays.

An innovative feature of the preferred embodiment is the ability to call up a search screen or map while viewing the data of a particular object in the database **54**. This feature is implemented through the use of embedded active links **2004**. By using embedded icons that are active within the data of an object being viewed or by using embedded text which is active within the data of an object in the database **54**, this feature allows the user to jump from viewing data to a search screen, menu, map or the like. The search screen or map can be one which has been previously generated or can be generated at the time of selecting the embedded active icon or active text.

The preferred method of using this feature is with text documents. Active icons or active text are embedded within the text documents and the user is alerted to these active icons or text through the use of highlighting or different coloring of the active icon or text. When the user sees an active icon or active text while viewing an object in the database **54**, the user may choose to jump out of the object and into a map, search screen, or the like.

The system may be configured so that upon selection of an active icon or active portion of text, a menu is displayed to the user wherein the user may select the generation of a particular map or the return to an existing map that was previously generated.

Although these active links **2004** within an object in the database **54** have been described for use in jumping from an object in the database **54** to a map, the active links **2004** may be used to jump to other objects in the database **54** or extensions to other databases **54**, other applications, or communication programs. Providing active links **2004** within objects being viewed in a database **54** allows great flexibility for the user to navigate through data in any manner he chooses.

To allow access to extensions to other databases, the preferred embodiment is set up in a modular fashion in order to be able to modularly add extensions or add on links to connect to other applications or programs which can be called up from the present invention.

In the preferred embodiment, the invention is set up in a modular fashion to accept one or more extensions. An extension can be another application or can be a communications link to connect to another computer or application. Use of these connections is particularly well suited for the invention in that the underlying data need not be stored locally with the user, but instead, through the use of extensions, the underlying data can be accessed by the user through an extension, another application and/or through a communications link.

Multiple extensions are possible and it is possible for the same underlying data to be available through one or more extensions, this allows the user to choose which extension or communication link it will use to access underlying data. In the preferred implementation, a box **1032** is given depth to signify that an extension associated with a particular box **1032** is available to the user. By activating the box **1032**, the user is given the opportunity to use the extension. In the preferred embodiment with modular implementations of extensions, a user can add on or plug in further extensions or eliminate extensions.

Facebook Inc. Ex. 1201

Another feature of the preferred embodiment is the "show usage" command. FIG. **8** is a screen display **38** depicting the use of the "show usage" command. The preferred embodiment includes this command to allow the user to see a portion of an object in the database **54** which uses cites or refers to the node **2008** from which the show usage command is requested. More specifically, the show usage command allows the user to see the text or data of a portion of the document that is represented by the node **2008** being searched. In the preferred embodiment, the show usage command is only available from a result node **2104**. When a map or graphics display is shown the search node **2100** is the node **2008** upon which the search being displayed is based. The result nodes **2104** are the nodes **2008** which are graphically displayed as a result of the search conducted upon the search node **2100**. Referring to FIG. **8**, the search node **2100** is Alves v. Commissioner and the result node **2104** is 26 U.S.C. §83.

Through the use of the show usage command, a user may immediately access that portion of the search node object **2108** or document **2108** which refers to a specific result node **2104**. This is accomplished by breaking up the data connected to the search node **2100** into groups of records with header identifiers. The data attached to the result node **2104** will also have an identifier, a header identifier, which particularly identifies the data attached to it. When the user executes the show usage command after activating the result node **2104**, the record or records in the data attached to the source node **2100** which match the result node **2104** identifier will be displayed and highlighted. For example, in FIG. **8**, the Alves v. Commissioner document **2108** is shown highlighted at the appropriate location identifying 26 U.S.C. §83 2104. The show usage command is accessed through the use of a pull-down menu from the result node 26 U.S.C. §83 2104. Using the earlier example of modern an classical architecture, if the search node **2100** was modern architecture and the search requested items influencing modern architecture an influence map or graphic display would be generated which would include the classical architecture node. By selecting the classical architecture node and using the "show usage" command on the classical architecture node (for example through a pull-down menu or directly in the node box) the invention will immediately bring the user to the first location in the modern architectural data where classical architecture is referred to as influencing modern architecture. Thus, in effect, the show usage command allows the user to jump from a result node **2104** to the specific location **2108** in the search node **2100** where the result node **2104** is referenced or identified.

Finally, one of the most important features of the invention is its method of integrating itself with third party software applications. Although useful with many third party software applications, it is particularly useful to integrate the present invention with third party database applications which operate in a windows type environment. Nearly all of the database management functions and graphical user interface **70** features can be used in an integrated scheme with third party database management software.

The preferred method of integrating the present invention with third party software is through the use of a subclassing technique in a windows multiple document interface (MDI) environment. Specifically, the present invention can take advantage of the common behavior exhibited by MDI applications to integrate with third party software operating in a windows environment.

When the preferred embodiment of the invention is loaded to be used in conjunction with third party software application, the invention immediately subclasses the third party software applications frame window. Through this subclassing technique, the present invention receives (intercepts) every message or command originally intended for the third party software. Since the invention is the first to receive each window message, it acts as a message arbiter. The message arbiter has the ability to recognize the message or command and decide how each message should be processed. For example, the arbiter decides whether any given message should be processed by the master program (the invention) or by the subclassed third party software.

The precise processing that is appropriate for a given message is somewhat message dependent. However, the general message scheme dictates that messages intended for one of the child MDI windows (or that depend in some way on the content of a child window) are dispatched to the application that is the "real" owner or creator of that child window. Thus, most messages are dispatched to the software application to which the child window belongs (to which the window is a native), if it the window belongs to a subclassed application, the message is directed or forwarded to the subclassed application. The subclassed application then processes the forwarded message and changes a child window display if necessary. Using this technique, the subclassed software application acts as if it alone owns the main frame window. Thus, operation of the master program has little affect on the performance of subclassed program. Further, the operation of the subclassed program is transparent to the user. To the casual user, the master program operates all the windows and is the only user interface used.

Using this technique, more than one software application may be subclassed with the present invention. Also, each subclassed application may have multiple child window displays. And finally, the master application may generate its own native windows which may be displayed simultaneously with the child windows of a subclassed application.

This computerized system for researching data is also effective with any type of internal or global network application (see generally FIGS. **14**A and **14**B). As long as a network stores data and provides links **2004** between that data, this system can provide an effective and efficient system for indexing, searching, and displaying that data. For example, this system can be applied to the Internet and the World Wide Web. The World Wide Web is made up of numerous web sites which contain documents and internet or web pages. Documents are usually defined in the art as unique pieces of data, which includes text files, graphic files, audio files, and video files. A web page is usually a document with its own Universal Resource Locator (URL). URLs are the standardized addresses commonly used for web pages. Generally, web sites are a collection of web pages and documents. Web sites are usually identified by a home page, which may contain an overall starting point for the web site and a summary of what is to be found at the web site. Hyperjump links, or hyperlinks, is the name commonly given to the links which connect web pages, web sites, and documents on the web. Hyperlinks are electronic links which allow end users to jump to the specified web page or web site. The software code commonly used to create the majority of web pages containing text files is HyperText Markup Language (HTML). Other pages containing graphics, audio, video, and other resources may not be coded in HTML, but still will be connected by hyperlinks.

The Internet can be viewed as an immense collection of linked documents providing varied information to the public via an elaborate electronic distribution channel. In the past, the end user's ability to search, find, index, and navigate

5,832,494

**49**

through relevant documents of interest has been primarily limited to word based queries which primarily rely on the target document's text indexing. Instead of relying on textual searching, this method and apparatus for indexing, searching, and displaying data analyzes hyperlinks which connect web pages to other web pages in order to help the end user to search, find, and navigate through the relevant documents of interest. This system analyzes hyperlinks using proximity indexing or clustering technology discussed previously. Once identified, the system displays the results in a variety of ways and end users are able to navigate directly to the documents identified by this system's analyzation technology.

In the preferred embodiment, this system uses the cluster link generation algorithm described in FIG. 3H to search and identify closely associated documents located on the Internet in the same manner as described above. The system treats hyperlinks **2004** on the Web in the same manner as it treats links **2004** in a database, and it treats web pages on the Web in the same manner as it treats nodes **2008** in a database **54**. Source links **2004** on the Web link a source node **2008** (or source web page) to a second node (or second web page). Influence links **2004** perform the same function in reverse. Direct links **2032** (as described above) are the same as hyperlinks **2004**, which use URLs, in the World Wide Web, and they directly link one web page (or node) to another. Indirect links **2036** link two web pages or nodes **2008** through more than one path. A cluster link, for purposes of the Web, is any relationship between two web pages.

To begin the process, as shown generally in FIG. **14A**, a node **2008** is chosen **3000** for analysis. Next, the system accesses link data **3004** or "crawls" the source web page (or source node **2008**) looking for URLs which directly link the source web page to other web pages. Web crawling is a known technique in the art, performed by most World Wide Web search services, such as Yahoo (located at www.yahoo.com) or Alta Vista. Crawling is accomplished by the use of automated programs called robots or spiders, which analyze a web page for objects which provide URL links to other web pages or documents. The source node **2008**, whether it is a web page, the home page of a web site, or a document with no links **2004**, is a data document which may have been encoded in HTML or some other language. The encoded data document includes commands such as "insert picture here" or "begin a new paragraph" or "place a link here to another document" along with the normal text of the document. These coded commands are generally invisible to the end user, although many Web documents reveal text containing coded links **2004** to other documents in different colors. The system reads the coded HTML instructions to identify **3008** the coded links, which are direct links **2032**. There are many publicly known methods of identifying links **2004** from a coded document that one skilled in the art could employ to perform this function.

FIG. **14B** describes the embodiment of the invention which executes **3020** the cluster link generator algorithm **2044** to generate direct and indirect links **2004** to find the set of candidate cluster links. After identifying **3008** all of the URLs referenced in the source web page, in the preferred embodiment, the cluster link generation algorithm **2044** retrieves **2056** a list of URLs and classifies them as the direct links **2032** to be analyzed. The cluster link generator **2044** traces the links **2032** to their destination nodes **2008** (a web site or web page) and performs a web crawl to retrieve **2056** a list of URLs referenced by the source nodes **2008**. The generator **2044** classifies the second set of nodes **2008** as being indirectly linked to the source node **2004**, and the links

**50**

**2036** to these nodes **2008** are added **2072** to the list of candidate cluster links. In order to find the set of candidate cluster links, the cluster link generator **2044** repeats the above steps **2052**. In the more general method described in FIG. **14A**, the system identifies **3012** the links **2036** which have an indirect relationship and then displays **3020** the direct **2032** and indirect **2036** links.

Once a candidate cluster link set is identified, the generator **2044** assigns **2064**, **2076** weights **2034** to the candidate cluster links **2004**. The weight **2034** of each individual path or link **2004** is a function of the weight **2034** of the path to the previous node **2008** and the weight **2034** of the last link **2004**. In order to determine the weight **2034** of an implied link **2004**, the preferred formula, $WC_{i+1}=\min(WC_i, D_{i+1}*W_{i+1})$ **2064**, as previously discussed, is used. Following weighting, the generator **2044** sorts the set of candidate cluster links **2004** by weight, and a subset of these links **2004** (those links **2004** above a specified cut-off weight) are retained for display **3020** to the end user. In the preferred embodiment, the formula T=min(constant, 4*d), discussed before determines the optimal cut-off weight.

In another embodiment, the Proximity Indexing Application Program (Program) **62** organizes and categorizes the crawled links **2004** using the statistical techniques and empirically generated algorithms described earlier in this application. The Program **62** treats URL addresses as citations and web pages as textual objects. The Program **62** applies some or all of the eighteen pattern list to determine the relatedness of the web pages (or nodes) which are linked to the source web page (or node). The Program **62** weighs the patterns by importance, giving one type of data document more importance than another type. For example, it may give more importance to a web site than to a single document which has no other links. The Program **62** may use other factors to weigh the data documents, such as the number of "hits" (visits by other end users to the site, a number which is available to web users) a data document receives in a specific time frame or the number of hyperlinks within a page. The Program **62** then forms a matrix based on ordered pairs of documents, and the matrix calculations discussed before of this specification can be carried out. The Program **62** generates a coefficient of similarity which will determine the relatedness of web pages to each other and to the source web page. The Program **62** displays the most similar web pages to the user.

The preferred embodiment of the network application of this system uses the graphical user interface program **70** to display the results of the algorithm as a list showing the selected links **2004** and the various data associated with the links **2004**. The links **2004** shown on the screen to the end user are active links **2004**, similar to the active comments used in the text boxes **1032** described previously in this application. The end user may instantaneously link to the destination node **2008** that the user selects. The list format provides link information in a style familiar to user of the Internet. However, this system is also capable of displaying the results in the user-friendly graphical format as described above. The graphical user interface program **70** described previously uses box coloring and sizing to communicate large amounts of information quickly and intelligibly to the user. In a preferred embodiment, different colors for boxes **1032** are assigned depending on what type of node **2008** they represent (e.g., a web page, web site, a document, a file transfer protocol (FTP) (a common internet designation for news sites)). Preferably, the box **1032** is given depth. The amount of URL links a node **2008** contains may determine the amount of depth.

Facebook Inc. Ex. 1201

5,832,494

51

The graphical user interface program **70** displays a list of the most related web pages to the source web page. This list includes documents, web sites, and pages which are directly or indirectly linked to the subject document or the subject topic. The links **2004** can be source links **2004** or influence links **2004**, so the end user may monitor the sites to which his site (the source web page) is referring, and the end user may view the sites which are referring to his site. The system can parse the URL of the destination nodes **2008** for a variety of information. Thus, the end user may monitor whether the connections to which his web site refers are still open, the end user may view the date and time a destination node **2008** was modified, and the end user may view the identification of the organization or author of the destination node that directly or indirectly links to the source node **2008**. The GUI program **70** displays all of this information either in the list format or in the text box **1032** used in the graphical format. Graphical comments may be placed in the text box to communicate information quickly, such as showing a happy face for a connected application, and so forth. Hyperlinks can appear as active comments in a text box in order to allow the user to instantaneously jump to the web page represented by the text box.

Although this computerized system for researching data is described as functioning in the World Wide Web environment, it can function equally well in any network system. A network that utilizes any type of hyperjump **2004** to connect documents together can serve as the links **2004** analyzed by this invention. This system therefore can be modified to navigate and search through internal company networks, and provide the same features as described above for the Web application. Additionally, the comment boxes can be tailored to display critical information about company files, thus enhancing its usefulness for the company employee who is attempting to sort through company documents stored on a network.

What is claimed is:

1. A method of analyzing a database with indirect relationships, using links and nodes, comprising the steps of:

   selecting a node for analysis;

   generating candidate cluster links for the selected node, wherein the step of generating comprises an analysis of one or more indirect relationships in the database;

   deriving actual cluster links from the candidate cluster links;

   identifying one or more nodes for display; and

   displaying the identity of one or more nodes using the actual cluster links.

2. The method of claim 1 wherein each link is given a length, the step of generating the candidate cluster links comprises the steps of:

   choosing a number as the maximum number of link lengths that will be examined; and

   examining only those links which are less than the maximum number of link lengths.

3. The method of claim 1 wherein the step of deriving actual cluster links comprises the step of:

   selecting the top rated candidate cluster links, wherein the top rated candidate cluster links are those which are most closely linked to the node under analysis.

4. The method of claim 3 wherein the selecting step further comprises the step of:

   calculating the top rated candidate links using the formula min(constant, 4*the number of direct links).

5. The method of claim 1 wherein the step of generating the candidate cluster links comprises the step of:

52

eliminating candidate cluster links, wherein the number of candidate cluster links are limited and the closest candidate cluster links are chosen over the remaining links.

6. The method of claim 1 wherein the step of displaying further comprises the step of:

   generating graphics to display the identity of the node, wherein a box is used to graphically represent the node.

7. The method of claim 1, wherein one or more nodes provide external connections to objects external to the database, the method further comprising the steps of:

   activating the desired node; and

   accessing the external object linked to the node.

8. The method of claim 7, wherein the external object is an independent application which can be executed in background, the method further comprising the step of:

   executing the independent application.

9. The method of claim 8, wherein one or more nodes provide links to more than one independent application which can be executed as an extension, the method further comprising the steps of:

   displaying a list of independent applications linked to the node, wherein the step of accessing accesses an independent application.

10. The method of claim 8, wherein the connection provides the independent application access to the information stored within the database.

11. The method of claim 7, wherein the external connection is to another computer, wherein information is located that can be accessed, the step of accessing further comprising the step of:

   accessing the information located within the computer.

12. A method for determining the proximity of an object in a stored database to another object in the stored database using indirect relationships, links, and a display, comprising:

   selecting an object to determine the proximity of other objects to the selected object;

   generating a candidate cluster link set for the selected object, wherein the generating step includes an analysis of one or more indirect relationships in the database;

   deriving an actual cluster link set for the selected object using the generated candidate cluster link set; and

   displaying one or more of the objects in the database, referred to in the actual cluster link set, on a display.

13. The method of **12** wherein a set of direct links exists for the database, and wherein the step of generating a candidate cluster link set comprises:

   recursively analyzing portions of the set of direct links for indirect links.

14. A method for representing the relationship between nodes using stored direct links, paths, and candidate cluster links, comprising the steps of:

   a) initializing a set of candidate cluster links;

   b) selecting the destination node of a path as the selected node to analyze;

   c) retrieving the set of direct links from the selected node to any other node in the database;

   d) determining the weight of the path using the retrieved direct links;

   repeating steps b through d for each path; and

   e) storing the determined weights as candidate cluster links.

15. The method of claim 14 further comprising the step of deriving the actual cluster links wherein the actual cluster links are a subset of the candidate cluster links.

Facebook Inc. Ex. 1201

5,832,494

**53**

16. The method of claim 15 wherein the step of deriving comprises the step of choosing the top rated candidate cluster links.

17. The method of claim 14 wherein the stored direct links are length L, the paths are counted i=0 to N, the nodes are counted $N_0$ to $N_{i+1}$, the weight's of the paths are stored as $C_{i+1}$, and wherein the step of determining the weight of the path comprises the steps of:

i) creating a new path P' of length i+1 consisting of the path P plus the direct link L from the selected node to the node $N_{i+1}$, for each direct link L;

ii) calculating the stored weight of the path ($C_{i+1}$) comprising the steps of:

deciding whether there already is a path in the cluster link from $Node_0$ to $Node_{i+1}$ and a stored weight, wherein: if there is a not already a path, the stored weight of the path ($C_{i+1}$) is set equal to P';

if there already is a path, the combined weight $WC_{i+1}$ is added to the already stored weight of the existing path (in $C_{i+1}$);

wherein the combined weight, $WC_{i+1}$, is computed from the weight of the path P ($WC_i$), a dampening factor ($D_{i+1}$) and the weight of direct Link L ($W_{i+1}$), and wherein the combined weight is computed using the following formula: $WC_{i+1}=\min(WC_i,D_{i+1}*W_{i+1})$; and

iii) repeating steps i and ii for each direct link.

18. A method of analyzing a database having objects and a first numerical representation of direct relationships in the database, comprising the steps of:

generating a second numerical representation using the first numerical representation, wherein the second numerical representation accounts for indirect relationships in the database;

storing the second numerical representation;

identifying at least one object in the database, wherein the stored numerical representation is used to identify objects; and

displaying one or more identified objects from the database.

19. The method of claim 18 wherein the step of generating a second numerical representation comprises:

selecting an object in the database for analysis;

analyzing the direct relationships expressed by the first numerical representation for indirect relationships involving the selected object; and

creating a second numerical representation of the direct and indirect relationships involving the selected object.

20. The method of 18 wherein the step of identifying at least one object in the database comprises:

searching for objects in a database using the stored numerical representation, wherein direct and/or indirect relationships are searched.

21. The method of claim 18 wherein the displaying step comprises:

generating a graphical display for representing an object in the database.

22. A method of representing data in a computer database with relationships, wherein nodes or objects in a database are represented by boxes of a default box size, and wherein various information types may be assigned to node, node sub-types, links, and link sub-types to be placed within the box, and assigned information types contain information, comprising the steps of:

generating links, wherein each link represents a relationship between two nodes and is identified by the two nodes in which the relationship exists;

**54**

allocating a weight to each link, wherein the weight signifies the strength of the relationship represented by the link relative to the strength of other relationships represented by other links;

generating link sub-types;

generating node sub-types;

selecting anchor points within the boxes for each information type;

placing each information type at their selected anchor point;

determining whether the information of the placed information type overflows the default box size, comprising the step of:

adjusting the position of the anchor points; and

adjusting the size of the box;

determining whether a placed information type overlaps another placed information type within the same box comprising the steps of;

adjusting the position of the anchor points; and

adjusting the size of the box; and

displaying the box.

23. A method of representing data in a computer database with relationships, comprising the steps of:

assigning nodes node identifications;

generating links, wherein each link represents a relationship between two nodes and is identified by the two nodes in which the relationship exists;

allocating a weight to each link, wherein the weight signifies the strength of the relationship represented by the link relative to the strength of other relationships represented by other links; and

displaying a node identification.

24. The method of claim 23, wherein the data in the database is objects, wherein in the nodes represent objects and each object is assigned a node identification, and wherein relationships that exist comprise direct relationships between objects, further comprising the step of:

searching generated links, wherein nodes are located by searching the generated links.

25. The method of claim 23 further comprising the step of:

generating link sub-types, comprising the steps of:

identifying each link sub-type with a name; and

providing a comment to one or more link sub-types.

26. The method of claim 25 further comprising the step of:

specifying the place to display the comment using a comment place holder.

27. The method of claim 26 wherein multiple comments are provided to a link sub-type, further comprising the step of:

specifying the order multiple comments appear in the comment place holder using a comment display order, comprising the steps of:

assigning each comment a value;

ranking the comments in order of their assigned value; and

displaying the comments in order of their rank.

28. The method of claim 25 further comprising the step of:

determining whether the comment will appear in all displays using the always display command, comprising the steps of:

assigning each comment a binary value based on its importance;

displaying comments which have been assigned the first binary value on all displays;

suppressing comments which have been assigned the second binary value from all displays wherein only one node of the link subtype is displayed.

Facebook Inc. Ex. 1201

5,832,494

## 55

**29**. The method of claim **26** wherein icon files are assigned to link sub-types.

**30**. The method of claim **26** wherein visual styles are assigned to link sub-types.

**31**. The method of claim **23** wherein attributes are assigned to nodes.

**32**. The method of claim **31** further comprising the step of:

generating node sub-types wherein the node sub-types are assigned information.

**33**. A method of representing data in a computer database and for computerized searching of the data, wherein relationships exist in the database, comprising:

assigning links to represent relationships in the database;

## 56

generating node identifications based upon the assigned links, wherein node identifications are generated so that each link represents a relationship between two identified nodes;

storing the links and node identifications, wherein the links and nodes may be retrieved;

searching for node identifications using the stored links; and

displaying node identifications, wherein the displayed node identifications are located in the searching step.

\* \* \* \* \*

Facebook Inc. Ex. 1201

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.          : 5,832,494                                              Page 1 of 1
APPLICATION NO.     : 08/649304
DATED               : November 3, 1998
INVENTOR(S)         : Daniel Egger, Shawn Cannon and Ronald D. Sauers

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In The Specifications:

| Column | Line | Correction |
|--------|------|------------|
| 22 | 55 | replace "search" with -- start -- |
|  |  | replace "target" with -- destination -- |
|  |  | replace "node.(2008)" with -- node (2008). -- |

Signed and Sealed this
First Day of May, 2012

David J. Kappos
Director of the United States Patent and Trademark Office

Facebook Inc. Ex. 1201

US005832494C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (8571st)

# United States Patent
Egger et al.

(10) **Number:**          US 5,832,494 C1

(45) **Certificate Issued:**      *Sep. 27, 2011

(54) **METHOD AND APPARATUS FOR INDEXING, SEARCHING AND DISPLAYING DATA**

(75) Inventors: **Daniel Egger**, Durham, NC (US);
**Shawn Cannon**, Hillsborough, NC (US);
**Ronald D. Sauers**, Mebane, NC (US)

(73) Assignee: **Software Rights Archive, LLC**,
Durham, NC (US)

Reexamination Request:
No. 90/011,014, May 26, 2010

Reexamination Certificate for:
Patent No.: 5,832,494
Issued: Nov. 3, 1998
Appl. No.: 08/649,304
Filed: May 17, 1996

( * ) Notice: This patent is subject to a terminal disclaimer.

#### Related U.S. Application Data

(63) Continuation-in-part of application No. 08/076,658, filed on Jun. 14, 1993, now Pat. No. 5,544,352.

(51) **Int. Cl.**
*G06F 17/30*          (2006.01)

(52) **U.S. Cl.** .......................... **707/737**; 707/716; 707/748
(58) **Field of Classification Search** ................... 707/102
See application file for complete search history.

(56)               **References Cited**

U.S. PATENT DOCUMENTS

4,839,853 A      6/1989  Deerwester et al.
4,868,733 A      9/1989  Fujisawa

(Continued)

FOREIGN PATENT DOCUMENTS

AU          48289/96          3/1997

CA          2177448          12/1996
WO          WO 95/00895 A2   1/1995

OTHER PUBLICATIONS

Carpenter et al., "Culstering of Scientific Journals" ASIS 24(6):425–436, 1973 (Exhibit B to Defendants' Identification of Prior Art).

(Continued)

*Primary Examiner*—Joshua Campbell

(57)               **ABSTRACT**

A computer research tool for indexing, searching and displaying data is disclosed. Specifically, a computer research tool for performing computerized research of data including textual objects in a database or a network and for providing a user interface that significantly enhances data presentation is described. Textual objects and other data in a database or network is indexed by creating a numerical representation of the data. The indexing technique called proximity indexing generates a quick-reference of the relations, patterns and similarity found among the data in the database. Proximity indexing indexes the data by using statisical techniques and empirically developed algorithms. Using this proximity index, an efficient search for pools of data having a particular relation, pattern or characteristic can be effectuated. The Computer Search program, called the Computer Search Program for Data represented in Matrices (CSPDM), provides efficient computer search methods. The CSPDM rank orders data in accordance with the data's relationship to time, a paradigm datum, or any similar reference. An alternative embodiment of the invention employs a cluster link generation algorithm which uses links and nodes to index and search a database or network. The algorithm searches for direct and indirect links to a search node and retrieves the nodes which are most closely related to the search node. The user interface program, called the Graphical User Interface (GUI), provides a user friendly method of interacting with the CSPDM program and prepares and presents a visual graphical display. The graphical display provides the user with a two or three dimensional spatial orientation of the data.



JA05086

Facebook Inc. Ex. 1201

## US 5,832,494 C1
Page 2

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,945,476 A | 7/1990 | Bodick et al. |
| 4,953,106 A | 8/1990 | Gaasner et al. |
| 5,040,133 A | 8/1991 | Feintuch et al. |
| 5,060,170 A | 10/1991 | Bourgeois et al. |
| 5,122,951 A | 6/1992 | Kamiya |
| 5,157,783 A | 10/1992 | Anderson et al. |
| 5,206,949 A | 4/1993 | Cochran et al. |
| 5,241,671 A | 8/1993 | Reed et al. |
| 5,243,655 A | 9/1993 | Wang |
| 5,265,065 A | 11/1993 | Turtle |
| 5,287,493 A | 2/1994 | Jacopi |
| 5,301,109 A | 4/1994 | Landauer et al. |
| 5,325,298 A | 6/1994 | Gallant |
| 5,341,293 A | 8/1994 | Vertelney et al. |
| 5,371,847 A | 12/1994 | Hargrove |
| 5,386,556 A | 1/1995 | Hedin et al. |
| 5,390,295 A | 2/1995 | Bates et al. |
| 5,418,948 A | 5/1995 | Turtle |
| 5,446,842 A | 8/1995 | Schaeffer et al. |
| 5,446,891 A | 8/1995 | Kaplan et al. |
| 5,463,728 A | 10/1995 | Blahut et al. |
| 5,471,611 A | 11/1995 | McGregor |
| 5,471,669 A | 11/1995 | Lidman |
| 5,530,852 A | 6/1996 | Meske, Jr. et al. |
| 5,542,024 A | 7/1996 | Balint et al. |
| 5,544,352 A | 8/1996 | Egger |
| 5,546,517 A | 8/1996 | Marks et al. |
| 5,586,311 A | 12/1996 | Davies et al. |
| 5,617,565 A | 4/1997 | Augenbraun et al. |
| 5,630,120 A | 5/1997 | Vachey |
| 5,649,186 A | 7/1997 | Ferguson |
| 5,649,193 A | 7/1997 | Sumita et al. |
| 5,712,995 A | 1/1998 | Cohn |
| 5,748,954 A | 5/1998 | Mauldin |
| 5,749,785 A | 5/1998 | Rossides |
| 5,794,001 A | 8/1998 | Malone et al. |
| 5,838,318 A | 11/1998 | Porter et al. |
| 5,838,906 A | 11/1998 | Doyle |
| 5,855,015 A | 12/1998 | Shoham |
| 5,898,434 A | 4/1999 | Small et al. |
| 5,956,030 A | 9/1999 | Conrad et al. |
| 6,098,081 A | 8/2000 | Heidorn et al. |
| 6,105,865 A | 8/2000 | Hardesty |
| 6,182,091 B1 | 1/2001 | Pitkow et al. |
| 6,304,675 B1 | 10/2001 | Osbourne et al. |
| 6,438,579 B1 | 8/2002 | Hosken |

### OTHER PUBLICATIONS

Brin, et al., "The Anatomy of a Large–Scale Hypertextual Web Search Engine", Computer Networks and ISDN Systems, vol. 30(1–7), 1998, pp. 107–117.

Bruandet, "Outline of a Knowledge Base Model for an Intelligent Information Retrieval System", Information Processing & Management, vol. 25, Issue 1, 1989, pp. 89–115.

Garfield, "Citation Indexes for Science", Science, vol. 123, No. 3159, Jul. 1955, pp. 108–111.

Garfield, "The Role of the Medical Librarian in SDI Systems", Bulletin of the Medical Library Association, vol. 57, No. 4, Oct. 1969, pp. 348–351.

Giles, et al., "CiteSeer: An Automatic Citation Indexing System", Third ACM Conference on Digital Libraries, ACM Press, 1998, pp. 89–98.

Matula, "k–Components, Clusters, and Slicings in Graphs", SIAM Journal on Applied Mathematics, vol. 22, No. 3, May 1972, pp. 459–480.

Salton, et al., "Automatic Structuring and Retrieval of Large Text Files", Communications of the ACM, vol. 37, No. 2, Feb. 1994, pp. 97–108.

Salton, et al., "Enhancement of Text Representations Using Related Document Titles", Information Processing & Management vol. 22, No. 5, 1986, pp. 385–394.

"Relationship Cards: Heroic Means of Saving," Future Banker (an American Banker publication), American Banker vol. 162, No. 109, Jun. 9, 1997, Copyright American Banker Inc.—Bond Buyer 1997 (2011 Factiva, Inc.), 5 pages total.

University of Michigan Journal of Law Reform note entitled "A Commerce Clause Challenge to New York's Tax Deduction For Investment In Its Own Tuition Savings Program," dated Winter, 1999, 22 pages total.

Fox, Virginia Discs 1 and 2, Nimbus Records, Virginia Polytechnic Institute and State University, 1998, 6 compact Disc.

"Brown University I.R.I.S. Intermedia: A Retrospective 53 Minutes", Video Cassette.

Libertech, "Libertech to release V–Search for Folio Views; Offers dramatic enhancements to electronics document research", Mar. 21, 1995, pp. 1–2.

Libertech, "Libertech Announces Major Equity Financing: Will Market New Products for On–Line and Internet Publishing", Apr. 24, 1995, pp. 1–3.

Kaplan, "New Ways to Find Needle in Data Haystack", Los Angeles Times, Mar. 29, 1995, pp. 1–3.

Kaplan, "Headline: The Cutting Edge/Computing/Technology/Innovation: New Ways to Find Needle in Data Haystack; Information: Novel Software is Making the Database Search Faster, More Efficient", Los Angeses Times, Mar. 29, 1995, pp. 1–5 (loaded Mar. 31, 1995).

The British Library, "Document Relationships at a Glance", Electronic Documents, vol. 3, No. 12, p. 1.

Libertech, "Americans with Disabilities Libertech / Lawyers Cooperative Publishing Proposed Pilot Project" Project Scope and Cost Estimates, Libertech Company Confidential, Feb. 5, 1995, pp. 1–38.

Libertech, "Business Plan" Mar. 1995, pp. 1–44.

NetCarta Corp., A trip to Hawaii with CyberPilot™ Pro, Feb. 21, 1996, pp. 1–30.

Mauldin, "Lycose 4. perl: Search the Web for Information", May 1, 1994, pp. 1–8.

Burt, "Structure" A General Purpose Network Analysis Program Providing Sociometric Indices, Cliques, Structural and Role Equivalences, Density Tables, Contagion, Autonomy, Power and Equilibria in Multiple Network Systems, Version 4.2, Reference Manual, Columbia University, 1991, pp. 1–232.

Analytic Technologies, "UCINET IV" Network Analysis Software, Oct. 1992, pp. 2–3.

Salton, "Associative Document Retrieval Techniques Using Bibliographic Information", Harvard University, Cambridge, Massachusetts, Mar. 1963, pp. 440–457.

Kessler, "TIP System Applications" A description of TIP Operations and a Preliminary Analysis of System Experience, Oct. 1967, pp. 1–14.

Kessler, "TIP User's Manual", A Guide for on–line Research and Retrieval of the Current Literature in Physics, 1967, pp. 1–22.

Garner et al., "Three Drexel Information Science Research Studies", Drexel Institute of Technology, 1967, pp. 1–46.

Salton, "Automatic Information Organization and Retrieval", Professor of Computer Science, Cornell University, 1968, pp. 1–514.

Facebook Inc. Ex. 1201

## US 5,832,494 C1
Page 3

Goffman, "An Indirect Method of Information Retrieval", Inform. Stor. Retr. vol. 4, Pergamon Press, 1969, pp. 361–373.

Salton, "Automatic Indexing Using Bibliographic Citations" In Automatic Content Analysis, 1970, pp. 99–117.

Salton, "The Smart Retrieval System", Experiments in Automatic Document Processing, 1971, pp. 1–556.

Schirminovich, "Automatic Classification and Retrieval of Documents by Means of a Bibliographic Pattern Discovery Algorithm", Inform. Stor. Retr., vol. 6, 1971, pp. 417–435.

Bichteler et al., "Document Retrieval by Means of An Automatic Classification Algorithm for Citations", Inform. Stor. Retr., vol. 10, May, 1974, pp. 267–278.

Shimko, "An Experiment with Semantics and Goffman's Indirect Method", Inform. Stor. Retr., vol. 10, Aug. 29, 1974, pp. 387–392.

Salton et al., "A Vector Space Model for Automatic Indexing", Communications of the ACM, vol. 18, No. 11, Nov. 1975, pp. 613–620.

Pinski et al., "Citation Influence for Journal Aggregates of Scientific Publications: Theory, With Application to the Literature of Physics", Information Processing & Management, vol. 12, No. 5, 1976, pp. 297–312.

Bitchteler et al., Comparing Two Algorithms for Document Retrieval using Citation Links (Journal of the American Society of Information Science, vol. 28, No. 4, Jul. 1977.

Garfield, "Citation Indexing" Its Theory and Application in Science, Technology, and Humanities, 1979, pp. 1–274.

Tapper, "The Use of Citation Vectors for Legal Information Retrieval", Journal of Law and Information Science, vol. 1, No. 2, 1982, pp. 131–161.

Kochtanek, "Bibilographic Compilation Using Reference and Citation Links", Information Processing & Management, vol. 18, No. 1, 1982, pp. 33–39.

Fox, "Some Consideration for Implementing the SMART Information Retrieval System Under UNIX", Department of Computer Science, Cornell University, 1983, pp. 1–88.

Fox, "Characterization of Two New Experimental Collections in Computer and Information Science Containing Textual and Bibliographic Concepts", 1983, pp. 1–64.

Salton et al., "Introduction to Modern Information Retrieval" 1983, pp. 1–448.

Fox, "Combining Information in an Extended Automatic Information Retrieval System for Agriculture", Computer Center International Institute of Tropical Agriculture, 1984, pp. 449–466.

Fox, "Composite Document Extended Retrieval" Proceedings of the 8th Annual International ACM SIGIR Conference on Research and Development in Information Retrieval, 1985, pp. 42–53.

Belew, "Adaptive Information Retrieval: Machine Learning in Associative Networks", 1986, pp. 1–312.

Conklin, "Hypertext: An Introduction and Survey" IEEE, Sep. 1987, pp. 17–40.

Croft et al., "Retrieving Documents by Plausible Inference: A Preliminary Study", Proceedings of the 11th International ACM SIGIR Conference on Research and Development in Information Retrieval, 1988, pp. 481–494.

Armstrong et al., "Manual of Online Search Strategies", 1988, pp. 1–831.

Frisse, "Searching for Information in A Hypertext Medical Handbook", Communications of the ACM, vol. 31, No. 7, Jul. 1988, pp. 880–886.

Salton et al., "On the Use of Spreading Activation Methods in Automatic Information Retrieval", Proceedings of the 11th Annual International ACM SIGIR Conference, 1988, pp. 147–160.

Fox et al., "Coefficients for Combining Concept Classes in a Collection", Proceedings of the 11th Annual International ACM SIGIR Conference on Research and Development in Information Retrieval, 1988, pp. 291–307.

Conklin et al., "gIBIS: A Hypertext Tool for Exploratory Policy Discussion", ACM, 1988, pp. 140–152.

Croft et al., "A Retrieval Model for Incorporating Hypertext Links", Proceedings of the Second Annual ACM Conference on Hypertext, 1989, pp. 213–224.

Frisse et al., "Information Retrieval From Hypertext Update on the Dynamic Medican Handbook Project", Proceedings of the Second Annual ACM Conference on Hypertext, 1989, pp. 199–212.

Berners–Lee, "Information Management: A Proposal", CERN, http://www/w3/org/History/1989/proposal.html, 1989, pp. 1–21.

Thompson, "The Design and Implementation of an Intelligent Interface for Information Retrieval", Feb. 1989, pp. 1–216.

Rose et al., "Legal Information Retrieval: A Hybrid Approach", ACM, 1989, pp. 138–146.

Kommers, "Graph Computation as an Orientation Device in Extended and Cyclic Hypertext Networks", Designing Hypermedia for Learning, NATO ASI Series, vol. F67, 1990, pp. 117–134.

Nielsen, "Hypertext and Hypermedia", Academic Press Limited, 1990, pp. 1–268.

Shepherd et al., "Transient Hypergraphs for Citation Networks", Information Processing Management, vol. 26, No. 3, 1990, pp. 395–412.

Nielsen, "The Art of Navigating", Communications of the ACM, vol. 33, No. 3, Mar. 1990, pp. 298–310.

Turtle, "Inference Networks for Document Retrieval", A dissertation by Howard Robert Turtle, Proceedings of the 13th Annual International ACM SIGIR Conference on Research and Development in Information Retrieval, Feb. 1991, pp. 1–198.

Turtle et al., Evaluation of an Inference Network–Based Retrieval Model, ACM Transactions on Information Systems, vol. 9, No. 3, Jul. 1991, pp. 187–222.

Shaw, "Subject and Citation Indexing Part 1: The Clustering Structure of Composite Representations in the Cystic Fibrosis Document Collection", Journal of the American Society for Information Science and Technology, 42(9), 1991, pp. 669–675.

Shaw, "Subject and Citation Indexing Part II: The Optimal, Cluster–Based Retrieval Performance of Composite Representations", Journal of the American Society for Information Science and Technology, 42(9), 1991, pp. 676–684.

Brueni et al., "What if There were Desktop Access to the Computer Science Literature?", ACM Conference on Computer Science, 1993, pp. 15–22.

Gelbart et al., Beyond Boolean Search: FLEXICON, A Legal Text–based Intelligent System, ACM, 1991; pp. 225–234.

Lin et al., "A Self–Organizing Semantic Map for Information Retrieval", SIGIR, ACM, 1991, pp. 262–269.

Berk et al., Hypertext/Hypermedia Handbook, 1991, pp. 1–583.

Facebook Inc. Ex. 1201

## US 5,832,494 C1
Page 4

Dunlop et al., "Hypermedia and Free Text Retrieval", 1991, pp. 1–20.

Rada, "Hypertext: from Text to Expertext", Department of Computer Science, University of Liverpool, 1991, pp. 1–237.

Rose, "A Symbolic and Connectionist Approach to Legal Information Retrieval", University of California, 1991, pp. 1–293.

Botafogo et al., "Structural Analysis of Hypertexts: Indentifying Hierarchies and Useful Metrics", ACM Transaction on Information Systems, vol. 10, No. 2, Apr. 1992, pp. 142–180.

Alain et al., "Hypertext Paradigm in the Field of Information Retrieval: a Neural Approach", ACM ECHT Conference, 1992, pp. 112–121.

Guinan et al., "Information Retrieval from Hypertext Using Dynamically Planned Guided Tours", ACM ECHT Conference, 1992, pp. 122–130.

Chen, "LEND Pattern Language Syntax Specification: VER 1.3", Oct. 12, 1992, pp. 1–8.

Chen, "An Object–Oriented Database System for Efficient Information Retrieval Applications", 1992, pp. 1–240.

Fox et al., "Users, User Interfaces, and Objects: Envision, a Digital Library", Journal of the American Society for Information Science, 44(8), 1993, pp. 480–491.

Croft et al., "Retrieval Strategies for Hypertext", Information Processing & Management vol. 29, No. 3, 1993, pp. 313–224.

Betrabet et al., "A Query Language for Information Graphs", Department of Computer Science, Jan. 27, 1993, pp. 1–7.

Betrabet, "A query Language for Information Graphs", Department of Computer Science, Dec. 1993, pp. 1–107.

Pinkerton, "Finding What People Want: Experiences with the WebCrawler", 1994, pp. 1–10.

Conrad et al., "A System for Discovering Relationships by Feature Extraction from Text Databases", Proceedings of the 17th Annual International ACM SIGIR Conference on Research and Development in Information Retrieval, Jul. 1994, pp. 1–11.

De Bra et al., "Information Retrieval in the World–Wide Web: Making Client–Based Searching Feasible", Computer Networks and ISDN Systems, vol. 27, No. 2, 1994, pp. 183–192.

McKee, "Towards Better Integration of Dynamic Search Technology and the World–Wide Web", 1994, pp. 129–135.

Krol, "The Whole Internet", User's Guide & Catalog, 1994, pp. 1–544.

Herzner et al., "Multimedia/Hyper Media in Open Distributed Environments", Proceedings of the Eurographics Symposium, Jun. 6–9, 1994, pp. 1–330.

Pitkow et al., "Webviz: A tool For World–Wide Web Access Log Analysis", In Proceedings of the First International WWW Conference, GVU Tech Report: GVU–GIT–94–20, Oct. 10, 1994, pp. 1–7.

France et al., "MARIAN Design", Virginia Tech Computing Center, Feb. 14, 1995, pp. 1–40.

Frei et al., "The Use of Semantic Links in Hypertext Information Retrieval", Information Processing & Management, vol. 31, No. 1, 1996, pp. 1–13.

Pirolli et al., "Silk from a Sow's Ear: Extracting Usable Structures from the Web", In Conference on Human Factors in Computing Systems, CHI, 1996, pp. 1–8.

Weiss et al., "HyPursuit: A Hierarchical Network Search Engine that Exploits Content–Link Hypertext Clustering", Conference on Hypertext and Hypermedia Archive Proceedings of the seventh ACM Conference on Hypertext, 1996, pp. 180–193.

Bourne et al., "A History of Online Information Services 1963–1976", Massachusetts Institute of Technology, 2003, pp. 1–493.

Seeley, "The Net of Reciprocal Influence", Can. Jour. Psych. III, 4, 1949, pp. 234–240.

Katz, "A New Status Index Derived from Sociometric Analysis", Psychometrika, vol. 18, No. 1, 1953, pp. 39–43.

Bar–Hillel, "A Logician's Reaction to Recent Theorizing on Information Search Systems", American Documentation, 8(2); ABI/INFORM Global; Apr. 1957, pp. 103–113.

Harary, "Structural Model: An Introduction to the Theory of Directed Graphs", John Wiley & Son, Inc., see, e.g. Preface Ch. 1, Digraphs and Structures, Ch. 5, Digraphs and Matrices, and Ch. 14, Networks, 1965, pp. 415.

Hubbell, "An Input–Output Approach to Clique Identification", 1965, pp. 376–399.

Jardine et al., "The Use of Hierarchic Clustering in Information Retrieval", Inform. Stor. Retr. vol. 7, Pergamon, pp. 217–240.

Van Rijsbergen, "Information Retrieval", 1979, pp. 2–147.

Jain et al., "Algorithms for Clustering Data", 1988, pp. 1–320.

Pao et al., "Retrieval Effectiveness by Semantic and Citation Searching", Journal of the American Society for Information Science, 40(4), 1989, pp. 225–235.

Consens, "Expressing Structural Hypertext Queries in GraphLog", Hypertext '89 Proceedings, Nov. 1989, pp. 269–292.

Kaufman et al., "Finding Groups in Data–An Introduction to Cluster Analysis", 1990, pp. 1–342.

Korfhage, "To See, or Not to See–Is That the Query?", ACM SIGIR Conference on Research and Development in Information Retrieval, 1991, pp. 134–141.

Li et al., "X–Window Interface to SMART, an Advanced Text Retrieval System", SIGIR Forum, 1992, pp. 5–16.

Agosti et al. "A Hypertext Environment for Interacting with Large Textual Databases," IP&M 28: No. 3, 1992, pp. 371–387.

Agosti et al., "User Navigation in the IRS Conceptual Structure Through a Semantic Association Function", The Computer Journal, vol. 35, No. 3, 1992, pp. 194–199.

Salton et al., "Approaches to Passage Retrieval in Full Text Information Systems", Proc. 16th SIGIR Conference, 1993, pp. 49–58.

Berners–Lee et al., "World–Wide Web: The Information Universe", 1992, pp. 1–9.

Crouch, "The Visual Display of Information in an Information Retrieval Environment", pp. 58–67.

Rizk, "Hypertext Concepts, Systems and Applications", Proceedings of the First European Conference on Hypertext, Cambridge University Press, 1990, pp. 1–373.

Salton et al., Automatic Analysis, Theme Generation, and Summarization of Machine–readable Texts, Science, vol. 264, Jun. 3, 1994, pp. 1421–1326.

Wood et al., "HyperSpace: Web Browsing with Visualization", Proceedings from the Third International World–Wide Web Conference, Apr. 10–14, 1995, pp. 1–5.

Furner et al., "The Representation and Comparison of Hypertext Structures Using Graphs", 1996, pp. 75–96.

Facebook Inc. Ex. 1201

Hara et al., "Implementing Hypertext Database Relationships Through Aggregations and Exceptions", Hypertext '91 Proceedings, Dec. 1991, pp. 75–90.

McBryan, "GENVL and WWWW: Tools for Taming the Web", May, 1994, pp. 1–10.

Cleveland, "An n–Dimensional Retrieval Model", Journal of American Society for Information Science, Sep.–Oct. 1976, pp. 342–347.

Salton et al., "Approaches to Text Retrieval for Structured Documents", Department of Computer Science, Cornell University, Jan. 11, 1990, pp. 1–19.

Can et al., "A Dynamic Cluster Maintenance System for Information Retrieval", ACM, 1987, pp. 123–131.

Aversa, "Contract Research Services at ISI: Customized Citation Analysis for Governmental, Industrial, and Academic Clients", Essays, vol. 15, Jun. 8, 1992, pp. 75–83.

Agosti et al.; A Two–Level Hypertext Retrieval Model for Legal Data: SIGIR '91 (1991), pp. 1–10.

Fowler et al.; Integrating Query, Thesaurus and Documents Through a Common Visual Representation, SIGIR '91 (1991), pp. 1–10.

Belew, Richard; A Connectionist Approach to Conceptual Information Retrieval ICAIL '87 (1987), pp. 1–11.

Turtle, Howard R., & Croft, W. Bruce, Inference Networks for Document Retrieval, SIGIR '90 (1990), pp. 1–24.

Infobase 95 Demonstration Disks, Libertech V–Search for Folio VIEWS, Installation Instructions, 3 pgs.

Krulwich. et al.; Learning User Information Interests Through Extraction of Semantically Significant Phrases; 1996; pp. 110–112; AAAI Technical Report SS–96–05.

Hull; Improving Text Retrieval for the Routing Problem Using Latent Semantic Indexing; 1994; 10 pgs.

J. MacQueen; Some Methods for Classification and Analysis of Multivariate Observations; 1967; pp. 281–297; Univ. of California.

K.L. Kwok & L Grunfeld; TREC2 Document Retrieval Experiments using PIRCS; 1994; 10 pgs.; NIST Special Publication SP.

Salton & Buckley; On the Automatic Generation of Content Links in Hypertext; Department of Computer Science, Cornell University TR 89–993, 1989, pp. 1–16.

Korfhage; Query Enhancement by User Profiles; Southern Methodist University, 1984, pp. 111–121.

Joachims et al; WebWatcher: Machine Learning and Hypertext, School of Computer Science, Carnegie Melton University, 1995, 5 pages.

Aalbersberg, A Document Retrieval Model Based on Term Frequency Ranks, Springer–Vertag New York, Inc., New York, NY, pp. 164–171, 1994; 11 pgs.

Aho et al., Data Structures and Algorithms, Addison–Wesley Publishing Company, pp. 199–229, pp. 171–223, 1983, 19 pgs.

Aho et al., The Design and Analysis of Computer Algorithms; Addison–Wesley Publishing Company, 1976, 30 pgs.

Baase, Computer Algorithms: Introduction to Design and Analysis, Chapter 3: Graphs & Digraphs, pp. 114–169, Addison–Wesley Publishing Company, 1978, 28 pgs.

Bichteler et al., Comparing Two Algorithms for Document Retrieval Using Citation Links, Journal of the American Society of Information Science, vol. 28, No. 4, pp. 192–195, Jul. 1977, 4 pgs.

Caplinger, Graphical Database Browsing, Bell Communications Research, Room 2A–261, 435 South Street, Morristown, NJ 07960, 1986, pp. 113–118, 6 pgs.

Cowart; Master Windows 3.1, Apr. 2, 1992, pp. 64–76, 867.

Crouch, et al., The Automatic Generation of Extended Queries, Department of Computer Science, Duluth, Minnesota, pp. 369–383, 1990, 15 pgs.

Crouch, et al., The Use of Cluster Hierarchies in Hypertext Information Retrieval, Department of Computer Science, Duluth, Minnesota, Hypertext '89 Proceedings, pp. 225–237, Nov. 1989, 14 pgs.

Fritsche, Commission of the European Communities: Automatic Clustering Techniques in Information Retrieval, Joint Nuclear Research Center, Ispra Establishment, Italy 1974, 142 pgs.

Furner et al., Information Retrieval and Hypertext: The Representation and Comparison of Hypertext Structures Using Graphs, Kluwer Academic Publishers, Norwell, Massachusetts, pp. 75–96, 1996, 14 pgs.

Golub et al., Matix Computations, The Johns Hopkins University Press, pp. 1–476, 492 pgs.

Hearst et al., Subtopic Structuring for Full–Length Document Access, Computer Science Division, Berkeley, CA, Proc. 16th SIGIR, pp. 59–68, 1993, 10 pgs.

Horowitz et al., Fundamentals of Data Structures, Chapter 6, Graphs, Computer Science Press, Inc., pp. 282–335, 1976 and 1982, 28 pgs.

Kommers, Designing Hypermedia for Learning: Chapter 7, Graph Computation as an Orientation Device in Extended and Cyclic Hypertext Networks, pp. 117–134, Springer–Verlag, Berlin, 1990, 20 pgs.

Kungl. Statskontoret, Citation Index and Measures of Association in Mechanized Document Retrieval; Swedish Rationalization Agency, Stockholm, Jan. 1, 1967, 14 pgs.

Libertech, Inc., V–Search™ Integration Toolkit for Folio VIEWS, Beta Release 2.0, User's Manual, Preliminary Draft, Draft 1.0, pp. 1–36, Dec. 6, 1995, 43 pgs.

Libertech, Inc., V–Search™ Publisher's Toolkit, Beta Release 2.0, User's Manual, Draft 2.0, pp. 1–160, Dec. 8, 1995, 171 pgs.

Products in the News: Document Relationships at a Glance, Electronic Documents, vol. 3, No. 12, 1994, 1 pg.

Salton et al., A Citation Study of the Computer Science Literature, Department of Computer Science, Ithaca, NY, 46 pgs.

Salton et al., Automatic Text Structuring and Retrieval—Experiments in Automatic Encyclopedia Searching, Department of Computer Science, Cornell University, pp. 21–30, 1991, 10 pgs.

R.A. Botafogo and B. Shneiderman, "Identifying Aggregates in Hypertext Structures," Hypertext '91 Proceedings, Dec. 1991, pp. 63–74 ("Botafogo 1991").

R.A. Botafogo, "Cluster Analysis for Hypertext Systems," ACM–SIGIR'93, vol. 6, pp. 116–125, 1993 ("Botafogo 1993").

H.P. Frei and D. Stieger, "Making Use of Hypertext Links when Retrieving Information," ACM, 1992 ("Frei & Stieger 1992").

S. Baase, Computer Algorithms: Introduction to Design and Analysis, 2nd Edition, Addison–Wesley Publishing Co., 1988 ("Baase 1988").

D. Lucarella, "A Model for Hypertext–Based Information Retrieval," Proceedings of the ECHT'90, Cambridge University Press, N. Streitz, A. Rizk and J. Andre, eds., pp. 81–94, Nov. 1990 ("Lucarella 1990").

US 5,832,494 C1

Page 6

E. Fox, "Extending the Boolean and Vector Space Models of Information Retrieval with P–Norm Queries and Multiple Concept Types," Cornell University, 1983 ("Fox 1983").

B.R. Schatz and J.B. Hardin, "NCSA Mosaic and the World Wide Web: Global Hypermedia Protocols for the Internet," Science, vol. 265, Aug. 12, 1994 ("Schatz & Hardin 1994").

Facebook Inc. Ex. 1201

US 5,832,494 C1

**1**

# EX PARTE
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the patent, but has been deleted and is no longer a part of the patent; matter printed in italics indicates additions made to the patent.**

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims 1-3, 5, 7-16 and 18-21 is confirmed.

Claims 23-25 and 31-33 are cancelled.

New claims 34-54 are added and determined to be patentable.

Claims 4, 6, 17, 22 and 26-30 were not reexamined.

*34. The method of claim 1, wherein said use of cluster links in displaying the identity of identified nodes comprises using one or more cluster links to determine a rank which is used as a factor in display, and wherein said generation of candidate cluster links recursively analyzes a set of direct links in a path.*

*35. The method of claim 5, wherein said indirect relationships are a chain of hyperlink references between objects on the world wide web; and wherein the step of generating uses a specified distance limit for determining whether a path is examined.*

*36. The method of claim 34, wherein the selected node is a start node and said actual cluster links are used to rank an importance of an object on the world wide web; and wherein the step of identifying comprises using the rank and a key work search.*

*37. The method of claim 34, wherein an independent application determines a cost associated with accessing the identified nodes.*

*38. The method of claim 13, wherein said direct links are hyperlink relationships of objects on the world wide web and said displayed objects referred to in the cluster link set includes at least the selected object, the method further comprising:*

*generating an importance rank for the selected object using the actual cluster links; and*

*using the importance rank as a factor to determine an order of display.*

*39. The method of claim 38, wherein one or more of said direct links includes a weight based upon a quantity of direct references from an object to other objects.*

*40. The method of claim 14, wherein said direct links are hyperlink relationships on the world wide web and said paths are chains of hyperlinks that make up indirect relationships, and wherein the determination of the path weight uses a damping factor.*

*41. The method of claim 40, wherein the generation of said direct links include a weight that uses the number of hyperlinks contained in a web object pointing to other objects in its calculation.*

**2**

*42. The method of claim 40, wherein the selected node is an object on the world wide web, further comprising:*

*selecting actual cluster links from the stored candidate cluster links based upon an analysis of a proximity of the selected node to another node;*

*using actual cluster links to calculate a value for an object prior to a search query; wherein said value is used to determine the object's importance; and*

*storing said value in an index prior to searching.*

*43. The method of claim 42, wherein the determination of importance considers a number of times the web object is visited.*

*44. The method of claim 41, wherein said determined path includes at least an indirect relationship of B cites f, f cites e, e cites d, and d cites A.*

*45. The method of claim 19, wherein the direct relationships are hyperlink relationships between objects on the world wide web and the second numerical representation of direct and indirect relationships is a value that is generated by analyzing direct link weights in a set of paths between two indirectly related objects, and wherein the step of identifying uses at least the value to determine an object's importance for ranking.*

*46. The method of claim 18, wherein the direct relationships are hyperlink relationships between objects on the world wide web and wherein generation of the second numerical representation uses a recursive analysis of a set of direct links between two objects and a damping factor; and said direct link weights are calculated using a quantity of direct relationships of an object.*

*47. The method of claim 46, wherein the step of identifying objects using the second numerical representation comprises a step of ranking that considers at least a number of times a web object is visited.*

*48. The method of claim 18, wherein the step of identifying objects using the second numerical representation comprises using the second numerical representation and semantical factors to rank objects for display.*

*49. The method of claim 48, wherein the step of generating the second numerical representation considers a quantity of direct relationships from an object to other objects.*

*50. The method of claim 48, wherein the second numerical representation is used to determine an object's importance.*

*51. The method of claim 48, wherein the identified objects include web sites and the step of identifying includes providing a Universal Resource Locator that identifies a web page within one of said web sites.*

*52. The method of claim 18, wherein the direct relationships are hyperlink relationships between objects on the world wide web and wherein generation of the second numerical representation comprises:*

*using a recursive analysis of a set of direct links between two objects and a damping factor to generate a set of cluster links;*

*selecting a subset of cluster links from the set of generated cluster links using said recursive analysis; and*

*using the subset of cluster links to calculate the second numerical representation.*

*53. The method of claim 48, wherein the indirect relationship of B cites f, f cites e, e cites d, and d cites A is analyzed for at least one identified object.*

*54. The method of claim 45, wherein an independent application determines a cost associated with accessing the identified objects.*

\* \* \* \* \*

Facebook Inc. Ex. 1201

**ADDENDUM 4**

Final Written Decision – 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73,
*Facebook, Inc. et al. v. Software Rights Archive, LLC*, Case IPR2013-00478
(P.T.A.B. February 2, 2015) (Paper 58)

1 – 42

2015-1649, 2015-1650, 2015-1651
SOFTWARE RIGHTS ARCHIVE, LLC
v.
FACEBOOK, INC., LINKEDIN CORPORATION, TWITTER, INC.

Trials@uspto.gov                                                    Paper 58
352.272.7822                                        Entered: February 2, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

FACEBOOK, INC., LINKEDIN CORP., and TWITTER, INC.,
Petitioner,

v.

SOFTWARE RIGHTS ARCHIVE, LLC,
Patent Owner.

_____

Case IPR2013-00478
Patent 5,544,352

_____

Before SALLY C. MEDLEY, CHRISTOPHER L. CRUMBLEY, and
BARBARA A. PARVIS, *Administrative Patent Judges.*

CRUMBLEY, *Administrative Patent Judge.*

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

## I.     BACKGROUND

*A. Introduction*

On July 30, 2013, Facebook, Inc., LinkedIn Corp., and Twitter, Inc. (collectively "Petitioner") filed a Petition requesting an *inter partes* review of claims 26, 28–30, 32, 34, and 39 of U.S. Patent No. 5,544,352 (Ex. 1001, "the '352 patent"). Paper 1 ("Pet."). On February 3, 2014, we instituted

IPR2013-00478
Patent 5,544,352

trial on all challenged claims, on certain of the grounds of unpatentability alleged in the Petition. Paper 17 ("Decision to Institute" or "Inst. Dec.").

After institution of trial, Software Rights Archive, LLC ("Patent Owner"), filed a Patent Owner Response ("PO Resp."). Paper 34. Petitioner also filed a Reply. Paper 43 ("Reply").

A consolidated oral hearing for IPR2013-00478, IPR2013-00479, IPR2013-00480, and IPR2013-00481, each involving the same Petitioner and the same Patent Owner, was held on October 30, 2014. The transcript of the consolidated hearing has been entered into the record. Paper 57, "Tr."

We have jurisdiction under 35 U.S.C. § 6(c). This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

Petitioner has shown by a preponderance of the evidence that claims 26, 28–30, 32, 34, and 39 of the '352 patent are unpatentable.

## B. Related Proceedings

Petitioner and Patent Owner both indicate that the '352 patent is involved in the following co-pending district court proceedings: *Software Rights Archive, LLC v. Facebook, Inc.,* Case No. 12-cv-3970; *Software Rights Archive, LLC v. LinkedIn Corp.,* Case No. 12-cv-3971; and *Software Rights Archive, LLC v. Twitter, Inc.,* Case No. 12-cv-3972, each pending in the United States District Court for the Northern District of California. Pet. 1; Paper 8, Patent Owner's Mandatory Notice, 2.

In addition, we instituted trial on Petitioner's petitions on related patents including: (1) IPR2013-00479 and IPR2013-00480, *inter partes* reviews of U.S. Patent No. 5,832,494 (the "'494 patent"); and (2) IPR2013-00481, an *inter partes* review of U.S. Patent No. 6,233,571 (the "'571 patent"). The '352 patent issued from the parent of the application that

2

IPR2013-00478
Patent 5,544,352

issued as the '494 patent. The '571 patent issued from an application that
was a divisional of the application that issued as the '494 patent. The '352
patent was the subject of Reexamination No. 90/011,010.

*C. The '352 patent*

The '352 patent relates to computerized research on databases. Ex.
1001, 1:7–11. The '352 patent discloses that it improves search methods by
indexing data using proximity indexing techniques. *Id.* at 3:42–55.
According to the '352 patent, proximity indexing techniques generate a
quick-reference of the relations, patterns, and similarity found among the
data in the database. *Id.* at 3:53–55.

Figure 2 of the '352 patent illustrates the high-level processing of
software for computerized searching (*Id.* at 8:7–8) and is reproduced below:



*Fig. 2*

Figure 2 depicts software system 60 comprising Proximity Indexing
Application Program 62, Computer Search Program for Data Represented by
Matrices ("CSPDM") 66, and Graphical User Interface ("GUI") program 70.

3

IPR2013-00478
Patent 5,544,352

*Id*. at 10:53–60.

Processing of software system 60 begins with Proximity Indexing Application Program 62 indexing a database. *Id.* at 11:4–5. Then, CSPDM 66 searches the indexed database and retrieves requested objects. *Id.* at 11:6–10. CSPDM 66 relays the retrieved objects to GUI program 70 to display on a display. *Id*. at 11:10–13.

Software system 60 runs on a computer system comprising, for example, a processor of a personal computer. *Id.* at 9:39–44. The system comprises a display, which displays information to the user. *Id.* at 10:4–7. Exemplary displays include computer monitors, televisions, LCDs, or LEDs. *Id*.

The processor is connected to a database to be searched. *Id*. at 9:46–47. The database contains cases—also called full textual objects—that contain citations to other objects within the database. *Id*. at 12:1–10. Each full textual object is assigned a number corresponding to its chronological order in the database. *Id*.

The '352 patent discloses that any two textual objects in the database may be related through a number of "patterns." *Id*. at 12:31–32. For example, object A may cite B, or the two objects may cite the same object C. *Id*. at 12:46–61. The Proximity Indexing Application (discussed above) applies algorithms to these relationships to create a matrix of pattern vectors that represent the relationships between the various objects in the database. *Id*. at 12:62–13:3, 14:18–20. The CSPDM is used to search the indexed database. *Id*. at 14:20–21.

4

IPR2013-00478
Patent 5,544,352

*D. Illustrative Claim*

Of the challenged claims, only claim 26 is independent, whereas claims 28–30, 32, 34, and 39 depend, directly or indirectly, from claim 26. Claim 26 is illustrative of the claimed subject matter and is reproduced below:

> 26. A non-semantical method for numerically representing objects in a computer database and for computerized searching of the numerically represented objects in the database, wherein direct and indirect relationships exist between objects in the database, comprising:
>
> marking objects in the database so that each marked object may be individually identified by a computerized search;
>
> creating a first numerical representation for each identified object in the database based upon the object's direct relationship with other objects in the database;
>
> storing the first numerical representations for use in computerized searching;
>
> analyzing the first numerical representations for indirect relationships existing between or among objects in the database;
>
> generating a second numerical representation of each object based on the analysis of the first numerical representation;
>
> storing the second numerical representation for use in computerized searching; and
>
> searching the objects in the database using a computer and the stored second numerical representations, wherein the search identifies one or more of the objects in the database.

Ex. 1001, 35:28–54.

IPR2013-00478
Patent 5,544,352

*E. The Prior Art References Upon Which Trial Was Instituted*

Yahiko Kambayashi et al., *Dynamic Clustering Procedures for Bibliographic Data*, Kyoto Univ., Dep't of Inf. Sci., 90–99 (1981) ("Kambayashi") (Ex. 1004).

Colin F.H. Tapper, *Citation Patterns in Legal Information Retrieval*, 3 DATENVERARBEITUNG IM RECHT 249–75 (1976) ("Tapper 1976") (Ex. 1005).

Colin Tapper, *The Use of Citation Vectors for Legal Information Retrieval*, 1 J. OF LAW AND INFO. SCI. 131–61 (1982) ("Tapper 1982") (Ex. 1006).

Edward A. Fox, *Characterization of Two New Experimental Collections in Computer and Information Science Containing Textual and Bibliographic Concepts* (Sept. 1983) (Ph.D. dissertation, Cornell Univ. Dep't of Comp. Sci.) ("Fox Collection") (Ex. 1007).

Edward A. Fox, *Some Considerations for Implementing the SMART Information Retrieval System under UNIX* (Sept. 1983) (Ph.D. dissertation, Cornell Univ. Dep't of Comp. Sci.) ("Fox SMART") (Ex. 1008).

Edward A. Fox, *Extending the Boolean and Vector Space Models of Information Retrieval with P-Norm Queries and Multiple Concept Types* (Aug. 1983) (Ph.D. dissertation, Cornell Univ. Dept. of Comp. Sci.) ("Fox Thesis") (Ex. 1009).

The parties do not dispute the prior art status of the references.

IPR2013-00478
Patent 5,544,352

F. *The Pending Grounds of Unpatentability*

| Reference(s) | Basis | Claims instituted |
|---|---|---|
| Kambayashi | § 102 | 26, 28–30, 32, 39 |
| Fox Thesis, Fox SMART, and Fox Collection | § 103 | 26, 28–30, 32, 34, 39 |
| Tapper 1976 and Tapper 1982 | § 103 | 26, 28–30, 32, 34, 39 |

II.     ANALYSIS

A. *Claim Construction*

1.     *Principles of Law*

Petitioner asserts, and Patent Owner does not dispute, that the '352 patent expired on August 6, 2013. Pet. 6. The Board's interpretation of the claims of an expired patent is similar to that of a district court's review. *See In re Rambus, Inc.*, 694 F.3d 42, 46 (Fed. Cir. 2012). We, therefore, are guided by the principle that the words of a claim "are generally given their ordinary and customary meaning," as understood by a person of ordinary skill in the art in question at the time of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc) (citation omitted). "In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.,* 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing *Phillips*, 415 F.3d at 1312–17). There is a "heavy presumption," however, that a claim term carries its ordinary and customary meaning. *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) (citation omitted).

IPR2013-00478
Patent 5,544,352

    *2.    Overview of the Parties' Positions*

    In the Decision to Institute, we found it instructive to construe the claim terms *direct relationships*, *indirect relationships*, *pool-similarity searching*, and *pool-importance searching*.  Inst. Dec. 10–14.  Our constructions are set forth in the table below.

| Claim Term or Phrase | Construction |
| --- | --- |
| *direct relationships* | "relationships where one object cites to another object"  Inst. Dec. 13. |
| *indirect relationships* | "relationships where at least one intermediate object exists between two objects and where the intermediate object(s) connect the two objects through a chain of citations"  Inst. Dec. 13. |
| *pool-similarity searching* | "identifying at least one object based on degree of similarity to a selected pool of objects"  Inst. Dec. 14. |
| *pool-importance searching* | "identifying at least one object based on the importance of the object to a selected pool of objects"  Inst. Dec. 14. |

    Petitioner does not challenge any of our constructions.  Reply 1–2. Patent Owner appears to agree with many of our constructions, and states that it uses our constructions for the purpose of evaluating patentability of the challenged claims of the '352 patent.  PO Resp. 12–14.  Based on the complete record now before us, we discern no reason to change our prior constructions.

    Additionally, Patent Owner addresses the following phrases or terms: 1) *objects in a computer database*; 2) *computerized searching*; 3) *non-semantical method*; 4) *some indirect relationships are weighed more heavily than other indirect relationships*; and 5) *relationships exist between or among subsets of objects*, which are discussed below.  *Id*. at 9–14.

IPR2013-00478
Patent 5,544,352

Petitioner's Reply further addresses *database* and *numerical representation*, but otherwise does not contest Patent Owner's proposed constructions of these terms.  Reply 2.

> 3.    *numerical representation*

Patent Owner's Response does not proffer an explicit construction of *numerical representation*, but appears to interpret the term to exclude strings that may include letters.  PO Resp. 21 (distinguishing prior art as having "non-numerical character strings).  At oral argument, Patent Owner confirmed that its construction of *numerical representation* is something "represented only by digits," or in other words "expressed by numbers, not by letters."  Tr. 85.

Petitioner responds that *numerical* includes "any representation of binary or digital data that can be processed and analyzed by a computer," and means simply "of or relating to numbers."  Reply 1; Tr. 13.  Petitioner's construction is, therefore, not limited to representations consisting only of numbers.  At oral argument, Petitioner argued that the inclusion of a single number into a string is sufficient to make that string a *numerical representation*.  Tr. 25.

Petitioner's proffered construction is overly broad and unsupported by the specification.  While one dictionary definition of *numerical* is "of or relating to a number or series of numbers," it may also refer to "expressed in or counted by numbers."  THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (2000) (Ex. 3001); *see also* COLLINS ENGLISH DICTIONARY (2000) (Ex. 3002) ("measured or expressed in numbers").

The specification of the '352 patent uses *numerical* consistent with this latter interpretation.  In the Initial Extractor Subroutine, the "full textual

IPR2013-00478
Patent 5,544,352

objects" of the database are numbered "with Arabic numbers from 1 through n." Ex. 1001, 14:49–50. These numbers are used to create vectors and matrices, which are then run through various algorithms such as the Opinion Patterner Subroutine. *Id.* at 14:55–15:22. "Numerical factors" are then "calculated" to determine "values." *Id.* at 15:19–22; 18:63–67. This emphasis on calculation, values, and on processing by computer algorithms, leads us to conclude that *numerical representation*, as used in the '352 specification, must refer to solely numbers, so that a computer can process the representations using mathematical algorithms.

Petitioner's attempt to link the *numerical representation* of the specification to the West "key number" system is unpersuasive. Reply 2. While the specification of the '352 patent does discuss the key number system, and such "key numbers" include letters, there is no indication that the patentee intended to link the *numerical representation* of the claims to the West key number system discussed—and distinguished—in the background portion of the specification. Ex. 1001, 2:38–43 ("such a numbering process is subjective and is prone to error").

Nor do we find persuasive Petitioner's argument that *numerical* is somehow distinct from "numeric," in that the latter term means only numbers but the former may encompass letters. Tr. 13. Not only was this argument advanced for the first time at oral hearing,[1] but it is unsupported by any evidence of record. Indeed, the two terms are used interchangeably in dictionary definitions. *See* Ex. 3001 (entry for "numerical also numeric"); Ex. 3002 (entry for "numerical or numeric").

---

[1] Our Rules do not permit arguments to be raised for the first time at oral hearing. 37 C.F.R. § 42.70(a) (permitting oral argument only on "an issue raised in a paper.").

10

IPR2013-00478
Patent 5,544,352

For these reasons, we construe *numerical representation* as "representation consisting exclusively of numbers or a set of numbers."

### 4.     *objects in a computer database and computerized searching*

Patent Owner addresses the terms *objects in a computer database* and *computerized searching*, both of which appear in claim 26. PO Resp. 9–11. Rather than proffer a construction for either term, however, Patent Owner discusses the general concept of computerized searching in the '352 patent. *Id*. It is not clear what construction Patent Owner wishes us to adopt, and we are not persuaded that either term requires an explicit construction.

### 5.     *non-semantical method*

Patent Owner asks that we interpret *non-semantical method* to mean "a method that uses the direct relationships between one database object and another and does not otherwise account for words and phrases in a textual object." PO Resp. 11. We note that Petitioner raised a similar construction in the Petition, but the Board declined to construe the term expressly in the Decision to Institute. Pet. 6–7; Inst. Dec. 11. We also note that we adopted a similar construction for "non-semantically" in the related case IPR2013-00481. We consider the proffered construction to be reasonable and consistent with the specification of the '352 patent, and adopt it herein.

### 6.     *some indirect relationships are weighed more heavily than other indirect relationships*

Patent Owner asks that we construe this phrase as "some *types* of indirect relationships are weighed more heavily than others." PO Resp. 13 (emphasis in original). To support this interpretation, Patent Owner cites the specification of the '352 patent, which discloses that the different "patterns," which include direct and indirect relationships, are assigned various weights.

11

IPR2013-00478
Patent 5,544,352

Ex. 1001, 13:34–38. Petitioner does not dispute this construction. We consider the proffered construction to be reasonable and consistent with the specification of the '352 patent, and adopt it herein.

### 7.    *relationships exist between or among subsets*

Patent Owner does not set forth an express construction for this phrase which appears in claim 34, but instead states that the "relationships" are the direct and indirect relationships of claim 26, and that subsets are a portion of a textual object. PO Resp. 13–14. Patent Owner has not persuaded us that an express construction of this phrase is necessary.

### B. *Anticipation of Claims 26, 28–30, 32, and 39 by Kambayashi*

We instituted trial to determine whether claims 26, 28–30, 32, and 39 are unpatentable under 35 U.S.C. § 102 as anticipated by Kambayashi. Dec. Inst. 19–20. To establish anticipation, Petitioner must prove that each and every element in a claim, arranged as is recited in the claim, may be found in a single prior art reference. *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008); *Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376, 1383 (Fed. Cir. 2001). We determine that Petitioner has not shown by a preponderance of the evidence that claims 26, 28–30, 32, and 39 are unpatentable as anticipated by Kambayashi.

### 1. *Kambayashi*

Kambayashi describes a method for clustering, which is said to be "an important tool for efficient retrieval of documents in bibliographic database systems." Ex. 1004, Abstract. The reference discloses the creation of "Direct Reference Matrix R," defining direct reference as "when a paper A refers to a paper B." *Id*. at 91–92. Kambayashi also discloses a set of pairs

12

IPR2013-00478
Patent 5,544,352

(ID, IDF) where ID and IDF are the identification codes of the papers and (ID, IDF) means that paper ID cites paper IDF. *Id*. at 93.

Kambayashi also discloses the creation of two secondary matrices, "Bibliographic Coupling Matrix B" (papers with one or more citation in common) and "Co-citation Matrix C" (citations frequently cited together). *Id*. at 92. These secondary matrices consist of vectors derived from the (ID, IDF) pairs noted above. *Id*. at 93–34. A "Similarity Matrix S" may then be created via weighted summation of matrices R, B, and C. *Id*. at 92.

### 2.    *Claim 26*

We focus our analysis herein on two steps required by the method of claim 26: "creating a first numerical representation for each identified object in the database based upon the object's direct relationship with other objects in the database," and "analyzing the first numerical representations for indirect relationships existing between or among objects in the database." Petitioner contends that Kambayashi discloses both of these steps in two alternative embodiments.

First, Petitioner directs us to Kambayashi's disclosure of (ID, IDF) pairs, and their use in creating the B and C matrices. Petitioner asserts that deriving the (ID, IDF) pairs may be considered to be creating a first numerical representation, and that they represent direct relationships between documents ID and IDF. Pet. 24–25; Tr. 22. The (ID, IDF) pairs are then analyzed for indirect relationships, leading to B and C matrices which Petitioner contends are second numerical representations. Pet. 25–26.

Second, Petitioner identifies Kambayashi's Direct Reference Matrix R as a first numerical representation that represents direct relationships. Pet. 24–25; Tr. 22. As noted above, Matrix R is used—along with matrices B

13

IPR2013-00478
Patent 5,544,352

and C—to generate a Similarity Matrix S.  Petitioner contends that if Matrix R is considered to be the first numerical representation, then Matrix S would be a second numerical representation within the scope of claim 26.  Tr. 22.

Upon review of the disclosure of Kambayashi, we find neither of these arguments persuasive.  First, in the case of the (ID, IDF) pairs that are used to derive the B and C matrices, Patent Owner argues that ID and IDF are *strings* that contain letters.  PO Resp. 21.  This is supported by the disclosure of Kambayashi, which discloses identification codes such as EVER7404 and GARDL7710.  Ex. 1004, 96.  The testimony of Dr. Jacobs, Patent Owner's declarant, explains how Kambayashi's source database shows that identification codes begin with the first four letters of the first author's name.  Ex. 2113 ¶¶ 100–103 (citing Ex. 2023).  Because, as discussed above, the proper construction of *numerical representation* is a representation that contains only numbers, Kambayashi's (ID, IDF) pairs cannot be the first numerical representation of claim 26.

Nor do we find that the Direct Reference Matrix R / Similarity Matrix S system of Kambayashi meets the limitations of claim 26.  Petitioners assert, and we agree, that Matrix R is an array of numbers that represents direct relationships between the objects in the Kambayashi database.  Pet. 24–25; Ex. 1004, 92 (values $r_{ij}$ of matrix R are either 0 or 1).  This conclusion is supported by the fact that, in order to derive Matrix S, Matrix R is multiplied by a constant $w_R$.  Ex. 1004, 92.  It would not make sense to multiply a matrix containing strings of letters by a constant.

Matrix S, however, cannot be the second numerical representation of claim 26.  The claim requires that the representation be created by "analyzing the first numerical representations for indirect relationships

14

IPR2013-00478
Patent 5,544,352

existing between or among objects in the database." Matrix S, however, is generated according to the following formula:

$$S = w_R * R + w_B * B' + w_C * C' \quad (Id.)$$

Patent Owner argues that multiplying matrix R by a constant is not *analyzing*, as that term is used in claim 26. PO Resp. 21. We agree. While Matrix S does take into account indirect relationships between objects, those relationships are not derived from an analysis of Matrix R (the first numerical relationship). Rather, the indirect relationships are accounted for in Matrix S by the inclusion of Matrices B (which tracks bibliographic coupling) and C (which tracks co-citation). *Id*. The indirect relationships reflected in the B and C matrices, in turn, are not derived from Matrix R, but rather from the (ID, IDF) pairs, which we have determined above cannot be the first numerical relationship. For these reasons, Matrix S of Kambayashi does not meet the second numerical representation limitation of claim 26, because it is not generated by analyzing the first numerical representation.

We, therefore, conclude that Kambayashi fails to disclose an embodiment having all elements of claim 26, as arranged in the claim. Kambayashi does not anticipate claim 26.

### 3. *Dependent Claims*

The remaining instituted claims all depend, directly or indirectly, from claim 26, and incorporate claim 26's requirements of a first numerical representation, and second numerical representation. We, therefore, find that Kambayashi does not anticipate the dependent claims, for the same reasons discussed above with respect to claim 26.

15

IPR2013-00478
Patent 5,544,352

*C. Obviousness of Claims 26, 28–30, 32, 34, and 39 Over Fox Papers*

We instituted trial to determine whether claims 26, 28–30, 32, 34, and 39 are unpatentable under 35 U.S.C. § 103 as having been obvious over the combined disclosures of Fox Thesis, Fox SMART, and Fox Collection (collectively, "the Fox Papers"). Inst. Dec. 14–19. In support of the asserted ground of unpatentability, Petitioner sets forth the teachings of the cited prior art, provides detailed claim charts, and cites to the declaration of Dr. Fox (Ex. 1016 ¶¶ 68–145), explaining how each limitation is taught in the cited prior art combination. Pet. 9–23.

The claim chart persuasively reads all elements of each of claims 26, 28–30, 32, 34, and 39 onto the teachings of the Fox Papers, taken together. Despite the counter-arguments in Patent Owner's Response, and the evidence cited therein, which we have also considered, Petitioner has shown by a preponderance of the evidence that each of claims 26, 28–30, 32, 34, and 39 of the '352 patent are unpatentable, under 35 U.S.C. § 103, as they would have been obvious over the combination of Fox Thesis, Fox Collection, and Fox SMART.

*1. Fox Thesis*

Fox Thesis describes improving query and document representation schemes for information retrieval. Ex. 1009, 261. In particular, useful types of bibliographic data are incorporated into a model to test clustering and retrieval functions. *Id*. at 164. Bibliographic connections between articles are illustrated for an exemplary set "O" of documents, which are represented by letters A through G. *Id*. at 165–66, Fig. 6.2. This exemplary set "O" includes direct and indirect citation references. *Id*. at 166–67, Table 6.2.

16

Based on the reference pattern for a set of documents, Fox Thesis describes deriving various measures of the interconnection between the documents. *Id.* at 166. For example, weights are assigned "based upon integer counts" for bibliographically coupled documents. *Id*. at 167. Citation submatrices represent reference or citation information. *Id*. at 169. For example, submatrix *bc* represents bibliographically coupled reference information and submatrix *cc* represents co-citation reference information. *Id*. at 169–72, Figs. 6.3–6.5.

## 2.     *Fox SMART*

Fox SMART describes the System for Mechanical Analysis and Retrieval of Text ("SMART") as a project for designing a fully automatic document retrieval system and for testing new ideas in information science. Ex. 1008, 3. Fox SMART describes the computer system used to implement the experiments described in the Fox Thesis. Ex. 1016, ¶ 27. The software components of SMART are implemented in the C Programming Language and run under the UNIX™ operating system on a VAX™ 11/780 computer. Ex. 1008, 1, 4.

In SMART, an automatic indexing component constructs stored representations of documents. *Id*. at 3. Bibliographic information is used to enhance document representations. *Id*. at 29. The SMART system may process basic raw data, such as an exemplary N collection of articles and citation data describing which articles are cited by others. *Id*. at 29–30. Data is entered into the SMART system as a set of tuples $\{(d_i, d_j)|d_i \rightarrow d_j\}$ which describe the cited and citing documents, as well as the direction of citation. *Id*. at 29. The exemplary input data also includes indirect citation relationships, such as bibliographic coupled and co-citation relationships.

IPR2013-00478
Patent 5,544,352

*Id*. at 30–32. These relationships are used to create extended vectors which can then be clustered and searched to aid document retrieval. *Id*. at 29.

### 3. *Fox Collection*

Fox Collection describes collections of data which are said to be useful for investigating the interaction of textual and bibliographic data in retrieval of documents. Ex. 1007, 1. According to the testimony of Dr. Edward Fox, Fox Collection was originally part of the same work as Fox Thesis and Fox SMART, and describes the manner in which the data sets were obtained and processed prior to their use in the Fox SMART experiments. Ex. 1016 ¶ 27.

According to Fox Collection, the experiments were performed on a collection of bibliographic records (title, abstract, author, keywords, etc.) from the *Communications of the ACM*, termed the "CACM collection." Ex. 1007, 14.[2] Two individuals then examined printed copies of the articles referenced by the CACM bibliographic records, and citation data was obtained from the articles and entered into a set Raw_data. *Id*. The citation data contained pairs of identifiers (citing, cited) which were the document id numbers ("dids") of the citing record and record it cites. *Id*. From this Raw_data matrix, secondary matrices such as bc (bibliographic coupling) and cc (co-citation) were derived computationally. *Id*. at 14–16.

---

[2] Fox Collection also discusses an ISI Collection, but in his Reply Declaration Dr. Fox explains that he cites the ISI collection to "emphasize findings in the prior art about the value of using co-citation data (a non-semantic indirect relationship) in information retrieval, not to fully address all the elements of claims. . . . For the sake of simplicity, the Board should focus on the methodology given in Fox Papers, and the examples of their use with the CACM Collection." Ex. 1030, ¶ 6.

IPR2013-00478
Patent 5,544,352

    *4.   Claim 26*

Petitioner's claim chart persuasively reads all elements of claim 26 onto the combined teachings of Fox Thesis, Fox SMART, and Fox Collection. Pet. 9–23 (citing Ex. 1007, 14–15, 43, 48; Ex. 1008, 3, 12–13, 16, 18, 25–27, 29–33, 36, 38–39, 41–43, 53; Ex. 1009, 17, 19, 179, 181–82, 195, 199, 203, 211; 1016 ¶¶ 71–108, 122–131). For instance, the combination of Fox Thesis, Fox SMART, and Fox Collection teaches "marking objects in the database" and "creating a first numerical representation for each identified object in the database based upon the object's direct relationship with other objects in the database," as recited in claim 26. In particular, Fox Collection teaches assigning document identification numbers ("dids") to the articles in the CACM collection, which is "marking objects in the database." Ex. 1007, 14. Printed copies of each article with a bibliographic entry in the CACM collection then are reviewed manually, to obtain bibliographic subvectors in the form "Raw_data (cited, citing)." *Id*. This is a first numerical representation created based on the direct relationship between the "cited, citing" pair of bibliographic records.

The combination of Fox Thesis, Fox SMART, and Fox Collection also teaches "analyzing the first numerical representations for indirect relationships existing between or among objects in the database" and "generating a second numerical representation of each object based on the analysis of the first numerical representation," as recited in claim 26. Fox SMART teaches that direct relationships may be represented by tuples called "CITED," which contain a citing document, a cited document, and the direction of the citation. Ex. 1008, 29. These tuples are then processed to

19

construct submatrices such as *bc* and *cc*, which contain numbers representing indirect relationships.  *Id*. at 30–32 ("construct BC by counting the number of identical tuples of C").  Dr. Fox testifies that the CITED tuples of Fox SMART refer to the Raw_data derived from the CACM collection.  Ex. 1016 ¶ 124.  Because these *bc* and *cc* submatrices are numerical representations, and are generated from the first numerical representations CITED which are based on direct relationships, we find that the Fox Papers together teach "generating a second numerical representation of each object based on the analysis of the first numerical representation."

### a. *Combination of References*

As to whether Petitioner has satisfied the requirements for combining the teachings of Fox Thesis, Fox SMART, and Fox Collection, we determine that Petitioner has articulated sufficient reasoning with a rational underpinning as to why one of ordinary skill in the art would have combined the retrieval systems taught in Fox Thesis, Fox SMART, and Fox Collection.  *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007) (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)).  Dr. Fox states that the three publications arose from the same thesis project, and were originally one document.  Ex. 1016 ¶ 70.  Furthermore, Dr. Fox notes that Fox Thesis "explain[s] the method and experimental results of [his] information retrieval work," Fox SMART "detail[s] the updated SMART computer system used to execute the experiments," and Fox Collection "describes how the data sets were obtained and processed prior to being used in the experiments."  *Id*.  We give Dr. Fox's statement that one of skill in the art would have been motivated to combine the references because they "describe a complete project with its underlying system and data" (*id*.)

substantial weight, because it is consistent with the considerable overlap in the disclosures of the Fox Papers and their internal references to one another. *See, e.g.,* Ex. 1009, 343 (Fox Thesis cites to Fox SMART); Ex. 1008, 84 (Fox SMART cites to Fox Thesis).

### b. *Patent Owner's Counterarguments*

We have considered Patent Owner's counterarguments but do not find them persuasive. Patent Owner contends that various elements of claim 26 are not taught or suggested by the Fox Papers in combination. First, Patent Owner argues that the Fox Papers do not teach a computer database in which direct and indirect relationships exist between objects in the database. PO Resp. 17. Because the databases of the Fox Papers are bibliographic databases, they contain certain information about documents such as title, abstract, author, and publication date. *See, e.g.,* Ex. 1007, 14 (describing CACM database). The Fox databases do not contain the full documents, meaning that the databases do not contain the portions of the documents that cite to other documents. As such, Patent Owner argues, the databases cannot have objects having direct and indirect relationships, as required by claim 26. PO Resp. 17–18.

We have construed *direct relationships* to mean "relationships where one object cites to another object." Based on this construction, the bibliographic records of Fox Collection's CACM database do not have direct relationships, because they do not contain cites to one another. It is only after the full documents—which are not in the database—are manually reviewed, and the first numerical representation (Raw_data) is entered, that the database contains objects that have direct relationships. Claim 26, however, requires that direct and indirect relationships exist between objects

IPR2013-00478
Patent 5,544,352

in the database first, prior to creating a first numerical representation.  In other words, the Raw_data of the Fox Collection CACM database cannot be both the objects that have relationships, as well as the first numerical representation of those relationships.

Petitioner contends, however, that it would have been "trivial and obvious" to modify the databases of the Fox Papers to contain full text documents.  Reply 10.  Dr. Fox's testimony supports this argument, noting that if storage resources allowed storage of the full text of documents, this would have been understood as preferable.  Ex. 1016 ¶¶ 76, 89.  We credit Dr. Fox's testimony on this point, as it is consistent with the disclosure of Fox Thesis that "some [information retrieval] systems store the full text of the various documents."  Ex. 1009, 6.  Fox Thesis adds that full text permits users to "locate documents of interest," as well as "retrieve and/or examine paragraphs, passages, sentences, or single word occurrences (in context)."  *Id*.  These extra capabilities are described as "straightforward generalizations of document retrieval methods."  *Id*.

We, therefore, conclude that the Fox Papers suggested to one of ordinary skill in the art at the time of the invention the modification of the Fox databases to include full text documents.  With such a modification, the databases would contain, as objects, the full text documents.  Therefore, even prior to generation of the Raw_data, the database would contain objects that have direct and indirect relationships due to their citation of one another.  Patent Owner's argument to the contrary is unpersuasive.

In the same vein, Patent Owner argues that the Fox Papers do not teach "creating a first numerical representation for each identified object in the database based upon the object's direct relationship with other objects in

22

IPR2013-00478
Patent 5,544,352

the database." PO Resp. 31. Because, for example, the Raw_data disclosed in the Fox Collection is derived from documents that are not in the CACM database, but rather compiled from full text printed versions of the documents, Patent Owner argues that Raw_data is not *based on* the object's direct relationship with other objects. *Id*. at 32.

We find this argument unpersuasive for the same reasons outlined above for the objects limitation. The Fox Papers suggest inclusion of full text documents in the databases. With such a modification, the databases would have—even prior to creation of Raw_data—objects with direct relationships. The subsequently-created Raw_data relation would be based on those objects, thus satisfying the first numerical representation element of claim 26.

Patent Owner's remaining contentions relate to whether the Petitioner has satisfied the requirements for combining the teachings of Fox Thesis, Fox SMART, and Fox Collection. For example, Patent Owner contends that the systems disclosed in the individual Fox Papers are "narrowly tailored" and would not have been combined merely because of their common authorship. PO Resp. 26.

As indicated above, we determine that Petitioner has articulated sufficient reasoning with a rational underpinning as to why one of ordinary skill in the art would have combined the retrieval systems taught in Fox Thesis, Fox SMART, and Fox Collection. *See KSR*, 550 U.S. at 398. For instance, Dr. Fox wrote each of Fox Thesis, Fox SMART, and Fox Collection. See Ex. 1009, i; Ex. 1008, 1; Ex. 1007, 1.

Patent Owner also contends that the Raw_data relation of Fox Collection could not be combined with the CITED tuples of Fox SMART,

IPR2013-00478
Patent 5,544,352

because they are "fundamentally incompatible." PO Resp. 27. In support of this argument, Dr. Jacobs testifies, for example, that CITED does not describe using document ids ("dids") while Raw_data does. Ex. 2113 ¶¶ 170–171. Dr. Fox testifies to the contrary, stating that the CITED tuples of Fox SMART specifically refer to the Raw_data derived from the CACM collection. Ex. 1016 ¶ 124. We give Dr. Fox's testimony on this point substantial weight. Our determination is not only due to Dr. Fox's personal knowledge of the Fox Papers, but also supported by the descriptions of Raw_data and CITED in the references. The references indicate that both Raw_data and CITED contain pairs of document identifiers, with the sole difference being that CITED also contains a third data element that signifies the direction of the citation. Furthermore, while the description of CITED in Fox SMART is silent as to document ids, other portions of the document discuss dids which are an "index in range 1 . . . N." Ex. 1008, 36. We do not consider the combination of Raw_data with CITED, or the combination of the systems of Fox Collection, Fox SMART, and Fox Thesis, to be beyond the level of ordinary skill in the art.

Patent Owner further contends that using indirect relationships in a computerized search system would not have been predictable at the time of the invention of the '352 patent. PO Resp. 50. Patent Owner's contention is based on its view that the combined teachings of Fox Thesis, Fox SMART, and Fox Collection are not sufficient because they do not teach computerized searching of an electronic database. PO Resp. 54; *see also* Tr. 49 ("[T]he Fox papers by themselves don't get you there . . . every one . . . is directed to printed articles, not an electronic database."). According to Patent Owner, the prior art cited by Petitioner teaches experiments that are

24

IPR2013-00478
Patent 5,544,352

not directed to a computer database, "but rather are directed toward limited experimentation with bibliographic relationships existing among paper documents." PO Resp. 1.

We disagree with Patent Owner. For example, Fox SMART teaches an implementation in which software components of SMART are implemented in the C Programming Language and run under the UNIX™ operating system on a VAX™ 11/780 computer. Ex. 1008, 1, 4. In SMART, an automatic indexing component constructs stored representations of documents. *Id.* at 3. In light of the various teachings of Fox Thesis, Fox SMART, and Fox Collection discussed herein, we determine that Fox Thesis, Fox SMART, and Fox Collection, taken together, teach or suggest computerized searching of an electronic database.

Patent Owner also contends that the inclusion of indirect relationships into search "degrades results," and therefore provides a teaching away from the invention. PO Resp. 50. As Patent Owner acknowledges, its evidence of degraded results does not teach away from the *combination* of the Fox Papers, but rather from the *modification* of the teachings of the Fox Papers to incorporate "an electronic database that has references to the objects in the database." Tr. 49–50. We found above, however, that the Fox Papers teach this feature. In addition, to the extent modification of the Fox Papers is necessary to meet claim 26, we have found that modification is expressly suggested by the Fox Papers themselves. The record is insufficient to establish a teaching away.

Patent Owner also asserts objective indicia of non-obviousness, focusing on Google's search engine using its PageRank algorithm. PO Resp. 56–60. As an initial matter, Patent Owner's contentions again appear

25

IPR2013-00478
Patent 5,544,352

to be based on its view that the combined teachings of Fox Thesis, Fox SMART, and Fox Collection are not sufficient because they do not teach computerized searching of an electronic database. *Id.* at 58 ("Link analysis technology applied to the Web, as claimed in the '352 patent and embodied in PageRank, satisfied a long felt need for improved computerized search." (citation omitted)); Tr. 60–61 ("[I]t certainly wouldn't have been obvious to one of ordinary skill based on Fox's work to extend these ideas from this paper collection to electronic databases."). For the reasons discussed above, we disagree with Patent Owner's view and determine that Fox Thesis, Fox SMART, and Fox Collection, taken together, teach or suggest computerized searching of an electronic database.

Furthermore, we note that Patent Owner has not shown that the asserted success of a commercial embodiment of the '352 patent actually resulted from features recited in the claims of the '352 patent. Patent Owner has not provided sufficient evidence to support a nexus between claim 26 and the Google PageRank algorithm. Because Patent Owner has failed to provide the source code of PageRank, or any other detailed information beyond publicly-available, generalized hearsay statements about Google's search (Ex. 2050), the record is insufficient to prove that PageRank uses the method of claim 26.

Even if PageRank's algorithm incorporates the method of claim 26, we cannot determine that Google's success is due to the method of claim 26, as opposed to other elements of the algorithm. Patent Owner's declarant Dr. Amy N. Langville conceded that the Google search technology involves a combination of link analysis (non-semantic) and semantic searching, whereas claim 26 recites a non-semantical method. Ex. 1034, 76:19–21.

26

IPR2013-00478
Patent 5,544,352

Even if we were to conclude that the PageRank algorithm utilized the non-semantical method of claim 26, we could not determine whether the alleged success of PageRank is due to its non-semantical aspects, its semantical aspects, or some combination of both.

Patent Owner also points to Google's license of the '352 patent as evidence of nexus. PO Resp. 59–60. Patent Owner, however, admits that this license resulted in the settlement of a lawsuit (*id*.), which without additional contextual evidence, weighs against finding a nexus.

Additionally, we determine that in light of the weak showing of secondary considerations, the evidence of obviousness with respect to Fox Thesis, Fox SMART, and Fox Collection, is sufficient to support the conclusion that claim 26 would have been obvious. *See Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007). As discussed above, Petitioner has provided a strong case of obviousness.

Accordingly, even after considering the counter-arguments in Patent Owner's Response, and the evidence cited therein, we find that Petitioner has shown by a preponderance of the evidence that claim 26 is unpatentable as it would have been obvious over the combination of Fox Thesis, Fox SMART, and Fox Collection.

5.    *Dependent Claims*

Petitioner's claim chart persuasively reads all elements of dependent claims 28, 29, 30, 32, 34, and 39 onto the teachings of Fox Thesis, Fox SMART, and Fox Collection, taken together. Pet. 16–23 (citing Ex. 1007, 12, 14–15, 43, 48–49; Ex. 1008, 14, 16, 24–25, 29, 30–33, 36–38, 41, 43–52; Ex. 1009, 1, 15, 17, 23, 126, 151, 173–74, 177–79, 181–82, 191–92, 194, 202, 213–18, 224, 232, 234, 238–43, 257; Ex. 1016 ¶¶ 71–108, 110–

27

IPR2013-00478
Patent 5,544,352

121, 124–125, 127–128, 132–135, 137–145).  For instance, we determine that Petitioner has shown by a preponderance of the evidence that the combination of Fox Thesis, Fox SMART, and Fox Collection teaches that the first and second numerical representations are vectors that are arranged in first and second matrices, as required by claim 28.  Fox SMART teaches CITED, which is a set of tuples indicating a pair of documents linked by a direct relationship, as well as the direction of citation.  Ex. 1008, 29.  These tuples are vectors, as are the components of the *bc* and *cc* submatrices, which represent indirect relationships.  *Id*. at 30–32.  Furthermore, the objects in the CACM database are bibliographic records which include publication date (Ex. 1007, 14), and therefore are assigned chronological data as required by claim 28.

We also determine that Petitioner has shown by a preponderance of the evidence that the combination of Fox Thesis, Fox SMART, and Fox Collection teaches weighing, wherein some indirect relationships are weighed more heavily than other indirect relationships, as recited in claim 32.  Fox Thesis, for example, discloses assigning weights to subvectors such as *bc* and *cc*, which are different types of indirect relationships.  Ex. 1009, 257 (Table 8.13).  In one weighting scheme disclosed in Fox Thesis, bibliographic coupling indirect relationships (*bc*) are weighted at .009, more heavily than co-citation indirect relationships (*cc*), weighted at 0.  *Id*.

Claim 39 requires both pool-similarity searching and pool-importance searching.  As noted above, we construed *pool-similarity searching* as "identifying at least one object based on degree of similarity to a selected pool of objects" and *pool-importance searching* as "identifying at least one object based on the importance of the object to a selected pool of objects."

28

IPR2013-00478
Patent 5,544,352

We determine that the Fox Papers have been shown by a preponderance of the evidence to teach these elements.  Fox Thesis and Fox SMART disclose a feedback search in which results are presented to a user, ranked according to importance, and then used to construct a new search.  Ex. 1008, 24, Fig. 6; Ex. 1009, 151, Fig. 5.1.  This teaches pool-importance searching as required by claim 39.  Similarly, Fox SMART discloses a search that "perform[s] exact matches as well as general similarity computations" (Ex. 1008, 37–38), which meets the pool-similarity searching limitation of claim 39.

Additionally, for the reasons discussed above with respect to claim 26, we determine that Petitioner has satisfied the requirements for combining the teachings of Fox Thesis, Fox SMART, and Fox Collection.

Patent Owner argues that Petitioner has not proven by a preponderance of the evidence that all elements of the dependent claims are taught or suggested by the Fox Papers.  PO Resp. 35–39.  Some of these arguments, for example those made with respect to claims 28, 29, 30, and 34, are based on the fact that the databases of the Fox Papers do not include objects because the bibliographic records do not cite to one another.  *Id*.  Just as we found such arguments unpersuasive with respect to claim 26, we are not persuaded by them here.  The Fox Papers suggest the inclusion of full text documents into the databases, and that such a modification could be beneficial.

Patent Owner also argues that claim 28's limitation that the step of searching comprises the steps of matrix searching of the second matrices and examining the chronological data is not met by the Fox Papers.  *Id*. at 35–36.  According to Patent Owner, the Fox Thesis discloses a "preliminary clustering experiment" in which chronological data is "summarily dismissed

29

IPR2013-00478
Patent 5,544,352

because of poor results." *Id*. We do not consider this reading of the Fox Thesis accurate. The quotation from the reference provided by Patent Owner, "the clustering result does not seem as good as that of the other methods" (Ex. 1009, 217), is partial and misleading. The full sentence reads: "*If the* clustering result does not seem as good as that of other methods *then a likely explanation is that improper coefficients were chosen and used in computing the combined similarity value*." *Id*. (omitted portion emphasized). Not only does Patent Owner omit the qualifier "if," but also the explanation that the result likely is due to improper weighting coefficients. This is far from the "summary dismissal" of chronological data asserted by Patent Owner.

Indeed, as Petitioner notes, other portions of the Fox Papers expressly disclose searching using indirect relationship matrices in combination with chronological data. Ex. 1008, 41 (p-norm queries include date, as well as bibliographically coupled or co-cited articles). We are not persuaded by Patent Owner's arguments regarding claim 28.

Patent Owner also contends that the Fox Papers do not teach or suggest marking subsets of objects in the database, as required by claim 34. PO Resp. 38. Fox SMART discloses "separate indexing of paragraphs or even sentences." Ex. 1008, 25; *id.* at 80 ("vectors could be computed for smaller items than just documents"). According to Patent Owner, however, the markings "must be usable by a computerized search to individually identify a specific subset of an object in a computer database as a search result." PO Resp. 38. This alleged requirement is drawn from the *marking* limitation of claim 26. *Id*. Claim 26, however, only requires that the "marked object . . . be individually identified by a computerized search."

IPR2013-00478
Patent 5,544,352

The subsets of claim 34 are marked, but this marking does not transform the subsets into objects as recited in claim 26. Patent Owner's argument that computerized searching of the marked subsets is required by claim 34 lacks merit.

Finally, Patent Owner argues that the Fox Papers do not teach or suggest pool-importance searching, as required by claim 39. PO Resp. 39. Patent Owner correctly notes that "importance is distinct from similarity," and therefore pool-importance searching is different than pool-similarity searching. *Id.* The Petition, Patent Owner argues, only identifies disclosures of pool-similarity searching in the Fox Papers, and, therefore, fails to establish that all elements are taught or suggested by the prior art. *Id.*

We disagree with Patent Owner's argument. In its claim chart, Petitioner set forth distinct disclosures from the Fox Papers to meet the pool-importance searching and pool-similarity searching elements. Pet. 22–23. For instance, Fox SMART teaches using "general similarity computations," (Ex. 1008, 37–38) which Petitioner contends is pool-similarity searching, as well as a "feedback" search loop in which results are ranked according to importance to a user, and then further results are retrieved (*id.* at 24, Fig. 6), which Petitioner contends is pool-importance searching. As we concluded above, the feedback search function disclosed in the Fox Papers teaches pool-importance searching, as required by claim 39.

For the foregoing reasons, Petitioner has shown by a preponderance of the evidence that claims 28, 29, 30, 32, 34, and 39 of the '352 patent are unpatentable under 35 U.S.C. § 103(a) as they would have been obvious over Fox Thesis, Fox SMART, and Fox Collection.

D. *Obviousness of Claims 26, 28–30, 32, 34, and 39 Over the Tapper Papers*

We instituted trial to determine whether claims 26, 28–30, 32, 34, and 39 are unpatentable under 35 U.S.C. § 103 as having been obvious over the combined disclosures of Tapper 1976 and Tapper 1982 (collectively, "the Tapper Papers"). Inst. Dec. 21–24.

We have considered Petitioner's arguments and evidence, as well as the counter-arguments in Patent Owner's Response, and the evidence cited therein, and conclude that Petitioner has not shown by a preponderance of the evidence that each of claims 26, 28–30, 32, 34, and 39 of the '352 patent are unpatentable, under 35 U.S.C. § 103, as having been obvious over the Tapper Papers.

1. *Tapper 1976*

Tapper 1976 discloses a "citation vector technique" for retrieving legal information that seeks to overcome perceived deficiencies in Boolean search strings. Ex. 1005, 270–71. Rather than characterizing a legal document by the words it contains, vector matching focuses on the citations the document contains. *Id*. at 263. Tapper 1976 also notes that the technique may be used as an adjunct to a full-text retrieval system. *Id*. at 272.

By repeating the vector characterization of the documents, Tapper 1976 discloses that a matrix may be created that shows the similarities between the documents. *Id*. By re-ordering the matrix, the documents may be clustered according to their similarity. *Id*. The reference also discloses that "second generation citations" may be used: "if a case cites cases A', B' and C', and case A' cites a1', a2' and a3', case B' b1', b2' and b3' and case C'

IPR2013-00478
Patent 5,544,352

c1', c2' and c3' the original case would be represented by a combination of its own vector, and those of cases A', B' and C'." *Id*. at 266.

### 2.     *Tapper 1982*

Tapper 1982 similarly focuses on the drawbacks of full-text searching of legal documents and the alternative use of citation vectors for legal research. Ex. 1006, 135–36. The reference discusses weighting certain citation vectors more heavily than others, for example by the difference in the ages of the citing and cited case. *Id*. at 138.

A pilot project implementing such a citation vector-based system is also described by Tapper 1982. *Id*. at 139. The reference discloses a correlation algorithm used in the pilot project to cluster together vectors with a high degree of association. *Id*. at 143–44. Such clustering is said to permit a document to be retrieved "not only because it is itself closely associated with another target document, but also because both it and the target document are closely associated with a third." *Id*.

### 3.     *Claim 26*

As discussed above, claim 26 requires steps of "creating a first numerical representation for each identified object in the database based upon the object's direct relationship with other objects in the database." We find that this limitation is neither taught nor suggested by the combined Tapper Papers.

Petitioner's claim chart identifies several portions which allegedly teach a first numerical representation. Pet. 47–48. For example, Tapper 1976 is cited as disclosing "quantifiable representation in the form of numerical weighting" *Id*. (citing Ex. 1005, 263). These "quantifiable representations" are of "other characteristics" of the citations, such as age or

33

IPR2013-00478
Patent 5,544,352

the importance of the court or jurisdiction deciding the case, not the citations (relationships) themselves.  Ex. 1005, 263.

Similarly, Tapper 1982 is cited as disclosing "[a]scription of numerical values to vector elements."  Pet. 48 (citing Ex. 1006, 141).  But Tapper 1982 explicitly defines "vectors" as "the strings [a document] contains and the frequency of their occurrence."  Ex. 1006, 134.  In other words, the "numerical values" of Tapper 1982 are the *frequency* of the appearance of citation *strings*, which as we discussed above, connotes the inclusion of letters.  The Petition provides no citation to either Tapper Paper that teaches representing direct relationships with a first numerical representation.

In its Reply Brief, Petitioner identifies two other disclosures by the Tapper Paper it contends satisfy the *first numerical representation* limitation.  First, Petitioner argues that "the legal citations in Tapper clearly qualify as numerical representations."  Reply 4–5.  The legal citations Petitioner identifies, however, are in the exemplary form of "500 F.2d 411," which includes letters.  As we have construed the term, this is not a numerical representation, but rather the "strings" of the vectors discussed above.

Second, Petitioner notes that the Tapper Papers describe assigning cases in the database a unique ID number.  *Id.* (citing Ex. 1006, 148).  At oral argument, Petitioner's counsel directed our attention to Table 2 of Tapper 1982, which includes in the leftmost column pairs of numbers which signify pairs of documents. Tr. 14; Ex. 1006, 147.  At most, the assignment of these numbers could satisfy the marking step of claim 26 (Ex. 1006, 148 ("[t]he first column gives the numbers allocated to the cases.")); they are not

IPR2013-00478
Patent 5,544,352

generating a first numerical representation.  The document numbers
indicated by Petitioner are numerical representations of *documents*, not of
the *relationships* between those documents.  Claim 26 requires that the first
numerical representations are based on direct relationships in the database.
The numbers allocated to the cases of Tapper 1982 cannot satisfy this
limitation.

Nor can the document number *pairs* of Table 2 be a first numerical
representation, as Tapper 1982 does not disclose that they represent a direct
relationship (i.e., one of the documents in the pair citing the second).
Rather, the pairs of documents appear to be listed together in the table
because of their high "correlation values."  Ex. 1006, 148.  As Petitioner
acknowledges, these correlation values represent indirect relationships
between the documents (Reply 6 ("correlation values of cases' indirect
relationships")), therefore they cannot be a first numerical representation
that represents a direct relationship.

Petitioner argues in the alternative that "there is nothing non-obvious
about creating citation vectors consisting solely of numbers."  Reply 4–5.
At the outset, we note that this argument was presented for the first time in
the Reply; the sole modification to the Tapper Papers addressed in the
Petition is the combination of the disclosures of the two references.  Pet. 45–
46.  Nor did Petitioner present any testimony with the Petition regarding the
Tapper Papers, or how a person of ordinary skill in the art would have
modified the references.  It would be a proper exercise of our discretion,
therefore, to not consider this argument and the Reply Declaration of Dr.
Fox (Ex. 1016), which presents testimony on the Tapper Papers for the first

IPR2013-00478
Patent 5,544,352

time.[3] *See* Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,767 (Aug. 14, 2012) ("a reply that raises a new issue or belatedly presents evidence will not be considered.")

      Even if we were to consider Petitioner's Reply and Dr. Fox's Reply Declaration, however, we are not persuaded.  Petitioner cites to various portions of the Tapper Papers (Reply 4–5), but none of these citations sufficiently establish a reason to substitute numerical representations for those disclosed in Tapper.  For example, Petitioner argues—using pieced-together quotations—that "Tapper [1982] also makes clear that one could 'very easily' use a 'simple conversion table' to map 'extracted' citations to any 'chosen style.'"  *Id*. at 5 (citing Ex. 1006, 136).  Upon reading the full context from which these quotes are drawn, however, it is clear that Tapper 1982 is discussing "parallel reports of the same decision."  Ex. 1006, 136.  In other words, Tapper 1982 does not contemplate converting letter-containing case citations into numbers, but rather converting one letter-containing citation into another.

      Dr. Fox's Reply Declaration (Ex. 1030 ¶¶ 107–115) relies on the same arguments as Petitioner's Reply, and we find them unpersuasive for the same reasons.  Nor are we persuaded by the portions of Dr. Jacobs's cross-examination Petitioner cites (Reply 5 (citing Ex. 1033, 313:7–316:23, 339:3–342:6)), as Dr. Jacobs's testimony was to what a person of ordinary skill would have understood from the '352 patent specification, not the Tapper Papers.  *See In re Vaeck*, 947 F.2d 488, 493 (Fed. Cir. 1991) (suggestion to make invention cannot "be founded . . . in the applicant's

---

[3] We address Patent Owner's Motion to Exclude portions of the Reply Declaration below.

IPR2013-00478
Patent 5,544,352

disclosure"). The record before us does not support the conclusion that a person of ordinary skill in the art would have modified the combined disclosures of the Tapper Papers to include a first numerical representation.

### 4.    *Dependent Claims*

The remaining instituted claims all depend, directly or indirectly, from claim 26, and thus incorporate claim 26's requirement of a first numerical representation. We, therefore, find that the Tapper Papers do not teach or suggest all elements of these dependent claims.

### E.  *Motion to Exclude*

Patent Owner filed a Motion to Exclude (Paper 47) in which Patent Owner seeks to exclude portions of the Reply Declaration of Dr. Edward A. Fox (Ex. 1030) ("Reply Declaration") submitted with Petitioner's Reply. In particular, Patent Owner identifies three issues with the Declaration, each of which is based on the argument that portions of the Declaration are improper reply evidence.

In its Reply, a Petitioner may only respond to arguments raised in the Patent Owner's Response. 37 C.F.R. § 42.23(a). "A reply that raises a new issue or belatedly presents evidence will not be considered." Office Patent Trial Practice Guide, 77 Fed. Reg. at 48,767 (Aug. 14, 2012). The Practice Guide provides, as indications of improper reply evidence, "new evidence necessary to make out a *prima facie* case for . . . patentability or unpatentability . . ., and new evidence that could have been presented in a prior filing." *Id.*

A motion to exclude evidence under 37 C.F.R. § 42.64(c), however, "normally is not the proper vehicle for resolution of a dispute regarding reply arguments and evidence exceeding the proper scope of a reply." *ABB,*

IPR2013-00478
Patent 5,544,352

*Inc. v. Roy-G-Biv Corp.*, Case IPR2013-00063, slip op. 13–14 (PTAB May 16, 2014) (Paper 71); *Corning Inc. v. DSM IP Assets B.V.*, Case IPR2013-00047, slip op 7 n.3 (PTAB May 1, 2014) (Paper 84) (characterizing such motions as "now disfavored").  Rather, when evaluating the record after oral argument, the Board is capable of determining what, if any, evidence exceeds the proper scope of rely, and accordingly disregarding that evidence.

While we, therefore, *deny* Patent Owner's Motion, we also note that even if it were proper, we would dismiss it as moot.  With respect to the objected-to portions of the Reply Declaration which discuss the Tapper Papers, we have considered them above, found Dr. Fox's testimony unpersuasive, and found in favor of Patent Owner on the Tapper Papers ground.  With respect to the Fox Papers ground, we have found in favor of Petitioner, but did not rely on any of the objected-to portions of the Reply Declaration in so doing.  A decision to exclude the Reply Declaration would, therefore, not affect our determinations in this case.

### F. Motions to Seal

Patent Owner filed a Motion to Seal (Paper 35) the Declaration of Dr. Amy N. Langville ("Langville Declaration") filed as Exhibit 2114. Petitioner filed a Motion to Seal (Paper 42) the Transcript of the Deposition of Amy N. Langville, Ph.D. ("Langville Transcript") filed as Exhibit 1034. Both of these motions are unopposed.

Regarding Patent Owner's Motion to Seal, according to Patent Owner paragraphs 25, 112, and 113 of the Langville Declaration makes reference to certain facts about confidential licenses to the patents under review.  Paper

38

IPR2013-00478
Patent 5,544,352

35, 3.  Additionally, Patent Owner contends that this information has not been made, and will not be made, public.  *Id.*

Regarding Petitioner's Motion to Seal, according to Petitioner, Patent Owner has designated the transcript as confidential.  Paper 42, 3.  To avoid public disclosure, therefore, Petitioner submits sealing the Langville Transcript is appropriate.  *Id.*

There is a strong public policy in favor of making information filed in *inter partes* review proceedings open to the public.  *See Garmin Int'l v. Cuozzo Speed Techs., LLC*, Case IPR2012-00001 (PTAB Mar. 14, 2013) (Paper 34).  Under 35 U.S.C. § 316(a)(1), the default rule is that all papers filed in an *inter partes* review are open and available for access by the public.[4]  The standard for granting a motion to seal is "good cause." 37 C.F.R. § 42.54.  A moving party bears the burden of showing that the relief requested should be granted.  37 C.F.R. § 42.20(c).

Regarding Patent Owner's Motion to Seal, Patent Owner, as the moving party, has failed to carry its burden.  Patent Owner identifies only three paragraphs in the Langville Declaration that purportedly contain confidential information.  However, Patent Owner has not pointed to proof in the record that any information contained in these paragraphs is confidential.  Additionally, although Patent Owner contends that this information has not been made, and will not be made, public, Patent Owner presented this information during the hearing on October 30, 2014, which

---

[4] Additionally, we note that confidential information subject to a protective order ordinarily would become public 45 days after final judgment in a trial. Office Patent Trial Practice Guide, 77 Fed. Reg. at 48,761.  However, after denial of a petition to institute a trial or after final judgment in a trial, a party may file a motion to expunge confidential information from the record.  37 C.F.R. § 42.56.

IPR2013-00478
Patent 5,544,352

was open to the public.  *See* Tr. 54:12–25.  We, therefore, determine that Patent Owner has not met its burden of proof.

Regarding Petitioner's Motion to Seal, Patent Owner's designation of the transcript as confidential is not sufficient to show that the transcript contains confidential information.  We, therefore, determine that Petitioner has not met its burden of proof.

We recognize a denial of the motions to seal would unseal immediately the material that Patent Owner desires to remain confidential and the effect would be irreversible.  Therefore, rather than denying the motions at this time, we will provide Patent Owner and Petitioner one week to (1) withdraw the motions to seal and request that we expunge Exhibits 2114 and 1034, or (2) withdraw the motions to seal, request that we expunge Exhibits 2114 and 1034, and replace them with redacted versions that leave out the confidential information.  We note that we have not relied on the three paragraphs of the Langville Declaration that Patent Owner identifies as containing allegedly confidential information.

## III.    CONCLUSION

We conclude that Petitioner has shown by a preponderance of the evidence that claims 26, 28–30, 32, 34, and 39 of the '352 patent are unpatentable under 35 U.S.C. § 103, as they would have been obvious over Fox Thesis, Fox SMART, and Fox Collection, taken together.

IPR2013-00478
Patent 5,544,352

## IV.    ORDER

For the reasons given, it is

ORDERED that claims 26, 28–30, 32, 34, and 39 of U.S. Patent No. 5,544,352 are determined by a preponderance of the evidence to be unpatentable;

FURTHER ORDERED that Patent Owner's Motion to Exclude the Reply Declaration of Dr. Edward A. Fox (Exhibit 1030) is denied;

FURTHER ORDERED that Exhibit 2114 and Exhibit 1034 will be made available to the public after 5 PM Eastern five business days after the entry date of this decision, unless prior to that time, each of Patent Owner and Petitioner (1) withdraws the motions to seal and requests that we expunge Exhibits 2114 and 1034, or (2) withdraws the motions to seal, requests that we expunge Exhibits 2114 and 1034, and replaces them with redacted versions that leave out the confidential information; and

FURTHER ORDERED that, because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2013-00478
Patent 5,544,352

FOR PETITIONER:

Heidi L. Keefe
COOLEY, LLP
hkeefe@cooley.com
dcpatentdocketing@cooley.com.

David Silbert
KEKER & VAN NEST, LLP
djs@kvn.com
efiling@kvn.com


FOR PATENT OWNER:

Martin M. Zoltick
Nancy J. Linck
Soumya P. Panda
ROTHWELL, FIGG, ERNST & MANBECK, P.C.
mzoltick@rfem.com
nlinck@rfem.com
SRA-IPR@rfem.com